# In the United States Court of Appeals for the District of Columbia Circuit

GREGORY T. ANGELO, ET AL.,

*Plaintiffs-Appellants*,

v.

DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees*,

## PLAINTIFFS-APPELLANTS' PETITION FOR INITIAL HEARING EN BANC

On Appeal from the United States District Court
for the District of Columbia (No. 1:22-cv-01878-RDM)

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
1929 Biltmore Street, NW
Washington, DC 20009
*gll@bergstromattorneys.com*
202-669-0442 (phone)
202-483-9267 (facsimile)

Edward M. Wenger
Caleb Acker
Daniel Bruce
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street NW, Suite 643A
Washington, DC 20037
*emwenger@holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (facsimile)

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES**

**Parties and Amici:** The Appellants, each of whom were Plaintiffs before the district court, are Gregory T. Angelo, Tyler Yzaguirre, Robert M. Miller, and Cameron M. Erickson. The Appellees, each of whom was Defendants before the district court, are the District of Columbia; D.C. Metropolitan Police Department Chief Robert J. Contee, III[1]; D.C. Attorney General Brian Schwalb; and D.C. Washington Metropolitan Area Transit Police Chief Michael L. Anzallo. The United States of America appeared as an interested party. Amici before the district court included March for Our Lives Action Fund; the Giffords Law Center to Prevent Gun Violence; Brady; Team Enough; the State of Illinois; the State of California; the State of Colorado; the State of Connecticut; the State of Delaware; the State of Hawaii; the State of Maryland; the State of Massachusetts; the State of Minnesota; the State of New Jersey; the State of New York; the State of North Carolina; the State of Oregon; the State of Rhode Island; the State of Washington; and the Second Amendment Foundation.

**Rulings Under Review:** The ruling under review is the district court's Memorandum Opinion dated August 9, 2024 (Dkt. No. 62) and Order (Dkt. No. 63), which dismissed Plaintiffs' first-amended complaint without prejudice.

---

[1] Chief Contee has since resigned his position and has been replaced by Asham M. Benedict.

**Related Cases:** There are no related cases pending in this Court or before the U.S. District Court for the District of Columbia.

# INTRODUCTION &
## RULE 35(B)(1) STATEMENT

"The [Supreme] Court has consistently applied [Article III standing] requirements whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021). This Court has not. And because the law of this Circuit imposes an arbitrarily higher burden on plaintiffs with non-First Amendment, pre-enforcement constitutional challenges than those bringing First Amendment challenges, the Circuit is far out of step with Supreme Court precedent,[2] sister circuit precedent,[3] and the fundamental-fairness principle that no person should have to subject themselves to criminal sanction before arguing that a statute transgresses our Nation's charter.[4]

---

[2] *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979).

[3] *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73 (4th Cir. 1991); *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522 (6th Cir. 1998); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898 (10th Cir. 2012); *GeorgiaCarry.org, Inc. v. Georgia*, 687 F.3d 1244 (11th Cir. 2012).

[4] *See Steffel v. Thompson*, 415 U.S. 452, 462 (1974) ("[A] refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the

This Circuit's Article III standing law creates this precise dilemma. As the district court accurately recounted, "[i]t is not enough" in this Circuit "to allege facts demonstrating a 'credible' threat of prosecution"—even though that's all required by any other federal court. Dkt. No. 62, at 9. Instead, a "plaintiff bringing a non-First Amendment pre[-]enforcement challenge to a criminal statute" must show he has "been singled out or uniquely targeted by the D.C. government for prosecution." *Id*. (quoting *Parker v. Dist. of Columbia,* 478 F.3d 370, 375 (D.C. Cir. 2007)); *see also Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997); *Seegars v. Ashcroft,* 396 F.3d 1248 (D.C. Cir. 2005). "Uniquely targeted for prosecution," as a practical matter, means a person must *break* the law, get *caught*, and hope the law enforcement officer exercises discretion not to arrest him.[5] In other words, this Court has (for all practical purposes) eliminated pre-enforcement, non-First Amendment constitutional challenges. And it has done so despite the Supreme Court's admonition that the Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago,* 561 U.S. 742, 780 (2010) (plurality op.).

---

Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.").

[5] *See Ord v. Dist. of Columbia*, 587 F.3d 1136, 1152 (D.C. Cir. 2009) (Brown, J., dissenting in part) ("A prosecution is unlikely to be imminent if individuals refrain from violating the law out of fear of prosecution.").

Litigants (like Plaintiffs did below) routinely argue that this Court's standing jurisprudence cannot be squared with Supreme Court precedent (or of any other circuit). And no fewer than four of this Court's jurists have pointed out the "sharp tension" between this Circuit's Article III meander around the "standard rules governing pre[-]enforcement challenges," *Seegars*, 396 F.3d at 1253, 1254; *id.* at 1257 (Sentelle, J., dissenting), or have already voted for correcting this issue en banc. *See Seegars v. Gonzales (Seegars II),* 413 F.3d 1, 1 (2005) (noting that Judges Sentelle, Randolph, and Roberts would have granted the petition for rehearing en banc). Both the district court here[6] and earlier panels of this Circuit maintain that, unless the Court sitting en banc addresses this incongruity,[7] the Circuit will remain out of step with the rest of the federal court system.

The time for correcting this exceptionally important doctrine is now—and not after a panel of this Court, considering itself bound by Circuit precedent, delays

---

[6] Hr'g Tr. at 13 ("I mean, I have to say, I understand your argument on standing, and I think that there is some force to the argument. But it seems to me to be arguments that the D.C. Circuit has two, three, four times considered and said yeah, there's considerable force to that argument, but our circuit precedent is to the contrary, and unless we go en banc, we can't accept that. I certainly can't do more than the panel of the D.C. Circuit could do. If the panels of the D.C. Circuit are bound, I'm certainly bound.").

[7] *Ord*, 587 F.3d at 1146 (Brown, J., dissenting in part) ("[T]his controversy demonstrates why litigants should not be required to jump through such hoops to get past the courthouse door. . . . I do think the en banc court can and should rehear this appeal *sua sponte* and overrule *Navegar*.").

correction for another year or more. So long as the Court's wayward pre-enforcement-challenge rule persists, litigants will rightly choose not to subject themselves to a possible criminal record. That means, however, that federal court review of potentially unconstitutional criminal laws will consistently skirt the crucible of constitutional examination. That, in turn, virtually guarantees law-respecting citizens (like Plaintiffs here) will labor under decrees that violate fundamental rights protected by the supreme law of the land, until they are ready to flip a coin on their freedom.

To be certain, the danger is manifestly not limited to Second Amendment litigation. Due Process and Equal Protection challenges are affected.[8] So too are Commerce Clause and Supremacy Clause challenges.[9] Indeed, unless the Court dispenses with both *Navegar* and *Seegars*, it would be hard pressed to allow cases like *Doe v. Bolton* to proceed, since, in that case, none of the physicians challenging a criminal abortion statute had "been prosecuted, or threatened with prosecution, for violation" of the law. 410 U.S. 179, 188 (1973). There, "[t]he statute's mere existence constituted 'a sufficiently direct threat of personal detriment.'" *Ord*, 587

---

[8] *Contra High Ol' Times v. Busbee*, 673 F.2d 1225, 1227 (11th Cir. 1982) (analyzing pre-enforcement challenge to state statute for violating Due Process, Equal Protection, the Commerce Clause, and the Supremacy Clause).

[9] *Contra id.*

F.3d at 1148 (Brown, J., dissenting in part) (quoting *Doe*, 410 U.S. at 188). Here, the courthouse doors remain bolted shut.

For all these reasons (and those that follow), I believe based on reasoned and studied professional judgment, that the district court's decision is contrary to (at least) the following Supreme Court precedents, and that initial consideration by the full Court is vital to secure and maintain uniformity of the decisions in this Court:

- *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021);
- *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014);
- *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007);
- *Virginia v. Am. Booksellers Association*, 484 U.S. 383 (1988); and
- *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979).

*/s/ Edward M. Wenger*
EDWARD M. WENGER

And given this Court's decades-long chill on non-First Amendment, pre-enforcement constitutional challenges, I believe based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance:

Whether this Court's Article III standing jurisprudence incorrectly requires plaintiffs to show that they have been "singled out or uniquely targeted by the D.C. government for prosecution" before they may lodge a non-First Amendment, pre-enforcement constitutional challenge to one of the District's statutes.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS & RELATED CASES ................... I

INTRODUCTION & RULE 35(B)(1) STATEMENT ........................................... III

TABLE OF CONTENTS .................................................................................... VIII

TABLE OF AUTHORITIES ............................................................................... IX

STATEMENT OF JURISDICTION ..................................................................... 1

STATEMENT OF THE ISSUE MERITING EN BANC CONSIDERATION ....... 2

STATEMENT OF FACTS & THE COURSE OF PROCEEDINGS ...................... 3

ARGUMENT ...................................................................................................... 5

    I.     SEEGARS AND PARKER CONFLICT WITH SUPREME COURT PRECEDENT AND PRECEDENT OF EVERY OTHER CIRCUIT TO CONSIDER THIS QUESTION. ................................................................................. 5

    II.    FEW ISSUES ARE MORE EXCEPTIONALLY IMPORTANT THAN THE ACCESS-TO-COURT QUESTION RAISED IN THIS PETITION. ................................... 10

CONCLUSION .................................................................................................. 12

CERTIFICATE OF COMPLIANCE .................................................................. 14

CERTIFICATE OF SERVICE ........................................................................... 15

# TABLE OF AUTHORITIES

## Cases

\* *Babbitt v. UFW Nat'l Union,*
442 U.S. 289 (1979) .................................................................. iii, vii, 6

*Consumer Data Indus. Ass'n v. King,*
678 F.3d 898 (10th Cir. 2012) ...................................................... iii, 9

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...........................................................................12

*Doe v. Bolton,*
410 U.S. 179 (1973) ...........................................................................vi

*Ezell v. City of Chi.,*
651 F.3d 684 (7th Cir. 2011) ....................................................... iii, 9

*GeorgiaCarry.org, Inc. v. Georgia,*
687 F.3d 1244 (11th Cir. 2012) ................................................... iii, 9

*Hedges v. Obama,*
724 F.3d 170 (2d Cir. 2013) .............................................................6, 9

*High Ol' Times v. Busbee,*
673 F.2d 1225 (11th Cir. 1982) ......................................................vi

*Jackson v. City & Cnty. of S.F.,*
746 F.3d 953 (9th Cir. 2014) ....................................................... iii, 9

*McDonald v. City of Chi.,*
561 U.S. 742 (2010) ...........................................................................iv

\* *MedImmune, Inc. v. Genentech, Inc.,*
549 U.S. 118 (2007) ............................................................... iii, vii, 10

*Mobil Oil Corp. v. Att'y Gen. of Va.,*

---

\* Authorities upon which we chiefly rely are marked with asterisks.

ix

940 F.2d 73 (4th Cir. 1991) ........................................................... iii, 9

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
804 F.3d 242 (2d Cir. 2015) ........................................................ iii, 9

\* *Navegar, Inc. v. United States,*
103 F.3d 994 (D.C. Cir. 1997) ........................................ iv, 5, 7, 8, 9, 10, 11, 12

\* *Ord v. District of Columbia,*
587 F.3d 1136 (D.C. Cir. 2009) ........................................ iv, v, vi, 8, 9

*Palmer v. District of Columbia,*
59 F. Supp. 3d 173 (D.D.C. 2014) ....................................................12

\* *Parker v. District of Columbia,*
478 F.3d 370 (D.C. Cir. 2007) ............................................. iv, 4, 5, 7

*Peoples Rights Org., Inc. v. City of Columbus,*
152 F.3d 522 (6th Cir. 1998) ........................................................ iii, 9

\* *Seegars v. Ashcroft,*
396 F.3d 1248 (D.C. Cir. 2005) ........................................ iv, v, 7, 9, 10, 11, 12

*Seegars v. Gonzales,*
413 F.3d 1 (D.C. Cir. 2005) ...........................................................v, 8

\* *Steffel v. Thompson,*
415 U.S. 452 (1974) ........................................................ iii, iv, 5, 6, 7

\* *Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) .................................................................. iii, vii

\* *Virginia v. Am. Booksellers Ass'n,*
484 U.S. 383 (1988) ............................................................. iii, vii, 10

\* *Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) ............................................................. iii, vii, 9, 10

*Woodhull Freedom Found. v. United States,*
948 F.3d 363 (D.C. Cir. 2020) .........................................................6

*Wrenn v. District of Columbia,*
  864 F.3d 650 (D.C. Cir. 2017) ...............................................................12

**Statutes**

28 U.S.C. § 1292 ...............................................................1

28 U.S.C. § 1331 ...............................................................1

42 U.S.C. § 1983 ...............................................................1

**STATEMENT OF JURISDICTION**

Because Plaintiffs sued under 42 U.S.C. § 1983 to vindicate their federal constitutional rights, the district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court dismissed Plaintiffs' First Amended Complaint on August 9, 2024. *See* Dkt. Nos. 62, 63. On September 3, 2024, Plaintiffs filed a timely notice of appeal. *See* Dkt. No. 64. Accordingly, this Court has subject-matter jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE
## MERITING EN BANC CONSIDERATION

Whether this Court's Article III standing jurisprudence incorrectly requires plaintiffs to show they have been "singled out or uniquely targeted by the D.C. government for prosecution" before they may lodge a non-First Amendment, pre-enforcement challenge to one of the District's statutes.

## STATEMENT OF FACTS &
## THE COURSE OF PROCEEDINGS

Plaintiffs sued the District of Columbia, the D.C. Metro Police Department Chief, the Metro Transit Police Chief, and the D.C. Attorney General, challenging the District's prohibition on carrying concealed handguns while using public transportation, including the Metro system. Dkt. No. 1; *see also* Dkt. No. 34 (adding via amended complaint Attorney General and Metro Police Chief). Their complaint alleged the District's law violates their Second Amendment right to carry arms and their Fifth Amendment right to due process. Dkt. No. 34 ¶¶ 130–33. While opposing the District's motion to dismiss, each Plaintiff submitted a sworn declaration stating:

- "I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department."

- "I am loath[] to break the law and would not do so intentionally."

- "I regularly ride the Metro subway and Metro buses."

- "I am aware of many instances of criminal violence occurring on the Metro system within the District of Columbia."

- "I am apprehensive for my safety while riding the Metro system."

- "I have in some circumstances avoided using the Metro system out of fear of my personal safety because I could not within the law carry my concealed firearm for personal protection."

- "If it were legal to do so, I would carry my concealed firearm on and within the Metro system for self-defense."

- "In sum, but[-]for D.C. law, I would carry my concealed handgun on Metro trains and buses for self-defense. I do not do so now because I fear, among other things, arrest [and] prosecution."

Dkt. Nos. 46-1, 46-2, 46-3, 46-4. Citing *Navegar* and *Seegars*, the District maintained that Plaintiffs lacked Article III standing to advance their Second and Fifth Amendment pre-enforcement challenges to the Metro carry ban.

On August 9, 2024, the district court dismissed Plaintiffs' amended complaint. Dkt. No. 62. In so doing, it acknowledged that, in this Circuit, Plaintiffs were tasked with establishing not only that a "threat of prosecution" is "credible," but also that such a threat is "imminent." Dkt. No. 62, at 8. In other words, it found itself bound "to look for an allegation that [the plaintiffs] have been singled out or uniquely targeted by the D.C. government for prosecution." Dkt. No. 62, at 9 (alteration in original) (quoting *Parker*, 478 F.3d at 375). And it acknowledged that it "remains bound by the D.C. Circuit's admonitions that 'the District's general threat to prosecute violations of its gun laws d[oes] not constitute an Article III injury,' and that a 'plaintiff bringing a pre[-]enforcement challenge must do more than show that the government enforces its laws as written.'" Dkt. No. 62, at 10 (first alteration in original) (citation omitted) (first quoting *Parker*, 478 F.3d at 374; then quoting *Angelo v. Dist. of Columbia*, 648 F. Supp. 3d 116, 126 (D.D.C. 2022)).

Because each Plaintiff opted to follow the District's criminal laws rather than flout them, they necessarily had never been "singled out or uniquely targeted by the

4

D.C. government for prosecution." Dkt. No. 62, at 9 (quoting *Parker*, 478 F.3d at

375). For that reason, the district court found that they lacked Article III standing.

But in so doing, it left a few parting comments:

> Whether the *Navegar* rule is sound and consistent with other precedent
> is not for this Court to decide. . . . [M]ultiple judges on the D.C. Circuit
> have raised substantial questions about the rule and have called for its
> reconsideration by the *en banc* court. But unless and until the Court of
> Appeals overrules *Navegar* and its progeny, this Court remains bound
> to follow the rule. Applying that rule here, the Court concludes . . . that
> Plaintiffs have failed to allege facts sufficient to show that they have
> been, or are likely to be, singled out for prosecution and that,
> accordingly, Plaintiffs lack standing to bring a pre[-]enforcement
> challenge.

Dkt. No. 62, at 23. Plaintiffs timely noticed their appeal on September 3, 2024.

Dkt. No. 64.

## ARGUMENT

**I.** ***SEEGARS*** **AND** ***PARKER*** **CONFLICT WITH SUPREME COURT PRECEDENT AND**
**PRECEDENT OF EVERY OTHER CIRCUIT TO CONSIDER THIS QUESTION.**

For the past fifty years, the Supreme Court has explicitly disclaimed the

practice of thrusting a "hapless plaintiff between the Scylla of intentionally flouting

state law and the Charybdis of forgoing what he believes to be constitutionally

protected activity in order to avoid becoming enmeshed in a criminal proceeding."

*Steffel*, 415 U.S. at 462. For that reason, the Supreme Court (and every other circuit

court on this issue), has unwaveringly maintained that a plaintiff has Article III

standing to bring a pre-enforcement challenge to a constitutionally suspect criminal

statute if she is exposed to a "credible threat of prosecution." *Babbitt*, 442 U.S. at 298. A threat of prosecution is credible if it "is not imaginary or wholly speculative." *Id*. at 302. And a plaintiff can clear the "credible" bar by showing merely that (1) the government has not disclaimed prosecution, and (2) the law has not fallen into disuse. *See Babbitt*, 442 U.S. at 302; *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 373 (D.C. Cir. 2020); *Hedges v. Obama,* 724 F.3d 170, 197 (2d Cir. 2013).

That's it. The Supreme Court has never required any more than the aforementioned credibility showing. And for good reason—adding another hurdle (like this Circuit has here) pushes the rule further toward a true risk-of-arrest prerequisite. Indeed, "[w]ere the law to be that a plaintiff could not obtain a declaratory judgment that a local ordinance was unconstitutional when no state prosecution is pending . . . , the Federal Declaratory Judgment Act would have been *pro tanto* repealed." *Steffel*, 415 U.S. at 471.

But that's exactly what the law in this Circuit does. As the district court correctly observed, in this Circuit, "[i]t is *not* enough to allege facts demonstrating a 'credible' threat of prosecution." Dkt. No. 62, at 9. Instead, a "plaintiff bringing a non-First Amendment pre[-]enforcement challenge to a criminal statute must also allege facts sufficient to permit a plausible inference that the threat of criminal or civil enforcement is 'imminent,'"—i.e., that she has been "singled out or uniquely

targeted by the D.C. government for prosecution." *Id.* (quoting *Parker*, 478 F.3d at 375). This added hurdle, in the end, means that plaintiffs within this Circuit have no meaningful avenue for challenging constitutionally suspect criminal statutes without first getting arrested.

If donning handcuffs is not a prerequisite for vindicating one's constitutional rights, then *Navegar* and *Seegars* cannot remain good law. If a person has been "singled out" or "uniquely targeted" for prosecution, it necessarily means that the person has (1) broken the law and (2) law enforcement knows about it—that's the only conceivable justification to "single[] out" or "uniquely target[]" someone for prosecution. The only thing keeping him from the back of a police cruiser is the discretion of the officer who knows he broke the law, which renders a right to "pre-enforcement" review entirely phantasmic.

None of this has flown under this Court's radar. In *Seegars* itself, the Court could not "help noting that" its controlling precedent remained "in sharp tension with standard rules governing pre[-]enforcement challenges to agency regulations" and with its "cases upholding pre[-]enforcement review of First Amendment challenges to criminal statutes." *Seegars*, 396 F.3d at 1253–54. After the panel issued *Seegars*, Judges Sentelle, Randolph and then-Judge John Roberts, voted to rehear it en banc, with Senior Judge Williams issuing a statement regarding the en banc denial.

7

Notably, Judge Williams, who authored *Seegars*, wrote in his separate statement that "[a]s a panel we were constrained by recent circuit authority, *Navegar* . . . , even though, as my opinion for the court made clear, it appeared to be in conflict with an earlier Supreme Court decision, *Babbitt* . . . ." *Seegars II,* 413 F.3d at 2 (statement of Williams, J.). The choice imposed on the plaintiffs in that case, according to Judge Williams, remained "between facing criminal prosecution and foregoing security measures they believe necessary and lawful." *Id.* at 3. In conclusion, Judge Williams correctly surmised the following: "I do not think our law of standing requires that citizens who want to obey the law, but also to follow their judgment as to self-preservation, be told that they cannot get a reading on the validity of the law except by . . . engaging in forbidden behavior." *Id.*

Since then, Judge Brown joined the chorus, noting that the Court's precedent has denied D.C. plaintiffs the federal court "access they would have under applicable Supreme Court precedent." *Ord*, 587 F.3d at 1146 (Brown, J., dissenting). She also proclaimed that "[i]t is long past time to recognize *Navegar*'s flaws and articulate a pre[-]enforcement standing doctrine consistent with decades of Supreme Court precedent." *Id.* at 1153. She concluded by "borrow[ing] a trope from Theodore

Roosevelt: 'Nine-tenths of wisdom consists in being wise in time,'" and then "urg[ing] the court to rehear this appeal en banc and overrule *Navegar*." *Id.*[10]

Since *Seegars* and *Ord*, the Supreme Court has doubled down on its pre-enforcement standing test. Specifically, *Whole Woman's Health v. Jackson* involved a pre-enforcement challenge to a Texas statute allowing a private cause of action against certain abortion providers. 595 U.S. at 35. The plaintiffs sued state officials to enjoin them from enforcing the statute. *Id.* at 36. Among those sued were state licensing officers charged with enforcing the Texas Health and Safety Code. *Id.* The Court found plaintiffs had standing to sue these officials even with no explicit threat of enforcement and even though the statute provided it was not to be enforced by state actors. *Id.* at 46. Standing was predicated on regulations imposing a general duty on the officials to enforce the health code. *Id.* at 46–47.

Like many pre-enforcement cases, *Whole Woman's Health* did not place the burden on the plaintiff to show the government's intent to enforce the law. Instead, the Court did what it had in previous cases—i.e., "presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such

---

[10] The access this Circuit denies, moreover, is available in the Second, Fourth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits. *See N.Y. State Rifle & Pistol Ass'n, Inc.*, 804 F.3d at 242; *Mobil Oil Corp.*, 940 F.2d at 73; *Peoples Rights Org., Inc.*, 152 F.3d at 522; *Ezell*, 651 F.3d at 684; *Jackson*, 746 F.3d at 953; *Consumer Data Indus. Ass'n*, 678 F.3d at 898; *GeorgiaCarry.org, Inc.*, 687 F.3d at 1244.

intent existed." *Hedges*, 724 F.3d at 197 (discussing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010); *Am. Booksellers*, 484 U.S. at 393; and *Babbitt*, 442 U.S. at 302). Thus, "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not 'first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.'" *Whole Woman's Health*, 595 U.S. at 46–47 (quoting *Babbitt*, 442 U.S. at 302). The Court, instead, presumed intent based on the law's existence and the notion that government officials are expected to perform their duty to enforce the Health and Safety Code. *Id*.; *see also American Booksellers*, 484 U.S. at 393 (finding "no reason to assume" the law would not be enforced).

Given the foregoing, this Court should, sitting en banc, reverse the court below and in so doing, overrule *Seegars* and *Navegar*.

## II. FEW ISSUES ARE MORE EXCEPTIONALLY IMPORTANT THAN THE ACCESS-TO-COURT QUESTION RAISED IN THIS PETITION.

The Circuit's errant pre-enforcement standing jurisprudence is not only wrong. It is also profoundly dangerous. This is true for several reasons.

First, it incites lawless behavior. This is because "[t]he plaintiff's own action (or inaction) in failing to violate the law *eliminates the imminent threat of prosecution*." *MedImmune, Inc*, 549 U.S. at 128–29. Even though laws are supposed to have a normative effect (having more law-abiding citizens in society is self-evidently superior to having fewer), those who feel like their fundamental rights

have been trammeled (and who would like the chance to persuade a federal court of the same) are forced to break the law to vindicate those rights. Creating this perverse incentive cannot be what the Court had in mind when it decided *Seegars* and *Navegar*.

The facts here neatly illustrate that point. Plaintiffs fear for their safety while riding the Metro. They also respect the District's law enough to avoid carrying their concealed firearms while riding. Their opportunity to assert their rights should not be less than a person willing to transgress the District's laws, but that is precisely what *Seegars* and *Navegar* demand. Indeed, *Seegars* and *Navegar* prompted comments from the district court like the following: "And my guess is—and I'm not saying you should do it, but my guess is that if you left the courthouse today and went down to Judiciary Square and got on the train with a concealed weapon, that no one would have any idea you did it." Hr'g Tr. at 7.

Second (and more perniciously), *Seegars* and *Navegar* allow the District to enact constitutionally suspect laws and then insulate them from meaningful federal court review. If the District passes a law that chills constitutionally protected activity, but the number of prosecutions under that law doesn't hit some as-yet-undefined (and plainly arbitrarily) level, the law never gets challenged, even where (as here) Plaintiffs would engage in the constitutionally protected activity but-for the law's deterrence. This Circuit's precedent in essence grants the District carte blanche

to (1) pass any kind of unconstitutional law, (2) use the threat of the law to chill the protected activity, (3) not prosecute, mainly because the protected activity has been sufficiently chilled, and then (4) move to dismiss any attempt to adjudicate the law's constitutionality in federal court. The incentive exceeds perversity, especially when this doctrine is wielded by a government that insists on enacting statutes that violate the Second Amendment.[11]

Third, this errant jurisprudence stymies this Court's ability to speak on pressing civil rights questions of the day. So long as *Seegars* and *Navegar* exist, this Court's voice will remain far more muted than it should. The Circuit's sole position among its sisters should counsel strongly in favor of immediate en banc review.

## CONCLUSION

For these reasons, the Court should hear this case en banc in the first instance.

---

[11] *See, e.g.*, *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); *Palmer v. Dist. of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014); *Wrenn v. Dist. of Columbia*, 864 F.3d 650 (D.C. Cir. 2017).

Dated: October 7, 2024          Respectfully submitted,

*/s/ George L. Lyon, Jr.*          */s/ Edward M. Wenger*
George L. Lyon          Edward M. Wenger
BERGSTROM ATTORNEYS          Caleb Acker
1929 Biltmore Street, NW          Daniel Bruce
Washington, DC 20009          HOLTZMAN VOGEL BARAN
(202) 669-0442 (phone)          TORCHINSKY & JOSEFIAK PLLC
(202) 483-9267 (facsimile)          2300 N Street NW, Suite 643A
*gll@bergstromattorneys.com*          Washington, DC 20037
          (202) 737-8808 (phone)
          (540) 341-8809 (facsimile)
          *emwenger@holtzmanvogel.com*
          *cacker@holtzmanvogel.com*

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume and word-count limits of FRAP 35(b)(2)(A), because, excluding the parts of the document exempted by FRAP 32(f), this document contains 3848 words.

2.      This document complies with the typeface and type-style requirements because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on this 7th day of October, 2024, a true copy of the Petition for Initial Hearing En Banc was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GREGORY T. ANGELO, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>*Defendants.* | Civil Action No. 22-1878 (RDM) |

## <u>MEMORANDUM OPINION</u>

District of Columbia law prohibits the carrying of firearms on public transportation, *see* D.C. Code § 7-2509.07(a)(6), unless the firearm is unloaded and secured in a locked container, *see* D.C. Code §§ 22-4504.01, 22-4504.02. Plaintiffs, four D.C.-area residents who hold concealed-carry licenses and use public transportation in the District of Columbia, bring this action challenging the constitutionality of § 7 2509.07(a)(6) under the Second Amendment and the Fifth Amendment's Due Process Clause. They allege, in short, that they have a constitutional right to carry concealed firearms for personal protection within the District of Columbia and that, but for § 7-2509.07(a)(6), they would do so while riding the Washington Metropolitan Area Transit Authority ("WMATA") owned and operated Metrorail and Metrobus system (collectively, "Metro system"). They further allege that they have on occasion opted to use other, more expensive modes of transportation, rather than risk riding the Metro system unarmed. They seek injunctive relief, declaratory relief, and compensatory damages.

Because Plaintiffs have failed to allege facts sufficient to support their standing to bring this preenforcement suit, the Court will **DISMISS** the amended complaint, without prejudice, for lack of Article III jurisdiction.

# I. BACKGROUND

The Court has previously described the background of this case in detail, *see Angelo v. District of Columbia*, 648 F. Supp. 3d 116, 119–21 (D.D.C. 2022) ("*Angelo I*"), and, thus, for present purposes will highlight only those aspects of the background that bear on the pending motions to dismiss. At this early stage of the proceeding, the Court "accept[s] as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Plaintiffs Gregory T. Angelo, Tyler Yzaguirre, and Cameron M. Erickson are residents of the District of Columbia. Dkt. 34 at 2, 4, 8 (Am. Compl. ¶¶ 2, 9, 26). Plaintiff Robert M. Miller is a resident of Virginia. *Id.* at 5 (Am. Compl. ¶ 15). All four Plaintiffs "hold[] a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department" and are "regular rider[s] of the" Metro system. Dkt. 34 at 2–4, 6, 8 (Am. Compl. ¶¶ 3, 10, 16, 27). All four Plaintiffs also are "loath to break the law," *id.* at 2, 4, 5, 8 (Am. Compl. ¶¶ 2, 9, 15, 26), and so they do not carry concealed firearms on D.C. public transport even though it would make them feel "more comfortable" or "better protected" to do so, *id.* at 3, 5, 7, 8–9 (Am. Compl. ¶¶ 6, 12, 20, 29).[1] And all four have, on occasion, opted not to use "the Metro system out of fear of [their] personal safety because [they] could not within the law carry [their] concealed firearm[s] for personal protection," and have, instead, used more expensive modes of transportation. *Id.* at 3 (Am. Compl. ¶ 6); *see also id.* at 5, 7–9 (Am. Compl. ¶¶ 12, 20, 29).

Plaintiffs acknowledge that because D.C. law permits a licensed owner to transport an unloaded firearm in a locked container that is separate from any ammunition, *see* D.C. Code

---

[1] Plaintiff Yzaguirre, in a different lawsuit against the District of Columbia, has alleged that he was "denied registration for a firearm on the ground that its magazine had a 12-round capacity in violation" of the District's ban on large-capacity magazines. *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 8 (D.D.C. 2023).

§§ 22-4504.01, 22-4504.02, it is "technically possible to transport a handgun on the Metro," *id.* at 35 (Am. Compl. ¶ 94). But they allege that these restrictions have the "practical effect" of disarming them "for the entirety of their journey." *Id.* While on the Metro system, Plaintiffs cannot access their firearms, and because D.C. law requires that firearms remain concealed while in public, D.C. Code § 7-2509.07(e), Plaintiffs would need to find a private place to remove their firearms from the locked contained and to holster them in a concealed manner, *id.* at 35–36 (Am. Compl. ¶ 95). They further allege that this "unnecessary handling of a firearm [would] create[] the risk of an accidental or negligent discharge." *Id.* at 36 (Am. Compl. ¶ 96).

This litigation commenced on June 30, 2022, when Plaintiffs brought suit against the District of Columbia and Robert J. Contee III, the Chief of the D.C. Metropolitan Police Department ("MPD"), alleging that D.C. Code § 7-2509.07(a)(6) violated their Second and Fifth Amendment rights by prohibiting them from carrying concealed firearms on public transportation vehicles. *See* Dkt. 1 at 33–34 (Compl. ¶¶ 81–83). At that time, Plaintiffs sought injunctive and declaratory relief, but mentioned damages "only in passing" and without any supporting factual allegations. *Angelo I*, 648 F. Supp. 3d at 121 n.2. Two weeks after filing suit, Plaintiffs moved for a preliminary injunction, requesting that this Court enjoin Defendants from enforcing § 7-2509.07(a)(6) during the pendency of this action. Dkt. 6. At that time, Plaintiffs also asked that the Court "merge" the preliminary injunction proceeding with the ultimate merits and issue a permanent injunction barring Defendants from enforcing § 7-2509.07(a)(6). Dkt. 6-1 at 50–51. On December 28, 2022, the Court declined to merge the preliminary injunction proceeding with the ultimate merits, *Angelo I*, 648 F. Supp. 3d at 121 n.3, and denied Plaintiffs' motion for preliminary injunctive relief, holding that Plaintiffs lacked standing to bring a preenforcement challenge to § 7-2509.07(a)(6), *id.* at 132.

On February 1, 2023, Plaintiffs filed an amended complaint. Dkt. 34. In Count One, Plaintiffs allege that § 7-2509.07(a)(6), violates the Second Amendment, both "facially and as applied" to their circumstances. Dkt. 34 at 47–48 (Am. Compl. ¶¶ 130–32). In Count Two, they allege that § 7-2509.07(a)(6) is "arbitrary and irrational and thus violates the due process clause of the Fifth Amendment." *Id.* at 48 (Am. Compl. ¶ 133). The amended complaint adds as defendants Brian Schwalb, the Attorney General of the District of Columbia, and Michael Anzallo, the Chief of Police of WMATA's Metro Transit Police Department ("MTPD" or "WMATA MTPD"). Dkt. 34 at 9–11 (Am. Compl. ¶¶ 33, 40); *see also* Dkt. 42-1 at 2, 7 n.2. Attorney General Schwalb and MTPD Chief Anzallo are each named in both their official and individual capacities. Dkt. 34 at 9–11 (Am. Compl. ¶¶ 33, 40). The amended complaint also adds factual allegations relating to Plaintiffs' claim for compensatory relief. *See id.* at 48 (Am. Compl. ¶ 132); *see also Angelo I*, 648 F. Supp. 3d. at 121 n.2 (observing that it was "unclear whether the complaint in fact s[ought] damages" because it contained "no allegation[s] relating to any monetary loss"). Other than those additions, however, the amended complaint largely tracks its predecessor.

In response, Defendants the District of Columbia, Attorney General Schwalb, and MPD Chief Contee (collectively "the District Defendants") and Defendant MTPD Chief Anzallo have moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 42 (Anzallo); Dkt. 44 (District Defendants). For the reasons explained below, the Court will **GRANT** both motions to dismiss.

## II. LEGAL STANDARD

Two legal standards govern the Court's consideration of the pending motions to dismiss.

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to adjudicate the claim and may take the form of either a "facial" or "factual" challenge. A facial challenge asks whether the plaintiff has pleaded facts sufficient to establish the Court's jurisdiction, while a factual challenge asks the Court to "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). In other words, a facial challenge is confined to the four corners of the complaint, while a factual challenge permits the court to look beyond the complaint to satisfy itself that it has jurisdiction to hear the suit. Whether the motion to dismiss is facial or factual, the plaintiff bears the burden of establishing that the Court has subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Considered against that background, Defendants' respective challenges to the Court's jurisdiction are best viewed as facial in nature. When considering a facial challenge to its jurisdiction, the Court must accept the allegations of the complaint as true and must construe "the complaint in the light most favorable to the non-moving party." *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006); *see I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003). In that sense, the Court resolves the motion in a manner similar to a motion to dismiss under Rule 12(b)(6). *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

In resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept the factual allegations of the complaint as true and may not rely on evidence or factual material beyond those allegations. A defendant can therefore prevail on a Rule 12(b)(6) motion only by demonstrating that the facts, as alleged in the complaint, do not warrant relief as

a matter of law. In resolving a 12(b)(6) motion, the Court need not accept legal conclusions as true. *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006). Rather, the question for the Court is whether the factual allegations "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### III. ANALYSIS

In significant part, the question now before the Court is a familiar one, since the Court previously held that Plaintiffs (1) had failed to allege facts sufficient to establish standing to bring a preenforcement challenge to § 7-2509.07(a)(6) under the standard set forth in two binding decisions from the D.C. Circuit and (2) had failed to show that those "precedents are no longer good law or do not control in this case." *Angelo I*, 648 F. Supp. 3d at 132. The Court must now decide whether Plaintiffs' amended complaint has cured the defects that the Court previously identified, whether any intervening law has now abrogated those precedents, or whether the Court's prior analysis was mistaken.

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), the Court must assess Plaintiffs' standing with respect to "each claim" asserted and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). This, in turn, requires the Court to determine whether Plaintiffs have alleged facts sufficient to satisfy the constitutional minimum for establishing Article III standing for each claim and for each form of relief sought—that is (1) that they are suffering or will likely suffer an "injury in fact" that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted); (2) that their injury is "'fairly traceable to the challenged action of the defendant[s],'" *Ord v. District of Columbia*, 587 F.3d

1136, 1140 (D.C. Cir. 2009) (quoting *Lujan*, 504 U.S. at 560); and (3) that their injury is "likely to be 'redressed by a favorable decision,'" *id.* (quoting *Lujan*, 504 U.S. at 561).

The Court first addresses Plaintiffs' claims for injunctive and declaratory relief and then turns to their claims for damages.

## A.    Injunctive and Declaratory Relief

### 1.    *The District of Columbia*

Like the complaint at issue in *Angelo I*, Plaintiffs' amended complaint seeks a declaration that D.C. Code § 7-2509.07(a)(6) is unconstitutional, and they seek an injunction prohibiting Defendants from the enforcing the law against them.  As in *Angelo I*, moreover, Plaintiffs bring a preenforcement challenge.  None of the Plaintiffs has been arrested, prosecuted, or subject to civil penalties for violating § 7-2509.07(a)(6).  None has been threatened with arrest or prosecution or with the imposition of a civil penalty.  And none has identified a credible, imminent threat of arrest, prosecution, or fine.  Instead, each asserts standing to seek declaratory and injunction relief based on his commitment to abide by the law and corresponding submission that, but for § 7-2509.07(a)(6), he would exercise his constitutional right to carry a concealed firearm while using the Metro system.

To bring a preenforcement challenge to the constitutionality of a statute, a plaintiff may "establish Article III standing by (1) 'alleging an intention to engage in the proscribed conduct,'" provided that the conduct is "arguably affected with a constitutional interest, . . . and (2) demonstrating that 'there exists a credible threat of prosecution.'" *Ord*, 587 F.3d at 1140 (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).  In the D.C. Circuit, moreover, when a plaintiff presents a "non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings," *Seegars v. Gonzales*,

396 F.3d 1248, 1254 (D.C. Cir. 2005), the plaintiff "must establish that the threat of prosecution is not only 'credible,' but also 'imminent,'" *Angelo I*, 648 F. Supp. 3d at 124 (quoting *Ord*, 587 F.3d at 1140).

Here, for reasons explained in *Angelo I*, Plaintiffs easily satisfy the first of the preenforcement standing requirements. *See Angelo I*, 648 F. Supp. 3d at 123. They have alleged a present intention to carry concealed firearms while using the Metro system, and they have alleged that the only thing that is keeping them from doing so is the law that they challenge. Because "[t]he D.C. Circuit has disavowed any requirement that plaintiffs asserting preenforcement challenges express an 'unconditional intention to engage in the proscribed behavior, regardless of whether the statute is invalidated,'" *id.* (quoting *Seegars*, 396 F.3d at 1251 (emphasis omitted), those allegations suffice. So far, so good.

The difficulty that Plaintiffs confronted in *Angelo I*, and that they continue to confront here, is that they have failed allege any facts that, if accepted as true, would show that they face (or would face) a credible and imminent threat of prosecution (were they to violate the law). *See Angelo I*, 648 F. Supp. 3d at 123–26. As the Court concluded in *Angelo I*, the Court once again concludes that Plaintiffs have failed to satisfy this requirement for establishing standing to bring a preenforcement, constitutional challenge to a statute.

By way of background, the Court's conclusion in *Angelo I* was dictated by three D.C. Circuit precedents: *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), *cert denied*, 531 U.S. 816 (2000); *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005), *cert denied*, 546 U.S. 1157 (2006); and *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008). Those cases, *Angelo I* explained, "paint a clear picture: to establish Article III standing, a plaintiff bringing a [non-First Amendment]

preenforcement challenge must do more than show that the government enforces its laws as written." 648 F. Supp. 3d at 126. It is not enough to allege facts demonstrating a "credible" threat of prosecution; the plaintiff bringing a non-First Amendment preenforcement challenge to a criminal statute must also allege facts sufficient to permit a plausible inference that the threat of criminal or civil enforcement is "imminent." *Id.* at 124. As the D.C. Circuit reaffirmed in *Parker*, *Navegar* and *Seegars* require courts "to look for an allegation that [the plaintiffs] have been singled out or uniquely targeted by the D.C. government for prosecution." 478 F.3d at 375.

Applying this test in *Angelo I*, the Court concluded that Plaintiffs' complaint lacked the allegations necessary to satisfy this test. *See Angelo I*, 648 F. Supp. 3d at 126. As the Court explained, as alleged in their original complaint, "Plaintiffs rest[ed] their entire standing argument on the facial contention that '[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense' and that they 'do not do so now because [they] fear arrest and prosecution.'" *Id.* To be sure, as the Court further explained, the *Seegars* court noted, in describing the "imminence requirement, that 'clarity prevails only at the poles.'" *Id.* (quoting *Seegars*, 396 F.3d at 1252). But that line-drawing problem is of little consequence when, as in *Angelo I*, a plaintiff alleges nothing more than a generalized and entirely speculative concern that he or she might face prosecution or a civil penalty proceeding, were he or she to violate the law. Thus, *Angelo I* concluded as follows:

> Notably, . . . nowhere do Plaintiffs allege . . . that they "have been singled out or uniquely targeted by the D.C. government for prosecution," *Parker*, 478 F.3d at 375, and they point to no "prior threats against them" and to no "characteristics indicating an especially high probability of enforcement against them," *Seegars*, 396 F.3d at 1255. The Court, accordingly, finds no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all.

*Id.*

The conclusion that the Court reached in *Angelo I* applies with equal force to the present motion. *Navegar*, *Seegars*, and *Parker* remain binding precedent, and Plaintiffs have yet to identify any reason to believe they have been, or will be, "singled out or uniquely targeted by the D.C. government for prosecution" or civil penalty proceedings. *Parker*, 478 F.3d at 375. Like the complaint at issue in *Angelo I*, Plaintiffs' amended complaint alleges that, but-for the challenged statute, they would carry concealed firearms on and within the metro system for purposes of self-defense. *See* Dkt. 34 at 1, 4–5, 7–9 (Am. Compl. ¶¶ 2, 7, 9, 13, 15, 21, 26, 30). As in their original complaint, they allege, in conclusory terms, that the District's gun laws are enforced "actively and vigorously," *id.* at 9 (Am. Compl. ¶ 33); *see also id.* at 12 (Am. Compl. ¶ 42), and that the District "has not disclaimed prosecution for violation of the law at issue in this proceeding," *id.* at 9 (Am. Compl. ¶ 33); *Angelo I*, 647 F. Supp. 3d at 126 ("Plaintiffs argue that '[t]he District has never disclaimed an intent to enforce the Metro carry ban.'").

These allegations were insufficient in *Angelo I*, and they remain insufficient for present purposes. This Court remains bound by the D.C. Circuit's admonitions that "the District's general threat to prosecute violations of its gun laws d[oes] not constitute an Article III injury," *Parker*, 478 F.3d at 374, and that a "plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written," *Angelo I*, 648 F. Supp. 3d at 126. As before, Plaintiffs have alleged "no prior threats against them or any characteristics indicating an especially high probability of enforcement against them." *Seegars*, 396 F.3d at 1255. And they have failed to allege any facts suggesting that they have been, or are likely to be, singled out for prosecution. *Parker*, 478 F.3d at 375.

Plaintiffs' efforts to cure the jurisdictional deficiencies in their original complaint, moreover, are unavailing. They now allege, for example, that their counsel emailed the Attorney

General of the District of Columbia in January 2023 requesting that he "waive enforcement" of D.C. Code § 7-2509.07(a)(6) "as to [his] clients," Dkt. 34 at 11 (Am. Compl. ¶ 38), and, almost two weeks later, sent a letter to the Chief of the WMATA Police Department requesting a similar waiver and also requesting that he "'enter into a non-prosecution agreement'" with the Plaintiffs, *id.* (Am. Compl. ¶ 41). They allege that neither official has responded to this correspondence. *Id.* (Am. Compl. ¶¶ 39, 41). This silence does not, however, suggest that Plaintiffs face an imminent threat of prosecution—or that they would face such a threat, were they to violate § 7-2509.07(a)(6). All the more so when considered against the backdrop of *Navegar* and its progeny. In *Navegar*, for example, the D.C. Circuit held that the plaintiffs had failed to show that they faced an imminent threat of enforcement, even though "case agents of the Bureau of Alcohol, Tobacco and Firearms had visited the plaintiff gun manufacturers, alerted them to the prohibitions in question, and conducted inventories of their firearms stocks, including those of the weapons about to be barred." *Seegars*, 396 F.3d at 1255 (citing *Navegar*, 103 F.3d at 997). Still, the *Navegar* court concluded that, "although the government ha[d] demonstrated its interest in enforcing the Act generally," there was no indication that the plaintiffs faced a jurisdictionally sufficient threat of enforcement. 103 F.3d at 1001; *see also Ord*, 587 F.3d at 1141 (noting that there was no imminence in *Parker* where "the District of Columbia had declared its intention to prosecute all violators").

Plaintiffs also now allege that Miller is "aware of instances when persons unlawfully carrying concealed weapons on DC Metro have been arrested and charged for violating" § 7-2509.07(a)(6). Dkt. 34 at 6 (Am. Compl. ¶ 18); *cf. Angelo I*, 648 F. Supp. 3d at 126 (noting that at oral argument, Plaintiffs could not identify a single person with a concealed carry permit who had ever been arrested for carrying a handgun on public transportation in the District while not

engaged in another crime). After the close of briefing, moreover, Plaintiffs filed "the result of an information request directed to Metro by Plaintiff Dr. Miller on January 13, 2023." Dkt. 51 at 3. According to that filing, Miller "asked Metro to advise him of the number of arrests occurring on the Metro system in the District for the unlawful carrying of firearms in years 2018 through 2022." *Id.* Miller reports that, in response, he was informed that a total of "71 arrests for possession/carrying firearms on the Metro system" occurred during this five-year period. *Id.* at 4. Although Plaintiffs contend that their filing "plainly shows [that] there is a credible threat of enforcement of DC Code Section 7-2509.07(a)(6)," *id.* at 4, the Court is unpersuaded for at least two reasons.[2]

First, there is no evidence that any of these arrests were for violating § 7-2509.07(a)(6), rather than other criminal laws, or that they involved efforts to enforce § 7-2509.07(a)(6). There are, of course, multiple laws—federal and D.C.—that preclude individuals from carrying firearms under specified circumstances. It is unlawful, for example, "for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to possess a firearm that has traveled in interstate commerce. 18 U.S.C. § 922(g)(1). It is also unlawful for a person who engages in a violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, to carry a firearm in furtherance of that offense. 18 U.S.C. § 924(g)(2). And it is unlawful for anyone to carry a firearm in the District of Columbia without a registration certificate. D.C. Code § 7-2502.01. Yet, Plaintiffs' statistics fail to indicate whether any of the 71 arrests were for violating § 7-2509.07(a)(6). Moreover, even in case where a defendant might

---

[2] When assessing whether it has jurisdiction, the Court may consider any record materials that bear on that question. *See Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 332 (D.D.C. 2021).

have been charged with violating § 7-2509.07(a)(6), Plaintiffs fail to indicate whether the arrest at issue was prompted by a violation of § 7-2509.07(a)(6) or whether a § 7-2509.07(a)(6) charge was added only after an arrest was made. Consider, for example, an individual who starts a fist fight on the Metro while carrying a concealed firearm. One can easily imagine that the individual might face arrest for assault, *see* D.C. Code § 22-404, and that the police or prosecutors might only add a § 7-2509.07(a)(6) charge after a gun is found in course of making the arrest. In any event, Plaintiffs offer no allegations—or facts—suggesting that the WMATA police department has engaged in any coordinated efforts to enforce § 7-2509.07(a)(6) against any licensed firearm owners who have carried concealed weapons on the Metro system.

Second, even if all 71 of the arrests over the five-year period were the product of a concerted effort by the WMATA police department to enforce § 7-2509.07(a)(6), that would not show that *Plaintiffs* have been or will be targeted for enforcement. That laws are generally enforced is presumed. *See Angelo I*, 648 F. Supp. 3d at 126; *Seegars*, 396 F.3d at 1255 (explaining that, absent "prior threats" or "characteristics indicating an especially high probability of enforcement," it was not enough to show that the District "enforces its guns laws, prosecuting all violators of the statute under normal prosecutorial standards" (internal quotation marks and citation omitted)). But an average of 14.2 arrests per year (71/5), throughout the entire portion of the Metro system located in the District of Columbia, hardly suggests that Plaintiffs face a credible threat of arrest or prosecution. In short, there is "no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all." *Angelo I*, 648 F. Supp. 3d at 126.

To be sure, the question in *Angelo I* was whether Plaintiffs could make a "'clear showing,'" *id.* at 121 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), that they were "likely" to establish standing, *id.* at 119.  Here, the standard is different, since the Court must assume the truth of Plaintiffs' factual allegations and must construe the amended complaint in the light most favorable to Plaintiffs.  But the Court's decision in *Angelo I* did not rest on the heightened preliminary injunction standard; it rested on the fact that Plaintiffs had failed to allege facts sufficient to sustain their standing.  As the Court wrote: "Nowhere do Plaintiffs allege (much less show a likelihood of establishing) that they 'have been singled out or uniquely targeted by the D.C. government for prosecution,' and they point to no 'prior threats against them' and to no 'characteristics indicating an especially high probability of enforcement against them.'"  *Angelo I*, 648 F. Supp. 3d at 126 (first quoting *Parker*, 478 F.3d at 375; and then quoting *Seegars*, 396 F.3d at 1255).  Accordingly, notwithstanding the different procedural posture, the Court's analysis and conclusions in *Angelo I* apply here with equal force.

Plaintiffs resist this conclusion with two arguments.

The first is a familiar one.  Plaintiffs once again argue that *Navegar* and its progeny are inconsistent with the Supreme Court's standing precedents.  Dkt. 46 at 33–34 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  Plaintiffs made the same argument, nearly verbatim, in *Angelo I*.  *Compare id.*, *with* Dkt. 29 at 17–18.  Notably, Plaintiffs nowhere address (or even acknowledge) the Court's rejection of these identical arguments in *Angelo I*.  648 F. Supp. 3d at 126–32.  But the blunt force of repetition cannot render the binding decisions in *Navegar*, *Seegars*, and *Parker* dead letter—or any less applicable.

As this Court explained in *Angelo I*, "'[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court,' and it is the province of the D.C.

14

Circuit, and not this Court, to harmonize circuit precedent and to say when D.C. Circuit decisions should be overruled." *Id.* at 129 (quoting *Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979)). That principle, moreover, applies with "particular force" here because the D.C. Circuit has itself "reckoned with the tension between *Navegar* and the Supreme Court's First-Amendment precedents" and because "[m]ultiple judges on the D.C. Circuit have . . . called for reconsideration of *Navegar* en banc—some of them precisely on the grounds that the decision is at odds with" Supreme Court precedent. *Id.* at 130. Because the D.C. Circuit has, at least to date, declined that invitation, "[w]hatever the merits of Plaintiffs' doctrinal critiques," this Court "must, just like the D.C. Circuit, remain faithful" to the *Navegar* line of cases. *Id.*; *see also Parker*, 478 F.3d at 375 ("Nevertheless, unless and until this court en banc overrules these recent precedents, we must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*.").

Plaintiffs' attempt to adorn an old argument with an additional Supreme Court precedent—*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), *see* Dkt. 46 at 28–30—is unavailing. That case, which was decided before *Angelo I*, held that the doctrine of sovereign immunity barred petitioners' preenforcement challenge to Texas Senate Bill 8 as brought against state court judges, state court clerks, and the Texas attorney general, but not against four executive licensing officials. *Whole Woman's Health*, 595 U.S. at 37–43, 51. Although not the focus of the Court's inquiry, each of the Court's opinions touches on standing as well. But Plaintiffs overstate the holding of the Court and its application to the present circumstances. For one thing, the paragraph that Plaintiffs quote from Justice Gorsuch's opinion, comes from a portion of the opinion, Part II-C, that failed to command a majority. *See* 595 U.S. at 34, 45–48.

Even more importantly, as explained in Chief Justice Roberts and Justice Sotomayor's separate opinions—which provided Justice Gorsuch with a majority on the question of standing—the present circumstances are readily distinguishable from what was at issue in *Whole Woman's Health*. *See id*. at 59–61 (Roberts, C.J., concurring in the judgment in part and dissenting in part); *id*. at 62–63 (Sotomayor, J., concurring in the judgment in part and dissenting in part). As explained in those opinions, the law at issue was "structured to thwart [judicial] review," *id.* at 67 (Sotomayor, J.), and to "nullify th[e] [Supreme] Court's rulings" while evading review, *id.* at 61 (Roberts, C.J.). Moreover, even assuming that *Whole Woman's Health* is in some tension with the *Navegar* line of cases, Plaintiffs cannot plausibly maintain that the decisions are so irreconcilable that this Court may—and should—conclude that *Navegar* and its progeny are no longer binding precedent. If that precedent is to be discarded, it is for the D.C. Circuit or the Supreme Court, and not this Court, to do so. *See Angelo I*, 648 F. Supp. 3d at 129.

Taking a slightly different tack, Plaintiffs also cite a passage from *Whole Woman's Health* in support of their separate contention that the D.C. Circuit's distinction between First Amendment and all other constitutional challenges does not hold water. That passage, which appears in a portion of Justice Gorsuch's opinion that did garner a majority, observes as follows:

> [T]he "chilling effect" associated with a potentially unconstitutional law being "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit. Instead, this Court has always required proof of a more concrete injury and compliance with traditional rules of equitable practice. The Court has consistently applied these requirements whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right. The petitioners are not entitled to a special exemption.

595 U.S. at 50 (internal citations omitted). Plaintiffs imply a tension between the penultimate sentence, equating "the free exercise of religion, the freedom of speech, [and] the right to bear arms," and the D.C. Circuit's treatment of non-First Amendment preenforcement challenges.

Dkt. 46 at 30.  But this is the same tension that the Court addressed in *Angelo I*.  *See* 648 F. Supp. 3d at 129–30 & n.5.  And it is the same tension that the D.C. Circuit grappled with in *Seegars*.  *See* 396 F.3d at 1254; *see also id.* at 1257 (Sentelle, J., dissenting) ("I know of no hierarchy of Bill of Rights protections that dictates different standing analysis.").  As this Court previously explained: "Notwithstanding that tension, '[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court.'"  *Angelo I*, 648 F. Supp. 3d at 129 (quoting *Brewster*, 607 F.2d at 1373).

Finally, Plaintiffs assert that they "continue to believe that *New York Rifle & Pistol Ass'n v. New York*," 590 U.S. 336 (2020) (per curiam), "undermines the *Navegar* line of cases."  Dkt. 46 at 30–33.  *Angelo I* addressed and rejected this argument.  *See* 648 F. Supp. 3d at 126–28.

Plaintiffs' second argument—that *Seegars* and *Navegar* are distinguishable, and, relatedly, that the absence of an administrative remedy requires the availability of preenforcement review, Dkt. 46 at 36; Dkt. 61 at 5 n.1—was addressed and rejected in *Angelo I*.  As the Court explained, "that argument is squarely foreclosed by the D.C. Circuit's decision in *Seegars*, which made clear that 'the lack of an administrative remedy, while it increases the hardship resulting from denial of preenforcement review, still does not enable [the plaintiff] to meet the *Navegar* test.'"  *Angelo I*, 648 F. Supp. 3d at 130–31 (second alteration in original) (quoting *Seegars*, 396 F.3d at 1256).

2.    *Individual Defendants*

In addition to seeking injunctive and declaratory relief against the District of Columbia, Plaintiffs seek similar relief with respect to three government officials, who Plaintiffs sue in both their individual and official capacities: Attorney General Schwalb, MPD Chief Contee, and WMATA MPTD Chief Anzallo.  These claims fail for all of the reasons explained above—

Plaintiffs have not "demonstrated a threat of prosecution sufficiently imminent under circuit law," *Seegars*, 396 F.3d at 1256, and, therefore, lack standing to pursue prospective relief, *see id.* at 1248, 1256 (claims against D.C. mayor and U.S. attorney general); *Parker*, 478 F.3d at 370, 375 (claims against the District and its mayor).[3]

A final note: Since the close of briefing, Plaintiffs have filed eight separate notices of supplemental authority bringing to the Court's attention various standing decisions in allegedly similar cases.[4] But those decisions are of little persuasive value here—none is from this Circuit, none analyzed standing under the *Navegar* standard that governs here, and none addresses whether this Court is free to depart from that standard.

## B.    Damages

Plaintiffs also seek compensatory relief, alleging that D.C. Code § 7-2509.07(a)(6) has caused them economic injuries in the form of increased transportation costs. As explained above, Plaintiffs added these allegations to their amended complaint in an effort to establish

---

[3] Plaintiffs' claims against MTPD Chief Anzallo in his official capacity fail for the further reason that he is not subject to suit in his official capacity under § 1983. Section 1983 provides a private cause of action against any "person" who, under color of state or District of Columbia law, deprives another individual of a federal constitutional or statutory right. But "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). And "there is no question that, as an interstate compact agency created by Maryland, Virginia, and the District of Columbia, WMATA is an arm of its signatory states for Section 1983 purposes and, as a result, cannot be sued under that statute." *Tapp v. WMATA*, 306 F. Supp. 3d 383, 394 (D.D.C. 2016). Nor is there question that MTPD is "a department within WMATA and not a separate entity." *White v. WMATA*, 303 F. Supp. 3d 5, 9 (D.D.C. 2018); *see also Hawkins v. WMATA*, 311 F. Supp. 3d 94, 108 (D.D.C. 2018) (dismissing § 1983 suit against MTPD officer in his official capacity).

[4] Dkt. 48 (District of Southern Illinois); Dkt. 51 (District of Eastern Virginia); Dkt. 55 (Ninth Circuit and the District of Colorado); Dkt. 56 (District of Maryland); Dkt. 58 (Second Circuit and the District of New Mexico); Dkt. 59 (Central District of California); Dkt. 60 (Southern District of California); Dkt. 61 (Second Circuit).

standing to bring a preenforcement challenge to § 7-2509.07(a)(6).  And, as explained below, the

Court concludes that the additional allegations fail fix the problem.

1.    *The District of Columbia*

In their amended complaint, Plaintiffs allege that they have incurred increased

transportation costs because they are fearful of riding the Metro system unarmed.  Dkt. 34 at 3, 5,

7–8 (Am. Compl. ¶¶ 4–5, 11–12, 17, 28).  Each Plaintiff avers that he has, on occasion, declined

to use the Metro system "out of fear of his personal safety" because he could not lawfully "carry

his concealed firearm for personal protection."[5]  Dkt. 34 at 3, 5, 7–8 (Am. Compl. ¶¶ 6, 12, 20,

29).  Plaintiffs emphasize that their avoidance of the Metro system has "nothing to do" with a

"fear of arrest" or prosecution.  Dkt. 46 at 40.  Instead, Plaintiffs rely on a slightly less direct

chain of events, which takes the following form: (1) § 7-2509.07(a)(6) prohibits Plaintiffs from

carrying their firearms on the Metro system in an accessible manner; (2) Plaintiffs are law

abiding and, accordingly, will not carry their firearms on the Metro system absent injunctive or

declaratory relief; (3) although Plaintiffs often ride the Metro system, they have, on occasion,

declined to do so based on a concern for their personal safety; (4) had they been allowed to carry

their firearms, they would have felt safe enough to ride the Metro system on these occasions; and

(5) when they have declined to ride the Metro system based on a concern for their personal

safety, they have used alternative forms of transportation (*e.g.*, taxis or Uber), which were more

costly than riding the Metro system.  For purposes of resolving the pending motions to dismiss,

the Court accepts these allegations as true.[6]

---

[5] Plaintiffs do not allege how frequently they have foregone riding the Metro system.

[6] The Court notes, however, that Uber "prohibits everyone from carrying firearms of any kind while using the app, to the extent permitted by applicable law."  Firearms Policy, Uber,

The District Defendants argue that Plaintiffs have failed to establish causation because the additional costs that they have incurred using alternative modes of transportation are not "fairly traceable" to § 7-2509.07(a)(6). Dkt. 44-1 at 15. In their view, these additional costs are self-inflicted, risk-mitigation expenses, and Plaintiffs "cannot establish standing by incurring costs that 'are simply the product of their fear[.]'" *Id.* at 14 n.1 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)). The District Defendants, accordingly, urge the Court to hold that the costs at issue are a form of "self-inflicted harm [that is] not fairly traceable to the challenged government conduct." *Id.* at 15 (quoting *Passut v. Cardona*, 540 F. Supp. 3d 27, 41 (D.D.C. 2021)).

Plaintiffs respond that these costs were not self-inflicted, but rather constitute "wholly predicable expenses" of "coerced compliance" with § 7-2509.07(a)(6). Dkt. 46 at 40. In their view, the additional costs that they have incurred are akin to increased administrative costs that a regulated party might incur in order to comply with an allegedly unconstitutional statute. *See* Dkt. 46 at 40 (citing *Metro. Wash. Chapter, Associated Builders & Contractors v. District of Columbia*, 62 F.4th 567, 573 (D.C. Cir. 2023) (holding that contractor had standing to challenge statute's hiring and reporting requirement based on increased administrative costs of compliance)). Plaintiffs contend that the cost of using a taxi, Uber, or personal vehicle is therefore directly traceable to D.C. Code § 7-2509.07(a)(6). *See* Dkt. 46 at 43.

Although the costs at issue here differ in material respects from the costs incurred by a regulated party in complying with a challenged law, the Court need not decide whether Plaintiffs' additional transportation costs were "self-inflicted" or "voluntarily" incurred because

https://help.uber.com/riders/article/firearms-policy?nodeId=e642d54a-dbfb-4e9d-922f-69aea2dd1e67 (last visited August 9, 2024).

Plaintiffs' claims for monetary relief fail for the same reasons that their claims for injunctive and declaratory relief fail. The form of relief sought does not alter the fact that this is a preenforcement challenge to a criminal statute; that *Navegar* and its progeny require a showing that Plaintiffs face a "credible" and "imminent" of prosecution; and that Plaintiffs have failed to make the requisite showing. *Angelo I*, 648 F. Supp. 3d at 124.

The Court need look no farther than *Navegar* itself to conclude that Plaintiffs' alleged monetary losses do not alter the result. Recall that in *Navegar* two federally licensed firearms manufacturers brought suit challenging the constitutionality of a federal law that "made it unlawful for a person to 'manufacture, transfer, or possess a semiautomatic assault weapon'" or to transfer or possess "any 'large capacity ammunition feeding device.'" 103 F.3d at 997 (citing 18 U.S.C. §§ 922(v)(1), 922(w)(1)). After they were visited by Bureau of Alcohol, Tobacco, and Firearms inspection agents and informed of these prohibitions, the plaintiffs "ceased the manufacture and transfer of the outlawed weapons . . . and [ ] expressed no intention to violate the Act in the future." *Id.* In bringing suit challenging the law, the plaintiffs alleged that they suffered substantial economic losses due to the law, including a prohibition on future sales of important products and the loss of tens of thousands of dollars of existing inventory. *See*, *e.g.*, Compl. ¶ 19, *Navegar, Inc. v. United States*, 914 F. Supp. 632 (D.D.C. 1996) (No. 95-550), ECF No. 11. The district court nonetheless dismissed the action for lack of standing, *Navegar*, 914 F. Supp. at 637, and on appeal the plaintiffs, again, invoked the cost of complying with the statute to support their claim to standing. As they did in the district court, they argued that they "had to cease manufacture of their products" and had "tens of thousands of dollars worth of inventory" that they could no longer sell. Brief of Appellant at 20, *Navegar, Inc. v. United States*, 914 F. Supp. 632 (D.C. Cir. 1996) (No. 96-5088).

Notwithstanding these allegations of economic loss that was both more direct and far more substantial than the economic loss the Plaintiffs invoke here, the D.C. Circuit held that the manufacturers lacked standing to bring a preenforcement challenge to those portions of the law that did not "single[] out the [plaintiffs] as intended targets." *Navegar*, 103 F.3d at 1000. As the D.C. Circuit explained, the plaintiffs lacked standing because they failed to demonstrate that the threat of prosecution was "genuine and imminent," *id.* at 1001–02, and the fact that they had incurred—and would continue to incur—substantial financial losses had no bearing on that question. In a preenforcement challenge, like this one, a plaintiff cannot establish causation by merely invoking risk-avoidance or compliance costs; such costs are fairly traceable to the challenged law only when they are linked to a "credible threat of imminent prosecution." *Seegars*, 396 F.3d at 1254–55. The same conclusion applies here with even greater force.

Ultimately, Plaintiffs' damages claim is "a repackaged version of [Plaintiffs'] first failed theory of standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). In some circumstances, the form of relief that a plaintiff seeks can affect his or her standing to sue. A plaintiff lacks standing, for example, to bring an action seeking injunctive relief, where the alleged wrong occurred in the past and is unlikely to reoccur. *See*, *e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). But, here, the addition of a claim for damages has no bearing on Plaintiffs' standing because, as in *Navegar*, Plaintiffs contend that they have incurred losses relating to their compliance with a criminal statute but have failed to show that they face a credible and imminent threat of prosecution. If the ongoing financial losses in *Navegar* were insufficient to establish standing in the absence of a "credible" and "imminent" threat of prosecution, then Plaintiffs' asserted losses resulting from their decision, on occasion, to use

taxis or Ubers in the absence of any "credible" and "imminent" threat of prosecution cannot suffice.

Whether the *Navegar* rule is sound and consistent with other precedent is not for this Court to decide. As noted above, multiple judges on the D.C. Circuit have raised substantial questions about the rule and have called for its reconsideration by the *en banc* court. But unless and until the Court of Appeals overrules *Navegar* and its progeny, this Court remains bound to follow the rule. Applying that rule here, the Court concludes, as it did in *Angelo I*, that Plaintiffs have failed to allege facts sufficient to show that they have been, or are likely to be, singled out for prosecution and that, accordingly, Plaintiffs lack standing to bring a preenforcement challenge to § 7-2509.07(a)(6). That conclusion applies, moreover, regardless of whether Plaintiffs seek injunctive, declaratory, or monetary relief.

      2.    *Individual-Capacity Defendants*

Turning to Plaintiffs' damages claim against the individual defendants, Plaintiffs "agree that monetary damage claims against the individual dependents do not lie." Dkt. 46 at 13; *see id.* at 44 ("Defendants move to dismiss damage remedies with respect to the individual defendants Anzallo, Contee and Schwalb on various immunity theories. We agree that damage remedies do not lie with respect to the individual defendants.").

Given that Plaintiffs have abandoned these individual-capacity claims, the Court will treat the matter as conceded and will grant Defendants' respective motions to dismiss with respect to the damages claims against the individually named defendants: Attorney General Schwalb, MPD Chief Contee, and MTPD Chief Anzallo.

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss, Dkt. 42; Dkt. 44, will be granted.

A separate order will issue.

<div align="center" style="margin-left:50%">

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

</div>

Date:  August 9, 2024

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GREGORY T. ANGELO, *et al.*,

       *Plaintiffs*,

   v.

DISTRICT OF COLUMBIA, *et al.*,

       *Defendants*.

Civil Action No. 22-1878 (RDM)

<u>**ORDER**</u>

    For the reasons explained in the Court's memorandum opinion, Dkt. 62, it is hereby

**ORDERED** that this case is **DISMISSED** without prejudice for lack of jurisdiction.

    This Order constitutes a final judgment of the Court within the meaning of Rule 58(a) of

the Federal Rules of Civil Procedure.  The Clerk of Court is directed to terminate the case.

    **SO ORDERED**.

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date:  August 9, 2024