# In the United States Court of Appeals for the District of Columbia Circuit

GREGORY T. ANGELO, TYLER YZAGUIRRE,
ROBERT M. MILLER, & CAMERON M. ERICKSON

*Plaintiffs-Appellants*,

v.

DISTRICT OF COLUMBIA; PAMELA A. SMITH, WASHINGTON
METROPOLITAN POLICE DEPARTMENT CHIEF; BRIAN L.
SCHWALB, DISTRICT OF COLUMBIA ATTORNEY GENERAL; &
MICHAEL ANZALLO, WASHINGTON METROPOLITAN TRANSIT
AUTHORITY POLICE DEPARTMENT CHIEF,

*Defendants-Appellees*,

## JOINT APPENDIX

On Appeal from the United States District Court
for the District of Columbia (No. 1:22-cv-01878-RDM)

George L. Lyon, Jr.
BERGSTROM ATTORNEYS
1929 Biltmore
Street, NW
Washington, DC 20009
*gll@
bergstromattorneys.com*
(202) 669-0442 (phone)
(202) 483-9267 (fax)

Edward M. Wenger
HOLTZMAN VOGEL
BARAN TORCHINSKY &
JOSEFIAK, PLLC
2300 N Street NW
Suite 643
Washington, DC 20037
*emwenger@
holtzmanvogel.com*
(202) 737-8808 (phone)
(540) 341-8809 (fax)

Caleb Acker
HOLTZMAN VOGEL
BARAN TORCHINSKY &
JOSEFIAK, PLLC
15405 John
Marshall Highway
*cacker@
holtzmanvogel.com*
(540) 341-8808 (phone)
(540) 341-8809 (fax)

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Page

Docket Entries, Case No. 22-1878-RDM (D.D.C.) ..……….…………………….. 1

District Court Order Dismissing Amended Complaint (August 9, 2024) ………... 17

District Court Memorandum Opinion (August 9, 2024) …………….………… 18

District Court Memorandum Opinion and Order Denying Preliminary
    Injunction Reported at 648 F. Supp.3d 116 (December 28, 2022) ………… 42

Plaintiffs' Amended Complaint (February 1, 2023 ……………...…………….. 67

Declaration Under Penalty of Perjury of Gregory Angelo (April 18, 2023) …….. 117

Declaration Under Penalty of Perjury of Tyler Yzaguirre (April 17, 2023) …….. 119

Declaration Under Penalty of Perjury
    of Cameron M. Erickson (April 24, 2023) ………………………………. 122

Declaration Under Penalty of Perjury
    of Robert M. Miller, Ph.D (April 16, 2023) ……………………………... 124

Transcript of Hearing on Preliminary Injunction ………………………….. 127

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:22-cv-01878-RDM

ANGELO et al v. DISTRICT OF COLUMBIA
Assigned to: Judge Randolph D. Moss
Case in other court: USCA, 24-07127
Cause: 42:1983 Civil Rights Act

Date Filed: 06/30/2022
Date Terminated: 08/09/2024
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**
**GREGORY T. ANGELO**

represented by **Dennis Polio**
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, NW
Suite 643a
Washington, DC 20037
202-737-8808
Email: dwpolio@holtzmanvogel.com
*TERMINATED: 10/06/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward M. Wenger**
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
2300 N Street, NW
Suite 643a
Washington, DC 20037
202-737-8808
Email: emwenger@holtzmanvogel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George L. Lyon , Jr.**
BERGSTROM ATTORNEYS
1929 Biltmore Street, NW
Washington, DC 20009
202-669-0442
Fax: 202-483-9267
Email: gll@bergstromattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**TYLER YZAGUIRRE**

represented by **Dennis Polio**
(See above for address)
*TERMINATED: 10/06/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

001

**Edward M. Wenger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George L. Lyon , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ROBERT M. MILLER**        represented by   **Dennis Polio**
(See above for address)
*TERMINATED: 10/06/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward M. Wenger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George L. Lyon , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CAMERON M. ERICKSON**        represented by   **Dennis Polio**
(See above for address)
*TERMINATED: 10/06/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Edward M. Wenger**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George L. Lyon , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DISTRICT OF COLUMBIA**        represented by   **Andrew J. Saindon**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
400 Sixth Street, NW
Suite 10100

002

Washington, DC 20001-2703
202-724-6643
Email: andy.saindon@dc.gov
*TERMINATED: 07/28/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
Civil Litigation Division, Equity Section
400 Sixth Street, NW
Suite 10100
Washington, DC 20001
202-805-7512
Email: richard.sobiecki@dc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helen Marie Rave**
OFFICE OF THE ATTORNEY GENERAL
District of Columbia
400 Sixth Street NW
District of Columbia, DC 20001
(202) 735-7520
Fax: (202) 741-0665
Email: helen.rave@dc.gov
*ATTORNEY TO BE NOTICED*

**Mateya Beth Kelley**
OFFICE OF THE ATTORNEY GENERAL
FOR THE DISTRICT OF COLUMBIA
400 Sixth Street, NW
Suite 10100
Washington, DC 20001-2703
202-724-7854
Email: Mateya.Kelley@dc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**
**ROBERT J. CONTEE, III**
*Chief*

represented by **Andrew J. Saindon**
(See above for address)
*TERMINATED: 07/28/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard P. Sobiecki**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helen Marie Rave**
(See above for address)
*ATTORNEY TO BE NOTICED*

003

**Mateya Beth Kelley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**BRIAN SCHWALB**               represented by  **Andrew J. Saindon**
*Attorney General*                       (See above for address)
*TERMINATED: 07/28/2023*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Helen Marie Rave**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL L. ANZALLO**       represented by  **Janice Lynn Cole**
*Chief*                               WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY
Office of General Counsel 7E
P.O. Box 44390
Washington, DC 20026
202-962-2543
Fax: 202-962-2550
Email: jlcole@wmata.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Interested Party**

**UNITED STATES OF AMERICA**     represented by  **Michael Leon Drezner**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Room 12210
Washington, DC 20005
(202) 514-4505
Fax: (202) 616-8470
Email: Michael.L.Drezner@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**EVERYTOWN FOR GUN SAFETY**    represented by  **Alison C. Barnes**
3938 Livingston Street NW
Washington, DC 20015
202-422-6874
Email: abarnes@everytown.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**BRADY**            represented by    **Jonathan Lee Diesenhaus**
HOGAN LOVELLS US LLP
555 13th St, NW
Washington, DC 20004
(202) 637-5416
Fax: (202) 637-5910
Email:
jonathan.diesenhaus@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**TEAM ENOUGH**        represented by    **Jonathan Lee Diesenhaus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**GIFFORDS LAW CENTER TO**
**PREVENT GUN VIOLENCE**      represented by    **Jonathan Lee Diesenhaus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MARCH FOR OUR LIVES ACTION**
**FUND**            represented by    **Jonathan Lee Diesenhaus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF ILLINOIS**       represented by    **Kathryn Hunt Muse**
ILLINOIS ATTORNEY GENERAL'S
OFFICE
115 S. LaSalle Street
31st Floor
Chicago, IL 60603
312-814-3000
Fax: 312-814-5024
Email: Kathryn.Muse@ilag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF CALIFORNIA**      represented by    **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF COLORADO**      represented by    **Kathryn Hunt Muse**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF CONNECTICUT**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF DELAWARE**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF HAWAII**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF MARYLAND**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF MASSACHUSETTS**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF MINNESOTA**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEW JERSEY**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NEW YORK**      represented by   **Kathryn Hunt Muse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF NORTH CAROLINA**            represented by **Kathryn Hunt Muse**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STATE OF OREGON**                    represented by **Kathryn Hunt Muse**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STATE OF RHODE ISLAND**              represented by **Kathryn Hunt Muse**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**STATE OF WASHINGTON**                represented by **Kathryn Hunt Muse**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

<u>Amicus</u>
**SECOND AMENDMENT**                   represented by **Adam J. Kraut**
**FOUNDATION**                                       SECOND AMENDMENT FOUNDATION
                                                     12500 N.E. Tenth Place
                                                     Bellevue, WA 98005
                                                     800-426-4302
                                                     Email: akraut@saf.org
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/30/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ADCDC-9340588) filed by CAMERON M ERICKSON, GREGORY T ANGELO, ROBERT M MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Summons Bowser, # 3 Summons Summons OAG, # 4 Summons Summons Contee)(Lyon, George) (Entered: 06/30/2022) |
| 07/01/2022 | | Case Assigned to Judge Randolph D. Moss. (zsb) (Entered: 07/05/2022) |
| 07/06/2022 | 2 | STANDING ORDER: The parties are hereby ORDERED to comply with the directives set forth in the attached Standing Order. See document for details. Signed by Judge Randolph D. Moss on 07/16/2022. (lcrdm3) (Entered: 07/06/2022) |
| 07/07/2022 | 3 | SUMMONS (3) Issued Electronically as to All Defendants, District of Columbia Attorney General, and the District of Columbia Mayor. (Attachment: # 1 Notice and Consent)(zsb) (Entered: 07/07/2022) |
| 07/07/2022 | 4 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia |

| | | |
|---|---|---|
| | | Attorney General 7/7/2022. Answer due for ALL D.C. DEFENDANTS by 7/28/2022. (Lyon, George) (Entered: 07/07/2022) |
| 07/08/2022 | 5 | NOTICE of Appearance by Andrew J. Saindon on behalf of All Defendants (Saindon, Andrew) (Entered: 07/08/2022) |
| 07/11/2022 | 6 | MOTION for Permanent Injunction by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Memorandum in Support Memorandum in Support of Application for Preliminary Injunction, # 2 Exhibit Angelo Declaration, # 3 Exhibit Tyler Declaration, # 4 Exhibit Miller Declaration, # 5 Exhibit Erickson Declaration, # 6 Text of Proposed Order Proposed Order)(Lyon, George) (Entered: 07/11/2022) |
| 07/11/2022 | | MINUTE ORDER: In light of Plaintiffs' motion for a permanent injunction, Dkt. 6 , the parties are hereby ORDERED to appear by video before Judge Randolph D. Moss for a scheduling conference at 4:00 p.m. on July 14, 2022. Signed by Judge Randolph D. Moss on 7/11/2022. (lcrdm1) (Entered: 07/11/2022) |
| 07/12/2022 | 7 | NOTICE of Appearance by Mateya Beth Kelley on behalf of All Defendants (Kelley, Mateya) (Entered: 07/12/2022) |
| 07/12/2022 | 8 | NOTICE of Appearance by Helen Marie Rave on behalf of All Defendants (Rave, Helen) (Entered: 07/12/2022) |
| 07/13/2022 | 9 | NOTICE of Appearance by Richard P. Sobiecki on behalf of All Defendants (Sobiecki, Richard) (Entered: 07/13/2022) |
| 07/13/2022 | 10 | First MOTION for Extension of Time to *Oppose Application for Prelim. Inj.* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order) (Kelley, Mateya) (Entered: 07/13/2022) |
| 07/14/2022 | 11 | Memorandum in opposition to re 10 First MOTION for Extension of Time to *Oppose Application for Prelim. Inj.* filed by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 07/14/2022) |
| 07/14/2022 | 12 | MOTION to Expedite *Discovery* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit Exhibit A - Proposed Interrogatories)(Rave, Helen) (Entered: 07/14/2022) |
| 07/14/2022 | 13 | REPLY to opposition to motion re 10 First MOTION for Extension of Time to *Oppose Application for Prelim. Inj.* filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Sobiecki, Richard) (Entered: 07/14/2022) |
| 07/14/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Video (Zoom) Scheduling Conference held on 7/14/2022. Plaintiffs' Response to Defendant's 12 Motion to Expedite Discovery is due by 7/19/2022; Any reply by Defendant is due by 7/21/2022. Defendant's obligation to answer the complaint is STAYED. (Court Reporter: Nancy Meyer.) (kt) (Entered: 07/14/2022) |
| 07/15/2022 | | MINUTE ORDER: Plaintiffs have filed a motion for preliminary injunction in this case. *See* Dkt. 6 . Under Local Rule 65.1(c), Defendants' response to the motion for preliminary injunction is currently due on July 18, 2022. Defendant has filed a motion for a 90-day extension of time to respond to Plaintiffs' motion for preliminary injunction. *See* Dkt. 10 . Plaintiffs consent to a 30-day extension conditioned on the Court granting Plaintiffs 30 days to reply to Defendants' response. *See* Dkt. 11 . The Court concludes that in light of the need to ensure that the record in this case is properly developed, a 60-day extension of time is appropriate. It is hereby ORDERED that Defendants' Partial Consent Motion for Extension of Time, Dkt. 10 , is GRANTED IN PART and DENIED IN PART. It is further |

ORDERED that Defendants shall file their response to Plaintiffs' motion for preliminary injunction on or before September 16, 2022 and that Plaintiffs shall file any reply on or before October 17, 2022. It is further ORDERED that if any party plans to seek an evidentiary hearing on the motion for preliminary injunction, that party shall file a motion requesting such a hearing on or before July 29, 2022.

Defendants have further requested, without objection, that the Court hold Defendants' deadline to respond to Plaintiffs' complaint in abeyance. As stated on the record, the Court has STAYED Defendants' obligation to answer the complaint. It is hereby ORDERED that Defendants file an answer or other responsive pleading within 14 days of the Court's resolution of Plaintiffs' motion for preliminary injunction.

The Court further notes that to the extent that Plaintiffs ask the Court to consolidate their motion for a preliminary injunction with resolution of the case on the merits, they must prove "actual success" on the merits, rather than likelihood of success on the merits, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 32 (2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987)), and, unless the Court advances the trial on the merits to occur contemporaneously with any hearing on Plaintiffs' motion, they must demonstrate that they are entitled to summary judgment. Accordingly, it is hereby ORDERED that Plaintiffs shall supplement their motion with the materials required under Fed. R. Civ. P. 56 on or before July 22, 2022, including a statement of material facts not in dispute (citing to particular portions of the record) and any supporting evidentiary material. Defendants, in turn, will be required to respond to that portion of Plaintiffs' motion in a manner consistent with Fed. R. Civ. P. 56, including by filing a statement of material facts that are in dispute (citing to any conflicting materials in the record or to the absence of admissible evidence), and any supporting evidentiary material. Defendants may also, if appropriate, seek to defer consideration of that portion of Plaintiffs' motion in the manner prescribed by Fed. R. Civ. P. 56(d), which requires the opposing parties to submit an affidavit or declaration that explains, in detail, why they cannot at this early stage of the litigation present facts essential to justify their opposition to Plaintiffs' motion for summary judgment.

Signed by Judge Randolph D. Moss on 07/15/2022. (lcrdm3) (Entered: 07/15/2022)

| 07/18/2022 | 14 | Memorandum in opposition to re 12 MOTION to Expedite *Discovery* filed by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 07/18/2022) |
| --- | --- | --- |
| 07/21/2022 | 15 | REPLY to opposition to motion re 12 MOTION to Expedite *Discovery* filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Saindon, Andrew) (Entered: 07/21/2022) |
| 07/21/2022 | | MINUTE ORDER: Upon consideration of Defendants' motion to expedite limited discovery, Dkt. 12 , it is hereby ORDERED that the motion is GRANTED. In considering such requests for expedited discovery, this Court "considers the reasonableness of the request in light of all of the surrounding circumstances," including "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014) (quotation marks omitted). Ultimately, however, these factors "are only guidelines for the exercise of the Court's discretion." *Id.*

In this instance, Plaintiffs have failed to identify any substantial burden that they would face in answering the narrowly targeted interrogatories that Defendants seek to propound. Furthermore, the prompt and efficient resolution of Plaintiffs' pending motion for a |

009

| | | |
|---|---|---|
| | | preliminary and permanent injunction, Dkt. 6 , will be furthered by ensuring that the record is complete. Therefore, it is ORDERED that Plaintiffs shall respond to the interrogatories in Defendants' motion, Dkt. 12 , on or before August 4, 2022. Signed by Judge Randolph D. Moss on 07/21/2022. (lcrdm3) (Entered: 07/21/2022) |
| 07/22/2022 | 16 | SUPPLEMENTAL MEMORANDUM to re 6 MOTION for Permanent Injunction *Rule 56 Statement of undisputed facts* filed by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Lyon, George) (Entered: 07/22/2022) |
| 09/13/2022 | 17 | NOTICE *of Potential Participation* by UNITED STATES OF AMERICA (Drezner, Michael) (Entered: 09/13/2022) |
| 09/14/2022 | | NOTICE OF ERROR re 17 Notice (Other); emailed to Michael.L.Drezner@usdoj.gov, cc'd 11 associated attorneys -- The PDF file you docketed contained errors: 1. **Please note the following for future filings; do not refile document**, 2. DO NOT REFILE. Counsel is reminded that log in and password should match signature page. (zjm, ) (Entered: 09/14/2022) |
| 09/16/2022 | 18 | Memorandum in opposition to re 6 Motion for Permanent Injunction, filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts, # 3 Exhibit List in Support of Opposition, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Exhibit P, # 20 Exhibit Q, # 21 Exhibit R, # 22 Exhibit S, # 23 Exhibit T, # 24 Exhibit U, # 25 Exhibit V, # 26 Exhibit W, # 27 Exhibit X, # 28 Exhibit Y, # 29 Exhibit Z, # 30 Exhibit AA, # 31 Exhibit BB, # 32 Exhibit CC, # 33 Exhibit DD, # 34 Exhibit EE, # 35 Exhibit FF)(Rave, Helen) (Entered: 09/16/2022) |
| 09/23/2022 | 19 | MOTION for Leave to File *Amicus Brief in Support of Defendants' Opposition to Plaintiffs' Application for Preliminary Injunction and Motion for Summary Judgment* by EVERYTOWN FOR GUN SAFETY. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Barnes, Alison) (Entered: 09/23/2022) |
| 09/23/2022 | 20 | MOTION for Leave to File *Amicus Brief in Support of Defendants by the States of Illinois, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Minnesota, New Jersey, New York, North Carolina, Oregon, Rhode Island, and Washington* by State of Illinois. (Attachments: # 1 Multistate Amicus Brief from 15 States)(Muse, Kathryn) (Entered: 09/23/2022) |
| 09/23/2022 | 21 | MOTION for Leave to File *Amicus Brief in Support of Defendants* by BRADY, TEAM ENOUGH, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES ACTION FUND. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Proposed Amicus Brief)(Diesenhaus, Jonathan) (Entered: 09/23/2022) |
| 09/23/2022 | | MINUTE ORDER: Upon consideration of the unopposed motion for leave to file amicus brief, Dkt. 19 , it is hereby ORDERED that the motion is GRANTED, and the amicus brief, Dkt. [19-1], is deemed FILED. Signed by Judge Randolph D. Moss on 09/23/2022. (lcrdm3) (Entered: 09/23/2022) |
| 09/23/2022 | | MINUTE ORDER: Upon consideration of the unopposed motion for leave to file amicus brief, Dkt. 20 , it is hereby ORDERED that the motion is GRANTED, and the amicus brief, Dkt. [20-1], is deemed FILED. Signed by Judge Randolph D. Moss on 09/23/2022. (lcrdm3) (Entered: 09/23/2022) |
| 09/23/2022 | | MINUTE ORDER: Upon consideration of the unopposed motion for leave to file amicus brief, Dkt. 21 , it is hereby ORDERED that the motion is GRANTED, and the amicus |

| | | brief, Dkt. [21-2], is deemed FILED. Signed by Judge Randolph D. Moss on 09/23/2022. (lcrdm3) (Entered: 09/23/2022) |
|---|---|---|
| 09/23/2022 | 23 | AMICUS BRIEF by EVERYTOWN FOR GUN SAFETY. (zjm) (Entered: 09/26/2022) |
| 09/23/2022 | 24 | AMICUS BRIEF by STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF MASSACHUSETTS, STATE OF MINNESOTA, STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF NORTH CAROLINA, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF WASHINGTON. (zjm) (Entered: 09/26/2022) |
| 09/23/2022 | 25 | AMICUS BRIEF by BRADY, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, MARCH FOR OUR LIVES ACTION FUND, TEAM ENOUGH. (zjm) (Entered: 09/26/2022) |
| 09/26/2022 | 22 | MOTION for Extension of Time to File Response/Reply *to Opposition to Application for Preliminary Injunction* by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 09/26/2022) |
| 09/26/2022 | | MINUTE ORDER: Upon consideration of Plaintiffs' motion for extension of time, Dkt. 22, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Plaintiffs shall file any reply to Defendant's opposition on or before October 31, 2022. Signed by Judge Randolph D. Moss on 09/26/2022. (lcrdm3) (Entered: 09/26/2022) |
| 09/30/2022 | 26 | NOTICE of Appearance by Michael Leon Drezner on behalf of UNITED STATES OF AMERICA (Drezner, Michael) (Entered: 09/30/2022) |
| 09/30/2022 | 27 | MEMORANDUM by UNITED STATES OF AMERICA. (Drezner, Michael) (Entered: 09/30/2022) |
| 10/05/2022 | 28 | Consent MOTION for Leave to File Excess Pages *for reply to opposition to application for preliminary injunction* by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Memorandum in Support Memorandum in Support, # 2 Text of Proposed Order Proposed Order)(Lyon, George) (Entered: 10/05/2022) |
| 10/07/2022 | | MINUTE ORDER: Upon consideration of Plaintiff's consent motion for leave to file excess pages, Dkt. 28, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that the page limit for Plaintiffs' reply is hereby increased to 45 pages. Signed by Judge Randolph D. Moss on 10/7/2022. (lcrdm3) (Entered: 10/07/2022) |
| 10/13/2022 | | MINUTE ORDER: Upon consideration of the Plaintiffs' motion for a preliminary injunction, Dkt. 6, it is hereby ORDERED that the parties shall appear for a motions hearing in this matter on December 12, 2022, at 2:00 p.m., in Courtroom 8. Signed by Judge Randolph D. Moss on 10/13/2022. (lcrdm3) (Entered: 10/13/2022) |
| 10/30/2022 | 29 | REPLY to opposition to motion re 6 MOTION for Permanent Injunction filed by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Exhibit 1 Antonyuk v. Hochul, # 2 Exhibit 2 Hardaway v. Nigrelli, # 3 Exhibit 3 Young, Mass Transit History, # 4 Exhibit 4 Standford, Railroad History, # 5 Exhibit 5 Chitty/Blackstone, # 6 Exhibit 6 Weingarten, Gun on Street Car, # 7 Exhibit 7 PBS, Buffalo Wars, # 8 Exhibit 8 Lynn, Woman Assaulted on Metrobus, # 9 Exhibit 9 Gerstein, US v. Caston, # 10 Exhibit 10 Briley Declaration, # 11 Exhibit 11 Spears Declaration)(Lyon, George) Modified on 10/31/2022 to correct docket link/ text (zjm). (Entered: 10/30/2022) |

| 11/02/2022 | 30 | Unopposed MOTION for Leave to File *AMICUS BRIEF IN SUPPORT OF PLAINTIFFS APPLICATION FOR PRELIMINARY INJUNCTION AND MOTION FOR SUMMARY JUDGMENT* by SECOND AMENDMENT FOUNDATION. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order, # 3 Certificate of Service)(Kraut, Adam) (Entered: 11/02/2022) |
|---|---|---|
| 11/02/2022 | | MINUTE ORDER: Upon consideration of the unopposed motion for leave to file amicus brief, Dkt. 30 , it is hereby ORDERED that the motion is GRANTED, and the amicus brief, Dkt. [30-1], is deemed FILED. Signed by Judge Randolph D. Moss on 11/2/2022. (lcrdm3) (Entered: 11/02/2022) |
| 11/02/2022 | 31 | AMICUS BRIEF by SECOND AMENDMENT FOUNDATION. (zjm) (Entered: 11/03/2022) |
| 11/21/2022 | | MINUTE ORDER: The parties' briefing on Plaintiffs' motion for preliminary injunction, Dkt. 6 , raises a substantial question about whether Plaintiffs have standing to bring this challenge in light of the D.C. Circuit's decisions in *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) and *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005). The motion hearing scheduled in this matter for December 12, 2022, at 2:00 p.m. will, accordingly, focus on the threshold jurisdictional question of standing, including whether Plaintiffs have shown a likelihood of success with respect to standing and whether the Court should dismiss the action for lack of jurisdiction. If necessary, the Court will schedule a further hearing to address whether Plaintiffs have shown that they are likely to succeed on the merits of their constitutional challenge and, if so, whether they are entitled to preliminary relief. Signed by Judge Randolph D. Moss on 11/21/2022. (lcrdm3) (Entered: 11/21/2022) |
| 12/12/2022 | | Minute Entry for proceedings held before Judge Randolph D. Moss: Motion Hearing held on 12/12/2022 re: 6 MOTION for Preliminary Injunction filed by TYLER YZAGUIRRE, CAMERON M. ERICKSON, ROBERT M. MILLER, GREGORY T. ANGELO. Matter taken UNDER ADVISEMENT. (Court Reporter: Jeff Hook.) (kt) (Entered: 12/12/2022) |
| 12/28/2022 | 32 | MEMORANDUM OPINION AND ORDER: For the reasons stated herein, it is hereby ORDERED that Plaintiffs' motion for preliminary and permanent injunctive relief, Dkt. 6 , is DENIED. See document for details. Signed by Judge Randolph D. Moss on 12/28/2022. (lcrdm3) (Entered: 12/28/2022) |
| 01/11/2023 | 33 | Consent MOTION for Scheduling Order by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 01/11/2023) |
| 01/11/2023 | | MINUTE ORDER: Upon consideration of Plaintiffs' consent motion for scheduling order, Dkt. 33 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that (1) Plaintiffs shall file any amended complaint on or before February 1, 2023; and (2) Defendants shall respond to Plaintiffs' existing or amended complaint on or before March 3, 2023. It is further ORDERED that, should Plaintiffs renew their motion for a preliminary injunction, Defendants shall respond to such motion within 60 days of filing, and Plaintiffs shall file a reply, if any, within 30 days of Defendants' response. Signed by Judge Randolph D. Moss on 1/11/2023. (lcrdm3) (Entered: 01/11/2023) |
| 02/01/2023 | 34 | AMENDED COMPLAINT *First* against All Defendants filed by TYLER YZAGUIRRE, GREGORY T. ANGELO, ROBERT M. MILLER, CAMERON M. ERICKSON. (Attachments: # 1 Summons Request for summons Brian Schwalb, # 2 Summons Request for summons Michael Anzallo)(Lyon, George) (Entered: 02/01/2023) |
| 02/02/2023 | 35 | SUMMONS (2) Issued Electronically as to MICHAEL L. ANZALLO, BRIAN SCHWALB. (Attachment: # 1 Notice and Consent)(zjm) (Entered: 02/02/2023) |

| 02/02/2023 | 36 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the District of Columbia Attorney General. Date of Service Upon District of Columbia Attorney General 2/2/2023. Answer due for ALL D.C. DEFENDANTS by 2/23/2023. (Lyon, George) (Entered: 02/02/2023) |
|---|---|---|
| 02/06/2023 | 37 | NOTICE of Appearance by Helen Marie Rave on behalf of BRIAN SCHWALB (Rave, Helen) (Entered: 02/06/2023) |
| 02/06/2023 | 38 | Consent MOTION for Extension of Time to File Response/Reply *to Plaintiffs' First Amended Complaint* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA, BRIAN SCHWALB. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order) (Rave, Helen) (Entered: 02/06/2023) |
| 02/07/2023 | | MINUTE ORDER: Upon consideration of Defendants' consent motion for extension of time, Dkt. 38 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Defendants District of Columbia, Chief Robert J. Contee III, and Attorney General Brian L. Schwalb shall respond to Plaintiffs' amended complaint on or before March 3, 2023. Signed by Judge Randolph D. Moss on 2/7/2023. (lcrdm3) (Entered: 02/07/2023) |
| 02/08/2023 | 39 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MICHAEL L. ANZALLO served on 2/8/2023, answer due 3/3/2023 (Lyon, George) (Entered: 02/08/2023) |
| 02/28/2023 | 40 | TRANSCRIPT OF MOTION HEARING before Judge Randolph D. Moss held on December 12, 2022. Page Numbers: 1 - 38. Date of Issuance: February 28, 2023. Court Reporter: Jeff Hook. Telephone number: 202-354-3373. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/21/2023. Redacted Transcript Deadline set for 3/31/2023. Release of Transcript Restriction set for 5/29/2023.(Hook, Jeff) (Entered: 02/28/2023) |
| 03/01/2023 | 41 | Consent MOTION to Modify *Briefing Schedule* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA, BRIAN SCHWALB. (Attachments: # 1 Text of Proposed Order) (Saindon, Andrew) (Entered: 03/01/2023) |
| 03/01/2023 | 42 | MOTION to Dismiss by MICHAEL L. ANZALLO. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Cole, Janice) (Entered: 03/01/2023) |
| 03/01/2023 | | MINUTE ORDER: Upon consideration of Defendants' consent motion to modify briefing schedule, Dkt. 41 , it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that: (1) Defendants shall file their dispositive motion on or before March 10, 2023; and (2) Plaintiffs shall file their response on or before April 14, 2023. Signed by Judge Randolph D. Moss on 3/1/2023. (lcrdm3) (Entered: 03/01/2023) |
| 03/02/2023 | 43 | Consent MOTION for Extension of Time to *Consolidate Motion to Dismiss Response Dates and Memorandum in Support Thereof* by GREGORY T. ANGELO, CAMERON M. |

| | | ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 03/02/2023) |
|---|---|---|
| 03/02/2023 | | MINUTE ORDER: Upon consideration of Plaintiffs' consent motion to consolidate the response dates for all motions to dismiss, Dkt. 43, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Plaintiffs shall respond to all motions to dismiss on or before April 14, 2023. Signed by Judge Randolph D. Moss on 3/2/2023. (lcrdm3) (Entered: 03/02/2023) |
| 03/10/2023 | 44 | MOTION to Dismiss *First Amended Complaint* by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA, BRIAN SCHWALB. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Rave, Helen) (Entered: 03/10/2023) |
| 03/20/2023 | 45 | Consent MOTION for Extension of Time to File Response/Reply *to Motions to Dismiss* by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 03/20/2023) |
| 03/22/2023 | | MINUTE ORDER: Upon consideration of Plaintiffs' consent motion for extension of time, Dkt. 45, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Plaintiffs shall respond to the pending motions to dismiss on or before April 24, 2023. Signed by Judge Randolph D. Moss on 3/22/2023. (lcrdm3) (Entered: 03/22/2023) |
| 04/24/2023 | 46 | Memorandum in opposition to re 44 Motion to Dismiss, 42 Motion to Dismiss filed by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. (Attachments: # 1 Exhibit Declaration of Gregory T. Angelo, # 2 Exhibit Declaration of Tyler Yzaguirre, # 3 Exhibit Declaration of Cameron M. Erickson, # 4 Exhibit Declaration of Robert M. Miller, Ph.D., # 5 Text of Proposed Order Proposed order)(Lyon, George) (Entered: 04/24/2023) |
| 04/25/2023 | 47 | Consent MOTION for Extension of Time to File Response/Reply by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA, BRIAN SCHWALB. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Rave, Helen) (Entered: 04/25/2023) |
| 04/26/2023 | | MINUTE ORDER: Upon consideration of Defendants' consent motion for extension of time, Dkt. 47, it is hereby ORDERED that the motion is GRANTED. It is further ORDERED that Defendants shall file their reply in support of their motion to dismiss on or before May 12, 2023. Signed by Judge Randolph D. Moss on 4/26/2023. (lcrdm3) (Entered: 04/26/2023) |
| 04/30/2023 | 48 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit Barnett v. Raoul)(Lyon, George) (Entered: 04/30/2023) |
| 05/12/2023 | 49 | REPLY to opposition to motion re 42 MOTION to Dismiss filed by MICHAEL L. ANZALLO. (Cole, Janice) (Entered: 05/12/2023) |
| 05/12/2023 | 50 | REPLY to opposition to motion re 44 MOTION to Dismiss *First Amended Complaint* filed by ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA, BRIAN SCHWALB. (Rave, Helen) (Entered: 05/12/2023) |
| 05/13/2023 | 51 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit Fraser v. ATF)(Lyon, George) (Entered: 05/13/2023) |
| 05/16/2023 | 52 | NOTICE of Appearance by Edward M. Wenger on behalf of GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Wenger, Edward) (Entered: 05/16/2023) |

| 05/26/2023 | 53 | NOTICE of Appearance by Dennis Polio on behalf of All Plaintiffs (Polio, Dennis) (Entered: 05/26/2023) |
|---|---|---|
| 07/28/2023 | 54 | NOTICE OF WITHDRAWAL OF APPEARANCE as to MICHAEL L. ANZALLO, ROBERT J. CONTEE, III, DISTRICT OF COLUMBIA, BRIAN SCHWALB. Attorney Andrew J. Saindon terminated. (Saindon, Andrew) (Entered: 07/28/2023) |
| 08/10/2023 | 55 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit Exhibit 1,, Teter v. Lopez, # 2 Exhibit Exhibit 2, Rocky Mountain Gun Owners v. Polis) (Lyon, George) (Entered: 08/10/2023) |
| 10/05/2023 | 56 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit Kipke v. Moore)(Lyon, George) (Entered: 10/05/2023) |
| 10/06/2023 | 57 | NOTICE OF WITHDRAWAL OF APPEARANCE as to GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. Attorney Dennis Polio terminated. (Polio, Dennis) (Entered: 10/06/2023) |
| 12/11/2023 | 58 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit Exhibit 1, Antonyuk opinion, # 2 Exhibit Exhibit 2, Springer opinion)(Lyon, George) (Entered: 12/11/2023) |
| 02/22/2024 | 59 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit May v. Bonta District Court Opinion)(Lyon, George) (Entered: 02/22/2024) |
| 02/29/2024 | 60 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit Fouts v. Bonta)(Lyon, George) (Entered: 02/29/2024) |
| 04/09/2024 | 61 | NOTICE OF SUPPLEMENTAL AUTHORITY by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE (Attachments: # 1 Exhibit Nastri v. Dykes)(Lyon, George) (Entered: 04/09/2024) |
| 08/09/2024 | 62 | MEMORANDUM OPINION: For the reasons explained herein, Defendants' motions to dismiss, Dkt 42 ; Dkt. 44 are hereby GRANTED. The Court will, accordingly, DISMISS the action without prejudice. See document for details. A separate order will issue. Signed by Judge Randolph D. Moss on 8/9/2024. (lcrdm3) (Entered: 08/09/2024) |
| 08/09/2024 | 63 | ORDER: For the reasons explained in the Court's memorandum opinion, Dkt. 62 , it is hereby ORDERED that this case is DISMISSED without prejudice. The Clerk of Court is directed to terminate the case. See document for details. Signed by Judge Randolph D. Moss on 8/9/2024. (lcrdm3) (Entered: 08/09/2024) |
| 09/03/2024 | 64 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 63 Order, 62 Order on Motion to Dismiss,,, by GREGORY T. ANGELO, CAMERON M. ERICKSON, ROBERT M. MILLER, TYLER YZAGUIRRE. Filing fee $ 605, receipt number ADCDC-11132129. Fee Status: Fee Paid. Parties have been notified. (Wenger, Edward) (Entered: 09/03/2024) |
| 09/04/2024 | 65 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 64 Notice of Appeal to DC Circuit Court,. (znmw) (Entered: 09/04/2024) |

| 09/10/2024 | USCA Case Number 24-7127 for 64 Notice of Appeal to DC Circuit Court, filed by TYLER YZAGUIRRE, CAMERON M. ERICKSON, ROBERT M. MILLER, GREGORY T. ANGELO. (mg) (Entered: 09/11/2024) |
|---|---|

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/17/2024 11:52:57 | | |
| **PACER Login:** | bleitch7932 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-01878-RDM |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GREGORY T. ANGELO, *et al.*,

               *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA, *et al.*,

               *Defendants*.

Civil Action No. 22-1878 (RDM)

## ORDER

For the reasons explained in the Court's memorandum opinion, Dkt. 62, it is hereby

**ORDERED** that this case is **DISMISSED** without prejudice for lack of jurisdiction.

This Order constitutes a final judgment of the Court within the meaning of Rule 58(a) of the Federal Rules of Civil Procedure.  The Clerk of Court is directed to terminate the case.

**SO ORDERED**.

                /s/ Randolph D. Moss
                RANDOLPH D. MOSS
                United States District Judge

Date:  August 9, 2024

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

GREGORY T. ANGELO, *et al.*,

        *Plaintiffs*,

    v.

DISTRICT OF COLUMBIA, *et al.*,

        *Defendants.*

Civil Action No. 22-1878 (RDM)

---

## <u>MEMORANDUM OPINION</u>

District of Columbia law prohibits the carrying of firearms on public transportation, *see* D.C. Code § 7-2509.07(a)(6), unless the firearm is unloaded and secured in a locked container, *see* D.C. Code §§ 22-4504.01, 22-4504.02.  Plaintiffs, four D.C.-area residents who hold concealed-carry licenses and use public transportation in the District of Columbia, bring this action challenging the constitutionality of § 7 2509.07(a)(6) under the Second Amendment and the Fifth Amendment's Due Process Clause.  They allege, in short, that they have a constitutional right to carry concealed firearms for personal protection within the District of Columbia and that, but for § 7-2509.07(a)(6), they would do so while riding the Washington Metropolitan Area Transit Authority ("WMATA") owned and operated Metrorail and Metrobus system (collectively, "Metro system").  They further allege that they have on occasion opted to use other, more expensive modes of transportation, rather than risk riding the Metro system unarmed. They seek injunctive relief, declaratory relief, and compensatory damages.

Because Plaintiffs have failed to allege facts sufficient to support their standing to bring this preenforcement suit, the Court will **DISMISS** the amended complaint, without prejudice, for lack of Article III jurisdiction.

# I. BACKGROUND

The Court has previously described the background of this case in detail, *see Angelo v. District of Columbia*, 648 F. Supp. 3d 116, 119–21 (D.D.C. 2022) ("*Angelo I*"), and, thus, for present purposes will highlight only those aspects of the background that bear on the pending motions to dismiss.  At this early stage of the proceeding, the Court "accept[s] as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Plaintiffs Gregory T. Angelo, Tyler Yzaguirre, and Cameron M. Erickson are residents of the District of Columbia.  Dkt. 34 at 2, 4, 8 (Am. Compl. ¶¶ 2, 9, 26).  Plaintiff Robert M. Miller is a resident of Virginia.  *Id.* at 5 (Am. Compl. ¶ 15).  All four Plaintiffs "hold[] a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department" and are "regular rider[s] of the" Metro system.  Dkt. 34 at 2–4, 6, 8 (Am. Compl. ¶¶ 3, 10, 16, 27).  All four Plaintiffs also are "loath to break the law," *id.* at 2, 4, 5, 8 (Am. Compl. ¶¶ 2, 9, 15, 26), and so they do not carry concealed firearms on D.C. public transport even though it would make them feel "more comfortable" or "better protected" to do so, *id.* at 3, 5, 7, 8–9 (Am. Compl. ¶¶ 6, 12, 20, 29).[1]  And all four have, on occasion, opted not to use "the Metro system out of fear of [their] personal safety because [they] could not within the law carry [their] concealed firearm[s] for personal protection," and have, instead, used more expensive modes of transportation.  *Id.* at 3 (Am. Compl. ¶ 6); *see also id.* at 5, 7–9 (Am. Compl. ¶¶ 12, 20, 29).

Plaintiffs acknowledge that because D.C. law permits a licensed owner to transport an unloaded firearm in a locked container that is separate from any ammunition, *see* D.C. Code

---

[1] Plaintiff Yzaguirre, in a different lawsuit against the District of Columbia, has alleged that he was "denied registration for a firearm on the ground that its magazine had a 12-round capacity in violation" of the District's ban on large-capacity magazines.  *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 8 (D.D.C. 2023).

019

§§ 22-4504.01, 22-4504.02, it is "technically possible to transport a handgun on the Metro," *id.* at 35 (Am. Compl. ¶ 94). But they allege that these restrictions have the "practical effect" of disarming them "for the entirety of their journey." *Id.* While on the Metro system, Plaintiffs cannot access their firearms, and because D.C. law requires that firearms remain concealed while in public, D.C. Code § 7-2509.07(e), Plaintiffs would need to find a private place to remove their firearms from the locked contained and to holster them in a concealed manner, *id.* at 35–36 (Am. Compl. ¶ 95). They further allege that this "unnecessary handling of a firearm [would] create[] the risk of an accidental or negligent discharge." *Id.* at 36 (Am. Compl. ¶ 96).

This litigation commenced on June 30, 2022, when Plaintiffs brought suit against the District of Columbia and Robert J. Contee III, the Chief of the D.C. Metropolitan Police Department ("MPD"), alleging that D.C. Code § 7-2509.07(a)(6) violated their Second and Fifth Amendment rights by prohibiting them from carrying concealed firearms on public transportation vehicles. *See* Dkt. 1 at 33–34 (Compl. ¶¶ 81–83). At that time, Plaintiffs sought injunctive and declaratory relief, but mentioned damages "only in passing" and without any supporting factual allegations. *Angelo I*, 648 F. Supp. 3d at 121 n.2. Two weeks after filing suit, Plaintiffs moved for a preliminary injunction, requesting that this Court enjoin Defendants from enforcing § 7-2509.07(a)(6) during the pendency of this action. Dkt. 6. At that time, Plaintiffs also asked that the Court "merge" the preliminary injunction proceeding with the ultimate merits and issue a permanent injunction barring Defendants from enforcing § 7-2509.07(a)(6). Dkt. 6-1 at 50–51. On December 28, 2022, the Court declined to merge the preliminary injunction proceeding with the ultimate merits, *Angelo I*, 648 F. Supp. 3d at 121 n.3, and denied Plaintiffs' motion for preliminary injunctive relief, holding that Plaintiffs lacked standing to bring a preenforcement challenge to § 7-2509.07(a)(6), *id.* at 132.

On February 1, 2023, Plaintiffs filed an amended complaint.  Dkt. 34.  In Count One, Plaintiffs allege that § 7-2509.07(a)(6), violates the Second Amendment, both "facially and as applied" to their circumstances.  Dkt. 34 at 47–48 (Am. Compl. ¶¶ 130–32).  In Count Two, they allege that § 7-2509.07(a)(6) is "arbitrary and irrational and thus violates the due process clause of the Fifth Amendment."  *Id.* at 48 (Am. Compl. ¶ 133).  The amended complaint adds as defendants Brian Schwalb, the Attorney General of the District of Columbia, and Michael Anzallo, the Chief of Police of WMATA's Metro Transit Police Department ("MTPD" or "WMATA MTPD").  Dkt. 34 at 9–11 (Am. Compl. ¶¶ 33, 40); *see also* Dkt. 42-1 at 2, 7 n.2. Attorney General Schwalb and MTPD Chief Anzallo are each named in both their official and individual capacities.  Dkt. 34 at 9–11 (Am. Compl. ¶¶ 33, 40).  The amended complaint also adds factual allegations relating to Plaintiffs' claim for compensatory relief.  *See id.* at 48 (Am. Compl. ¶ 132); *see also Angelo I*, 648 F. Supp. 3d. at 121 n.2 (observing that it was "unclear whether the complaint in fact s[ought] damages" because it contained "no allegation[s] relating to any monetary loss").  Other than those additions, however, the amended complaint largely tracks its predecessor.

In response, Defendants the District of Columbia, Attorney General Schwalb, and MPD Chief Contee (collectively "the District Defendants") and Defendant MTPD Chief Anzallo have moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Dkt. 42 (Anzallo); Dkt. 44 (District Defendants).  For the reasons explained below, the Court will **GRANT** both motions to dismiss.

## II.  LEGAL STANDARD

Two legal standards govern the Court's consideration of the pending motions to dismiss.

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to adjudicate the claim and may take the form of either a "facial" or "factual" challenge. A facial challenge asks whether the plaintiff has pleaded facts sufficient to establish the Court's jurisdiction, while a factual challenge asks the Court to "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). In other words, a facial challenge is confined to the four corners of the complaint, while a factual challenge permits the court to look beyond the complaint to satisfy itself that it has jurisdiction to hear the suit. Whether the motion to dismiss is facial or factual, the plaintiff bears the burden of establishing that the Court has subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Considered against that background, Defendants' respective challenges to the Court's jurisdiction are best viewed as facial in nature. When considering a facial challenge to its jurisdiction, the Court must accept the allegations of the complaint as true and must construe "the complaint in the light most favorable to the non-moving party." *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006); *see I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003). In that sense, the Court resolves the motion in a manner similar to a motion to dismiss under Rule 12(b)(6). *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

In resolving a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept the factual allegations of the complaint as true and may not rely on evidence or factual material beyond those allegations. A defendant can therefore prevail on a Rule 12(b)(6) motion only by demonstrating that the facts, as alleged in the complaint, do not warrant relief as

a matter of law.  In resolving a 12(b)(6) motion, the Court need not accept legal conclusions as true.  *See Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006).  Rather, the question for the Court is whether the factual allegations "state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### III.  ANALYSIS

In significant part, the question now before the Court is a familiar one, since the Court previously held that Plaintiffs (1) had failed to allege facts sufficient to establish standing to bring a preenforcement challenge to § 7-2509.07(a)(6) under the standard set forth in two binding decisions from the D.C. Circuit and (2) had failed to show that those "precedents are no longer good law or do not control in this case."  *Angelo I*, 648 F. Supp. 3d at 132.  The Court must now decide whether Plaintiffs' amended complaint has cured the defects that the Court previously identified, whether any intervening law has now abrogated those precedents, or whether the Court's prior analysis was mistaken.

Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), the Court must assess Plaintiffs' standing with respect to "each claim" asserted and "each form of relief" sought, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  This, in turn, requires the Court to determine whether Plaintiffs have alleged facts sufficient to satisfy the constitutional minimum for establishing Article III standing for each claim and for each form of relief sought—that is (1) that they are suffering or will likely suffer an "injury in fact" that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted); (2) that their injury is "'fairly traceable to the challenged action of the defendant[s],'" *Ord v. District of Columbia*, 587 F.3d

023

1136, 1140 (D.C. Cir. 2009) (quoting *Lujan*, 504 U.S. at 560); and (3) that their injury is "likely to be 'redressed by a favorable decision,'" *id.* (quoting *Lujan*, 504 U.S. at 561).

The Court first addresses Plaintiffs' claims for injunctive and declaratory relief and then turns to their claims for damages.

**A.     Injunctive and Declaratory Relief**

1.     *The District of Columbia*

Like the complaint at issue in *Angelo I*, Plaintiffs' amended complaint seeks a declaration that D.C. Code § 7-2509.07(a)(6) is unconstitutional, and they seek an injunction prohibiting Defendants from the enforcing the law against them.  As in *Angelo I*, moreover, Plaintiffs bring a preenforcement challenge.  None of the Plaintiffs has been arrested, prosecuted, or subject to civil penalties for violating § 7-2509.07(a)(6).  None has been threatened with arrest or prosecution or with the imposition of a civil penalty.  And none has identified a credible, imminent threat of arrest, prosecution, or fine.  Instead, each asserts standing to seek declaratory and injunction relief based on his commitment to abide by the law and corresponding submission that, but for § 7-2509.07(a)(6), he would exercise his constitutional right to carry a concealed firearm while using the Metro system.

To bring a preenforcement challenge to the constitutionality of a statute, a plaintiff may "establish Article III standing by (1) 'alleging an intention to engage in the proscribed conduct,'" provided that the conduct is "arguably affected with a constitutional interest, . . . and (2) demonstrating that 'there exists a credible threat of prosecution.'"  *Ord*, 587 F.3d at 1140 (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).  In the D.C. Circuit, moreover, when a plaintiff presents a "non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings," *Seegars v. Gonzales*,

396 F.3d 1248, 1254 (D.C. Cir. 2005), the plaintiff "must establish that the threat of prosecution is not only 'credible,' but also 'imminent,'" *Angelo I*, 648 F. Supp. 3d at 124 (quoting *Ord*, 587 F.3d at 1140).

Here, for reasons explained in *Angelo I*, Plaintiffs easily satisfy the first of the preenforcement standing requirements.  *See Angelo I*, 648 F. Supp. 3d at 123.  They have alleged a present intention to carry concealed firearms while using the Metro system, and they have alleged that the only thing that is keeping them from doing so is the law that they challenge. Because "[t]he D.C. Circuit has disavowed any requirement that plaintiffs asserting preenforcement challenges express an 'unconditional intention to engage in the proscribed behavior, regardless of whether the statute is invalidated,'" *id.* (quoting *Seegars*, 396 F.3d at 1251 (emphasis omitted), those allegations suffice.  So far, so good.

The difficulty that Plaintiffs confronted in *Angelo I*, and that they continue to confront here, is that they have failed allege any facts that, if accepted as true, would show that they face (or would face) a credible and imminent threat of prosecution (were they to violate the law).  *See Angelo I*, 648 F. Supp. 3d at 123–26.  As the Court concluded in *Angelo I*, the Court once again concludes that Plaintiffs have failed to satisfy this requirement for establishing standing to bring a preenforcement, constitutional challenge to a statute.

By way of background, the Court's conclusion in *Angelo I* was dictated by three D.C. Circuit precedents: *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), *cert denied*, 531 U.S. 816 (2000); *Seegars v. Gonzales*, 396 F.3d 1248 (D.C. Cir. 2005), *cert denied*, 546 U.S. 1157 (2006); and *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008).  Those cases, *Angelo I* explained, "paint a clear picture: to establish Article III standing, a plaintiff bringing a [non-First Amendment]

preenforcement challenge must do more than show that the government enforces its laws as written." 648 F. Supp. 3d at 126. It is not enough to allege facts demonstrating a "credible" threat of prosecution; the plaintiff bringing a non-First Amendment preenforcement challenge to a criminal statute must also allege facts sufficient to permit a plausible inference that the threat of criminal or civil enforcement is "imminent." *Id.* at 124. As the D.C. Circuit reaffirmed in *Parker*, *Navegar* and *Seegars* require courts "to look for an allegation that [the plaintiffs] have been singled out or uniquely targeted by the D.C. government for prosecution." 478 F.3d at 375.

Applying this test in *Angelo I*, the Court concluded that Plaintiffs' complaint lacked the allegations necessary to satisfy this test. *See Angelo I*, 648 F. Supp. 3d at 126. As the Court explained, as alleged in their original complaint, "Plaintiffs rest[ed] their entire standing argument on the facial contention that '[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense' and that they 'do not do so now because [they] fear arrest and prosecution.'" *Id.* To be sure, as the Court further explained, the *Seegars* court noted, in describing the "imminence requirement, that 'clarity prevails only at the poles.'" *Id.* (quoting *Seegars*, 396 F.3d at 1252). But that line-drawing problem is of little consequence when, as in *Angelo I*, a plaintiff alleges nothing more than a generalized and entirely speculative concern that he or she might face prosecution or a civil penalty proceeding, were he or she to violate the law. Thus, *Angelo I* concluded as follows:

> Notably, . . . nowhere do Plaintiffs allege . . . that they "have been singled out or uniquely targeted by the D.C. government for prosecution," *Parker*, 478 F.3d at 375, and they point to no "prior threats against them" and to no "characteristics indicating an especially high probability of enforcement against them," *Seegars*, 396 F.3d at 1255. The Court, accordingly, finds no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all.

*Id.*

9

026

The conclusion that the Court reached in *Angelo I* applies with equal force to the present motion. *Navegar*, *Seegars*, and *Parker* remain binding precedent, and Plaintiffs have yet to identify any reason to believe they have been, or will be, "singled out or uniquely targeted by the D.C. government for prosecution" or civil penalty proceedings. *Parker*, 478 F.3d at 375. Like the complaint at issue in *Angelo I*, Plaintiffs' amended complaint alleges that, but-for the challenged statute, they would carry concealed firearms on and within the metro system for purposes of self-defense. *See* Dkt. 34 at 1, 4–5, 7–9 (Am. Compl. ¶¶ 2, 7, 9, 13, 15, 21, 26, 30). As in their original complaint, they allege, in conclusory terms, that the District's gun laws are enforced "actively and vigorously," *id.* at 9 (Am. Compl. ¶ 33); *see also id.* at 12 (Am. Compl. ¶ 42), and that the District "has not disclaimed prosecution for violation of the law at issue in this proceeding," *id.* at 9 (Am. Compl. ¶ 33); *Angelo I*, 647 F. Supp. 3d at 126 ("Plaintiffs argue that '[t]he District has never disclaimed an intent to enforce the Metro carry ban.'").

These allegations were insufficient in *Angelo I*, and they remain insufficient for present purposes. This Court remains bound by the D.C. Circuit's admonitions that "the District's general threat to prosecute violations of its gun laws d[oes] not constitute an Article III injury," *Parker*, 478 F.3d at 374, and that a "plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written," *Angelo I*, 648 F. Supp. 3d at 126. As before, Plaintiffs have alleged "no prior threats against them or any characteristics indicating an especially high probability of enforcement against them." *Seegars*, 396 F.3d at 1255. And they have failed to allege any facts suggesting that they have been, or are likely to be, singled out for prosecution. *Parker*, 478 F.3d at 375.

Plaintiffs' efforts to cure the jurisdictional deficiencies in their original complaint, moreover, are unavailing. They now allege, for example, that their counsel emailed the Attorney

027

General of the District of Columbia in January 2023 requesting that he "waive enforcement" of D.C. Code § 7-2509.07(a)(6) "as to [his] clients," Dkt. 34 at 11 (Am. Compl. ¶ 38), and, almost two weeks later, sent a letter to the Chief of the WMATA Police Department requesting a similar waiver and also requesting that he "'enter into a non-prosecution agreement'" with the Plaintiffs, *id.* (Am. Compl. ¶ 41). They allege that neither official has responded to this correspondence. *Id.* (Am. Compl. ¶¶ 39, 41). This silence does not, however, suggest that Plaintiffs face an imminent threat of prosecution—or that they would face such a threat, were they to violate § 7-2509.07(a)(6). All the more so when considered against the backdrop of *Navegar* and its progeny. In *Navegar*, for example, the D.C. Circuit held that the plaintiffs had failed to show that they faced an imminent threat of enforcement, even though "case agents of the Bureau of Alcohol, Tobacco and Firearms had visited the plaintiff gun manufacturers, alerted them to the prohibitions in question, and conducted inventories of their firearms stocks, including those of the weapons about to be barred." *Seegars*, 396 F.3d at 1255 (citing *Navegar*, 103 F.3d at 997). Still, the *Navegar* court concluded that, "although the government ha[d] demonstrated its interest in enforcing the Act generally," there was no indication that the plaintiffs faced a jurisdictionally sufficient threat of enforcement. 103 F.3d at 1001; *see also Ord*, 587 F.3d at 1141 (noting that there was no imminence in *Parker* where "the District of Columbia had declared its intention to prosecute all violators").

Plaintiffs also now allege that Miller is "aware of instances when persons unlawfully carrying concealed weapons on DC Metro have been arrested and charged for violating" § 7-2509.07(a)(6). Dkt. 34 at 6 (Am. Compl. ¶ 18); *cf. Angelo I*, 648 F. Supp. 3d at 126 (noting that at oral argument, Plaintiffs could not identify a single person with a concealed carry permit who had ever been arrested for carrying a handgun on public transportation in the District while not

engaged in another crime). After the close of briefing, moreover, Plaintiffs filed "the result of an information request directed to Metro by Plaintiff Dr. Miller on January 13, 2023." Dkt. 51 at 3. According to that filing, Miller "asked Metro to advise him of the number of arrests occurring on the Metro system in the District for the unlawful carrying of firearms in years 2018 through 2022." *Id.* Miller reports that, in response, he was informed that a total of "71 arrests for possession/carrying firearms on the Metro system" occurred during this five-year period. *Id.* at 4. Although Plaintiffs contend that their filing "plainly shows [that] there is a credible threat of enforcement of DC Code Section 7-2509.07(a)(6)," *id.* at 4, the Court is unpersuaded for at least two reasons.[2]

First, there is no evidence that any of these arrests were for violating § 7-2509.07(a)(6), rather than other criminal laws, or that they involved efforts to enforce § 7-2509.07(a)(6). There are, of course, multiple laws—federal and D.C.—that preclude individuals from carrying firearms under specified circumstances. It is unlawful, for example, "for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to possess a firearm that has traveled in interstate commerce. 18 U.S.C. § 922(g)(1). It is also unlawful for a person who engages in a violation of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.*, to carry a firearm in furtherance of that offense. 18 U.S.C. § 924(g)(2). And it is unlawful for anyone to carry a firearm in the District of Columbia without a registration certificate. D.C. Code § 7-2502.01. Yet, Plaintiffs' statistics fail to indicate whether any of the 71 arrests were for violating § 7-2509.07(a)(6). Moreover, even in case where a defendant might

---

[2] When assessing whether it has jurisdiction, the Court may consider any record materials that bear on that question. *See Ranchers-Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 573 F. Supp. 3d 324, 332 (D.D.C. 2021).

029

have been charged with violating § 7-2509.07(a)(6), Plaintiffs fail to indicate whether the arrest at issue was prompted by a violation of § 7-2509.07(a)(6) or whether a § 7-2509.07(a)(6) charge was added only after an arrest was made.  Consider, for example, an individual who starts a fist fight on the Metro while carrying a concealed firearm.  One can easily imagine that the individual might face arrest for assault, *see* D.C. Code § 22-404, and that the police or prosecutors might only add a § 7-2509.07(a)(6) charge after a gun is found in course of making the arrest.  In any event, Plaintiffs offer no allegations—or facts—suggesting that the WMATA police department has engaged in any coordinated efforts to enforce § 7-2509.07(a)(6) against any licensed firearm owners who have carried concealed weapons on the Metro system.

Second, even if all 71 of the arrests over the five-year period were the product of a concerted effort by the WMATA police department to enforce § 7-2509.07(a)(6), that would not show that *Plaintiffs* have been or will be targeted for enforcement.  That laws are generally enforced is presumed.  *See Angelo I*, 648 F. Supp. 3d at 126; *Seegars*, 396 F.3d at 1255 (explaining that, absent "prior threats" or "characteristics indicating an especially high probability of enforcement," it was not enough to show that the District "enforces its guns laws, prosecuting all violators of the statute under normal prosecutorial standards" (internal quotation marks and citation omitted)).  But an average of 14.2 arrests per year (71/5), throughout the entire portion of the Metro system located in the District of Columbia, hardly suggests that Plaintiffs face a credible threat of arrest or prosecution.  In short, there is "no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all."  *Angelo I*, 648 F. Supp. 3d at 126.

To be sure, the question in *Angelo I* was whether Plaintiffs could make a "'clear showing,'" *id.* at 121 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), that they were "likely" to establish standing, *id.* at 119. Here, the standard is different, since the Court must assume the truth of Plaintiffs' factual allegations and must construe the amended complaint in the light most favorable to Plaintiffs. But the Court's decision in *Angelo I* did not rest on the heightened preliminary injunction standard; it rested on the fact that Plaintiffs had failed to allege facts sufficient to sustain their standing. As the Court wrote: "Nowhere do Plaintiffs allege (much less show a likelihood of establishing) that they 'have been singled out or uniquely targeted by the D.C. government for prosecution,' and they point to no 'prior threats against them' and to no 'characteristics indicating an especially high probability of enforcement against them.'" *Angelo I*, 648 F. Supp. 3d at 126 (first quoting *Parker*, 478 F.3d at 375; and then quoting *Seegars*, 396 F.3d at 1255). Accordingly, notwithstanding the different procedural posture, the Court's analysis and conclusions in *Angelo I* apply here with equal force.

Plaintiffs resist this conclusion with two arguments.

The first is a familiar one. Plaintiffs once again argue that *Navegar* and its progeny are inconsistent with the Supreme Court's standing precedents. Dkt. 46 at 33–34 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Plaintiffs made the same argument, nearly verbatim, in *Angelo I*. *Compare id.*, *with* Dkt. 29 at 17–18. Notably, Plaintiffs nowhere address (or even acknowledge) the Court's rejection of these identical arguments in *Angelo I*. 648 F. Supp. 3d at 126–32. But the blunt force of repetition cannot render the binding decisions in *Navegar*, *Seegars*, and *Parker* dead letter—or any less applicable.

As this Court explained in *Angelo I*, "'[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court,' and it is the province of the D.C.

Circuit, and not this Court, to harmonize circuit precedent and to say when D.C. Circuit decisions should be overruled." *Id.* at 129 (quoting *Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979)). That principle, moreover, applies with "particular force" here because the D.C. Circuit has itself "reckoned with the tension between *Navegar* and the Supreme Court's First-Amendment precedents" and because "[m]ultiple judges on the D.C. Circuit have . . . called for reconsideration of *Navegar* en banc—some of them precisely on the grounds that the decision is at odds with" Supreme Court precedent. *Id.* at 130. Because the D.C. Circuit has, at least to date, declined that invitation, "[w]hatever the merits of Plaintiffs' doctrinal critiques," this Court "must, just like the D.C. Circuit, remain faithful" to the *Navegar* line of cases. *Id.*; *see also Parker*, 478 F.3d at 375 ("Nevertheless, unless and until this court en banc overrules these recent precedents, we must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*.").

Plaintiffs' attempt to adorn an old argument with an additional Supreme Court precedent—*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021), *see* Dkt. 46 at 28–30—is unavailing. That case, which was decided before *Angelo I*, held that the doctrine of sovereign immunity barred petitioners' preenforcement challenge to Texas Senate Bill 8 as brought against state court judges, state court clerks, and the Texas attorney general, but not against four executive licensing officials. *Whole Woman's Health*, 595 U.S. at 37–43, 51. Although not the focus of the Court's inquiry, each of the Court's opinions touches on standing as well. But Plaintiffs overstate the holding of the Court and its application to the present circumstances. For one thing, the paragraph that Plaintiffs quote from Justice Gorsuch's opinion, comes from a portion of the opinion, Part II-C, that failed to command a majority. *See* 595 U.S. at 34, 45–48.

Even more importantly, as explained in Chief Justice Roberts and Justice Sotomayor's separate opinions—which provided Justice Gorsuch with a majority on the question of standing—the present circumstances are readily distinguishable from what was at issue in *Whole Woman's Health*.  *See id*. at 59–61 (Roberts, C.J., concurring in the judgment in part and dissenting in part); *id*. at 62–63 (Sotomayor, J., concurring in the judgment in part and dissenting in part).  As explained in those opinions, the law at issue was "structured to thwart [judicial] review," *id.* at 67 (Sotomayor, J.), and to "nullify th[e] [Supreme] Court's rulings" while evading review, *id*. at 61 (Roberts, C.J.).  Moreover, even assuming that *Whole Woman's Health* is in some tension with the *Navegar* line of cases, Plaintiffs cannot plausibly maintain that the decisions are so irreconcilable that this Court may—and should—conclude that *Navegar* and its progeny are no longer binding precedent.  If that precedent is to be discarded, it is for the D.C. Circuit or the Supreme Court, and not this Court, to do so.  *See Angelo I*, 648 F. Supp. 3d at 129.

Taking a slightly different tack, Plaintiffs also cite a passage from *Whole Woman's Health* in support of their separate contention that the D.C. Circuit's distinction between First Amendment and all other constitutional challenges does not hold water.  That passage, which appears in a portion of Justice Gorsuch's opinion that did garner a majority, observes as follows:

> [T]he "chilling effect" associated with a potentially unconstitutional law being "'on the books'" is insufficient to "justify federal intervention" in a pre-enforcement suit.  Instead, this Court has always required proof of a more concrete injury and compliance with traditional rules of equitable practice.  The Court has consistently applied these requirements whether the challenged law in question is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right.  The petitioners are not entitled to a special exemption.

595 U.S. at 50 (internal citations omitted).  Plaintiffs imply a tension between the penultimate sentence, equating "the free exercise of religion, the freedom of speech, [and] the right to bear arms," and the D.C. Circuit's treatment of non-First Amendment preenforcement challenges.

033

Dkt. 46 at 30.  But this is the same tension that the Court addressed in *Angelo I*.  *See* 648 F. Supp. 3d at 129–30 & n.5.  And it is the same tension that the D.C. Circuit grappled with in *Seegars*.  *See* 396 F.3d at 1254; *see also id.* at 1257 (Sentelle, J., dissenting) ("I know of no hierarchy of Bill of Rights protections that dictates different standing analysis.").  As this Court previously explained: "Notwithstanding that tension, '[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court.'"  *Angelo I*, 648 F. Supp. 3d at 129 (quoting *Brewster*, 607 F.2d at 1373).

Finally, Plaintiffs assert that they "continue to believe that *New York Rifle & Pistol Ass'n v. New York*," 590 U.S. 336 (2020) (per curiam), "undermines the *Navegar* line of cases."  Dkt. 46 at 30–33.  *Angelo I* addressed and rejected this argument.  *See* 648 F. Supp. 3d at 126–28.

Plaintiffs' second argument—that *Seegars* and *Navegar* are distinguishable, and, relatedly, that the absence of an administrative remedy requires the availability of preenforcement review, Dkt. 46 at 36; Dkt. 61 at 5 n.1—was addressed and rejected in *Angelo I*.  As the Court explained, "that argument is squarely foreclosed by the D.C. Circuit's decision in *Seegars*, which made clear that 'the lack of an administrative remedy, while it increases the hardship resulting from denial of preenforcement review, still does not enable [the plaintiff] to meet the *Navegar* test.'"  *Angelo I*, 648 F. Supp. 3d at 130–31 (second alteration in original) (quoting *Seegars*, 396 F.3d at 1256).

2.    *Individual Defendants*

In addition to seeking injunctive and declaratory relief against the District of Columbia, Plaintiffs seek similar relief with respect to three government officials, who Plaintiffs sue in both their individual and official capacities: Attorney General Schwalb, MPD Chief Contee, and WMATA MPTD Chief Anzallo.  These claims fail for all of the reasons explained above—

Plaintiffs have not "demonstrated a threat of prosecution sufficiently imminent under circuit law," *Seegars*, 396 F.3d at 1256, and, therefore, lack standing to pursue prospective relief, *see id.* at 1248, 1256 (claims against D.C. mayor and U.S. attorney general); *Parker*, 478 F.3d at 370, 375 (claims against the District and its mayor).[3]

A final note:  Since the close of briefing, Plaintiffs have filed eight separate notices of supplemental authority bringing to the Court's attention various standing decisions in allegedly similar cases.[4]  But those decisions are of little persuasive value here—none is from this Circuit, none analyzed standing under the *Navegar* standard that governs here, and none addresses whether this Court is free to depart from that standard.

## B.    Damages

Plaintiffs also seek compensatory relief, alleging that D.C. Code § 7-2509.07(a)(6) has caused them economic injuries in the form of increased transportation costs.  As explained above, Plaintiffs added these allegations to their amended complaint in an effort to establish

---

[3] Plaintiffs' claims against MTPD Chief Anzallo in his official capacity fail for the further reason that he is not subject to suit in his official capacity under § 1983.  Section 1983 provides a private cause of action against any "person" who, under color of state or District of Columbia law, deprives another individual of a federal constitutional or statutory right.  But "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  And "there is no question that, as an interstate compact agency created by Maryland, Virginia, and the District of Columbia, WMATA is an arm of its signatory states for Section 1983 purposes and, as a result, cannot be sued under that statute." *Tapp v. WMATA*, 306 F. Supp. 3d 383, 394 (D.D.C. 2016).  Nor is there question that MTPD is "a department within WMATA and not a separate entity." *White v. WMATA*, 303 F. Supp. 3d 5, 9 (D.D.C. 2018); *see also Hawkins v. WMATA*, 311 F. Supp. 3d 94, 108 (D.D.C. 2018) (dismissing § 1983 suit against MTPD officer in his official capacity).

[4] Dkt. 48 (District of Southern Illinois); Dkt. 51 (District of Eastern Virginia); Dkt. 55 (Ninth Circuit and the District of Colorado); Dkt. 56 (District of Maryland); Dkt. 58 (Second Circuit and the District of New Mexico); Dkt. 59 (Central District of California); Dkt. 60 (Southern District of California); Dkt. 61 (Second Circuit).

035

standing to bring a preenforcement challenge to § 7-2509.07(a)(6).  And, as explained below, the Court concludes that the additional allegations fail fix the problem.

1.    *The District of Columbia*

In their amended complaint, Plaintiffs allege that they have incurred increased transportation costs because they are fearful of riding the Metro system unarmed.  Dkt. 34 at 3, 5, 7–8 (Am. Compl. ¶¶ 4–5, 11–12, 17, 28).  Each Plaintiff avers that he has, on occasion, declined to use the Metro system "out of fear of his personal safety" because he could not lawfully "carry his concealed firearm for personal protection."[5]  Dkt. 34 at 3, 5, 7–8 (Am. Compl. ¶¶ 6, 12, 20, 29).  Plaintiffs emphasize that their avoidance of the Metro system has "nothing to do" with a "fear of arrest" or prosecution.  Dkt. 46 at 40.  Instead, Plaintiffs rely on a slightly less direct chain of events, which takes the following form: (1) § 7-2509.07(a)(6) prohibits Plaintiffs from carrying their firearms on the Metro system in an accessible manner; (2) Plaintiffs are law abiding and, accordingly, will not carry their firearms on the Metro system absent injunctive or declaratory relief; (3) although Plaintiffs often ride the Metro system, they have, on occasion, declined to do so based on a concern for their personal safety; (4) had they been allowed to carry their firearms, they would have felt safe enough to ride the Metro system on these occasions; and (5) when they have declined to ride the Metro system based on a concern for their personal safety, they have used alternative forms of transportation (*e.g.*, taxis or Uber), which were more costly than riding the Metro system.  For purposes of resolving the pending motions to dismiss, the Court accepts these allegations as true.[6]

---

[5] Plaintiffs do not allege how frequently they have foregone riding the Metro system.

[6] The Court notes, however, that Uber "prohibits everyone from carrying firearms of any kind while using the app, to the extent permitted by applicable law."  Firearms Policy, Uber,

036

The District Defendants argue that Plaintiffs have failed to establish causation because the additional costs that they have incurred using alternative modes of transportation are not "fairly traceable" to § 7-2509.07(a)(6). Dkt. 44-1 at 15. In their view, these additional costs are self-inflicted, risk-mitigation expenses, and Plaintiffs "cannot establish standing by incurring costs that 'are simply the product of their fear[.]'" *Id.* at 14 n.1 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015)). The District Defendants, accordingly, urge the Court to hold that the costs at issue are a form of "self-inflicted harm [that is] not fairly traceable to the challenged government conduct." *Id.* at 15 (quoting *Passut v. Cardona*, 540 F. Supp. 3d 27, 41 (D.D.C. 2021)).

Plaintiffs respond that these costs were not self-inflicted, but rather constitute "wholly predicable expenses" of "coerced compliance" with § 7-2509.07(a)(6). Dkt. 46 at 40. In their view, the additional costs that they have incurred are akin to increased administrative costs that a regulated party might incur in order to comply with an allegedly unconstitutional statute. *See* Dkt. 46 at 40 (citing *Metro. Wash. Chapter, Associated Builders & Contractors v. District of Columbia*, 62 F.4th 567, 573 (D.C. Cir. 2023) (holding that contractor had standing to challenge statute's hiring and reporting requirement based on increased administrative costs of compliance)). Plaintiffs contend that the cost of using a taxi, Uber, or personal vehicle is therefore directly traceable to D.C. Code § 7-2509.07(a)(6). *See* Dkt. 46 at 43.

Although the costs at issue here differ in material respects from the costs incurred by a regulated party in complying with a challenged law, the Court need not decide whether Plaintiffs' additional transportation costs were "self-inflicted" or "voluntarily" incurred because

---

https://help.uber.com/riders/article/firearms-policy?nodeId=e642d54a-dbfb-4e9d-922f-69aea2dd1e67 (last visited August 9, 2024).

Plaintiffs' claims for monetary relief fail for the same reasons that their claims for injunctive and declaratory relief fail.   The form of relief sought does not alter the fact that this is a preenforcement challenge to a criminal statute; that *Navegar* and its progeny require a showing that Plaintiffs face a "credible" and "imminent" of prosecution; and that Plaintiffs have failed to make the requisite showing.  *Angelo I*, 648 F. Supp. 3d at 124.

The Court need look no farther than *Navegar* itself to conclude that Plaintiffs' alleged monetary losses do not alter the result.  Recall that in *Navegar* two federally licensed firearms manufacturers brought suit challenging the constitutionality of a federal law that "made it unlawful for a person to 'manufacture, transfer, or possess a semiautomatic assault weapon'" or to transfer or possess "any 'large capacity ammunition feeding device.'"  103 F.3d at 997 (citing 18 U.S.C. §§ 922(v)(1), 922(w)(1)).  After they were visited by Bureau of Alcohol, Tobacco, and Firearms inspection agents and informed of these prohibitions, the plaintiffs "ceased the manufacture and transfer of the outlawed weapons . . . and [ ] expressed no intention to violate the Act in the future."  *Id.*  In bringing suit challenging the law, the plaintiffs alleged that they suffered substantial economic losses due to the law, including a prohibition on future sales of important products and the loss of tens of thousands of dollars of existing inventory.  *See*, *e.g.*, Compl. ¶ 19, *Navegar, Inc. v. United States*, 914 F. Supp. 632 (D.D.C. 1996) (No. 95-550), ECF No. 11.  The district court nonetheless dismissed the action for lack of standing, *Navegar*, 914 F. Supp. at 637, and on appeal the plaintiffs, again, invoked the cost of complying with the statute to support their claim to standing.  As they did in the district court, they argued that they "had to cease manufacture of their products" and had "tens of thousands of dollars worth of inventory" that they could no longer sell.  Brief of Appellant at 20, *Navegar, Inc. v. United States*, 914 F. Supp. 632 (D.C. Cir. 1996) (No. 96-5088).

Notwithstanding these allegations of economic loss that was both more direct and far more substantial than the economic loss the Plaintiffs invoke here, the D.C. Circuit held that the manufacturers lacked standing to bring a preenforcement challenge to those portions of the law that did not "single[] out the [plaintiffs] as intended targets." *Navegar*, 103 F.3d at 1000. As the D.C. Circuit explained, the plaintiffs lacked standing because they failed to demonstrate that the threat of prosecution was "genuine and imminent," *id.* at 1001–02, and the fact that they had incurred—and would continue to incur—substantial financial losses had no bearing on that question. In a preenforcement challenge, like this one, a plaintiff cannot establish causation by merely invoking risk-avoidance or compliance costs; such costs are fairly traceable to the challenged law only when they are linked to a "credible threat of imminent prosecution." *Seegars*, 396 F.3d at 1254–55. The same conclusion applies here with even greater force.

Ultimately, Plaintiffs' damages claim is "a repackaged version of [Plaintiffs'] first failed theory of standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). In some circumstances, the form of relief that a plaintiff seeks can affect his or her standing to sue. A plaintiff lacks standing, for example, to bring an action seeking injunctive relief, where the alleged wrong occurred in the past and is unlikely to reoccur. *See*, *e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). But, here, the addition of a claim for damages has no bearing on Plaintiffs' standing because, as in *Navegar*, Plaintiffs contend that they have incurred losses relating to their compliance with a criminal statute but have failed to show that they face a credible and imminent threat of prosecution. If the ongoing financial losses in *Navegar* were insufficient to establish standing in the absence of a "credible" and "imminent" threat of prosecution, then Plaintiffs' asserted losses resulting from their decision, on occasion, to use

taxis or Ubers in the absence of any "credible" and "imminent" threat of prosecution cannot suffice.

Whether the *Navegar* rule is sound and consistent with other precedent is not for this Court to decide. As noted above, multiple judges on the D.C. Circuit have raised substantial questions about the rule and have called for its reconsideration by the *en banc* court. But unless and until the Court of Appeals overrules *Navegar* and its progeny, this Court remains bound to follow the rule. Applying that rule here, the Court concludes, as it did in *Angelo I*, that Plaintiffs have failed to allege facts sufficient to show that they have been, or are likely to be, singled out for prosecution and that, accordingly, Plaintiffs lack standing to bring a preenforcement challenge to § 7-2509.07(a)(6). That conclusion applies, moreover, regardless of whether Plaintiffs seek injunctive, declaratory, or monetary relief.

2. *Individual-Capacity Defendants*

Turning to Plaintiffs' damages claim against the individual defendants, Plaintiffs "agree that monetary damage claims against the individual dependents do not lie." Dkt. 46 at 13; *see id.* at 44 ("Defendants move to dismiss damage remedies with respect to the individual defendants Anzallo, Contee and Schwalb on various immunity theories. We agree that damage remedies do not lie with respect to the individual defendants.").

Given that Plaintiffs have abandoned these individual-capacity claims, the Court will treat the matter as conceded and will grant Defendants' respective motions to dismiss with respect to the damages claims against the individually named defendants: Attorney General Schwalb, MPD Chief Contee, and MTPD Chief Anzallo.

040

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss, Dkt. 42; Dkt. 44, will be granted.

A separate order will issue.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  August 9, 2024

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GREGORY T. ANGELO, *et al.*,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>        *Defendants*. | Civil Action No. 22-1878 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs, residents of District of Columbia and Virginia who hold licenses to carry concealed pistols in the District, challenge the constitutionality of a District law that prohibits them from carrying their firearms on "public transportation vehicle[s], including the Metrorail transit system and [in] its stations." D.C. Code § 7-2509.07(a)(6). A "[p]ublic transportation vehicle" is defined to include "any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train." *Id.* § 7-2509.07(g)(3). Plaintiffs each aver that, "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution." Dkt. 6-2 at 1 (Angelo Decl. ¶ 4); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 at 1 (Miller Decl. ¶ 4); Dkt. 6-5 at 1 (Erickson Decl. ¶ 4). They assert that the prohibition on carrying a pistol on Metrobus or Metrorail train, which is allegedly enforced by Defendants the District of Columbia and the Chief of the Metropolitan Police Department ("MPD"), violates Plaintiffs' Second and Fifth Amendment rights. Dkt. 1 (Compl.).

Pending before the Court is Plaintiffs' motion for preliminary injunction. Dkt. 6. Plaintiffs ask the Court to enjoin Defendants from enforcing D.C. Code § 7-2509.07(a)(6) while

the Court considers the merits of their constitutional claim.  Because Plaintiffs have not shown

that they likely have standing to challenge § 7-2509.07(a)(6), the Court will **DENY** their motion

for a preliminary injunction.

## I. BACKGROUND

District of Columbia law permits individuals to carry pistols "concealed on or about their

person" if they have "a license issued pursuant to District of Columbia law."  D.C. Code

§ 22-4504(a); *see id.* § 7-2509.07(e) (prohibiting individuals from "carry[ing] a pistol openly or

otherwise in a manner that is not concealed").[1]  To obtain a license, an applicant must

demonstrate to the satisfaction of the MPD Chief of Police that she has registered the firearm she

wishes to carry; has satisfied certain age and mental health requirements; and has completed a

series of required firearms training courses.  *See id.* § 7-2509.02(a).  But even after obtaining a

license, gun owners may not carry their pistols everywhere they go.  *See id.* § 7-2509.07; *see

also id.* § 7-2509.06 (prohibiting individuals from carrying a pistol while "impaired" by drugs or

alcohol).  D.C. law provides that "[n]o person holding a license shall carry a pistol" in, among

other places, "[a] building or office occupied by the District of Columbia;" at "[t]he building [or]

grounds" of a childcare facility, school, or university; at "[a] hospital," "[a] penal institution" or

"[a] polling place while voting is occurring;" or at federal landmarks such as "[t]he public

memorials on the National Mall and along the Tidal Basin," at "[t]he White House Complex and

its grounds," or at "[t]he U.S. Naval Observatory."  *Id.* § 7-2509.07(a)(1)–(5), (10)–(12).

As relevant here, the law also prohibits licensed gun owners from carrying a pistol on

"[a] public transportation vehicle, including the Metrorail transit system and its stations."  *Id.*

---

[1] D.C. law defines "pistol" as "any firearm originally designed to be fired by use of a single hand
or with a barrel less than 12 inches in length."  D.C. Code § 7-2501.01(12).

§ 7-2509.07(a)(6).  "Public transportation vehicles" include "any publicly owned or operated commercial vehicle, including any DC Circulator bus, DC Streetcar, MetroAccess vehicle, Metrobus, or Metrorail train." *Id.* § 7-2509.07(g)(3).  If a licensee "carries a concealed pistol and approaches [one of these] prohibited location[s]," she must secure the unloaded pistol in her vehicle as described in D.C. Code § 22-4504.02(b) or "immediately leave the prohibited location." *Id.* § 7-2509.07(c)(1)–(2).  A licensee may also "carry the firearm to any other place where [s]he may lawfully possess and carry" it, *id.* § 22-4504.02(a), but only if the firearm is "[u]nloaded," "[i]nside a locked container," and "[s]eparate from any ammunition, *id.* § 22-4504.02(c).  Any licensed gun owner convicted of carrying a pistol in a prohibited place may be fined or imprisoned for up to 180 days or, in the alternative, may be subject to "[c]ivil fines, penalties, and fees." *Id.* § 7-2509.10(a).  Any prosecution for a violation of these rules must be brought by the D.C. Attorney General "in the name of the District of Columbia." *Id.* § 7-2509.10(b).

Plaintiffs Gregory T. Angelo, Tyler Yzaguirre, and Cameron M. Erickson live in the District of Columbia.  *See* Dkt. 6-2 at 1 (Angelo Decl. ¶ 1); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶ 1); Dkt. 6-5 at 1 (Erickson Decl. ¶ 1).  Plaintiff Robert M. Miller is a resident of Virginia.  *See* Dkt. 6-4 at 1 (Miller Decl. ¶ 1).  Each avers that he "hold[s] a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department" and that he "regularly ride[s] the Metro subway and Metro buses," *see* Dkt. 6-2 at 1 (Angelo Decl. ¶¶ 2–3); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶¶ 2–3); Dkt. 6-4 at 1 (Miller Decl. ¶¶ 2–3); Dkt. 6-5 at 1 (Erickson Decl. ¶¶ 2–3).  Erickson and Yzaguirre use public transportation to commute to work, Dkt. 18-4 at 5–6 (Defs.' Ex. A) (Pls.' Interrog. Resp.), and, although he works from home, Angelo estimates that he used public transportation in the District "[a]n average of 24 times a month from 2019 and 2022," *id.*

044

at 7 (Defs.' Ex. A).  Miller indicates that his use of public transit in D.C. "was very limited" between 2020 and 2022 "because of COVID-19[-related closures]," but that, in 2019, he "traveled to, from, and within DC on public transit approximately 45 times per month."  *Id.* Plaintiffs each declare, moreover, that "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution."  Dkt. 6-2 at 1 (Angelo Decl. ¶ 4); Dkt. 6-3 at 1 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 at 1 (Miller Decl. ¶ 4); Dkt. 6-5 at 1 (Erickson Decl. ¶ 4).

On June 30, 2022, Plaintiffs sued the District of Columbia and Robert J. Contee III, the Chief of the D.C. Metropolitan Police Department, for declaratory and injunctive relief under 42 U.S.C. § 1983,[2] alleging that D.C. Code § 7-2509.07(a)(6) violates Plaintiffs' Second and Fifth Amendment rights by prohibiting them from carrying their firearms on public transportation vehicles.  Dkt. 1 at 33–34 (Compl. ¶¶ 81–83).  Plaintiffs moved for a preliminary injunction on July 11, 2022, requesting that this Court enjoin Defendants from enforcing § 7-2509.07(a)(6) during the pendency of this action.  Dkt. 6.  Plaintiffs also ask that the Court "merge" the preliminary injunction proceeding with the ultimate merits and issue a permanent injunction barring Defendants from enforcing § 7-2509.07(a)(6).[3]  Dkt. 6-1 at 50–51.  Plaintiffs' motion is fully briefed, and the Court heard oral argument on December 12, 2022.

---

[2] Although Plaintiffs style their complaint as one for "Declaratory, Injunctive Relief and Damages," Dkt. 1 at 1 (Compl.), it is unclear whether the complaint in fact seeks damages. Beyond the title of the complaint, damages are mentioned only in passing—and only in following a claim for attorney's fees under 42 U.S.C. § 1988.  *See id.* at 35 (Compl.).  Notably, the complaint contains no allegation relating to any monetary loss that any Plaintiff has suffered. In any event, the question of damages is not presently before the Court.

[3] Federal Rule of Civil Procedure 65 allows the Court to "advance the trial on the merits and consolidate it with the hearing [on a motion for a preliminary injunction]."  Fed. R. Civ. P. 65(a)(2).  This Court has adopted that approach when "resolving . . . the merits would not involve exploration of additional factual issues" beyond those necessary for resolving the

## II.  LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  To prevail on a motion for a preliminary injunction, "[t]he movant must: (1) establish a likelihood of 'succe[ss] on the merits;' (2) show 'irreparable harm in the absence of preliminary relief;' (3) demonstrate that the equities favor issuing an injunction; and (4) persuade the court that 'an injunction is in the public interest.'" *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (second alteration in original) (quoting *Winter*, 555 U.S. at 20).  Before the Supreme Court's decision in *Winter*, courts in this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  Since *Winter*, however, the D.C. Circuit has hinted on several occasions that *Winter* should be read to suggest that "a likelihood of success is an independent, free-standing requirement for a preliminary injunction," *id.* at 393 (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring)), but it "has not yet needed to decide th[e] issue," *League of Women Voters of U.S*

preliminary injunction, as long as no prejudice to either party would result.  *Melinta Therapeutics, LLC v. U.S. Food & Drug Admin.*, 22-cv-2190, 2022 WL 6100188, at *1 n.2 (D.D.C. Oct. 7, 2022) (internal quotation marks omitted); *see also, e.g.*, *Republican Nat'l Comm. v. Pelosi*, --- F.3d ---, 2022 WL 1295409, at *6 n.3 (D.D.C. May 1, 2022) (consolidating the preliminary-injunction motion with the trial on the merits where "the record [was] sufficient for a determination on the merits under the summary judgment standard" (quoting *March for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015))), *vacated as moot*, 2022 WL 4349778 (D.C. Cir. Sept. 16, 2022).  Because the Court concludes that Plaintiffs have not established a substantial likelihood that the Court has jurisdiction, the Court declines to consolidate the preliminary-injunction inquiry with what would be a premature trial on the merits.

*.v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022).

In any event, the D.C. Circuit has declared in unequivocal terms that "[a] party seeking a preliminary injunction 'must show a substantial likelihood of standing.'" *Green v. U.S. Dep't of Just.*, --- F. 4th ---, 2022 WL 17419644, at *3 (D.C. Cir. Dec. 6, 2022) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); *see also Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J.) ("The affirmative burden of showing a likelihood of success on the merits . . . necessarily includes a likelihood of the court's *reaching* the merits, which in turn depends on a likelihood that the plaintiff has standing." (internal quotation marks omitted) (emphasis in original)); *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (noting that "regardless of whether the sliding scale approach applies, parties seeking a preliminary injunction must" establish a likelihood that all "jurisdictional prerequisites" are satisfied. That rule makes eminent sense, as "[d]efect[s] of standing" constitute "defect[s] in subject matter jurisdiction," *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), and courts must proceed with caution when their jurisdiction is in doubt. Whatever the precise contours of the authority of courts sitting in equity, it is safe to conclude that—at a bare minimum—a court ought not issue an injunction, which could remain in place for many months while the parties litigate the case to a final judgment, when the court is unpersuaded that it has jurisdiction—or even that it "likely" has jurisdiction—and the injunction is unnecessary to preserve the court's jurisdiction.

Plaintiffs must support their standing to bring suit "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir.

2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  Accordingly, at the

pleading stage, "general factual allegations of injury resulting from the defendant's conduct may

suffice," *Lujan*, 504 U.S. at 561, and the court should dismiss a claim for lack of jurisdiction

only if the plaintiffs have failed to "state a plausible claim that [they have] suffered an injury in

fact fairly traceable to the actions of the defendant that is likely to be redressed by a favorable

decision on the merits," *Food & Water Watch, Inc.*, 808 F.3d at 913 (alteration in original)

(quoting *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015)).  But because, on a

motion for preliminary injunction, the Court should "evaluate[] Plaintiffs' standing to bring their

claims under the heightened standard for evaluating a motion for summary judgment," *id.* at 912

(internal quotation marks omitted), the plaintiff "can no longer rest on such 'mere allegations,'

but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the

summary judgment motion will be taken as true," *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P.

56(e)).

### III. ANALYSIS

To establish Article III standing, Plaintiffs must demonstrate that they are suffering an

"injury in fact"—"an invasion of a legally protected interest which is (a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at

560 (internal citations and quotation marks omitted).  "The plaintiff[s'] injury must be 'fairly

traceable to the challenged action of the defendant,' and likely to be 'redressed by a favorable

decision.'" *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (quoting *Lujan*,

504 U.S. at 560–61).  "In a case of this sort, where the plaintiffs seek declaratory and injunctive

relief, past injuries alone are insufficient to establish standing."  *Dearth v. Holder*, 641 F.3d 499,

501 (D.C. Cir. 2011).  Rather, Plaintiffs must show that they are "suffering an ongoing injury" or

that they "face[] an immediate threat of injury."  *Id.* (citing *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

No plaintiff in this case has been arrested and prosecuted—or threatened with arrest or prosecution or with the imposition of a civil penalty—for violating the provision of D.C. law at issue here.  But Plaintiffs contend that they are suffering continuing, adverse effects sufficient to support standing because § 7-2509.07(a)(6) "prohibit[s] them from carrying their registered personal protection handguns in . . . public transportation vehicles and stations in violation of their Second Amendment right."  Dkt. 6-1 at 12.  "Where," as here, "a plaintiff has yet to face prosecution under a statute he seeks to challenge," the Supreme Court "requires that he establish Article III standing by '(1) alleg[ing] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute,' and [by] (2) demonstrating that 'there exists a credible threat of prosecution thereunder.'"  *Ord*, 587 F.3d at 1140 (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).

### A.

The first of the preenforcement standing requirements is easily satisfied here.  The D.C. Circuit has disavowed any requirement that plaintiffs asserting preenforcement challenges express an "*unconditional* intention to engage in the proscribed behavior, regardless of whether the statute is invalidated."  *Seegars v. Gonzales*, 396 F.3d 1248, 1251 (D.C. Cir. 2005) (emphasis in original).  As a result, the first *United Farm Workers* prong is satisfied where, for example, plaintiffs who did not own firearms at the time of litigation alleged that they forewent the "additional security of possessing pistols" "because of the threat of criminal prosecution."  *Id.* at 1251; *see also Ord*, 587 F.3d at 1143 (concluding that a plaintiff had standing to bring a preenforcement challenge where "his complaint and affidavit c[ould] only be understood to mean

that if the threat of arrest [were] removed, he intend[ed] to travel to D.C. while armed"). Here, Plaintiffs aver, under the penalty of perjury, that, "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution." Dkt. 6-2 (Angelo Decl. ¶ 4); Dkt. 6-3 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 (Miller Decl. ¶ 4); Dkt. 6-5 (Erickson Decl. ¶ 4). That course of conduct—*i.e.*, the carrying of pistols on public transportation—moreover, is one "arguably affected with a constitutional interest." *Ord*, 587 F.3d at 1140 (quoting *United Farm Workers*, 442 U.S. at 298); *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022) (concluding that the Second Amendment "protect[s] the right of an ordinary, law-abiding citizen" to "carry handguns publicly for their self-defense").

It is at the second prong of the *United Farm Workers* test where Plaintiffs' claim of standing falters. Significantly, binding D.C. Circuit case law "demands more than does *United Farm Workers*," *Ord*, 587 F.3d at 1141—at least where the plaintiff presents a "non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings," *Seegars*, 396 F.3d at 1254. In those contexts, plaintiffs must establish that the threat of prosecution is not only "credible," but also "imminent." *Ord*, 587 F.3d at 1140. In other words, plaintiffs bringing a preenforcement challenge must "demonstrate that their prosecution results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the . . . government for prosecution.'" *Id.* at 1140–41 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir. 2007)).

The D.C. Circuit first articulated this imminence requirement in *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), which required the court to evaluate the Article III standing of gun manufacturers to bring a preenforcement challenge to various provisions of the

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1796.  The

challenged law, among other things, made it unlawful for any person to "manufacture, transfer,

or possess a semiautomatic assault weapon," *Navegar, Inc.*, 103 F.3d at 997 (quoting 18 U.S.C.

§ 922(v)(1) (1994)), and defined "semiautomatic assault weapon" to include "any of the

firearms . . . known as . . . INTRATETEC-9, TEC-DC9, and TEC-22; and . . . revolving cylinder

shotguns, such as (or similar to) the Street Sweeper and Striker 12," *id.* (quoting 18 U.S.C.

§ 921(a)(30)(A) (1994)).  The statute also outlawed the transfer or possession of any "large

capacity ammunition feeding device," which was defined to include "ammunition magazines . . .

which can hold more than ten rounds of ammunition."  *Id.* (quoting 18 U.S.C. § 922(w)(1)

(1994)).  In considering the plaintiffs' challenges to those provisions, the D.C. Circuit explained

that "[t]he question of whether a threat of prosecution adequate to satisfy the requirements of

justiciability is present in any particular preenforcement challenge is a factual and case-specific

one."  *Id.* at 999.  In that vein, the court distinguished between the Act's ban on "large capacity

ammunition feeding devices" more generally, *id.* at 1001, and those that "specifically name[d]

products made only by the [challengers]," *id.* at 1000.

     As to the statutory provisions that explicitly named the plaintiffs' products, the court held

that, "[b]ecause it is clear to whom these provisions of the Act would be applied were they to be

applied at all," the fear of prosecution was "firmly grounded in the language of the Act;" the only

context in which that fear could be deemed "speculative" would be "if it [were] likely that the

government [would] simply decline to enforce these provisions at all."  *Id.*  But for those

statutory provisions that identified prohibited materials by their characteristics, rather than by

their manufacturers, the D.C. Circuit held that the asserted injury (or prospect of injury) was too

speculative to establish Article III standing.  *Id.* at 1001–02.  Even though inspection agents from

the Bureau of Alcohol, Tobacco and Firearms ("ATF") had visited the challengers' facilities and "informed officers of the[] companies [about] the [relevant] prohibitions," *id.* at 997, the court stressed that "nothing in . . . [the Act] indicate[d] any special priority placed upon preventing these parties from engaging in specified conduct," *id.* at 1001. The gun manufacturers, accordingly, lacked standing to challenge the characteristic-specific provisions.

The D.C. Circuit reaffirmed this approach to preenforcement challenges eight years later—at least as to those that challenge "a criminal statute not burdening expressive rights and not in the form of appeal from an agency decision." *Seegars*, 396 F.3d at 1253. In *Seegars v. Gonzalez*, a group of D.C. residents who wished "lawfully [to] possess pistols in the District" challenged a series of firearms registration laws that effectively prohibited them from "purchas[ing] and lawfully possess[ing] a new pistol" (unless the pistol was registered "before September 24, 1976") and from, in one plaintiff's case, "remov[ing] the trigger lock" on the shotgun that she stored in her home. *Id.* at 1250–51. The *Seegars* plaintiffs averred that "because of the threat of criminal prosecution, they fore[went] what they believe[d] would be the additional security of possessing pistols or possessing a shotgun ready for immediate use." *Id.* at 1251.

In considering whether the *Seegars* plaintiffs had standing to challenge these laws, the D.C. Circuit acknowledged that its analysis in *Navegar* was "in sharp tension with" both the "standard rules governing preenforcement challenges to agency regulations" and with the D.C. Circuit's "cases upholding preenforcement review of First Amendment challenges," where the court's apparent concern with "'chilling effects' on speech" had allowed plaintiffs to bring preenforcement challenges even absent a specific threat of enforcement or a high probability thereof. *Id.* at 1253–54. But "[d]espite these apparent tensions, [the court] faithfully appl[ied]

the analysis articulated by *Navegar*," *id.* at 1254, and held that the plaintiffs lacked Article III standing because they had not "allege[d] . . . prior threats against them or any characteristics indicating an especially high probability of enforcement against them," *id.* at 1255.  In doing so, the *Seegars* court disavowed any requirement that the plaintiffs had to be "individually or specifically burdened in a way distinct from some broader class of potential prosecutees;" rather, the court recognized that an injury could be cognizable where it was "widely shared," but only if it was also "concrete."  *Id.* at 1253 (quoting *FEC v. Akins*, 524 U.S. 11, 24 (1998)).

Two years after its decision in *Seegars*, the D.C. Circuit once again considered a preenforcement challenge to the same laws challenged in *Seegars*; the Court, again, reached the same conclusion as to all but one plaintiff.  *See Parker*, 478 F.3d at 374–78.  As in *Seegars*, the *Parker* plaintiffs alleged that the D.C. licensing and trigger-lock requirements precluded them from "possess[ing] what they describe[d] as 'functional firearms'"—*i.e.*, "ones that could be 'readily accessible to be used effectively when necessary' for self-defense in the home," *id.* at 374—because they "fear[ed] arrest, criminal prosecution, incarceration, and fine" under the statute, Compl. at 2, *Parker v. District of Columbia*, 311 F. Supp. 2d 103 (D.D.C. 2004).  But because the plaintiffs failed to allege that they "ha[d] been singled out or uniquely targeted by the D.C. government for prosecution," the D.C. Circuit, bound by *Seegars* and *Navegar*, concluded that the *Parker* plaintiffs—with the exception of one who had "applied for and been denied a registration certificate to own a handgun"—lacked Article III standing to challenge the laws.  *Parker*, 478 F.3d at 375–76.  The court reached that conclusion even though the District indicated during the course of litigation that it intended to "enforce the law" against the *Parker* plaintiffs "if, in fact, they br[oke] [it]," Br. of Appellant at 21, *Parker*, 478 F.3d 370 (No. 04-7041), reasoning that those statements, standing alone, did not evidence the requisite

"'special priority' for preventing *these* appellants from violating the gun laws, or a particular interest in punishing *them* for having done so," *Parker*, 478 F.3d at 375 (emphasis in original). "Rather," the Court explained, "the District appear[ed] to be expressing a sentiment ubiquitous among stable governments the world over, to wit, scofflaws will be punished." *Id.*[4]

These cases paint a clear picture: to establish Article III standing, a plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written. Measured against this standard, Plaintiffs' grounds for asserting standing fall short. At this stage, Plaintiffs rest their entire standing argument on the facial contention that "[b]ut for D.C. law, [they] would carry [their] concealed handgun[s] on Metro trains and buses for self-defense" and that they "do not do so now because [they] fear arrest and prosecution." Dkt. 6-2 (Angelo Decl. ¶ 4); Dkt. 6-3 (Yzaguirre Decl. ¶ 4); Dkt. 6-4 (Miller Decl. ¶ 4); Dkt. 6-5 (Erickson Decl. ¶ 4). Although the *Seegars* court observed, in describing the imminence requirement, that "clarity prevails only at the poles," 396 F.3d at 1252, Plaintiffs—who could not, at oral argument, identify a single person "with a concealed carry permit [who has] ever been arrested for carrying a handgun on public transportation in the District of Columbia while not engaged in another crime," Rough Tr. at 8–9 (Dec. 12, 2022 Hearing)—have done little to establish that the threat of enforcement is more than "speculative," *Seegars*, 396 F.3d at 1252.

Notably, notwithstanding binding D.C. Circuit precedent on the issue, Plaintiffs made no colorable effort to establish standing in moving for a preliminary injunction; surprisingly, they

---

[4] The D.C. Circuit's decision in *Ord v. District of Columbia*, 587 F.3d 1136 (D.C. Cir. 2009), is not to the contrary. In that case, a warrant had been issued for the plaintiff's arrest after he allegedly violated the D.C. firearms licensing law that he wished to challenge. *Id.* at 1138. Although the D.C. government later declared a nolle prosequi as to Ord, the Court concluded that the past warrant and the District's concession, in litigation, that Ord would likely be prosecuted in the future suggested that "the District of Columbia place[d] a special priority on enforcing the laws against *him*." *Id.* at 1142 (emphasis added).

do not even mention *Navegar*, *Seegars*, or *Parker* in their opening brief.  *See* Dkt. 6-1.  For the first time in their reply, Plaintiffs argue that "[t]he District has never disclaimed an intent to enforce the Metro carry ban."  Dkt. 29 at 13.  But nowhere do Plaintiffs allege (much less show a likelihood of establishing) that they "have been singled out or uniquely targeted by the D.C. government for prosecution," *Parker*, 478 F.3d at 375, and they point to no "prior threats against them" and to no "characteristics indicating an especially high probability of enforcement against them," *Seegars*, 396 F.3d at 1255.  The Court, accordingly, finds no basis to distinguish the plaintiffs who, fearing prosecution, decide not to bring their handguns on a Metrorail train or Metrobus from those in *Seegars* and *Parker* who, fearing prosecution, decided not to possess pistols at all.  *See id.* at 1251; *see, e.g.*, Compl. at 1, *Parker*, 311 F. Supp. 2d 103.

**B.**

Rather than squarely address their burden to establish standing under *Navegar* and its progeny, Plaintiffs argue that the D.C. Circuit's precedents are either "not the law under binding Supreme Court precedent" or are "distinguishable" from the present case.  Dkt. 29 at 14.  The Court is unpersuaded.

Plaintiffs first contend that *Seegars* and *Navegar* "have been eviscerated" by the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n v. City of New York* ("*NYSR&P*"), 140 S. Ct. 1525 (2020) (per curiam).  *See* Dkt. 29 at 14.  In *NYSR&P*, three gun owners challenged a New York City rule that regulated the transportation of handguns, alleging that the rule unconstitutionally prevented them from transporting their firearms to their second residences and to shooting ranges outside of the city.  *See N.Y. State Rifle & Pistol Ass'n v. City of New York*, 86 F. Supp. 3d 249, 253 (S.D.N.Y. 2015).  The Second Circuit concluded that the rule did not violate the Second Amendment, *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d

45, 64 (2d Cir. 2018), and the Supreme Court granted certiorari, *see* 139 S. Ct. 939 (mem.).

Before the Supreme Court heard oral argument in the case, the State and City of New York

amended their statutes and rules, respectively, which effectively awarded the plaintiffs "the

precise relief that [they] requested in . . . their complaint." *NYSR&P*, 140 S. Ct. at 1526.  The

Supreme Court, accordingly, concluded that the case was moot and vacated the judgment of the

Court of Appeals, remanding for "such proceedings as are appropriate" and leaving the door

open for "the Court of Appeals and the District Court" to consider, on remand, "whether

petitioners m[ight] still add a claim for damages" with respect to the City's old rule.  *Id.* at 1526–

27.

In Plaintiffs' view, the Supreme Court's per curiam order—which said nothing about

standing—implicitly rejected the D.C. Circuit's preenforcement standing precedents.  "If

plaintiffs had needed to be singled out or personally threatened to have standing," they argue,

"the Court would have never reached the question whether the claims were moot, nor would the

Court have vacated and remanded for a determination whether the plaintiffs could assert a

damage claim."  Dkt. 29 at 15.  That argument is unavailing for at least three reasons.  First, as

the Supreme Court has repeatedly recognized, courts may resolve the question of mootness

"without first determining whether [the plaintiffs] ha[ve] standing because the former question"

(mootness), "like the latter" (standing), "goes to the Article III jurisdiction of this Court and the

courts below, not to the merits of the case."  *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43,

66–67 (1997); *see also Burke v. Barnes*, 479 U.S. 361, 364 (1987) (declining to address standing

because the Court determined that the case was moot); *Friends of the Earth, Inc. v. Laidlaw*

*Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (endorsing this same approach).  To be sure,

"subject-matter jurisdiction necessarily precedes a ruling on the merits."  *Ruhrgas AG v.*

*Marathon Oil Co.*, 526 U.S. 574, 584 (1999).  But "the same principle does not dictate a sequencing of jurisdictional issues" and "[i]t is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."  *Id.* at 585.

Second, it is not evident that the New York City residents challenging the transportation laws faced the same difficulty establishing standing that the Plaintiffs do in this case.  At least two of the three plaintiffs in *NYSR&P* had "been advised by out-of-state ranges that they were not permitted to engage in target practice or [to] participate in shooting competitions at those ranges because of New York City's enforcement" of the handgun-transportation rule.  *N.Y. State Rifle & Pistol Ass'n*, 86 F. Supp. 3d at 257.  Those plaintiffs, accordingly, may well have alleged a concrete injury based on their inability to engage in those activities, regardless of whether they faced a credible fear of prosecution.  *Cf. Cuti v. Garland*, --- F. Supp. 3d --- , 2022 WL 4598536, at *2, *4 (D.D.C. Sept. 29, 2022) (concluding that the plaintiff had "at least plausib[ly] allege[d]" a redressable injury where "licensed ranges and bird hunting facilities located in New Jersey" had indicated "that they would refuse . . . [the plaintiff] access to their guns" based on their interpretation of the challenged federal statute (internal quotation marks omitted)).

Third, although the Supreme Court typically "vacate[s] the judgment with directions to dismiss" when "disposing of a case that has become moot on appeal," the Court does not follow that practice "where the mootness is attributable to a change in the legal framework governing the case, and where the plaintiff may have some residual claim under the new framework that was understandably not asserted previously."  *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 482 (1990); *see also NYSR&P*, 140 S. Ct. at 1526 (quoting same).  In those circumstances, the Supreme Court typically "vacate[s] the judgment and remand[s] for further proceedings in which the parties may, if necessary, amend their pleadings or develop the record more fully."  *Lewis*,

494 U.S. at 482.  The Supreme Court opted for the latter approach in *NYSR&P*, but, in doing so, expressed no view as to whether the plaintiffs had standing to assert an as-yet-unpled damages claim—a question that would, presumably, be presented first to the lower courts and only after the plaintiffs filed an amended complaint.  *See NYSR&P*, 140 S. Ct. at 1526–27.  But even if the Supreme Court implicitly assumed, in remanding the case, that the petitioners would—or might—have standing to bring a *damages* claim, that assumption would have no bearing on the distinct question of whether they had standing to bring a preenforcement challenge for *injunctive* relief.  *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) ("[A] plaintiff must 'demonstrate standing separately for each form of relief sought.'" (quoting *Friends of the Earth*, 528 U.S. at 185)); *Lyons*, 461 U.S. at 102 (explaining that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief" (alteration in original) (internal quotation marks omitted)).  The Supreme Court's decision in *NYSR&P*, accordingly, does not speak to—much less "eviscerate"—the *Navegar* line of cases.  And none of Plaintiffs' tea-leaf reading comes close to persuading this Court to disregard binding D.C. Circuit precedent.

Plaintiffs' second argument posits that the *Navegar* line of cases is inconsistent with the Supreme Court's standing precedents, which, in Plaintiffs' view, require only a "credible" threat of prosecution and expressly disavow the notion that an individual must be subject to "arrest, prosecution, or other enforcement action" before challenging a criminal statute.  Dkt. 29 at 17– 18 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 159 (2014)); *see also United Farm Workers*, 442 U.S. at 298.  Of particular relevance to Plaintiffs' argument is the Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), in which the Court concluded that a party to a patent license agreement had standing to "challenge the validity

of [a] patent without terminating or breaking the agreement," *id.* at 135.  Because *MedImmune*,

unlike *Susan B. Anthony List* and *United Farm Workers*, did not allege an infringement of First

Amendment rights, Plaintiffs argue that the case undermines D.C. Circuit precedent suggesting

that "there is one standing requirement for First Amendment cases and another for others."  Dkt.

29 at 19.

   But *MedImmune* casts less doubt on *Navegar* and *Seegars* than Plaintiffs suggest.  As the

Supreme Court recounts, before the petitioner in *MedImmune* brought suit, the respondent

(Genentech) sent a letter to MedImmune that MedImmune "considered . . . to be a clear threat to

enforce [the challenged] patent, terminate the [relevant] license agreement, and sue for patent

infringement if petitioner did not make royalty payments as demanded."  *MedImmune, Inc.*, 549

U.S. at 122.  That letter prompted MedImmune to "pa[y] the demanded royalties" rather than to

risk the serious consequences of a patent infringement suit.  *Id.*  That threat alone distinguishes

MedImmune from the plaintiffs in *Seegars* and *Parker*, none of whom faced specific threats that

the challenged laws would be enforced against them.  *See, e.g.*, *Seegars*, 396 F.3d at 1255

(finding it significant that "plaintiffs allege[d] no prior threats against them"); *cf. Parker*, 478

F.3d at 375 (determining that the threats of enforcement lodged against the plaintiffs during

litigation were insufficiently targeted).  Moreover, unlike the plaintiffs in *Seegars* and *Parker*,

whose gun ownership, if commenced, might have gone unnoticed, Genentech would have known

as soon as MedImmune stopped making the required royalty payments—a fact that, in itself,

increased the certainty of an enforcement action.

   To be sure, the Supreme Court's First Amendment precedents are more difficult to square

with *Navegar* and its progeny.  Although the Supreme Court has emphasized even in the First

Amendment context that the "threatened enforcement [must be] sufficiently imminent" to

059

warrant "preenforcement review," *Susan B. Anthony List*, 573 U.S. at 159, the Court has not always required, in that context, that challengers "have been singled out or uniquely targeted by the . . . government for prosecution," *Parker*, 478 F.3d at 375.  In *Babbitt v. United Farm Workers*, for example, the Supreme Court concluded that the plaintiffs had standing to bring a preenforcement suit challenging a statute that barred the use of "dishonest, untruthful, and deceptive publicity" based on allegations that the plaintiffs had "actively engaged in consumer publicity campaigns in the past," intended to continue doing so, and that "erroneous statements [were] inevitable" in those future publicity campaigns.  442 U.S. at 301–02 (internal quotation marks omitted).  And in *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988), the Court concluded that a group of booksellers had standing to challenge a Virginia law that criminalized the display of certain types of sexually explicit materials for commercial purposes simply because "the State ha[d] not suggested that the newly enacted law w[ould] not be enforced" and because the booksellers, accordingly, had "an actual and well-founded fear that the law will be enforced against them." *Id.* at 392–93.  That last point is in tension with the D.C. Circuit's conclusion, in the Second Amendment context, that a "general threat of prosecution" does not establish standing.  *Parker*, 478 F.3d at 374.

Notwithstanding that tension, "[s]tare decisis compels adherence to a prior factually indistinguishable decision of a controlling court," *Brewster v. Comm'r of Internal Revenue*, 607 F.2d 1369, 1373 (D.C. Cir. 1979), and it is the province of the D.C. Circuit, and not this Court, to harmonize circuit precedent and to say when D.C. Circuit decisions should be overruled, *see Critical Mass Energy Proj. v. Nuclear Reg. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (noting that decisions of the D.C. Circuit "bind the circuit 'unless and until overturned by the court en banc or by Higher Authority'" (quoting *Save Our Cumberland Mountains, Inc. v. Hodel*, 826

F.2d 43, 54 (D.C. Cir. 1987), *vacated in part en banc*, 857 F.2d 1516 (D.C. Cir. 1988) (en banc))).  That principle has particular force where, as here, the D.C. Circuit itself has reckoned with the tension between *Navegar* and the Supreme Court's First-Amendment precedents, including *United Farm Workers* and *American Booksellers Ass'n*.  Notably, in *Parker*, the D.C. Circuit explained that the Supreme Court "took a far more relaxed stance on pre-enforcement challenges" in those First Amendment cases than "*Navegar* and *Seegars* permit" in the context of other constitutional challenges.  478 F.3d at 375; *see also Seegars*, 396 F.3d at 1254 (articulating the "tension between *Navegar* and [the D.C. Circuit's] cases upholding preenforcement review of First Amendment challenges to criminal statutes").[5]  Multiple judges on the D.C. Circuit have, moreover, called for reconsideration of *Navegar* en banc—some of them precisely on the grounds that the decision is at odds with *United Farm Workers*.  *See, e.g.*, 396 F.3d at 1257 (Sentelle, J., dissenting) ("I know of no hierarchy of Bill of Rights protections that dictates different standing analysis."); *Ord*, 587 F.3d at 1146 (Brown, J., dissenting in part) (calling on the en banc D.C. Circuit to "rehear this appeal *sua sponte* and overrule *Navegar*"); *Seegars v. Gonzales*, 413 F.3d 1, 2 (D.C. Cir. 2005) (mem.) (Williams, J.) (explaining his "call for rehearing en banc" of the panel decision in *Seegars*).  "Nevertheless," the D.C. Circuit has explained that, "unless and until [the] en banc [D.C. Circuit] overrules these recent precedents,

---

[5] Although the *Seegars* dissent is correct in explaining that there is no "hierarchy of Bill of Rights protections" that necessarily "dictates different standing analysis," *Seegars*, 396 F.3d at 1257 (Sentelle, J., dissenting), the Court notes that the Supreme Court has adopted a particularly expansive view of standing in the First-Amendment context, *see, e.g.*, *Am. Booksellers Ass'n*, 484 U.S. at 392–93 ("[I]n the First Amendment context, '[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" (alteration in original) (quoting *Sec. State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 956–57 (1984))).  Given existing precedent, it is for the en banc D.C. Circuit or the Supreme Court, and not this Court, to decide whether that distinction matters outside the context of an overbreadth challenge.

[the court] must be faithful to *Seegars* just as the majority in *Seegars* was faithful to *Navegar*."
*Parker*, 478 F.3d at 375.  Whatever the merits of Plaintiffs' doctrinal critiques, then, this Court
must, just like the D.C. Circuit, remain faithful to these precedents.

Lastly, Plaintiffs contend, to no avail, that *Seegars* and *Navegar* are distinguishable, even
if they remain good law.  Dkt. 29 at 20.  Unlike the plaintiffs in *Seegars*, who "could have
applied to register a pistol and then challenged the subsequent denial," a preenforcement
challenge is, in Plaintiffs' view, the only "means of seeking relief" here—aside from risking
arrest and prosecution.  *Id.* (internal quotation marks omitted).  But that argument is squarely
foreclosed by the D.C. Circuit's decision in *Seegars*, which made clear that "the lack of an
administrative remedy, while it increases the hardship resulting from denial of preenforcement
review, still does not enable [the plaintiff] to meet the *Navegar* test."  396 F.3d at 1256.  *Contra*
*Seegars*, 413 F.3d at 1 (Ginsburg, J., concurring in the denial of rehearing en banc) (suggesting,
contrary to the decision of the panel, that the availability of administrative remedies to the
*Seegars* plaintiffs was among the reasons to deny preenforcement review).  And even if, as
Plaintiffs suggest, the D.C. Circuit's standing doctrine would make § 7-2509.07(a)(6) altogether
"unchallengeable," Dkt. 29 at 21, that fact alone would not militate in favor of a different
interpretation of the D.C. Circuit's precedents, for "[t]he assumption that if [the plaintiffs] have
no standing to sue, no one would have standing, is not a reason to find standing."  *Clapper v.*
*Amnesty Int'l USA*, 568 U.S. 398, 420 (2013) (first alteration in original) (quoting *Valley Forge*
*Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982)).

Plaintiffs also suggest, although only in passing, that this case is distinct from *Navegar*
because "[a] specific statute governs when and where [these plaintiffs] may carry their firearms,"
Dkt. 29 at 21, while "the general nature of the language" in some portions of the Act at issue in

*Navegar* "ma[de] it impossible to foretell precisely how [the Act's] provisions [would] be applied," *Navegar, Inc.*, 103 F.3d at 1001.  But the "general nature of the language" at issue in *Navegar* "suggest[ed] [to the D.C. Circuit] additional concerns as to the[] [claim's] *ripeness*" and did not seem to factor into the plaintiff's *standing* to bring the suit.  *Id.* (emphasis added); *see Worth v. Jackson*, 451 F.3d 854, 857–61 (D.C. Cir. 2006) (articulating that standing addresses the nature and redressability of the plaintiff's injury while the related doctrine of ripeness ensures that the courts do not "entangl[e] themselves in abstract disagreements").  Moreover, even if *Navegar*'s generality concern factored into the Court's standing analysis, *see Seegars*, 396 F.3d at 1258 (Sentelle, J., dissenting) (distinguishing *Navegar* on this ground), the statute in *Navegar*, which prohibited, among other weapons, "large capacity ammunition feeding devices" (*i.e.*, those with a capacity of "more than 10 rounds of ammunition"), was no less specific than the statute at issue in this case.  *Navegar*, 103 F.3d at 1001 (quoting 18 U.S.C. §§ 922(w)(1) and 921(a)(31) (1994)).  *Cf. Parker*, 478 F.3d at 373, 375 (concluding that certain plaintiffs did not have standing to challenge a number of specific laws, including one "requiring that all lawfully owned firearms be kept unloaded and disassembled or bound by a trigger lock or similar device").

Finally, the Court notes that it is far from clear that Plaintiffs have shown enough to establish standing—or a likelihood that they have standing—even under a standard less onerous than that set forth in the *Navegar* line of cases.  In *United Farm Workers*, for example, the Supreme Court identified three requirements to establish standing in a First Amendment, preenforcement suit: the plaintiff must show that (1) she intends "to engage in a course of conduct arguably affected with a constitutional interest;" (2) her actions are "proscribed by a statute;" and (3) "there exists a credible threat of prosecution" under that statute.  442 U.S. at

298.  Here, Plaintiffs have offered declarations that arguably satisfy the first two elements of this test.  They leave the third element, however, entirely unaddressed.

To be sure, as Judge Williams observed in *Seegars*, "the adjective 'credible' says little or nothing about the requisite level of probability of enforcement."  396 F.3d at 1252.  But the term does provide "clarity . . . at the poles," *id*., and, here, Plaintiffs have failed to proffer *any* evidence relating to any threat or risk of enforcement.  Although they do allege that the MPD Chief is responsible for enforcing D.C. law and "is in fact presently enforcing the challenged laws, customs and practices against plaintiffs," Dkt. 1 at 3 (Compl. ¶ 6), that allegation is insufficient on multiple levels.  To start, it is not even clear that the MPD, as opposed to the Metro Transit Police Department ("MTPD"), bears primary responsibility for policing Metrorail trains and Metrobuses.  More importantly, a conclusory allegation contained in an unverified complaint is insufficient to support a motion for a preliminary (or permanent) injunction.  *See Food & Water Watch, Inc*., 808 F.3d at 913.  Plaintiffs bear the burden of demonstrating that the Court is likely to conclude that they have Article III standing, *id.*, but have offered no evidence indicating that the MPD has had any contact with them regarding the law at issue; that they have contacted the MPD or MTPD; or, more generally, that they have any other reason to believe that they face a threat of prosecution.  Dkts. 6-2, 6-3, 6-4 & 6-5.  Indeed, when asked at oral argument, Plaintiffs' counsel was unable to identify any case in which an individual licensed to carry a handgun has ever been prosecuted simply for carrying a concealed handgun on a Metrorail train or a Metrobus.  *See* Rough Tr. at 8–9 (Dec. 12, 2022 Hearing).  Instead, Plaintiffs' counsel merely speculated that those carrying concealed handguns often pat their sides (to confirm that they have their guns with them) and that, by doing so, they might provide a tell for law enforcement officers and thereby invite arrest, *id.* at 7; he also asserted that the MPD

064

invariably arrests those who violate any of "the myriad of firearms regulations" in the District of Columbia, *id.* at 9.  Neither statement by counsel, however, is evidence, and the evidence that Plaintiffs have offered says nothing about the risk of criminal or civil enforcement of § 7-2509.07(a)(6).[6]  As a result, even under the standard set forth in *United Farm Workers*, the Court is unpersuaded that Plaintiffs have shown that they face a "credible threat of prosecution" or civil fine.  *See* 442 U.S. at 298 ("[P]ersons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." (quoting *Younger v. Harris*, 401 U.S. 37, 42 (1971))).

In sum, then, Plaintiffs have failed to allege that they satisfy the imminence requirement as articulated by the D.C. Circuit in *Navegar* and *Seegars*; have failed to persuade the Court that the D.C. Circuit's precedents are no longer good law or do not control this case; and, indeed, have failed to offer any evidence regarding whether and how § 7-2509.07(a)(6) is enforced. Because "an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction," *Food & Water Watch*, 808 F.3d at 913, the Court will deny Plaintiffs' motion for temporary and permanent injunctive relief.

---

[6] The risk of a civil enforcement action, moreover, raises very different considerations than the risk of a criminal prosecution.  Plaintiffs, however, offer no evidence regarding which, if either, path the D.C. Attorney General typically takes in cases involving first-time violations of § 7-2509.07(a)(6) by license handgun owners.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for preliminary and permanent injunctive relief, Dkt. 6, is hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 28, 2022

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **GREGORY T. ANGELO** | ) | |
| 130 M St NE, #908 | ) | |
| Washington, DC 20002 | ) | |
| | ) | |
| **TYLER YZAGUIRRE** | ) | |
| 40 Quincy Place, NE | ) | |
| Washington, DC 20002 | ) | |
| | ) | |
| **ROBERT M. MILLER** | ) | |
| 4094 Majestic Lane # 278 | ) | |
| Fairfax, Virginia 22033 | ) | |
| | ) | |
| **CAMERON M. ERICKSON** | ) | |
| 2516 Q Street NW | ) | |
| Washington, DC 20007 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-cv-1878 |
| | ) | |
| **DISTRICT OF COLUMBIA**, | ) | |
| Serve: Mayor Muriel Bowser | ) | |
| 1350 Pennsylvania Avenue, NW | ) | |
| Washington, DC 20004 | ) | |
| | ) | |
| c/o Office of Attorney General | ) | |
| 1 Judiciary Square | ) | |
| 441 4th Street, N.W., 6th Fl. South | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | |
| **ATTORNEY GENERAL BRIAN SCHWALB** | ) | |
| 1 Judiciary Square | ) | |
| 441 4th Street, N.W., 6th Fl. South | ) | |
| Washington, D.C. 20001 | ) | |
| | ) | |
| **CHIEF ROBERT J. CONTEE III** | ) | |
| Metropolitan Police Department | ) | |
| 300 Indiana Avenue, N.W. | ) | |
| Washington, DC 20004 | ) | |

067

**CHIEF MICHAEL ANZALLO**           )
Metro Transit Police                               )
Washington Metropolitan Transit Authority  )
600 5th St NW                                       )
Washington, DC 20001                         )
                                                          )
                Defendants.   )
_____  )

## FIRST AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE RELIEF AND DAMAGES

COME NOW the Plaintiffs, Gregory T. Angelo, Tyler Yzaguirre, Robert M. Miller, and Cameron M. Erickson, by and through their undersigned counsel, and complain of the Defendants as follows:

1.      This case raises a Second Amendment challenges to the District of Columbia's ban on licensed carry of handguns on public transportation vehicles and stations, specifically DC Code Section 7-2509.06(a)(6) ("Metro Ban").

**THE PARTIES**

2.      Plaintiff Gregory T. Angelo is a natural person and a citizen of the United States and of the District of Columbia. He is a law-abiding individual who has never been arrested or convicted of any crime. Mr. Angelo has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

3.      Mr. Angelo holds a Concealed Pistol Carry License issued by the Chief of the Metropolitan Police Department ("MPD"). He regularly carries a concealed firearm for personal protection within Washington, DC. He is also a regular rider of the Washington Metropolitan Transit Authority ("WMATA") which operates bus and subway lines in the greater Washington, DC area, including in northern Virginia and Montgomery and Prince Georges Counties in

068

Maryland and in the District of Columbia. He uses the Metro because on balance it is more cost effective and time efficient than other means of transportation within the District.

4.    Mr. Angelo has personally witnessed a criminal assault occurring on a Metrorail train where an individual brandished an edged weapon and threatened passengers on the train, including Mr. Angelo. Mr. Angelo is further aware of additional instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of witnessing the above-described assault and being aware of other instances of violence occurring within the Metro system, including stabbings and shootings, Mr. Angelo is apprehensive for his safety while riding the Metro system.

5.    Because of his apprehension of becoming a victim of criminal violence, Mr. Angelo carries self-defense spray while riding Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious. Moreover, Mr. Angelo is aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

6.    Mr. Angelo would feel more comfortable riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Mr. Angelo has in some circumstances avoided using the Metro system out of fear of his personal safety because he could not within the law carry his concealed firearm for personal protection. As a result, Mr. Angelo has had to expend sums greater for transportation than he would have if he had been using the Metro system. Mr. Angelo is convinced he will have to do likewise in the future unless the Metro ban is declared unconstitutional and voided.

7.     Because District law as discussed herein forbids Mr. Angelo from carrying his concealed firearm within the Metro system, Mr. Angelo has avoided carrying his concealed firearm within the Metro system, thereby forfeiting his Second Amendment rights. If it were legal to do so, Mr. Angelo would carry his concealed firearm on and within the Metro system for self-defense.

8.     If Mr. Angelo were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

9.     Plaintiff Tyler Yzaguirre is a natural person and a citizen of the United States and of the District of Columbia. He is a law-abiding individual who has never been arrested or convicted of any crime. Mr. Yzaguirre has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

10.    Mr. Yzaguirre holds a Concealed Pistol Carry License issued by the MPD Chief. He regularly carries a concealed firearm for personal protection within Washington, DC. He is also a regular rider of the Metro system. He uses the Metro because on balance it is more cost effective and time efficient than other means of transportation within the District.

11.    Mr. Yzaguirre is aware of instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of being aware of such instances of violence occurring within the Metro system, including stabbings and shootings, Mr. Yzaguirre is apprehensive for his safety while riding the Metro system. Because of his apprehension of becoming a victim of criminal violence, Mr. Yzaguirre carries pepper spray while riding the Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not

070

always effective against an assailant who is intoxicated, enraged or delirious.  Moreover, Mr. Yzaguirre is aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

12.     Mr. Yzaguirre would feel more comfortable riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Mr. Yzaguirre has in some circumstances avoided using the Metro system out of fear of his personal safety because he could not within the law carry his concealed firearm for personal protection. As a result, Mr. Yzaguirre has had to expend sums greater for transportation than he would have if he had been using the Metro system. Mr. Yzaguirre is convinced he will have to do likewise in the future unless the Metro ban is declared unconstitutional and voided.

13.     Because District law as discussed herein forbids Mr. Yzaguirre from carrying his concealed firearm within the Metro system, Mr. Yzaguirre has avoided carrying his concealed firearm within the Metro system thereby sacrificing his Second Amendment rights. If it were legal to do so, Mr. Yzaguirre would carry his concealed firearm on and within the Metro system for self-defense.

14.     If Mr. Yzaguirre were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

15.     Plaintiff Robert M. Miller, Ph.D., is a natural person and a citizen of the United States and of Virginia. He is a law-abiding individual who has never been arrested or convicted of any violent crime. Dr. Miller has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

16.     Dr. Miller holds a Concealed Pistol Carry License issued by the MPD Chief. He also holds licenses and permits issued by the Commonwealths of Virginia, Pennsylvania and the State of Maryland, authorizing him to carry a concealed handgun in those jurisdictions and to other states with reciprocity agreements, most recently in West Virginia. He regularly carries a concealed firearm for personal protection within Virginia, the District, and Maryland where allowed. He is also a regular WMATA rider and carries his firearm when riding the Metro system wholly within the Commonwealth of Virginia and Maryland.

17.     Dr. Miller is aware of frequent instances of criminal violence occurring on the Metro system within the District of Columbia from news reports. As a social scientist in Public Economics, Dr. Miller is aware of the high crime rates within the District, generally. Because of frequent violence within the Metro system, including stabbings and shootings, Dr. Miller is apprehensive for his safety while riding the Metro system within the District of Columbia. Because of his apprehension of becoming a victim of criminal violence, Dr. Miller carries pepper spray while riding the Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not always effective against an assailant who is intoxicated, enraged, or delirious. Moreover, Dr. Miller is aware that self-defense spray allows an assailant to get too close for safety's sake, and it is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon, or a firearm. Dr. Miller is aware that pepper spray can adversely affect the user as well as the intended target.

18.     Dr. Miller is aware of instances when persons unlawfully carrying concealed weapons on DC Metro have been arrested and charged for violating the Metro Ban.

19.     Dr. Miller is apprehensive about violating the Metro Ban because he is unacceptably likely to be convicted of a crime involving a firearm, he would have his DC carry

072

permit permanently revoked, he would forfeit his unlawfully carried firearm worth more than $500, he might be forced to forfeit his $250,000 collection of firearms, he would risk the use of deadly force by police, and such a conviction would adversely affect his right to keep and bear arms in other states.

20.     Dr. Miller would feel better protected riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Dr. Miller has in many circumstances avoided using the Metro system in the District of Columbia out of fear of his personal safety because he could not within the law carry his concealed firearm for personal protection. As a result, Dr. Miller has had to expend sums greater for transportation than he would have if he had been using the Metro system, including gasoline, mileage, tolls, and parking expenses. It is certain Dr. Miller must do likewise in the future unless the Metro Ban is declared unconstitutional and voided.

21.     Because of the Metro Ban, Dr. Miller has avoided carrying his concealed firearm within the Metro system thereby forfeiting his Second Amendment rights. If it were legal to do so, Dr. Miller would carry his concealed firearm on and within the Metro system for self-defense.

22.     Because of the Metro Ban, Dr. Miller has been unable to carry his concealed firearm where lawful in Virginia, Maryland, and the District at his origin or destination, infringing his Second Amendment rights for his entire journey, not just on Metro within the District.

23.     If Dr. Miller were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

073

24.     Dr. Miller has been subjected in the past to public fear, scorn, and ridicule when exercising his right to openly carry firearms in Virginia, Colorado, and Illinois.

25.     Dr. Miller would lose his job with a Federal agency if he were arrested or convicted of any firearm offense, including misdemeanor violation of the DC Metro Ban.

26.     Plaintiff Cameron M. Erickson is a natural person and a citizen of the United States and of Washington, DC. He is a law-abiding individual who has never been arrested or convicted of any crime. Mr. Erickson has respect for the law and legal processes. He is loath to break the law. As a consequence, he is obeying the Metro Ban despite the continuing harm it causes him.

27.     Mr. Erickson holds a Concealed Pistol Carry License issued by the MPD Chief. He regularly carries a concealed firearm for personal protection within Washington, DC. He is also a regular WMATA rider.

28.     Mr. Erickson is aware of instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of being aware of such instances of violence occurring within the Metro system, including stabbings and shootings, Mr. Erickson is apprehensive for his safety while riding the Metro system. Because of his apprehension of becoming a victim of criminal violence, Mr. Erickson carries pepper spray while riding Metro; however, that does not fully assuage his apprehension because he is aware that pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious.  Moreover, Mr. Erickson is aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

29.     Mr. Erickson would feel more comfortable riding the subway and Metro buses if he were allowed to carry his concealed firearm for self-defense when using the Metro system.  Mr. Erickson has in some circumstances avoided using the Metro system out of fear of his personal

safety because he could not within the law carry his concealed firearm for personal protection. As a result, Mr. Erickson has had to expend sums greater for transportation than he would have if he had been using the Metro system. Mr. Erickson is convinced he will have to do likewise in the future unless the Metro Ban is declared unconstitutional and voided.

30.     Because District law as discussed herein forbids Mr. Erickson from carrying his concealed firearm within the Metro system, Mr. Erickson has avoided carrying his concealed firearm within the Metro system and prior embarking on the Metro and after disembarking the Metro, thereby forfeiting his Second Amendment rights. If it were legal to do so, Mr. Erickson would carry his concealed firearm on and within the Metro system for self-defense.

31.     If Mr. Erickson were to unload, clear, and secure his lawfully carried concealed firearm in a locked container before or after riding Metro within the District, he would expose himself to substantial risks of arrest, being killed or assaulted by police or concerned citizens, negligent discharge, or public fear, scorn, and ridicule.

32.     Defendant District of Columbia ("DC" or "the District") is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate much of its power to make laws for the governing of DC to the mayor and city council of the District.

33.     Defendant Brian Schwalb is the Attorney General of the District of Columbia. General Schwalb is responsible for the prosecution of the District's laws at issue in this lawsuit. General Schwalb and the official acting under him actively and vigorously enforces the myriad of firearms regulations of the District and has not disclaimed prosecution for violation of the law at issue in this proceeding. The prospective prosecution of a violation of the law at issue in this

proceeding by the Attorney General and officials acting under him chills the exercise of Plaintiffs' right to bear arms, including on the Metro system. Defendant Schwalb is sued in both his individual and official capacities.

34.     On January 19, 2023, counsel for Plaintiffs emailed General Schwalb and advised him that Plaintiffs all carry their registered handguns in the District of Columbia when it is otherwise legal to do so. Counsel explained that the Metro carry ban represents a significant hardship to Plaintiffs' Second Amendment rights.

35.     Counsel further explained that the Metro system is the primary means of transportation for Mr. Angelo who does not have a personal vehicle and that Mr. Yzaguirre and Mr. Erickson also do not own a personal vehicle. Counsel also explained that although Dr. Miller does own a personal vehicle, he finds the Metro system to be the most cost-effective means of transportation within DC, Virginia and Maryland and he regularly carries his firearm when riding the Metro system solely within Virginia, his state of residence.

36.     Counsel further explained that Mr. Angelo has previously been threatened with an edged weapon while riding the system. In addition, counsel explained that on January 11, 2023, Mr. Yzaguirre had just left the Metro Center station when he was approached by an individual who made threatening racial comments to him. Mr. Yzaguirre attempted to leave the scene, but the individual followed him continuing his threatening behavior. Counsel explained that Mr. Yzaguirre was quite apprehensive for his safety.

37.     Counsel further explained that all Plaintiffs have on previous occasions declined to ride the Metro system because of concerns for their personal safety in light of the District's Metro carry ban and the violence plaguing the system. As a result, counsel explained that Plaintiffs have expended significantly higher sums for transportation than if they would have used the Metro

service, e.g., using taxis, Uber or in the case of Dr. Miller, his personal vehicle. As a result, counsel explained that Plaintiffs are thus experiencing economic injury as a result of the Metro carry ban as well as a violation of their Second Amendment rights.

38.   Counsel further stated that in light of the above, and in light of the obvious unconstitutionality of the Metro carry ban, "this is to ask you to waive enforcement of the Metro carry ban as to my clients." An identical copy of the letter emailed to General Schwalb was emailed to Defendant Chief Contee.

39.   Counsel received no response from either General Schwalb or Chief Contee.

40.   Defendant Michael L. Anzallo is the Chief of the Washington Metropolitan Transit Authority Police Department ("WMATA-PD").   WMATA-PD has primary responsibility for enforcing the laws of the District of Columbia as they pertain to the Metro System including the law at issue in this proceeding. WMATA-PD is known to take a zero tolerance approach to violations of the law observed by its officers. The prospect of arrest by WMATA-PD officers for violation of the law at issue in this proceeding chills Plaintiffs' exercise of their right to bear arms on the Metro system and at other locations they would transit before and after their use of the Metro system. Defendant Anzallo is sued in both his individual and official capacities.   The Metro has stated publicly with respect to gun carry on the system that it follows the laws of the particular jurisdiction where such carry occurs.

41.   On January 31, 2023, Counsel for Plaintiffs deposited in the U.S. Mail a letter to Chief Anzallo providing substantially the same information as was emailed to General Schwalb and Chief Contee. The letter asked Chief Anzallo "to waive enforcement of the Metro carry ban as to my clients and enter into a non-prosecution agreement" with respect to Plaintiffs' carrying their firearms on the Metro system. Chief Anzallo has not yet responded to the letter.

42.     Defendant Robert J. Contee III is the MPD Chief. Defendant Contee is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit including the law at issue in this proceeding. MPD places a priority on enforcement of the city's firearm laws. On information and belief MPD has a policy to arrest for any violation of the District's firearm regulations. Indeed, MPD has a specialized unit, the Gun Recovery Unit, whose job is to search for persons carrying firearms in violation of District law and confiscating such firearms. The aggressive enforcement conducted y the Gun Recovery Unit has long been an issue in the city. MPD regularly publishes compilations of its gun arrests on its web site. *See, e.g.,* https://mpdc.dc.gov/release/mpd%E2%80%99s-weekly-firearm-recoveries-monday-august-1-2022-monday-august-8-2022. MPD's 2021 Annual Report touts that it recovered 2,310 firearms in that year. The prospect of arrest by MPD officers for violation of the law at issue in this proceeding chills Plaintiffs' exercise of their right to bear arms on the Metro system and other areas they would transit during their journeys before and after their use of the Metro system. Defendant Contee is sued in both his individual and official capacities.

43.     Defendant Contee also administers the District's firearm registration and license to carry laws. Officials under Defendant Contee's command regularly revoke carry licenses and firearm registration certificates when concealed carry license holders are arrested for any firearm related offense, even if the arrest is not prosecuted, the arrested person is found not guilty, or the charge is otherwise dismissed. The likely loss of their carry licenses and firearm registration certificates is yet another factor preventing Plaintiffs from exercising their right to carry handguns on the Metro system in light of the Metro Ban.

**JURISDICTION AND VENUE**

44.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

45.     Venue lies in this Court pursuant to 28 U.S.C. § 1391.

**STATEMENT OF FACTS**

**Modern handguns**

46.     All modern  handguns have multiple safety devices built in by design to prevent them from firing when dropped, bumped, or jostled. That is, firearms do not just "go off" when they are disturbed.

47.     Many firearms have a manual, external safety that physically prevents the firearm from being fired if it is dropped, bumped, or jostled. Other firearms, e.g., a Glock pistol, have multiple, independent internal safeties: (1) a trigger safety that prevents firing unless the trigger is pressed by the user; (2) a striker block safety that prevents firing unless the trigger is pulled; and (3) a drop safety preventing the gun from firing when dropped.

48.     Although trained concealed carriers have a very low chance of negligent discharges, these chances rise substantially at the point when handling a firearm, such as unholstering, loading, unloading, or clearing the firearm. The National Safety Council estimates that about 1 percent of all gun deaths (535 deaths per year) are from negligent discharges.[1] District regulations require firearms to be carried concealed inside a holster covering the trigger, which further prevents a firearm from firing from abrupt contact.

49.     The District uses a roster of approved firearms combining the rosters of California, Massachusetts, and Maryland. Those states rigorously test each firearm on the roster for safety.

---

[1] *See* https://injuryfacts.nsc.org/home-and-community/safety-topics/guns/..

That is, every handgun approved for concealed carry within the District has been rigorously tested to prevent firing unless the user deliberately presses the trigger, and not when the firearm is dropped, bumped, or jostled.

50.   Drawing reasonable inferences from the paragraphs above, the carrying of concealed firearms on crowded Metro buses and trains does not pose a safety risk to the public.

**Lawful Carry of Firearms on DC Metro**

51.   To lawfully transport a concealed carry firearm on the Metro system within the District, a concealed carry permit holder would be required to remove his firearm from concealment and the holster, remove the magazine, clear the firearm, then place the firearm inside of a lockable container carried by the user for such purpose and separate from any ammunition.

52.   If a lawful concealed carrier did this outside of Metro but within the District, removing the firearm from concealment to secure it in a container he would violate District law requiring the gun to be fully concealed.

53.   If a lawful concealed carrier on Metro in Virginia or Maryland approached the District, at some point the carrier would have to unload and clear the firearm, place it within a lockable container, then reverse this process after leaving the DC Metro system.

54.   Removing the firearm from its holster, removing the magazine, clearing it in public, and reversing these processes when leaving Metro in the District, exposes the lawful concealed carrier and the public to a potentially deadly or grievously harmful negligent discharge.

55.   A well accepted rule of handling a firearm is to always point the firearm in a safe direction, which might not be possible to do in public spaces.

56.   Drawing a firearm in a public place to clear and store it is substantially likely to expose the lawful concealed carrier to being killed or assaulted by police or concerned citizens,

080

and to cause public fear, scorn, and ridicule, regardless of whether the concealed carrier is in complete compliance with the law and safety procedures.

57.     Drawing reasonable inferences from the above paragraphs, the District's law prohibiting concealed carry on Metro causes Plaintiffs to violate other District laws, infringes their lawful carry outside the District and within the District but outside the Metro system. The Metro Ban exposes Plaintiffs and the public to the risk of negligent discharges, and puts Plaintiffs at risk of death, assault, and public fear, scorn, and ridicule. In the totality of the circumstances, the Metro Ban causes Plaintiffs substantial harm from many sources.

**The Second Amendment.**

58.     The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

59.     The Second Amendment guarantees the People of the United States a fundamental, individual right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *New York State Rifle and Pistol Association v. Bruen,* 142 S.Ct. 2111 (2022) (hereinafter "*Bruen*"); *District of Columbia v. Heller*, 554 U.S. 570 (2008) (hereinafter *"Heller")*; *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 411 (2016) (hereinafter *"Caetano")*; *Wrenn v. District of Columbia,* 864 F.3d 650 (D.C. Cir. 2017) (hereinafter *"Wrenn"*); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C 2014) (hereinafter *"Palmer"*).

60.     Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.). They are anything that a man [or woman] wears for his defense, or takes

into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)." *Heller*, 554 U.S. at 581.

61.     The Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (*per curiam*).

62.     Pursuant to the Supreme Court's decision in *Bruen, supra,* and the DC Circuit's decision in *Wrenn*, *supra,* the Second Amendment protects the right of law-abiding citizens to carry a handgun in public for self-protection. A necessary component of the right to carry a firearm is the right to possess and carry ammunition for that firearm. Otherwise, the firearm would be useless as a self-defense tool, other than perhaps as a clubbing weapon. *Cf. Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) (the ability to train and practice with a firearm is protected by the Second Amendment).

63.     Under the Second Amendment, the District retains the ability presumptively to regulate consistent with the nation's historical tradition of firearms regulation the manner of carrying arms, including handguns, and may prohibit certain arms in narrowly defined sensitive places, and prohibit the carrying of arms that are not within the scope of the Second Amendment's protection, such as unusual and dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627; *Wrenn,* 864 F.3d at 662-63 & n. 5. *See also Bruen,* 142 S.Ct. at 2128-29. However, when such regulations impinge on the ability of law-abiding persons to protect themselves and their loved ones, such laws are invalid unless supported by the text of the Second Amendment or by well-established representative historical analogues existing at the time of the founding or shortly thereafter. *Bruen*, 142 S.Ct. at 2129-30.

64.     Given the decisions in *Bruen* and *Heller*, The District of Columbia may not ban the keeping and bearing of arms for self-defense that are not unusual and dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the text of the Second Amendment and the historical tradition of firearms regulation in the United States. *Id. See also Caetano*, 577 U.S. 411; *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Wrenn,* 864 F.3d 650; *Palmer,* 59 F.Supp.3d 173.

**The statutory scheme**

65.     The regulation at issue in this case, runs afoul of the Second Amendment because it lacks any historical justification, is arbitrary and capricious, and unnecessarily impinges on the core right of self-protection. Moreover, to the extent any continuing validity exists of the interest balancing test adopted by the D.C. Circuit in *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) – and we suggest there is not – the regulation at issue herein is not justified by an articulated compelling or substantial governmental interest, and lacks sufficient tailoring to achieve whatever governmental interest, if any, might exist to otherwise support it, without unreasonably intruding on Second Amendment liberties.

66.     Following the issuance of *Palmer*, the District enacted a detailed scheme that restricted the public carrying of handguns to persons who are issued licenses to carry concealed pistols.[2]  *See* DC Code Section 22-4504(a) ("No person shall carry within the District of Columbia

---

[2] DC Code Section 7-2505.01(12) defines the term "pistol" as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." Generally, in usage, the term "pistol" refers to a handgun having one chamber integral with the barrel, making pistols distinct from the other main type of handgun, the revolver, which has a revolving cylinder containing multiple chambers. Most handgun experts and dictionaries make a technical distinction that views pistols as a subset of handguns. The District uses the term pistol to refer to all handguns,

either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon."). The MPD Chief was given discretion to issue carry licenses to persons who could show good cause and otherwise meet detailed eligibility requirements. *See* DC Code Section 22-4506(a), which provided:

> The Chief of the Metropolitan Police Department ("Chief") may, upon the application of a person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed.

67. Under this provision, some 123 carry licenses were issued between the date of enactment of Section 22-4506, and the decision of the Court of Appeals in *Wrenn*. Pursuant to *Wrenn*, the District became what is known as a shall issue jurisdiction, meaning that upon an applicant meeting objective qualifications, the Chief was required to issue a license to carry a handgun to the applicant unless the Chief had information indicating that the applicant was otherwise not suitable to carry a handgun, for example, that he presented a danger to himself or others. Such objective criteria include meeting the requirement to take 16 hours of classroom training and two hours of range training from an MPD licensed concealed carry instructor, passing a 50 round shooting test administered by a DC licensed instructor, passing a background check, and not being a person prohibited from possessing firearms and ammunition under federal or District law. *See* DC Code Section 7-2509.02.

---

however. For the sake of clarity, this complaint will use the term "handgun" to refer to both pistols, revolvers and other weapons coming within the term "pistols" as defined by District law.

68.     Based upon MPD's response to a Freedom of Information Act request as of August 29, 2019, the District had issued 3,339 carry licenses. *See* Response to FOIA Request, 2019-FOIA-05038. On information and belief, the District has issued several thousand more carry licenses since August of 2019.

69.     The District has adopted strict regulations on the carrying of handguns. For example, District law substantially limits where handguns may be carried. *See* DC Code 7-2509.07. Quoting from Code Section 7-2509.07(a), handguns may not be carried in the following places or in the following circumstances:

(**1**) A building or office occupied by the District of Columbia, its agencies, or instrumentalities;

(**2**) The building and grounds, including any adjacent parking lot, of a childcare facility, preschool, public or private elementary or secondary school; or a public or private college or university;

(**3**) A hospital, or an office where medical or mental health services are the primary services provided;

(**4**) A penal institution, secure juvenile residential facility, or halfway house;

(**5**) A polling place while voting is occurring;

(**6**) A public transportation vehicle, including the Metrorail transit system and its stations;

(**7**) Any premises, or portion thereof, where alcohol is served, or sold and consumed on the premises, pursuant to a license issued under Title 25; provided, that this prohibition shall not apply to premises operating under a temporary license issued pursuant to § 25-115, a C/R, D/R, C/H, D/H or caterer license issued pursuant to § 25-113, or premises with small-sample tasting permits issued pursuant to § 25-118, unless otherwise prohibited pursuant to subsection (b)(3) of this section;

(**8**) A stadium or arena;

(**9**) A gathering or special event open to the public; provided, that no licensee shall be criminally prosecuted unless:

(A) The organizer or the District has provided notice prohibiting the carrying of pistols in advance of the gathering or special event and by posted signage at the gathering or special event; or

(B) The licensee has been ordered by a law enforcement officer to leave the area of the gathering or special event and the licensee has not complied with the order;

(10) The public memorials on the National Mall and along the Tidal Basin, and any area where firearms are prohibited under federal law or by a federal agency or entity, including U.S. Capitol buildings and grounds;

(11) The White House Complex and its grounds up to and including to the curb of the adjacent sidewalks touching the roadways of the area bounded by Constitution Avenue, N.W., 15th Street, N.W., H Street, N.W., and 17th Street, N.W.;

(12) The U.S. Naval Observatory and its fence line, including the area from the perimeter of its fence up to and including to the curb of the adjacent sidewalks touching the roadway of Observatory Circle, from Calvert Street, N.W., to Massachusetts Avenue, N.W., and around Observatory Circle to the far corner of Observatory Lane;

(13)(A) When a dignitary or high-ranking official of the United States or a state, local, or foreign government is moving under the protection of the MPD, the U.S. Secret Service, the U.S. Capitol Police, or other law enforcement agency assisting or working in concert with MPD, within an area designated by the Chief, the Chief of the U.S. Secret Service, or the Chief of the U.S. Capitol Police, or a designee of any of the foregoing, that does not include any point at a distance greater than 1,000 feet from the moving dignitary or high-ranking official; provided, that no licensee shall be criminally prosecuted unless:

(i) The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of protection obvious;

(ii) The District or federal government has provided notice prohibiting the carrying of pistols along a designated route or in a designated area in advance of the event, if possible, and by posted signage along a route or in a designated area; or

(iii) The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order.

(B) For the purposes of this paragraph, the term "moving" shall include any planned or unplanned stops, including temporary stops, in locations open to the public.

**(14)** When demonstration in a public place is occurring, within an area designated by the Chief or his or her designee, or other law enforcement agency, that does not include any point at a distance greater than 1,000 feet from the demonstration; provided, that no licensee shall be criminally prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;

> **(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or

> **(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order; …

**(15)** Any prohibited location or circumstance that the Chief determines by rule; provided, that for spontaneous circumstances, no criminal penalty shall apply unless the licensee has notice of the prohibition and has failed to comply.

70.     In addition, DC Code Section 7-2509.07(b) provides that carrying a handgun into the residence of another is presumed prohibited unless authorized in advance by the owner or person in control of the property. DC Code Section 7-2509.07(b)(1). A similar provision presumes that carrying a handgun into a place of worship is prohibited unless signage allows it, or the licensee is provided permission personally in advance. DC Code Section 7-2509.07(b)(2). Under DC Code Section 7-2509.07(b)(3), it is presumed that a licensee has permission to carry in and on other non-residential property unless conspicuous signage prohibits handgun carry or the licensee has been personally told not to carry on the property.[3]

---

[3] DCMR 24-2346.1 specifies that "Signs stating that the carrying of firearms is prohibited on any private property shall be clearly and conspicuously posted at any entrance, open to the public, of a building, premises, or real property."  DCMR 24-2346.2, in turn, provides that "A sign shall be considered conspicuous if it is at least eight (8) inches by ten (10) inches in size and contains writing in contrasting ink using not less than thirty-six (36) point type.

087

71.     In dicta, *Heller* designated schools and government building as presumptively sensitive areas where carriage of firearms could be restricted. *Heller,* 554 U.S. at 626. In *U.S. v. Class,* 930 F.3d 460, 463 (D.C. Cir. 2019) the D.C. Circuit noted that "A challenger may rebut this presumption by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller [v. District of Columbia],* 670 F.3d [1244,] 1253 [D.C. Cir. 2011]."  The court in *Class* further explained that the question of what a sensitive area is turns on "the people found there" or the "activities that take place there."  *Class,* 930 F.3d at 465, quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011, *aff'd,* 687 F.3d 1244 (11th Cir. 2012).

72.     *Bruen* appeared to narrow the reach of the sensitive places concept, suggesting that only legislative assemblies, courts and polling places appear to be established as sensitive places and that these . *Bruen,* 142 S.Ct. at 2133. "We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." However, the Court cautioned that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id.* at 2134.

73.     DC Code Section 7-2509.07 goes far beyond *Heller* or *Bruen* in restricting handgun carry in a variety of locations other than the schools and government buildings *Heller* discussed as presumptively sensitive or courts, polling places and legislative assemblies *Bruen* states as established sensitive places. Although it is questionable whether many of the areas set forth in DC Code Section 7-2509.07 are truly sensitive areas, one area stands far apart from the others in terms of the lack of any basis for its designation as such: that is the prohibition on the carriage of personal

protection firearms on public transportation vehicles such as Metro buses and trains. *See* DC Code Section 7-2509.07(a)(6). Discussion of each of the prohibited locations set forth in DC Code Section 7-2509.07 makes this abundantly clear.

74.     As noted immediately above, under *Heller* government buildings (*see* DC Code Section 7-2509.07(a)(1) are presumptively[4] considered sensitive areas, 554 U.S. at 626, unless the prohibition on firearm carry imposes a more than de minimis burden on a citizen's right to bear arms, *see Class,* 930 F.3d at 463. The logic behind this is not difficult to fathom. Government buildings house government officials and often sensitive information and activities. The buildings themselves have been the subject of terrorist attacks and government officials represent potential prime targets to terrorists, deranged persons, or persons who have some perceived grudge against some governmental action. As Professor Kopel has put it in discussing the sensitive places doctrine, "misuse of arms may prevent the operation of courts and other institutions of a free government."   David B. Kopel & Joseph G.S. Greenlee, *The Sensitive Places Doctrine,* 13 Charleston L. Rev. 203, 209 (2018) (hereinafter "Kopel")[5]

---

[4] We emphasize the word presumptive. Presumptions are just that, presumptions.  Presumptions can be overcome with evidence. *See* Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.") Thus, we would not concede that all government buildings in all circumstances are sensitive areas. Consider for example, a government store selling maps and navigational aids. Such a store is indistinguishable from any other commercial establishment. Or consider a bathroom structure in a national park. As discussed above, the D.C. Circuit in *Class*, 930 F.3d at 463, stated that "A challenger may rebut this presumption by 'showing the regulation [has] more than a de minimis effect upon his right' to bear arms. *Heller [v. District of Columbia]*, 670 F.3d at 1253." Surely, even if the Metro system could be considered a presumptive sensitive place and we suggest it cannot, the burden the Metro Ban imposes on Plaintiffs' right to bear arms is plainly more than de minimis.

[5]  The court in *Bruen* cites to Kopel in its discussion of the "sensitive places" doctrine. *Bruen,* slip op. at 21.

75.     Moreover, one generally enters a government building at one's own volition. Significantly, the vast majority of government buildings in the District of Columbia employ security measures such as armed security guards (designated special police officers in the District), and metal detectors at entrances. Thus, although a person gives up personal security by not being able to carry a firearm in a government building, he does so under the circumstances generally where the prohibited place provides an added layer of security not present in other public places.[6] Thus, the burden presented to his or her personal security and his or her need for self-defense is substantially lessened by the security measures employed.  Finally, traditionally the government has more authority to control its own property than to control other properties.[7]

---

[6] The court in *Class* declined to hold the presence of security as a definitive factor in the determination of whether a location qualified as "sensitive" under *Heller*.  Nonetheless, the presence of armed security and the screening of persons entering a location bear on the degree to which a person entering such a location runs a risk of criminal attack and thus bears directly on the degree of burden on the person's right to bear arms.  It stands to reason that there is less need for an individual to be armed for his or her self-protection if there is the presence of adequate armed security, including screening of persons entering a location, and thus the burden on his or her Second Amendment right to be armed in the event of a violent confrontation is diminished.

[7]  In addressing the issue of firearm carry on the grounds of the U.S. Capitol, the court in *Class,* explained,

> With respect to the Capitol itself, there are few, if any, government buildings more "sensitive" than the "national legislature at the very seat of its operations." *Jeanette Rankin Brigade v. Chief of the Capitol Police*, 421 F.2d 1090, 1093 n.3 (D.C. Cir. 1969). And tragically, gunmen have targeted the Capitol before. [Citation omitted.] … [W]e have little trouble concluding that the same security interests which permit regulation of firearms "in" government buildings permit regulation of firearms on the property surrounding those buildings as well….

> As for the Maryland Avenue parking lot, although it is not a government building, we conclude that it is sufficiently integrated with the Capitol for Heller I's sensitive places exception to apply….

> First, though it is open to the public, the Maryland Avenue parking lot may be used during working hours only by Capitol employees with a permit. This makes the

76.     Schools are also a location presumptively sensitive under *Heller,* 554 U.S. at 626. *See* DC Code Section 7-2509.07(a)(2). Schools are populated by large numbers of persons under the age of 21, the age limit most states have adopted for issuance of carry permits to citizens, and thus unable to defend themselves with firearms due to age. *But see Firearm Policy Coalition, Inc. v. McCraw,* Case No. 21-cv-01245 (N.D. Tex. August 25, 2022) (invalidating Texas law prohibiting 18–20-year-olds from carrying a handgun for self-defense outside the home), appeal dismissed Dec. 21, 2022.

---

area a potential stalking ground for anyone wishing to attack congressional staff and disrupt the operations of Congress….

Second, the lot is close to the Capitol and legislative office buildings. Class possessed a firearm less than 1,000 feet away from the entrance to the Capitol, and a block away from the Rayburn House Office Building. Although there is surely some outer bound on the distance Congress could extend the area of protection around the Capitol without raising Second Amendment concerns, Congress has not exceeded it here.

Finally, as the owner of the Maryland Avenue lot, the government—like private property owners—has the power to regulate conduct on its property. *See Adderly v. Florida*, 385 U.S. 39, 47 (1966) (observing in the free-speech context that the government, "no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"); *cf. Bonidy v. U.S. Postal Serv*., 790 F.3d 1121, 1126 (10th Cir. 2015) (observing that when the U.S. Postal Service acts "as a proprietor rather than as a sovereign, [it] has broad discretion to govern its business operations according to the rules it deems appropriate").

In sum, because the Maryland Avenue lot has been set aside for the use of government employees, is in close proximity to the Capitol building, and is on land owned by the government, we consider the lot as a single unit with the Capitol building, and conclude that the lot is a "sensitive" place where firearms prohibitions are presumptively lawful. *Accord id.* at 1125-28 (finding that a post office parking lot is "sensitive" for Second Amendment purposes); *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009) (same).

930 F.3d at 463-64. *But see Morris v. U.S. Army Corps of Engineers,* 60 F.Supp.3d 1120 (D. Idaho 2014) (invalidating regulation prohibiting firearms on Army Corps of Engineers lands).

77.     In addition, schools generally have some degree of enhanced security compared to most public areas. For example, schools generally have locked doors, the presence of armed school resource officers, and in some schools, students are required to pass through metal detectors. To be sure, schools have been a target of active killers, perhaps emboldened by the prospect of the lack of any effective armed resistance, resulting in calls to allow teachers and other school employees to possess arms to defend against such attacks. *See, e.g.,* Massad Ayoob, *The Case for Arming Teachers and the Reality of How it Works,* Personal Defense World (August 21, 2018), available at https://www.personaldefenseworld.com/2018/08/hard-targets-arming-teachers/. However, these calls do not generally extend to proposing to allow visitors to elementary and secondary schools to carry on school premises without permission of school authorities.[8] Most states prohibit the carrying of firearms in K-12 schools by non-school personnel even with carry licenses or permits.[9]

78.     DC goes beyond the Supreme Court's *Heller* dicta on schools to prohibit licensed carry also at colleges and universities. Plainly the justification for finding such institutions to be sensitive locations is weaker than for elementary and secondary schools, though such institutions also have substantial numbers of persons under the age of 21 who would lack the legal ability to carry a firearm for personal protection. There has been robust public debate over allowing licensed firearm carriers to carry personal protection firearms on college campuses. Some states, allow

---

[8] The Federal Gun Free School Zones Act, passed pre-*Heller*, prohibits firearm carry on and around elementary and secondary school property, but exempts persons holding a carry permit or license issued by the state wherein the school is located.  *Cf. United States v. Lopez,* 514 U.S. 549 (1995) (invalidating the previous iteration of this law on commerce clause grounds).

[9] A notable exception is the State of Utah.  *See* Utah Code Section 76-10-505.5 which allows Utah concealed weapons permit holders to carry in schools.

carriage on college campuses while prohibiting carrying firearms on elementary and secondary school grounds. Some have noted that gun free zones are the preferred choice of active killers, while others have suggested that the presence of firearms may limit academic freedom and free class discussion. *See Room for Debate, Should Guns Be Allowed on College Campuses,* The New York Times (May 31, 2016), available at https://www.nytimes.com/roomfordebate/2016/05/31/should-guns-be-permitted-on-college-campuses.[10] *See Digiacinto v. The Rector and Board of Visitors of George Mason University,* 281 Va. 127 (2011) (finding parts of George Mason University to be a sensitive place under *Heller*).[11]

79.    Hospitals share with schools the fact that substantial numbers of persons present are incapable of effectively using a firearm for self-defense due to physical infirmities or illness. *See* DC Code Section 7-2509.07(a)(3). And although hospitals generally lack the tight security of government buildings, e.g., use of metal detectors to screen for weapons, hospitals generally will have a security staff present to provide somewhat of an enhanced degree of security for patients and staff.

80.    Mental health facilities present an additional factor in determining whether such a location is a "sensitive" area. Approximately two-thirds of firearm deaths are the result of suicide.

---

[10] According to Campus Safety Magazine, 12 states allow carry on college campuses, while 16 states prohibit the practice as of August 2017.  22 states leave the decision to the individual colleges and universities. *See A List of States that Allow Concealed Guns on Campus,* Campus Safety (August 30, 2017), available at *https://www.campussafetymagazine.com/university/list-of-states-that-allow-concealed-carry-guns-on-campus/.*

[11] The court in *Digiacinto* found that the regulation in question was not a total ban on carrying firearms but was "tailored, restricting weapons only in those places where people congregate and are most vulnerable – inside campus buildings and at campus events. Individuals may still carry or possess weapons on the open grounds of GMU, and in other places on campus not enumerated in the regulation." 281 Va. at 136. *Cf.* Op. *Atty.* Gen. Va. 05-078 (January 4, 2006) (opining that licensed individuals may not be prohibited from carrying firearms in open areas of public universities

093

*See* Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, *Web-based Injury Statistics Query and Reporting System (WISQARS) Fatal Injury Reports*. Thus, at least a plausible basis exists to limit the carrying of firearms at facilities providing mental health treatment. On the other hand, it is questionable whether a compelling basis exists for restricting hospital or medical staff from having the means to protect themselves and their patients from a deadly criminal attack. In one well known incident,

> an enraged man entered a psychiatric clinic and shot a caseworker dead and wounded one of the doctors before the latter drew a small-caliber pistol and shot the man down, limiting the death toll to one. The doctor recovered and, declared a hero by local police, suffered no consequences for being armed in a "gun-free" zone.

Massad Ayoob, 10 Cases Where An Armed Citizen Took Down An Active Shooter, *Personal Defense World* (March 11, 2015), available at https://www.personaldefenseworld.com/2015/03/10-cases-where-an-armed-citizen-took-down-an-active-shooter/.[12] The District's prohibition on its face extends to both staff and to patients and visitors.  DC also extends its prohibition to medical offices in general. There would appear a much weaker basis for upholding such a prohibition based on "sensitive" areas for medical offices in general as opposed to hospitals and locations where mental health treatment is being provided. Recent decisions cast substantial doubt on the District's prohibition on carrying in medical

---

[12] Undersigned counsel is aware of an incident where a psychiatrist employed at a DC university hospital took a patient off a scheduled prescription drug because the patient was abusing the drug with alcohol thus creating a danger to himself. The patient became enraged and showed up at the hospital threatening to kill the doctor. Under the then "may issue" regime, MPD granted the doctor a carry license finding she had a legitimate need for self-protection distinct from the population in general, but she was prohibited from carrying her firearm to work – the most likely place where her patient might try to carry out his threat – because of the various DC prohibitions against carrying in a medical facility, carrying where mental health treatment was provided, carrying in a hospital, or on a college or university grounds. For her, these restrictions resulted in a more than de minimis infringement on her Second Amendment rights.

094

facilities. *See Antonyuk v. Hochel,* Case No. 22-cv-00968, pp. 123-28 (N.D.N.Y. Nov. 7, 2022) (enjoining enforcement of New York's similar regulation. *See also Koons v. Reynolds,* Case No. 22-cv-07464 (D.N.J. Jan. 9, 2023) (temporarily restraining enforcement of various provisions of New Jersey law designating 'sensitive areas' where guns may not be carried). *Accord Siegal v. Platkin,* 22-cv-07464 (D.N.J. Jan. 30, 2023).

81.    DC prohibits licensed gun carry in a penal institution or in a secure juvenile residential facility or halfway house. DC Code Section 7-2509.07(a)(4). If any locations would appear to meet the requirements for "sensitive" it would be these locations. Persons incarcerated for crimes plainly have no right to deadly weapons. Penal facilities generally have armed security and the risk of a dangerous person taking a gun away from a firearm carrier is not insubstantial.

82.    DC prohibits carrying a firearm in a polling place. DC Code Section 7-2509.07(a)(5). Traditionally, governments have had substantial latitude to regulate the conduct of elections. *Burson v. Freeman*, 504 U.S. 191 (1992). It is a common restriction to limit the first amendment right to engage in political speech inside a polling place. *See Minnesota Majority v. Mansky*, 849 F.3d 749 (8th Cir. 2017). There is also a governmental interest in preventing intimidation of voters. The argument could be made that preventing firearms aids in effectuating that latter governmental interest. On the other hand, most polling places do not have police protection and could be a prime candidate for some type of election day terrorist or active killer incident. As discussed above, *Bruen*, states that restrictions on carriage at polling places is historically supported by 18th and 19th century regulations and is thus an established sensitive area. Given this, DC regulation appears valid.

83.    DC prohibits carrying firearms at taverns and nightclubs, while allowing it at other establishments licensed to sell alcohol, subject to licensees not consuming alcohol. DC Code

Section 7-2509.07(a)(7). This type of prohibition is not unusual among the various states. It is well known that consumption of alcohol impairs judgment, inhibitions, and coordination. Consumption of alcohol increases the risk of firearm accidents and inhibits the ability of an individual to properly evaluate whether use of deadly force in self-defense is legally justified. Under DC law, a licensee is free to go to a restaurant for dinner and carry his firearm as long as he does not consume alcohol. The limitation on carrying into a night club or tavern can be supported by the fact that such establishments are not required to serve food and thus service of alcohol is a primary activity occurring at such an establishment. On the other hand, the flat prohibition on consuming alcohol versus consuming to the point of impairment could indicate that the alcohol prohibition is overbroad. *See Koons v. Reynolds,* Case No. 22-cv-07464, pp. 32-33, 60 (D.N.J. Jan. 9, 2023) (temporarily restraining enforcement of prohibition on carrying firearm into an establishment serving alcohol).

84.     The District bans carrying of firearms at stadia and arenas. DC Code Section 7-2509.07(a)(8). Stadia and arenas are characterized by the presence of large numbers of persons who are concentrated on a sporting event. They are likely not situationally aware. Moreover, alcohol is often served at such events, and persons often are very emotional over their teams, perhaps taking offense at persons cheering for the other team. Fights have been known to break out at such locations. Moreover, such events at least in the District have a substantial police and private security presence, including in some cases metal detector screening. Thus, there is some support for the view these venues could be considered sensitive and the burden on self-defense and Second Amendment rights minimal. Nonetheless, there appears scant historical support for such a prohibition. *See, e.g., Koons v. Reynolds,* Case No. 22-cv-07464, at 33-36 & 60 (D.N.J. Jan.

30

096

9, 2023) (temporarily restraining enforcement of ban on carrying firearms in entertainment facilities).

85.    DC prohibits the carrying of a handgun at a "gathering or event open to the public." DC Code Section 7-2509.07(a)(9). Quite frankly, this prohibition, without more, likely suffers from the fatal flaw of vagueness. *See, e.g., Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952)*. The District, however, substantially ameliorates this problem by providing that a person cannot be prosecuted for carrying a firearm at such an event unless there has been advance notice that carrying firearms is prohibited at the event and by posted signage at the event, or unless the licensed carrier is ordered by law enforcement to leave and does not leave. Thus, the degree of interference with the right to carry by this prohibition is substantially less than a regulation that outright prohibits carriage at such events. And the likelihood of a justiciable case being presented with respect to this prohibition is limited. DC law provides that licensees must fully conceal their carried handguns, so it is unlikely that a law enforcement official would even notice that a licensed carrier was attending such an event.[13]

86.    DC's treatment of demonstrations in a public place is similar to its treatment of "public events." *See* DC Code Section 7-2509.07(a)(14). Demonstrations have the potential for confrontations between persons of differing views. Some might argue that this would be just such

---

[13] DC Code Section 7-2509.07(e). *See also* DCMR 24-2344:

> Pistol Carry Methods. 2344.1 A licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person, or when in a vehicle in such a way as it is entirely hidden from view of the public. 2344.2 A licensee shall carry any pistol in a holster on their person in a firmly secure manner that is reasonably designed to prevent loss, theft, or accidental discharge of the pistol.

a location where possession of effective self-defense tools would be appropriate due to the potential of a violent attack. However, demonstrations in the District almost always are marked by substantial police presence to prevent violence from breaking out. Nonetheless, there would appear little historical support for such a prohibition. *See Antonyuk v. Hochel,* Case No. 22-cv-00986, at 159-66 (preliminarily enjoining substantially similar New York regulation). The prohibition on carrying at demonstrations also contains a safe harbor provision that violators cannot be prosecuted unless:

> **(A)** The law enforcement agency provides notice of the designated area by the presence of signs, law enforcement vehicles or officers acting as a perimeter, or other means to make the designated area of the demonstration obvious;
>
> **(B)** The District or federal government has provided notice prohibiting the carrying of pistols along or within a demonstration route or designated area in advance of the event, if possible, and by posted signage along a demonstration route or designated area; or
>
> **(C)** The licensee has been ordered by a law enforcement officer to leave the designated area and the licensee has not complied with the order;

87.     DC prohibits carry in the public memorials on the Mall and around the Tidal Basin and areas where carrying a firearm is prohibited by federal law, including the Capitol Grounds. DC Code Section 7-2509.07(a)(10). Areas prohibited by federal law needs no further discussion. The memorials are plainly a possible target of a terrorist or active killer given their status as landmarks and symbols of the country. To that extent one could argue that these locations could be considered sensitive; but these facts might also suggest a heightened need for persons to be able to defend themselves. They are also, however, areas that generally have a high degree of police presence to provide added security. However, there would not appear a historical tradition of banning firearm carry in such areas other than the Capitol Grounds.

88.     The District prohibits carrying a firearm around the perimeter of the White House grounds and Lafayette Park and the Vice President's residence. DC Code Section 7-2509.07(a)(11)-(12). In light of the *Class* decision discussed above, there cannot be any serious debate over whether these qualify as sensitive areas. Moreover, the White House and the Vice President's residence are substantially similar to legislative assemblies and courts making these areas in *Bruen's* words "settled" as to their sensitive place nature.

89.     The District requires licensed carriers to stay 1,000 feet away from a motorcade (moving or stopped for an event) carrying domestic or foreign dignitaries under police escort. DC Code Section 7-2509.07(a)(13). The provision contains a safe harbor, however, providing that a licensee cannot be prosecuted for violating this provision unless advanced notice has been given of the prohibited route – which is almost never done – or the area of protection is obvious as a result of a police perimeter, or the licensee is told to leave and refuses to do so. This prohibition is relatively meaningless since law enforcement is not in the habit of providing advance notice of motorcade routes.

90.     DC law essentially allows houses of worship and private property owners to determine if they will allow firearm carry. Thus, the law does not outright ban carrying firearms on private property. Few would argue that there is or should be an unlimited right to conduct oneself as one pleases on the private property of another. However, the District's choosing to establish a default condition of no carry absent express permission has serious constitutional issues according to recent cases. *See Antonyuk v. Hochel,* Case No. 22-cv-00986 at 166-80 (Nov. 7, 2022); *Koons v. Reynolds,* Case No. 22-cv-07464, at 36-48 (Jan. 9, 2023).

91.     There is no need to discuss Code Section 7-2509.07(a)(15), allowing the Chief to designate other sensitive areas, as the Chief has not to our knowledge done so.

**The Metro carry ban violates Plaintiff's Second Amendment rights**

92.     Public transportation vehicles and stations, essentially the DC Metro, share few, if any, of the characteristics that might support the designation of other locations as sensitive areas, assuming historical support exists for such other areas to be considered sensitive. They are not largely populated with persons lacking the physical ability to defend themselves with a firearm or other tool. They are not populated with individuals who would be high value targets to a terrorist or active killer. They are not landmarks or symbols of our nation which would be inviting to terrorists or active killers.[14] The Metro system does not screen persons entering its stations or embarking on a Metro bus or train. The Metro is not an area of intellectual debate, law-making, adjudication, voting, or where demonstrations regularly take place. The Metro is essentially a commercial enterprise providing an essential transportation service to an area with highly congested routes of travel. And although Metro has its own police force, the overwhelming number of trains and buses lack any police presence. Most importantly, there is not an established tradition or history of prohibitions of carrying firearms on public transportation vehicles despite the rise of public transportation shortly after the Founding. In short there is no basis to label the Metro as a sensitive area.

93.     Some might argue that mass transit systems are soft targets of terrorists, and the hijacking of planes might be used to support such an argument; however, soft targets are "soft" because they lack security to harden them from attack. Further, in the case of the terrorist attacks on 9/11, the airliners and their passengers were not targets in and of themselves. Instead, they were

---

[14] Of course, the evidence strongly indicates that active killers seek out gun free zones to accomplish their nefarious plans. Thus, a location that might not otherwise be a target could be endangered by giving it the status of a "gun free zone." *See* Crime Prevention Research Center, *Updated: Mass Public Shootings Keep Occurring in Gun-Free Zones: 94% of Attacks Since 1950* (June 15, 2018).

used as weapons to attack national symbols. The response to that threat was to intensify airport security and to deploy a large cadre of air marshals and screeners. The Metro system lacks such security measures. Rather, DC's prohibition on carrying arms in the Metro system is what would make Metro a soft target for terrorists and criminals alike.

94.     Even if the public transportation vehicles could be considered "sensitive areas," the prohibition on licensed carry on such vehicle is a substantial infringement on carry licensees' Second Amendment rights. This is especially the case as to persons of limited means lacking access to alternative transportation. It is certainly more than a de minimis burden on persons such as the Plaintiffs here who regularly use the Metro system in their day-to-day activities, and thus no presumption of constitutionality would accrue to this prohibition. *See Class,* 930 F.3d at 463. The practical effect is that persons who need to travel around the District via the Metro are disarmed for the entirety of their journey. This is true despite that it is technically possible to transport a handgun on the Metro.

95.     To transport a handgun on the Metro, the firearm must be unloaded, stored in a locked container with the ammunition stored separately. DC Code Section 22-4504.02. Thus, a woman with a DC concealed pistol license could theoretically holster her gun for the walk through her crime ridden neighborhood as she heads out for shopping, but before she could enter the Metro station or get on a Metro bus, she would have to unholster her firearm, unload it, open a lockable container, place the gun in the lockable container, lock it, and store the ammunition separately. *See* DC Code Section 22-4504.02. All of this would be done in public and in violation of the requirement of DC Code Section 7-2509.07(e) that the gun has to be fully concealed.[15] And once

---

[15] The penalties for violating the requirement that the firearm must be fully concealed are enormous. The District provides for a potential jail term of up to six months and a fine of up to $1000 for such violation. *See* DC Code Sections 7-2707.06(a) and 22-3571.01(b)(4).  Moreover

getting off the Metro, to continue to her ultimate destination while exercising her constitutional right to be armed in the event of a violent confrontation, she would have to unlock the locked container, remove her firearm from the container, load it, holster it, and conceal it, again all in public.  The likelihood of creating a public disturbance with a dangerous police response and likely arrest is substantial.

96.      Moreover, notwithstanding that DC Code Section 7-2509.07(e) makes it impossible to comply with the transport code section, unnecessary handling of a firearm creates the risk of an accidental or negligent discharge. *See* Farnam, Unnecessary Gun Handling, *Ammoland Shooting Sports News* (July 27, 2015), available at https://www.ammoland.com/2015/07/unnecessary-gun-handling/#axzz5mywSQ2FR; Michalowski, Avoiding a Negligent Discharge, available at https://www.usconcealedcarry.com/blog/avoiding-negligent-discharge/.

97.      *Bruen, Heller* and *Wrenn* teach us that firearm prohibitions are to be evaluated in light of the text of the Second Amendment, and the Nation's history and tradition of firearms regulation. *Bruen,* 142 S.Ct. at 2129-30; *Heller,* 554 U.S. at 576-628*; Wrenn,* 864 F.3d at 657-61*; See also Moore v. Madigan,* 702 F.3d 933, 935-37 (7th Cir. 2012), *reh'g en banc denied*, 708 F.3d 901 (7th Cir. 2013). Nothing in the text of the Second Amendment, or the Nation's history and tradition of firearms regulation supports upholding a ban on arms carry on public transportation.

---

conviction "in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device" is defined as a "weapons offense." DC Code Section 7-2501.01(18). Conviction of a weapons offense – with very minor exceptions not pertinent hereto – by a DC resident renders that person ineligible for life to register or carry a firearm, thus stripping him of his firearms rights in DC. *See* DC Code Section 7-2502.03(a)(2). Under such circumstances no DC carrier is likely to intentionally expose his firearm and risk losing his firearms rights in the District. We note that MPD actively enforces this provision as it does all of its firearm regulations.

98.    Public transportation systems did not exist at the founding of the nation. However, they developed soon after. Moreover, there was plainly a tradition of firearms carry when citizens traveled from their homes. In modern parlance, Americans carried arms to prevent their gatherings from becoming soft targets. For example, a March 9, 1636, ordinance provided that every person above 18 years of age (except magistrates and elders of the churches) were ordered to "come to public assemblies with their muskets, or other pieces fit for service, furnished with match, powder, & bullets, upon paine of 12*d* for every default… And no person shall travel above one mile from his dwelling house, except in places wheare other houses are nearby together, without some armes, upon paine of 12*d* for every default."  Shurleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston:  William White, 1853), 1:190, 1:210.

99.    Connecticut in 1643 ordered that at least one person in every house "shall bring a musket, pistol or some piece, with powder and shot" to every church meeting. Trumbell, *The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony* (Hartford, Conn.: Brown & Parsons, 1950), 1:95, 96., *Records of the Colony and Plantation of New Haven From 1638 to 1649* (Hartford, Conn.: Case, Tiffany, 1857), at 131-32. It is reported that several persons were fined for neglecting to bring their arms to meetings. *Id.* at 486.

100.    In the New Haven Colony, militia members were required to arrive at Church with their guns charged. Hoadly, ed. *Records of the Colony and Plantation of New Haven, From 1638 to 1649* (Hartford, Conn.: Case, Tiffany, 1857), 131.

101.    Rhode Island ordered "that no man shall go two miles from the Towne unarmed, either with Gun or Sword, and that none shall come to any public Meeting without his weapon." Barlett, ed., *Records of the Colony of Rhode Island and Providence Plantations, in New England* (Providence, R.I.: Crawford Greene and Brother, 1856), 1:94.

103

102.    The requirement to carry arms when traveling from home and while attending gatherings was not just a New England requirement. A 1619 statute in Virginia commanded that churchgoers who "bear arms shall bring their pieces, swords, powder and shot" to worship services with violators subject to fine. August 2, 1619, "Proceedings of the Virginia Assembly, 1619," in Tyler, *Narratives of Early Virginia, 1606-1625* (New York: Charles Scribner & Sons, 1907; reprinted New York: Barnes & Noble, 1959), 273. Virginia reissued the law in 1632 and again in 1738. Cramer, *Gun Control in the Middle & Southern Colonies*, citing Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia* (New York: R & W & G. Bartow, 1832), 1:198 & 5:19. Similarly, a 1743 South Carolina law required church attendees on pain of fine "with minor exceptions to come to church armed." Cramer, Gun Control in the Middle & Southern Colonies at 6.

103.    In *Heller*, the court cited "the most important early American edition of Blackstone's Commentaries," 554 U.S. at 594, by St. George Tucker. Speaking in 1803 of the right to bear arms Tucker noted that in "many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than a European fine gentleman without his sword by his side." *Id.*

104.    The limitation of carrying arms in sensitive places at least reaches as far back as the 14th century. Professor Kopel reports that a 1313 statute provided "in all parliaments, treaties, and other assemblies which should be made in the realm of England for ever, every man shall come without all force and armour, well and peaceably.' In other words, Parliament and similar assemblies should be conducted without arms present at the deliberations." Kopel at 209-10 & n. 22.

104

105.     In 1328, the Statute of Northampton was propounded which in pertinent part prohibited carrying arms around the king's officials: "no man great nor small . . . be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace. . ." Kopel at 212. Professor Kopel explains that the "prohibition served several purposes: preventing powerful criminals from armed attacks on the functioning of courts; preventing criminal attacks on other government officials; and preventing armed overthrow of the Queen and her consort." *Id.* Additional provisions of the statute on its face purported to prohibit riding "armed by night or by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere. . ." *Id.* Various reiterations of the statute were propounded through the 17th century. *See Id.* at 216-17. However, *Bruen* explains that this provision merely prohibited being armed with unusual weapons that would likely terrorize the populace. 142 S.Ct. at 2139-40.

106.     Various commentators have noted that even at the founding or shortly thereafter, it was not uncommon for the states or localities to enact laws regulating firearms such as regulations for the storage of powder, prohibiting discharge in public, surety laws designed to keep the peace and state variances of the English Statute of Northhampton. *See, e.g.,* Cornell, *The Right to Carry Firearms Outside the Home: Separating Historical Myths and Historical Realities,* 39 Fordham L. Urb. L. J. 1695, 1707-17 & 1719-20 (2012) (hereinafter cited as "Cornell").

107.     The D.C. Circuit in *Wrenn*, acknowledged the existence of these laws but noted that considering *Heller's* analysis, the Statute of Northhampton did not support a prohibition on handgun carry outside the home for the law-abiding citizens. *Wrenn*, 864 F.3d 660 ("[T]he history showcased in *Heller* contradicts the main scholar whose work the District cites for the idea that Northhampton banned all carrying in crowded areas (as opposed to carrying dangerous arms or

carrying so as to terrify."). And *Wrenn* further explained that "surety laws did not deny a responsible person carrying rights … [t]hey only burdened someone reasonably accused of posing a threat." *Id.* 864 F.3d at 661.

108.    In the antebellum era, several states enacted laws prohibiting the carrying of concealed pistols and Bowie knives. The Court in *Heller* noted that state Court decisions on these laws are instructive in understanding the scope of the Second Amendment.  *State v. Reid,* 1 Ala. 612 (1840), for example, cited at 554 U.S. at 688, held it was within the legislature's power to prohibit the carrying of a *concealed* firearm where the legislature had left open the option to carry the weapon *openly*. By contrast, *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822), cited at 554 U.S. 585 n. 9, invalidated a Kentucky statute that criminalized the carry of concealed weapons. *Heller* explained that in *Nunn v. State,* 1 Ga. 243, 251 (1846), "the Georgia Supreme Court construed the Second Amendment as protecting the '*natural* right of self-defense' and therefore struck down a ban on carrying pistols openly." *Heller,* 554 U.S. at 612.

109.    The Heller opinion further cited *State v. Chandler,* 5 La. Ann. 489, 490 (1850), in which the Louisiana Supreme Court held that citizens had a right to carry arms openly: "'This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations.'"  *Heller,* 554 U.S. at 613. *See also Wilson v. State,* 33 Ark. 557 (1878)[16]

---

[16] Citing *Fife v. State,* 31 Ark. 455 (1876) the court said the legislature might constitutionally prohibit the carrying of such pistols and other arms easily concealed about the person, as are used in quarrels, brawls, and fights between maddened individuals, but that the Constitution guaranteed to the citizens the right to keep and bear arms for defense, etc." Remarking on what we would now call sensitive areas, the court stated that the state could in time of peace ban "wearing war arms [army pistols] to places of public worship or elections" (citing *Andrews v. State,* 50 Tenn. (3 Heiskel) 165 (1871)), [b]ut to prohibit the citizen from wearing or carrying a war arm, except upon

110.    It is noteworthy that the laws at issue in those cases that prohibited the concealed carry of pistols, generally made an exception for travelers. *See* Cramer, Concealed Weapons Laws of the Early Republic (Praeger:  Westport, Conn. 1999), Appendix A, p. 143-52. Illustrative is Kentucky's 1813 statute that criminalized "any person in this commonwealth, who shall wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey, shall be fined in any sum, not less than one hundred dollars[.]" Cramer, at 143.[17] Indiana enacted a similar exception in its 1820 statute and its 1831 reenactment. *Id.* at 145.[18] Arkansas also had an exception for travelers carrying concealed weapons in its 1838 statute. *Id.* at 150.[19]

111.    Cornell, who has written extensively in support of restrictions on firearm carry, cites (at 1719 n. 132) several post Reconstruction state laws regulating the carriage of firearms in sensitive places, including: 1870 La. Acts 61 (prohibited weapons carrying "on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration"); 1870 Tex. Gen. Laws 63 (prohibiting carry at a church or religious assembly, school or other place where persons

---

his own premises or when on a journey traveling through the country with baggage … is an unwarranted restriction upon his constitutional right to keep and bear arms." 33 Ark. at 559-60.

[17] Citing *Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky* (Frankfurt: Gerald & Berry 1813), 100-01.

[18] Citing *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (Jeffersonville:  Isaac Cox, 1820), 39, and *Revised Laws of Indiana in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831), 192.

[19] Citing *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan & Co. 1838), Div. VIII, Art. I § 13, p. 280.

are assembled for educational, literary or scientific purposes, ballroom, social party or other social gathering, election precinct on the day or days of any election, place where people may be assembled to perform any other public duty, or other public assembly);[20] 1878 Va. Acts 37 ("place of worship while a meeting for religious purposes is being held without good and sufficient cause therefor, and on Sundays); and 1859 Wash. Sess. Laws 489 (penitentiary, jail or house of correction). *See also Hill v. State,* 53 Ga. 473 (1874) (upheld a statute prohibiting carrying weapons at sensitive locations such as courts of justice and religious gatherings). With the exception of the outlier Texas legislation, these statutes share a general consistency with modern day sensitive place restrictions. Significantly, Cornell fails to point to any historical restriction on firearm carry on public conveyances. Plaintiffs are aware of none in the relevant Founding era and the time around the adoption of the 14th Amendment.

112.   Although much has been written purporting to discuss the history of public carriage of firearms in the 19th century following the adoption of the Second Amendment, we have been unable to find any authority to support a tradition of prohibiting the carriage of weapons on public conveyances of the time such as riverboats, ferries, trains or stagecoaches. Indeed, the outlier statute at issue in *State v. Duke,* 42 Tex. 455 (1874), which generally prohibited pistol carry outside one's home or place of business except in case of apprehended danger, like the antebellum laws discussed above, also excepted travelers within the state. 42 Tex. at 457.[21]

113.   Given the discussion above, it cannot be said that the Nation's history and tradition of firearms regulation supports treating public transportation vehicles as sensitive for firearm carry.

---

[20] *Bruen*, however, labeled Texas's 1870s restrictions on firearm carry as an outlier not representative of the Nation as a whole. *Slip. op.* at 56-58.

[21] Cornell erroneously claims the Texas law was a comprehensive ban on traveling when armed. Cornell at 1721.

Rather, the historical evidence is that there was an established consensus that persons traveling from their homes had a need to be armed.

114.     Nor does there appear to be a current widespread practice or tradition of treating public transportation facilities as sensitive. Firearm carry restrictions on public transportation are relatively rare and of recent vintage. A survey of available data for state "sensitive area" restrictions, pre-*Bruen,* shows that although restrictions vary considerably from state to state, restrictions on public transportation are not well established. Other than the District of Columbia, only a handful of states, including Illinois, Missouri, New Mexico, and South Carolina prohibit carry on public transportation. *See* 430 Ill Comp. Stat. §66/65; RSMO §§70.441(11) & 577.030(4); NM Stat. Ann. §30-7-13; S.C. Code Ann. §58-23-1830. Montana also prohibits carrying firearms on trains, but not on other public transportation. *See* Mont. Code Ann. §87-5-401. None of these restrictive statutes can be said to be longstanding. The oldest appears to be Missouri's restriction on carry on buses, but it dates back only to 1982. *See* RSMO §577.030(4).

115.     Admittedly, there has been a reaction by some of the more restrictive states to add to their lists of so-called "sensitive places." These recent enactments are irrelevant to an analysis under *Bruen,* and as cases cited above show, largely lack a historical pedigree. Prior to *Bruen,* none of the may-issue states prohibited carry on public transportation by licensed carriers. Connecticut, which was technically a may issue jurisdiction but was liberal in granting carry permits, prohibited carrying firearms in schools, state parks, wilderness management areas, by non-owner employees of a business, on posted property, legislative buildings and in the town-owned           property           of           Woodbridge.           *See*

109

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ct-gun-laws/#loc_res

(providing citations to Connecticut authorities).[22]

116.    New Jersey prohibited carrying firearms in schools and universities, state parks and on ferry cruises to the national landmarks of Ellis Island and the Statue of Liberty. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/nj-gun-laws/#loc_res.

117.    Rhode Island prohibited the carrying of firearms in state parks and wilderness management areas, secured areas in airports and detention facilities. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ri-gun-laws/#loc_res.

118.    Massachusetts prohibited carry in schools and universities, courthouses, airports, and when using off-highway vehicles. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ma-gun-laws/#loc_res.

119.    New York had numerous restricted areas: schools and universities, childcare facilities, public campgrounds, courthouses, mental health facilities, government buildings, airports, and certain parks and recreation areas. New York also had a narrow public transportation ban prohibiting the carrying of firearms on Ellis Island and Liberty Island cruises and at the Statue of Liberty, but the state did not ban the carrying of firearms on subways, buses or ferries.

120.    Maryland restricts firearms carry in public schools, most childcare centers, state parks, state and national forests, Chesapeake forest lands, state highway rest areas, commercial aircraft, lodging establishments if the innkeeper so requires, dredge boats, community rehabilitation centers, state buildings and grounds, legislative buildings, and at demonstrations.

---

[22] The United States Concealed Carry Association maintains an up-to-date web site listing state by state restrictions on the carry of firearms, including citation to the specific state statutes. *See* https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/. To review carry restrictions in any state, one simply clicks on the state, scrolls down to "location restrictions" and clicks on that link.

110

https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/md-gun-laws/#loc_res.        It does not prohibit carry on the Metro system, however.

121.    California also has a long list of restricted locations: schools and universities, courtrooms, gun shows (if in possession of ammunition for the gun), state capitol and legislative buildings and the residences of state officers and legislators, state parks, wildlife management areas, polling places, labor demonstrations (picketing), bars, the Cal Expo Center, and San Francisco City property.  https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ca-gun-laws/#loc_res. California law allows permitted carriers to carry on public transportation. Cal. Penal Code §§ 171.7(b)(1), 171.7(c)(2).

122.    Hawaii prohibits the carrying firearms in the secured area of an airport, in state and national parks, national forests and wildlife management areas, and in rest stop buildings. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/hi-gun-laws/#loc_res.

123.    Delaware prohibits carrying firearms in schools and universities, vehicles owned or operated by a school, public recreational buildings, sports stadia and fields, prisons, and detention facilities.  https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/de-gun-laws/#loc_res.

124.    With respect to those states with substantial numbers of carry licenses outstanding, while limitations again vary considerably, public transportation limitations do not exist. Where the appropriate warning sign is posted, Texas prohibits the carrying of firearms at schools and private colleges and universities, hospitals and nursing homes, churches, and government meetings. Texas also prohibits carrying firearms in establishments deriving 51 or more percent of their income from alcohol sales, as well as courthouses, correctional institutions, places of execution, certain posted

111

private property, polling places, racetracks, and the secured area of an airport. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/tx-gun-laws/#loc_res.

125.    Florida prohibits carry in schools and universities including vocational technical centers, school and professional athletic events, police stations, detention facilities, court houses, polling places, legislative meetings, hospitals providing mental health services, bar portions of establishments serving alcohol, The Seaport, Savannas State Reserve, and airport passenger terminals.                  https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/fl-gun-laws/#loc_res.

126.    Utah prohibits carrying firearms in any secure area in a correctional, law enforcement, courthouse, airport, mental health facility, and houses of worship and private residences    that    have    given    notice    that    firearms    are    prohibited. https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/ut-gun-laws/#loc_res.

127.    Neighboring Virginia prohibits carry on school grounds, school buses, and areas open to the public and exclusively used for school-sponsored functions or extracurricular activities while such functions or activities are taking place. Most public colleges and universities have promulgated regulations prohibiting carry in buildings and at events. Carrying firearms is also banned in courthouses, airports, and detention facilities. Carrying is also banned in the Capitol Square in Richmond, in state executive branch offices, on certain Tennessee Valley Authority lands, the portion of Hog Island Wildlife Management Area bordering on the James River north of the Surry Nuclear Power Plant (except while hunting), on Buggs Island, and a portion of the Gaston                  Reservoir                  (Roanoke                  River). https://www.usconcealedcarry.com/resources/ccw_reciprocity_map/va-gun-laws/#loc_res.

112

128.    In sum, in line with *Heller,* the broad consensus of states regulate schools, court houses, and some government buildings as sensitive locations. Hospitals, polling places, colleges and universities, sports stadia and events, and certain outdoor recreational locations are sometimes treated as sensitive locations as well. But there does not appear a consensus or tradition to treat public transportation facilities as sensitive. Moreover, in those few jurisdictions which do so, the restrictions in questions are not longstanding. Even New York, prior to *Bruen*, which generally had the most restrictive laws on firearms, for 153 years did not ban carry on the New York subway, one of the world's largest underground transit systems.

129.    Thus, an analysis of text, history and tradition requires a conclusion that DC's prohibition of carrying firearms on public transportation facilities and vehicles is not grounded in the nation's historic tradition of firearms regulation, and therefore cannot be restricted as sensitive areas under *Heller* or *Bruen*. Accordingly, DC's prohibition on carrying defensive firearms within public transportation vehicles and stations violates Plaintiffs' Second Amendment right to bear arms in public for self-defense.

**FIRST CLAIM FOR RELIEF:**

**U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS**

130.    DC Code § 7-2509.07(a)(6) prohibits Plaintiffs from carrying their personal protection firearms on public transportation vehicles, including the Metro trains and Metro stations. No national historical tradition of firearms regulation supports this ban, and this ban is a substantial infringement of Plaintiffs' ability to exercise their Second Amendment right to carry and use a handgun for personal protection. As such, the Metro ban violates the Second Amendment rights.

113

131.    Defendants' laws, customs, practices, and policies banning Plaintiffs from carrying their personal protection handguns on public transportation vehicles violates the Second Amendment to the United States Constitution, facially and as applied against the individual Plaintiffs in this action, damaging plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, polices, and practices.

132.    Plaintiffs have suffered and will suffer monetary damages as a result of compliance with the Metro Ban because of the increased cost of transportation of not using the Metro system. They therefore demand recovery of damages of the defendants in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF:**

**U.S. CONSTITUTION, AMEND. V, 42 U.S.C. § 1983.**

133.    DC Code § 7-2509.01(a)(6)'s prohibition on carrying firearms on public transportation vehicles and stations is arbitrary and irrational and thus violates the due process clause of the Fifth Amendment to the United States Constitution in light of the Plaintiffs' Second Amendment rights to carry firearms for personal protection in public.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

1.  Enter a declaratory judgement that DC Code 7-2509.07(a)(6) is arbitrary and irrational under the Second and Fifth Amendments to the United States Constitution.

2.  Enter a declaratory judgement that DC Code §7-2509.07(a)(6) violates the Second Amendment to the United States Constitution.

3.  Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing DC Code §7-2509.07(a)(6) as to persons holding District of Columbia concealed pistol licenses;

4.  Enter an order awarding Plaintiff's their costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988 and monetary damages to be proven at trial; and

5.  Enter an order providing any other and further relief as the court deems just and appropriate.

Respectfully submitted,

**GREGORY T. ANGELO**

**TYLER YZAGUIRRE**

**ROBERT M. MILLER**

**CAMERON M. ERICKSON**

By:  /s/ George L. Lyon, Jr.
George L. Lyon, Jr. (D.C. Bar No. 388678)
Bergstrom Attorneys PLLC
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
202-669-0442, fax 202-483-9267
gll@arsenalattorneys.com

Matthew J. Bergstrom (D.C. Bar. No. 989706)
Arsenal Attorneys
4000 Legato Road, Suite 1100
Fairfax, VA 22033
800-819-0608
mjb@arsenalattorneys.com

*Attorneys for Plaintiffs*

Dated:  February 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that I served all counsel of record in this proceeding this day through the court's ECF system.

George L. Lyon, Jr., DC Bar 388678

## DECLARATION UNDER PENALTY OF PERJURY
## OF GREGORY T. ANGELO

Gregory T. Angelo, under penalty of perjury, deposes and states as follows:

1. My name is Gregory T. Angelo. I am a resident of the District of Columbia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a concealed firearm for personal protection within Washington, DC and outside the District when it is legal to do so.

3. I have never been arrested or convicted of any crime. In fact I have great respect for the rule of law and the legal processes. I am loath to break the law and would not do so intentionally.

4. I regularly ride the Metro subway and Metro buses. I do not own a personal motor vehicle. The Metro system is a primary means of transportation within the District for me and my preferred mode of transportation if I could carry my firearm on the Metro system.

5. However, I am aware of many instances of criminal violence occurring on the Metro system within the District of Columbia. In fact, I have personally witnessed a criminal assault occurring on a Metrorail train where an individual brandished an edged weapon and threatened passengers on the train, including me. That incident was extremely upsetting, as was the fact that had that person carried through on his threats I would have been constrained on the ability to defend myself.

6. As a result of being aware of such instances of violence occurring within the Metro system, including stabbings and shootings, I am apprehensive for my safety while riding the Metro system. Because of my apprehension of becoming a victim of criminal violence, I will often carry pepper spray while riding Metro. However, having pepper spray does not fully assuage my apprehension because I am aware that pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious. Moreover, I am aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

7. I would feel more comfortable riding the subway and Metro buses if I were allowed to carry my concealed firearm for self-defense when using the Metro system and in that event I would carry my firearm while riding the Metro system.

8. I have in some circumstances avoided using the Metro system out of fear of my personal safety because I could not within the law carry my concealed firearm for personal protection. This has been especially the case in light of the incident discussed above. As a result, I have had to expend sums greater for transportation than I would have if I had been using the Metro system. I am convinced I will have to do likewise in the future unless the Metro carry ban is declared unconstitutional and voided.

9. If it were legal to do so, I would carry my concealed firearm on and within the Metro system for self-defense.

10. In addition to prohibiting me from carrying on the Metro system itself, the Metro carry ban interferes with my exercise of my Second Amendment rights both before and after I ride the system such as the case discussed above regarding the person making threats against me. Prior to entering a Metro station or getting on a Metro bus, to legally transport my concealed firearm within the Metro system in the District, I would have to unload and clear my firearm and store it in a locked container with the ammunition separate. However, doing so in public would violate the law that requires that my firearm to be fully concealed. And finding a private place to do so would be problematic. Likewise, upon exiting a Metro subway station or getting off a Metro bus, I would have to expose my gun in public to remove it from the lockbox, load and holster the gun. Again, finding a private place to do so is problematic. I would end up exposing myself to a substantial risks of arrest, being killed or assaulted by police or concerned citizens, as well as making myself a potential victim from a criminal intent on stealing my gun. Furthermore, unnecessary gun handling risks a negligent discharge which would endanger myself and others. In addition, I likely would face public fear, scorn, and ridicule.

11. In sum, but for D.C. law, I would carry my concealed handgun on Metro trains and buses for self-defense. I do not do so now because I fear among other things, arrest, prosecution and physical injury.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: April 18, 2023

Gregory T. Angelo

118

## DECLARATION UNDER PENALTY OF PERJURY
## OF TYLER YZAGUIRRE

Tyler Yzaguirre, under penalty of perjury, deposes and states as follows:

1. My name is Tyler Yzaguirre. I am a resident of the District of Columbia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a concealed firearm for personal protection within Washington, DC and outside the District when it is legal to do so.

3. I have never been arrested or convicted of any crime. In fact I have great respect for the rule of law and the legal processes. I am loath to break the law and would not do so intentionally.

4. I regularly ride the Metro subway and Metro buses. In fact, I do not own a personal motor vehicle. The Metro system is a primary means of transportation within the District for me. However, I am aware of many instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of being aware of such instances of violence occurring within the Metro system, including stabbings and shootings, I am apprehensive for my safety while riding the Metro system. Because of my apprehension of becoming a victim of criminal violence, I will often carry pepper spray while riding Metro. However, having pepper spray does not fully assuage my apprehension because I am aware that pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious.  Moreover, I am aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

5. Earlier this year, after exiting a DC Metro station, I was followed, harassed and threatened by a person making racially based threats of violence against me. I was not carrying my concealed firearm at the time because I had been riding the subway to my destination. That incident was extremely upsetting, as was the fact that had that person carried through on his threats I would have been constrained on the ability to defend myself.

6. I would feel more comfortable riding the subway and Metro buses if I were allowed to carry my concealed firearm for self-defense when using the Metro system and in that event I would carry my firearm while riding the Metro system.

119

7. I have in some circumstances avoided using the Metro system out of fear of my personal safety because I could not within the law carry my concealed firearm for personal protection. This has been especially the case in light of the incident discussed above. As a result, I have had to expend sums greater for transportation than I would have if I had been using the Metro system.

8. I am convinced I will have to do likewise in the future unless the Metro carry ban is declared unconstitutional and voided.

9. If it were legal to do so, I would carry my concealed firearm on and within the Metro system for self-defense.

10. In addition to prohibiting me from carrying on the Metro system itself, the Metro carry ban interferes with my exercise of my Second Amendment rights both before and after I ride the system such as the case discussed above regarding the person making racially based threats against me. Prior to entering a Metro station or getting on a Metro bus, to legally transport my concealed firearm within the Metro system in the District, I would have to unload and clear my firearm and store it in a locked container with the ammunition separate. However, doing so in public would violate the law that requires that my firearm to be fully concealed. And finding a private place to do so would be problematic. Likewise, upon exiting a Metro subway station or getting off a Metro bus, I would have to expose my gun in public to remove it from the lockbox, load and holster the gun. Again, finding a private place to do so is problematic. I would end up exposing myself to a substantial risks of arrest, being killed or assaulted by police or concerned citizens, as well as making myself a potential victim from a criminal intent on stealing my gun. Furthermore, unnecessary gun handling risks a negligent discharge which would endanger myself and others. In addition, I likely would face public fear, scorn, and ridicule.

11. In sum, but for D.C. law, I would carry my concealed handgun on Metro trains and buses for self-defense. I do not do so now because I fear among other things, arrest, prosecution and physical injury.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: April __17_ 2023

_____

Tyler Yzaguirre

**DECLARATION UNDER PENALTY OF PERJURY**
**OF CAMERON M. ERICKSON**

Cameron M. Erickson, under penalty of perjury, deposes and states as follows:

1. My name is Cameron M. Erickson. I am a resident of the District of Columbia.

2. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I regularly carry a concealed firearm for personal protection within Washington, DC and outside the District when it is legal to do so.

3. I have never been arrested or convicted of any crime. In fact I have great respect for the rule of law and the legal processes. I am loath to break the law and would not do so intentionally.

4. I regularly ride the Metro subway and Metro buses. In fact, the Metro system is my primary means of transportation within the District. However, I am aware of many instances of criminal violence occurring on the Metro system within the District of Columbia. As a result of being aware of such instances of violence occurring within the Metro system, including stabbings and shootings, I am apprehensive for my safety while riding the Metro system. Because of my apprehension of becoming a victim of criminal violence, I will often carry pepper spray while riding Metro. However, having pepper spray does not fully assuage my apprehension because I am aware that pepper spray is not always effective against an assailant who is intoxicated, enraged or delirious. Moreover, I am aware that self-defense spray is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon or a firearm.

5. I would feel more comfortable riding the subway and Metro buses if I were allowed to carry my concealed firearm for self-defense when using the Metro system and in that event I would carry my firearm while riding the Metro system.

6. I have in some circumstances avoided using the Metro system out of fear of my personal safety because I could not within the law carry my concealed firearm for personal protection. As a result, I have had to expend sums greater for transportation than I would have if I had been using the Metro system.

7. I am convinced I will have to do likewise in the future unless the Metro carry ban is declared unconstitutional and voided.

8. If it were legal to do so, I would carry my concealed firearm on and within the Metro system for self-defense.

9. In addition to prohibiting me from carrying on the Metro system itself, the Metro carry ban interferes with my exercise of my Second Amendment rights both before and after I ride the system. Prior to entering a Metro station or getting on a Metro bus, to legally transport my concealed firearm within the Metro system in the District, I would have to unload and clear my firearm and store it in a locked container with the ammunition separate. However, doing so in public would violate the law that requires that my firearm be fully concealed. And finding a

private place to do so would be problematic. Likewise, upon exiting a Metro subway station or getting off a Metro bus, I would have to expose my gun in public to remove it from the lockbox, load and holster the gun. Again, finding a private place to do so is problematic. I would end up exposing myself to a substantial risks of arrest, being killed or assaulted by police or concerned citizens, as well as making myself a potential victim from a criminal intent on stealing my gun. Furthermore, unnecessary gun handling risks a a negligent discharge which would endanger myself and others. In addition, I likely would face public fear, scorn, and ridicule.

10. In sum, but for D.C. law, I would carry my concealed handgun on Metro trains and buses for self-defense. I do not do so now because I fear among other things, arrest, prosecution and physical injury.

The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information and belief.

Dated: April __, 2023

_____

Cameron M. Erickson

123

Declaration of
Robert M. Miller
April 16, 2023

# DECLARATION UNDER PENALTY OF PERJURY
## OF ROBERT M. MILLER, PH.D.

I, Robert M. Miller, Ph.D., under penalty of perjury, depose and state as follows:

1. My name is Robert M. Miller. I am a resident of the Commonwealth of Virginia near the District of Columbia.

2. I am a federal employee with a regular duty location in Washington, D.C. I am also a licensed firearm seller in Virginia, working for a gun store. I am a disabled veteran who frequently attends medical appointments in Washington, D.C. As an Economist, I frequently attend professional educational events in the District. I frequently enter the District for leisure activities. I often cross through the District to and from destinations outside the District, such as in Maryland.

3. I hold a license to carry a concealed pistol issued by the D.C. Metropolitan Police Department. I also hold licenses and permits issued by the Commonwealths of Virginia and Pennsylvania and the State of Maryland, authorizing me to carry a concealed handgun in those jurisdictions and to other states with reciprocity agreements. I regularly carry a concealed firearm for personal protection within Virginia, the District, and Maryland where allowed.

4. I am also a regular WMATA rider and carry my firearm when riding the Metro system wholly within Virginia and Maryland. The Metro system is my primary means of transportation within the District. Metro would be my preferred mode of transportation to, from, and within the District if I could carry my firearm on the Metro system.

5. I have never committed, been arrested for, or been convicted of any violent or property crime. I have great respect for the rule of law. I am loath to break the law and would not do so intentionally, not just for fear of punishment but because it is the morally and ethically right thing to do. Yet it is my right to peacefully challenge laws I believe are unconstitutional, as in the instant case.

6. I am aware of frequent incidents of criminal violence occurring on the Metro system within the District of Columbia from news reports. As a social scientist in Public Economics, I am aware of the alarmingly high crime rates within the District. Washington, D.C. is among the top-20 cities for homicide rates in the United States, and it is in the top-25 for all violent crimes. Homicide rates in the District have more than doubled in the past decade, peaking recently in 2020—2022. I am aware that most

Initials: _RM_

Declaration of
Robert M. Miller
April 16, 2023

homicides inside the District are highly concentrated in areas that I frequently travel through on Metro and cannot avoid.

7. In the eight years I have regularly used the Metro system, I have never seen a uniformed D.C. or Metro police officer on any train, bus, or transportation platform.

8. In my use of the Metro system, I have frequently observed intoxicated, unruly, abusive, lawbreaking, and mentally unstable passengers that put me in a state of great apprehension and mental preparation to respond to violence. When buses and trains are in motion with the doors closed between stops and with cell phone service often unavailable, I have felt trapped and helpless to respond to any acts of violence.

9. Because of frequent violence within the Metro system, including stabbings and shootings, I am apprehensive for my safety while riding the Metro system within the District of Columbia. Because of my apprehension of becoming a victim of criminal violence, I carry pepper spray while riding the Metro. That does not assuage my apprehension because I know that pepper spray is not always effective against an assailant who is intoxicated, enraged, or delirious. Because I know that pepper spray has a very short effective range, it will allow an assailant to get too close for safety's sake, and it is not a very effective weapon against an assailant armed with an edged weapon, a bludgeon, or a firearm. I am also aware that pepper spray can adversely affect the user as well as the intended target.

10. I am aware from local news reports of instances when persons unlawfully carrying concealed weapons on DC Metro have been arrested and charged for violating the Metro Ban.

11. I am apprehensive about violating the Metro carry ban because if I were to be convicted of a crime involving a firearm, I would have my DC carry license permanently revoked, I would forfeit my unlawfully carried firearm worth more than $700, I might be forced to forfeit my $250,000 collection of firearms, I would risk the use of deadly force by police, I would likely lose my current jobs as a federal employee and licensed firearm seller, such a conviction would adversely affect my ability to obtain employment, and it would adversely affect my right to keep and bear arms in other states.

12. I would feel better protected riding the subway and Metro buses if I could exercise my right to carry my concealed firearm for self-defense. If I could lawfully carry my firearm while riding the Metro system, I definitely would.

Initials: _RMM_

13. I have, in many circumstances, avoided using the Metro system in the District of Columbia out of fear for my personal safety because I could not lawfully carry my concealed firearm for personal protection. As a result, I have had greater expenses for transportation than I would have if I had been using the Metro system, including gasoline, mileage, tolls, and parking expenses. It is certain I must do likewise in the future unless the Metro Ban is declared unconstitutional and voided.

14. In addition to prohibiting me from carrying on the Metro system itself, the Metro carry ban interferes with the exercise of my Second Amendment rights both before and after I ride the system. To legally transport my concealed firearm within the Metro system in the District, I would have to unload and clear my firearm and store it in a locked container with the ammunition separate. However, doing so in public would violate the law requiring that my firearm be fully concealed. Finding a private place to do so would be very difficult, limited mostly to rest rooms open to the public. Such rest rooms are not usually available at all Metro stations or bus stops. Likewise, upon exiting a Metro subway station or getting off a Metro bus, I would have to expose my gun in public to remove it from the lockbox, load, and holster the gun. Again, finding a private place to do so is very difficult. I would expose myself to substantial risks of arrest, being killed or assaulted by police or alarmed citizens, as well as making myself a target for theft of my firearm. Furthermore, unnecessary gun handling risks a negligent discharge which would endanger myself and others. In the past, I have been subjected to public fear, scorn, and ridicule when exercising my right to carry firearms in Virginia and Colorado, and I would likely face the same threats in the District if my gun were exposed for loading or unloading.

15. In summary, but for D.C. law, I would carry my concealed handgun on Metro trains and buses for self-defense. I do not do so now because I fear, *inter alia*, arrest, prosecution, and physical injury.

    The above statement, given under penalty of perjury, is true and correct to the best of my knowledge, information, and belief.

Dated: April 16, 2023

_____
          Robert M. Miller, PhD

3

Initials: _____

1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3    GREGORY T. ANGELO, et al.,
                                        Civil Action
4            Plaintiffs,               No. 1:22-cv-1878

5        vs.                           Washington, DC
                                       December 12, 2022
6    DISTRICT OF COLUMBIA, et al.,
                                       2:08 p.m.
7            Defendants.
     _____/
8

9               TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE RANDOLPH D. MOSS
10                UNITED STATES DISTRICT JUDGE

11
     APPEARANCES:
12
     For the Plaintiffs:      GEORGE LYON, JR.
13                              Bergstrom Attorneys
                                1929 Biltmore Street, NW
14                              Washington, DC 20009

15
     For the Defendants:      MATEYA KELLEY
16                             HELEN RAVE
                               ANDREW SAINDON
17                              OAG-DC
                                400 Sixth Street, NW, Suite 10100
18                              Washington, DC 20001

19

20

21

22

     Court Reporter:          JEFF M. HOOK
23                              Official Court Reporter
                                U.S. District & Bankruptcy Courts
24                              333 Constitution Avenue, NW
                                Room 4700-C
25                              Washington, DC 20001

1                    **P R O C E E D I N G S**

2          **DEPUTY CLERK:**  This is civil action 22-1878,

3    Gregory T. Angelo, et al. vs. District of Columbia, et al.

4    Counsel, starting with plaintiffs, please approach the

5    podium and identify yourself for the record.

6          **MR. LYON:**  George Lyon for the plaintiffs, Your

7    Honor.

8          **THE COURT:**  Good afternoon, Mr. Lyon.

9          **MS. KELLEY:**  Mateya Kelley for the defendant,

10   District of Columbia.  I'm joined by my colleagues Helen

11   Rave and Andy Saindon, Your Honor.

12         **THE COURT:**  Good afternoon, Ms. Kelley.  So as I

13   indicated in my minute order, I'd like to take up standing

14   first, because I think there are significant standing

15   hurdles in this case.  And then if I conclude that there's a

16   likelihood of success with respect to standing, I can bring

17   you back and I can hear from you on the remaining merits of

18   the case.

19         So Mr. Lyon, I'm happy to hear from you.

20         **MR. LYON:**  Thank you, Your Honor.  Your Honor,

21   there are three elements of standing:  Injury, causation and

22   redressability.  The District does not contest causation or

23   redressability, so the issue here is injury.  Let me

24   summarize my points on why plaintiffs are injured here.

25   First, outside of overbreadth cases, there is no special

1    relaxed First Amendment doctrine on injury nor is there a

2    requirement in non First Amendment cases that plaintiffs

3    must be singled out or specifically threatened to have a

4    sufficient injury to challenge a criminal law that invades

5    constitutionally protected freedoms.

6           Second, plaintiffs and other CPL -- for concealed

7    pistol license -- holders are in fact specifically targeted

8    by the Metro ban which unambiguously, in violation of the

9    Second Amendment rights, prohibits carrying handguns on

10   public transportation.  That is an ongoing injury, Your

11   Honor, and the threat of prosecution is real.  There is no

12   gun law in the District of Columbia that they do not

13   enforce.  Third, Your Honor, the Metro ban creates hardships

14   for plaintiffs, and those hardships are more severe than

15   present in the First Amendment cases where standing has been

16   found, and more severe than present in the Seegars case

17   cited by the District since this is the plaintiffs' sole

18   remedy other than facing arrest.

19          **THE COURT:**  Hasn't the Supreme Court said that

20   doesn't matter in the Clapper case?

21          **MR. LYON:**  Well, in fact the Supreme Court -- I'm

22   sorry, which case?

23          **THE COURT:**  In Clapper.

24          **MR. LYON:**  The Clapper case.  I'm not familiar

25   with that case.  I can cite you that the Supreme Court has

1   said that they don't require plaintiffs to bet the farm.

2       **THE COURT:**  Right, but I think that's a different

3   proposition.  I mean, in Clapper, what the Supreme Court

4   held was the fact that there might not be anybody who would

5   have standing to bring the challenge doesn't matter.  If

6   there's -- you need standing, and if there's nobody who has

7   standing, that's just tough luck.  That's what the Supreme

8   Court held in Clapper.

9       **MR. LYON:**  That is certainly inconsistent, Your

10  Honor, with various cases including Babbitt, and also with

11  the New York State Rifle & Pistol vs. New York which is a

12  case that is indistinguishable from this case.  There was no

13  specific threat in New York State Rifle & Pistol --

14      **THE COURT:**  Are you talking about simply the

15  remand order in that case?

16      **MR. LYON:**  Yes, Your Honor, I am talking about

17  that.  That was a case where New York City prohibited

18  licensed plaintiffs -- similar to licensed plaintiffs here,

19  although they had home licenses, prohibited them from

20  carrying their pistols outside of the city; for example, to

21  go to a range outside the city or to go to a second home.

22  There was no specific threat in that case.  The only thing

23  the plaintiffs did is, in order to ensure that the statute

24  did in fact prohibit what they were doing, they wrote a

25  letter to the police and asked can we do this.  The answer

1  was no.  That wasn't a specific threat, they weren't singled

2  out any more than any other licensed pistol owners were

3  singled out.  There was no question in the Supreme Court nor

4  in the district court nor in the Second Circuit that they

5  had standing.

6          **THE COURT:**  What happened with that case on

7  remand?

8          **MR. LYON:**  That I don't know.  It was remanded for

9  the purpose of allowing the plaintiffs to raise a damage

10  remedy.

11          **THE COURT:**  Well, I think it was remanded to see

12  if they might be able to seek a damage remedy.  I don't

13  think the court said there was a damage remedy, they just

14  remanded to see if there might be one, right?

15          **MR. LYON:**  I attempted to find out where that

16  stood, but unfortunately was not successful.

17          **THE COURT:**  Is the rule that you're articulating

18  one that applies to any constitutional challenge?

19          **MR. LYON:**  Well, I would cite you Justice

20  Gorsuch's recent statement in Whole Woman's Health where

21  he -- I think I have the quote here.  He states:  "The Court

22  has consistently applied standing requirements whether the

23  challenged law in question is said to chill the free

24  exercise of religion, the freedom of speech or the right to

25  bear arms or any other right."  He did not make any

1    distinctions between those rights.  I think it is important

2    to make a distinction between what was at issue in Navegar

3    and what is an issue here.

4         **THE COURT:**  Just before you move on to that, I

5    just wanted to follow up on this question about all

6    constitutional challenges.  What if it was a Commerce Clause

7    challenge, would the rules still be in the same in your

8    mind?

9         **MR. LYON:**  I think when we're talking an

10   enumerated right in the Bill of Rights, that it makes a

11   difference.

12        **THE COURT:**  Why is that?

13        **MR. LYON:**  Well, because the -- among other

14   things, Commerce Clause cases may be very general in terms

15   of what's allowed, what's not allowed.  It's very similar to

16   Navegar where the court said that because of the general

17   language as to the copycat ban in that case, it's not clear

18   how the law is going to be enforced, if it is going to be

19   enforced.  Contrasting that with the specific language in

20   Navegar that targeted specific firearms made by the

21   plaintiffs.  And there the court, relying principally on the

22   language of the statute that brought these plaintiffs within

23   the ambit, said that the specific language makes it very

24   clear that this law applies to them.

25             In our case, there is absolutely no doubt that the

1    Metro ban applies to my clients.  They have concealed carry

2    licenses issued by the District.  The law is very specific

3    where they may and where they may not carry.  This is a

4    concrete injury, very similar to the specific ban in Navegar

5    where the court found standing.

6         THE COURT:  But wasn't the risk that the

7    plaintiffs who didn't have standing in Navegar would be

8    prosecuted higher than the risk here?  Because the

9    authorities obviously are going to know -- the ATF is going

10   to know who's manufacturing and selling particular types of

11   firearms.  And my guess is -- and I'm not saying you should

12   do it, but my guess is that if you left the courthouse today

13   and went down to Judiciary Square and got on the train with

14   a concealed weapon, that no one would have any idea you did

15   it.  I just raise that by way of saying that the risk of

16   prosecution, at least, seems higher -- or seemed higher in

17   Navegar than in this circumstance.

18        MR. LYON:  Well, two answers to that, Your Honor.

19   The first is that the D.C. Circuit in Navegar specifically

20   questioned the ripeness, because it wasn't clear how the

21   copycat ban was going to be enforced.  That would be one,

22   and it's not applicable here.  Second, I'm not so sanguine

23   that one who is carrying a concealed weapon may not come to

24   the attention of police.  I know --

25        THE COURT:  How would --

1          **MR. LYON:**  -- for a fact --

2          **THE COURT:**  I'm sorry, go ahead.

3          **MR. LYON:**  I know for a fact that police have

4    various ways to determine whether you are likely carrying a

5    concealed weapon.  One of them is that they look for bulges

6    along your waistline.  Another is that they look for what

7    one officer said was a security check.  You probably have

8    done this many times, you patted your pocket to go, yes, my

9    glasses are here or my cell phone is here.  Well, it is a

10   fact -- and we try to train this out of people when we teach

11   them to carry a concealed firearm, but it is a fact that

12   very often someone will pat where their gun is to make sure,

13   yes, it's still there.  It's sort of an involuntary

14   response.  Police look for that.

15          Not only that, though, Your Honor, let's say that

16   we are looking at a crowded subway, as the District has

17   indicated, that someone might brush up against my firearm or

18   my clients' firearms and feel that hard object, and go I

19   think that person's carrying a gun.

20          **THE COURT:**  Isn't that, on the merits, some

21   suggestion that maybe the law on its merits is --

22          **MR. LYON:**  Well, we can certainly --

23          **THE COURT:**  I'm sorry, the court reporter can't

24   get it down if we're speaking at the same time.

25          **MR. LYON:**  I'm sorry, Your Honor.

1      **THE COURT:**  If it's so tightly packed where people

2      are actually banging against people's firearms in the Metro,

3      doesn't that fall within some of the analogs -- and I know

4      I'm not really supposed to get the merits at this point, but

5      analogs over history to crowded places and people

6      carrying -- whether people are allowed to carry firearms in

7      very crowded places?

8      **MR. LYON:**  Well, when we get to the merits, I'm

9      happy to address that.  I don't think that there is a

10     sufficient analog to prohibit carrying in all crowded

11     places.  And Justice Thomas pretty much said the same thing

12     in Bruen.  But the point I am making is just because your

13     gun is concealed doesn't mean it may not come to the

14     attention of law enforcement.  I would contrast that with

15     the situation in Seegars with respect to the woman who had a

16     shotgun, and District law made that shotgun -- basically

17     made that shotgun kept unlocked and so forth.  And she said

18     if it comes to the point where someone breaks into my home,

19     I want to be able to unlock that shotgun and use it for

20     self-defense.  And the response there was, well, that's

21     highly speculative that someone's going to break in, that

22     you decide to unlock your shotgun and that you decide to use

23     it.  I think this is much more concrete than a situation

24     like that.

25     **THE COURT:**  To your knowledge, has anyone with a

135

1   concealed carry permit ever been arrested for carrying a

2   handgun on public transportation in the District of Columbia

3   while not engaged in another crime?

4        **MR. LYON:**   Okay, so the specific answer to that

5   question is no.  But the answer to the question of whether

6   people have been arrested for violating some other provision

7   of this particular act, the list of places where you cannot

8   carry, the answer is yes, that has been the case.  There was

9   a case that I was consulted on by an individual who was

10  arrested for carrying a firearm in a tavern.  He also had

11  been drinking, so it was a double violation.  And also, the

12  butt of his revolver was exposed so there was a three-for

13  there.

14        Also, people have been arrested prior to the

15  repeal of the 20 plus round limit of what you can carry.

16  There had been people arrested for carrying, quote, too much

17  ammunition.  The fact is that when they find a violation

18  under the myriad of firearms regulations, they arrest.  Now,

19  the U.S. Attorney may nolle pros, the U.S. Attorney may no

20  paper it, but D.C. police arrest.  In fact, I'm familiar

21  with an advisory memorandum that went to officers

22  essentially saying that if someone -- if you stop someone

23  and there is an expended shell that you see on the

24  floorboard of their car and they don't have a registered

25  firearm, you are to arrest them.

1    **THE COURT:**  Is the right body of law here really

2    the Metropolitan Police Department?  I suppose I'm maybe

3    even questioning whether the Chief of Police is the right

4    defendant.  Because aren't you really concerned about the

5    Metro police, which is an entirely different organization?

6    **MR. LYON:**  Well, the D.C. police enforce these

7    laws as well.  One would be -- and the District of Columbia

8    is a defendant.

9    **THE COURT:**  Right.  But do you know what the

10   policies are of the Metro police?  You talked about what the

11   policies are of the Metropolitan Police Department.  Do you

12   know what the policies are of the Metro police?

13   **MR. LYON:**  The policies of the Metro police is

14   that we follow whatever the law is in the jurisdiction.  So,

15   for example, in Virginia where it is not illegal to carry on

16   the Metro, you would not -- they certainly wouldn't arrest

17   you.

18   **THE COURT:**  Well, no, no, of course.  I understand

19   that they're just applying the law of the jurisdiction.  But

20   I thought you were referring to the fact that there was some

21   policy versus a law of the Metropolitan Police Department

22   that they always -- the police officers are directed that in

23   every case in which someone is carrying a gun without -- in

24   a manner that is not authorized by law, that they must make

25   an arrest under those circumstances.  I think that's what

1    you said.

2         MR. LYON:  That is my understanding of the policy,

3    Your Honor.

4         THE COURT:  Do you know if Metro police has the

5    same policy?

6         MR. LYON:  I do not know that.

7         THE COURT:  That raises another question that I

8    had, which is in your brief you said that if the Court were

9    inclined to deny the motion for a preliminary injunction on

10   the grounds that you had failed to demonstrate a likelihood

11   of success on standing, you would seek discovery relating to

12   standing.

13        Do you remember that?

14        MR. LYON:  We would seek discovery with respect to

15   MPD as to their specific policies, whether they would

16   disclaim enforcement of this.

17        THE COURT:  I'm sorry, just to back up, because I

18   want to get it down.  You said MPD, do you mean Metro police

19   or the D.C. police?

20        MR. LYON:  D.C. police.

21        THE COURT:  Again, I'm not sure the D.C. police is

22   the right entity.  I mean, it might be.

23        MR. LYON:  Well, D.C. police patrol Metro as well

24   as Metro police.  Now, I'm happy to have discovery of Metro

25   police as well, but I don't believe there will be a

1    difference there.

2              **THE COURT:**  So what discovery would you seek?

3              **MR. LYON:**  Probably a deposition of the chief, and

4    probably --

5              **THE COURT:**  I don't know why it would necessarily

6    need to be the chief.  Couldn't it just be a 30(b)(6)

7    witness?

8              **MR. LYON:**  It could be a 30(b)(6) witness as well.

9    Certainly, a 30(b)(6) witness of the Metro police.

10             **THE COURT:**  Anything other than a deposition that

11   you would seek?

12             **MR. LYON:**  Not that comes to mind at this point,

13   Your Honor.  I will be honest with you, that I haven't given

14   great thought to discovery given the status of the case at

15   this point.

16             **THE COURT:**  I mean, I have to say, I understand

17   your argument on standing, and I think that there is some

18   force to the argument.  But it seems to me to be arguments

19   that the D.C. Circuit has two, three, four times considered

20   and said yeah, there's considerable force to that argument,

21   but our circuit precedent is to the contrary, and unless we

22   go en banc, we can't accept that.  I certainly can't do more

23   than the panel of the D.C. Circuit could do.  If the panels

24   of the D.C. Circuit are bound, I'm certainly bound.

25             **MR. LYON:**  Your Honor, I understand that.  But I

1    believe that this case is distinguishable from the D.C.

2    Circuit cases you're thinking of, Navegar in particular.

3            **THE COURT:**  I'm sorry, just to interrupt for a

4    second, I want to make sure I'm understanding this.   To

5    review the grounds for distinction, one you've indicated is

6    no alternative remedy, right?

7            **MR. LYON:**  That's correct.

8            **THE COURT:**  Number two is the certainty or clarity

9    of the law?

10           **MR. LYON:**  Yes, similar to the specific ban in

11   Navegar.

12           **THE COURT:**  Anything other than those two things?

13           **MR. LYON:**  Well, there is substantial hardship

14   here, and it's in a variety of means.  One is the fact that

15   this is the sole remedy that our clients have.  The Supreme

16   Court made it clear in the Free Enterprise Fund case that we

17   don't require people to bet the farm.  But beyond that, I

18   want you to think of what is the situation with someone who

19   wants to carry for personal protection and they need to use

20   the Metro.  In order to comply with this law while still

21   carrying, here's what they'd have to do.  They would put on

22   their gun at home.  They would go into the vicinity of the

23   Metro, and then they have a serious problem.  They're going

24   to have to take their gun out, take the magazine out, rack a

25   round out -- okay, all of this in public in violation of the

1    law that says your gun has to be fully concealed.

2         **THE COURT:**  Couldn't you step into a restroom or

3    some private place to do that?

4         **MR. LYON:**  Possibly.  But restrooms are not always

5    private, there are little -- the doors do not shut entirely.

6    And there's no restrooms, for example, in the Metro station

7    that are available.  And you can't even go into the Metro

8    station under this law, so they'd have to go somewhere where

9    they're going to take a gun out in public.  Now, anytime --

10   very noted old guy firearms instructor John Farnam says the

11   most dangerous thing that we do with a gun is taking it out

12   of the holster and putting it back in the holster.  If you

13   look at the various incident reports of training schools

14   around the country, the overwhelming number of situations

15   when people shoot themselves are when they've taken the gun

16   out of the holster or are putting it back in.

17        So unnecessary gun handling in and of itself is

18   dangerous to yourself, it's dangerous to other people.  If

19   someone else sees you with a gun, it could possibly cause

20   panic.  Depending upon the situation, if there's another

21   lawful concealed carrier or an off-duty officer, you could

22   very well get shot by doing -- by taking your gun out,

23   unloading it, putting it away in public.  And the same thing

24   after you get off the Metro.

25        So Your Honor, practically, the hardship here that

1    plaintiffs face is for the entirety of their trip, they are

2    rendered defenseless.  So this law sweeps not only the

3    specific location where D.C. says you cannot carry, but it

4    sweeps into locations that even D.C. will admit that under

5    Bruen and Wrenn and Palmer are constitutionally protected.

6    So this is a law that causes substantial hardship.

7              THE COURT:  Any other -- I just want to make sure

8    I'm considering all of your arguments.  Any other grounds

9    for distinguishing the D.C. case law?

10             MR. LYON:  Well, the principal ground of

11   distinguishing both Parker and Seegars -- that is, as to the

12   Parker plaintiffs who did not have standing, including

13   myself, by the way, is that in Parker and Seegars, they had

14   a remedy to file an application, to register a gun.  And

15   upon that being turned down, they would have had standing.

16   This is something that Judge Ginsburg emphasized, and not

17   only Judge Ginsburg, but the Solicitor General, when Seegars

18   went up on cert, that the Seegars plaintiffs had a remedy.

19   We do not have that remedy.

20             If you go back to the Babbitt case, the Supreme

21   Court emphasized that a pre-enforcement challenge was the

22   only opportunity the Babbitt plaintiffs had other than

23   breaking the law.

24             THE COURT:  Let me ask you this:  Is another

25   potential remedy you would have -- and I have no idea

1    whether this would work or not, would be to write a letter

2    to the chief of police or to whoever the right official is

3    in the D.C. government, and to say:  Look, I understand the

4    law.  I'm not proposing during the busiest hours of rush

5    hour, when everyone is jostling together on the Metro, to be

6    carrying my firearm.  But I come home late at night on the

7    Metro where the Metro trains are largely empty.  I'm very

8    concerned about my personal safety when I do it.  As soon as

9    I get off the train, I have to walk eight blocks through a

10   dangerous neighborhood.  I'm requesting permission in light

11   of the Supreme Court's decision in Bruen to be allowed under

12   those circumstances to carry my firearm.  And I understand

13   what the law says, but on the other hand, D.C. has an

14   obligation not only to enforce its statutes, but also to

15   enforce the Constitution.

16           And you say to them:  Applying both the

17   Constitution and the statutes, you should be of the view

18   that I can't do that -- that I can do this.  And D.C. might

19   write back to you and say no, under no circumstances can you

20   do that, and that's unacceptable, which would bolster your

21   argument for standing.  Or they might write back and say

22   well, I don't think -- no one's going to enforce the law

23   against you if you're doing it in an entirely concealed way,

24   you know, after 10:00 p.m. on the Metro between those

25   places.

1    **MR. LYON:**  Your Honor, I would be happy to do that

2    on behalf of my plaintiffs or have them do it.  I have

3    absolutely no doubt what the response will be, it will be

4    one of either two things:  One, I will get no response; or

5    two, the response will be no, the law says what the law

6    says.

7    **THE COURT:**  Anything else you want to address on

8    standing?

9    **MR. LYON:**  No, thank you, Your Honor.

10   **THE COURT:**  All right.  Ms. Kelley.

11   **MS. KELLEY:**  Good afternoon, Your Honor.  Thank

12   you for having us.  In response to counsel's arguments, I

13   have three points for you.  I'm going to speak very briefly

14   to the questions about enforcement, and then alleged

15   distinctions with Parker and Seegars, and then a little bit

16   about the harms of public carry.

17   **MR. LYON:**  Your Honor, could I ask counsel to

18   speak up?  Years of shooting has deadened my hearing a bit.

19   **THE COURT:**  Okay, fair enough.

20   **MS. KELLEY:**  I will try.  First, Your Honor

21   discussed the question of whether the Metropolitan Police

22   Department or the WMATA police force have ever enforced this

23   law.  I would note first that there is no evidence in the

24   record as to that point regardless of what counsel has to

25   say.  And further, there are no allegations in the complaint

1     that even touch upon this.  And therefore, I would note that

2     the District opposes counsel's request for discovery.  We

3     think discovery is appropriate to probe allegations in a

4     complaint.  But here, there is nothing in the complaint that

5     would entitle them to further discovery.

6          **THE COURT:**  And at this point, all that's --

7     there's not even a motion to dismiss in front of me at this

8     point, there's just the preliminary injunction motion at

9     this point.  But I was trying to really explore whether

10    there were facts that could conceivably be at issue or not

11    down the road.

12         **MS. KELLEY:**  Yes, Your Honor.

13         **THE COURT:**  Can I just ask you, just to your

14    knowledge -- and I understand the limits of the record at

15    this point, but to your knowledge, have there been cases

16    where someone has been arrested who has a concealed carry

17    permit who was on the Metro with a firearm who has not

18    committed any other violation of law?

19         **MS. KELLEY:**  Well, to my knowledge, Your Honor,

20    again, there is nothing in the record and we have nothing to

21    offer on this point.

22         **THE COURT:**  Okay.

23         **MS. KELLEY:**  Second, the District agrees, of

24    course, as we argued in our opposition, that Parker and

25    Seegars are squarely on point here and they continue to bind

1    this Court.  Counsel has pointed to a question of clarity in

2    the law, and also a question of hardship in attempting to

3    distinguish these cases.  As to clarity, there might be a

4    distinction between plaintiffs' facts and Navegar where

5    there was a question of ripeness and how the not

6    specifically named firearms would -- you know, what they

7    were and how they would be enforced.  But that is not at all

8    true for Parker and Seegars.  In both Parker and Seegars,

9    the problem was that plaintiffs wanted to register their

10   guns under District law, and District law clearly did not

11   permit that.  There was no question about how it would be

12   enforced against the plaintiffs or whether that was a

13   problem.  So that offers no distinction here.

14        Second, as to hardship, as Your Honor has already

15   acknowledged, there is no -- Clapper's on point, and there

16   is no general principle that an alleged harm always gets a

17   remedy.  I would also point to the Court to the Seegars

18   decision at page 1256 which specifically rejects the

19   argument that counsel has made, that the idea that there's

20   no administrative remedy should distinguish a plaintiff.

21   Third, I just want to point out that of course we describe

22   at length what the District views as the harms of public

23   carry on the Metro.  And in the course of counsel's

24   argument, I believe he has conceded the truth of those

25   facts.

1    **THE COURT:**  What is your view about what someone

2    would have to do to actually carry a firearm?  It wasn't

3    even entirely clear to me from looking at the statutes that

4    Mr. Lyon's solution would even work, and whether you

5    could -- whether you're even allowed to carry a firearm in

6    the Metro in a locked container.  The definition and

7    language that he was relying on, I think, dealt with the

8    transportation of firearms.  And the exception in the

9    statute either allows a firearm to be secured in a vehicle

10   or -- and then it says if not, the person just has to leave

11   the location.

12   So I'm interested in whether you think that in

13   fact one can carry a firearm on the Metro, even in a locked

14   container?

15   **MS. KELLEY:**  They can, Your Honor.  I don't have

16   the citation in my head, perhaps my co-counsel does.  I

17   believe under both District and federal law, that firearms

18   can be transported if they are essentially not operable, if

19   they're not loaded and if they're in some sort of locked

20   container.  So as I understand it, it is possible, for

21   example, to carry arms to a firing range or out of town, et

22   cetera.

23   **THE COURT:**  And do you agree with Mr. Lyon about

24   what one would have to do if one carried a firearm in

25   practice?  You walk to the Metro station, and is there any

1  way you could actually secure it without violating the law

2  in the process of securing the firearm?

3      **MS. KELLEY:**  Not that I'm aware of.  I have never

4  tried to do so myself.  No, Your Honor.

5      **THE COURT:**  You just don't know?

6      **MS. KELLEY:**  I just don't know.

7      **THE COURT:**  Okay, fair enough.  Anything else you

8  wanted to add?

9      **MS. KELLEY:**  Yes.  I would also like to respond to

10  counsel's point about New York State Pistol & Rifle

11  Association.

12      **THE COURT:**  If you can just make sure and keep

13  your voice up.

14      **MS. KELLEY:**  Sorry.  I would also like to respond

15  to the point about New York State Rifle & Pistol

16  Association.  Plaintiffs argue that this abrogates Parker

17  and Seegars.  It does not.  It was a per curiam opinion

18  simply holding that plaintiffs' prospective claims were moot

19  because the law had been repealed.  It does not in any way

20  speak to standing.  I see Your Honor nodding, so I'm happy

21  to take questions, otherwise I'll sit.

22      **THE COURT:**  I'm nodding that I understand your

23  argument.  I'm happy to hear anything else you want to add,

24  if not, I'll give Mr. Lyon the last word.

25      **MS. KELLEY:**  No, Your Honor, nothing more here.

1          THE COURT:  Mr. Lyon, anything more you want to

2    say?

3          MR. LYON:  Sure, Your Honor.  About the only thing

4    that I think I need to respond to is the suggestion that

5    Seegars and Parker are on point here.  They're absolutely

6    not because there was a separate remedy, whereas in this

7    case, the sole remedy is a pre-enforcement challenge or

8    betting the farm.

9          THE COURT:  But I think that Ms. Kelley is right

10   in that Seegars actually says that the availability of a

11   remedy is not -- of an alternative remedy is not essential

12   for the court's concluding that it lacks standing, which is

13   the same point I was making from the Clapper decision.

14         MR. LYON:  Well, that is not what Judge Ginsburg

15   said in concurring on denial of rehearing en banc.

16         THE COURT:  Right, but that's --

17         MR. LYON:  And that's certainly not what the

18   Solicitor General said in opposing cert.

19         THE COURT:  Well, that's all good, and I respect

20   the views of the Solicitor General and I respect the views

21   of Judge Ginsburg, but I'm bound by the views of the panel

22   from the D.C. Circuit.

23         MR. LYON:  Okay.  And I would refer you back to

24   Babbitt where the Supreme Court emphasizes --

25         THE COURT:  Although the problem I have is the

1   D.C. Circuit in its cases addresses Babbitt and says -- and

2   I think there's one point --

3          **MR. LYON:**  You know, I understand that.  All I can

4   say is that they're the Supreme Court, they've said we don't

5   require you to bet the farm.  Do I have some issues with the

6   holdings in these cases?  The answer is yeah, as I would

7   agree with Judge, and now Justice, Kavanaugh, that the D.C.

8   Circuit has made standing much too complicated.  But that

9   doesn't change the fact that the cases are distinguishable,

10  both Seegars and Parker -- and lastly Navegar as well, given

11  the specific targeted statute that we're dealing with here.

12         **THE COURT:**  What Judge Williams said in Seegars,

13  which resonated with me, is he pointed to the fact that the

14  Supreme Court on more than one occasion has said that the

15  test is whether there is a credible fear of prosecution or

16  credible risk of prosecution.  But then what he says is he

17  says:  "Unfortunately the adjective credible says little or

18  nothing about the requisite level of probability of

19  enforcement, and clarity prevails only at the poles," which

20  strikes me as sort of the nub of the problem here.

21         **MR. LYON:**  Very good point.  On the one pole, you

22  have a situation where an officer says if you don't stop

23  doing that, I'm going to arrest you, no doubt about that.

24  On the other, you have a clearly speculative, generalized

25  complaint.  And in Parker and Seegars, while I don't think

1   it was speculative, I think it was very -- it was a very

2   generalized type of harm that applied to the population as a

3   whole.  I think the cases have called it a generalized

4   complaint.

5           **THE COURT:**  But the --

6           **MR. LYON:**  And this is not that, Your Honor.  This

7   is a specific statute addressed to a defined group of

8   individuals who are licensed to carry a firearm outside the

9   home, very similar to the persons in New York State Rifle &

10  Pistol vs. New York.

11          **THE COURT:**  But one of the problems I think that

12  you have is in your complaint and in your evidence submitted

13  in support of your motion for a preliminary injunction, you

14  say nothing -- absolutely nothing more than that.  You don't

15  point to any evidence or any indication or reason to think

16  that you or one of your clients would in fact be prosecuted

17  if you rode the Metro with a concealed weapon.  And as far

18  as I know, at least sitting here today, no such prosecution

19  has ever been brought, at least to my knowledge.

20          **MR. LYON:**  Probably because my concealed carriers

21  are very law abiding.

22          **THE COURT:**  No, I understand that.  That's

23  obviously an issue in general with pre-enforcement

24  challenges, is that those members of the population that are

25  risk averse are never going to put themselves in a position

1   in which they get to test the law.  But there's law, for

2   example, that says that if you want -- at least in some

3   circuits, if you want to challenge a subpoena you think is

4   invalid in the court of appeals, you've got to wait for the

5   district court to hold new contempt.  That's a bitter pill

6   to have to swallow to bring a challenge.  So there are

7   circumstances where that happens.

8           **MR. LYON:**  But here, Your Honor, there's an even

9   more bitter pill.  If my clients violate this law, they bet

10  the farm, and --

11          **THE COURT:**  Well, they bet the farm --

12          **MR. LYON:**  And ultimately if the law is found to

13  be valid -- which I don't think it would be.  But if

14  ultimately the law is found to be valid, they not only face

15  possible fine or imprisonment -- probably won't be

16  imprisoned, because no one goes to jail in the District.

17          **THE COURT:**  Well, it's a misdemeanor as well.

18          **MR. LYON:**  But there's one other factor that we

19  haven't touched on, and that factor is that they're now

20  convicted of a weapons offense and they forfeit their Second

21  Amendment rights in the District of Columbia for the rest of

22  their life.

23          **THE COURT:**  Ms. Kelley, do you agree with that,

24  that if someone was convicted of the misdemeanor of carrying

25  a concealed weapon, for example, on the Metro, that they

1    would never be allowed again to own a firearm in the

2    District of Columbia?

3              **MS. KELLEY:**  I don't know the --

4              **THE COURT:**  If you know.

5              **MS. KELLEY:**  I don't know the answer.  I believe

6    that was asserted in the briefing.  We can file a

7    supplemental if it pleases the Court.

8              **THE COURT:**  Well, I'm just curious about that

9    issue.  I don't have any reason to doubt Mr. Lyon, although

10   we can take a look at that as well.

11             **MR. LYON:**  Your Honor, we did cite the statute.

12   The statute prohibits the chief from registering a firearm

13   to anyone who's ever been convicted of a weapons offense,

14   not only in the District of Columbia, but in any other

15   jurisdiction.  And the chief has the authority to revoke a

16   registration for any factor coming to his attention that

17   would allow him to deny a registration.

18             **THE COURT:**  And a weapons offense is defined as?

19             **MR. LYON:**  A weapons offense is defined as any law

20   regulating the use, carry -- basically the use, carry or

21   possession of a firearm.  It doesn't apply to knives, it

22   doesn't apply to bludgeons, but it does apply to any law

23   regulating the use, possession, transport -- I'm probably

24   leaving out something, but they've covered all the bases.

25             **THE COURT:**  That may go to the question about

1  whether you -- whether the U.S. Attorney's Office I suppose

2  would prosecute an innocent violation.  You know, if you

3  found yourself inadvertently at one of the places that the

4  statute prohibits with a firearm and you had a concealed

5  carry permit, I suppose they might decline to prosecute

6  under those circumstances realizing that the repercussions

7  for that would be severe.

8          **MR. LYON:**  That's certainly possible.  But I have

9  to presume that the District intends to enforce its laws,

10 especially given their history of enforcement of gun laws.

11 By the way, the definition of weapons offense is at

12 7-2501.01 of the D.C. Code.

13          **THE COURT:**  Well, thank you.  Anything else?

14          **MR. LYON:**  No, Your Honor.

15          **THE COURT:**  Ms. Kelley, anything else?

16          **MS. KELLEY:**  Yes, Your Honor.  My colleague does

17 have a citation for you as to your transportation question.

18          **THE COURT:**  Oh, yes, thank you.

19          **MS. KELLEY:**  There's a federal law, the Federal

20 Firearms Owners Protection Act, 18 U.S.C. section 926A,

21 1986.

22          **THE COURT:**  Great, okay.  Thank you, I'll take a

23 look at that.

24          **MR. LYON:**  If I could just clarify?

25          **THE COURT:**  Yes, please.

1        MR. LYON:  FFOPA, as we call it, deals with an

2   interstate transport.  But D.C. does have an analog to

3   FFOPA, which is why I believe that you can carry -- or

4   transport a firearm on the Metro as long as it's in a locked

5   container, ammunition separate.

6        THE COURT:  Do you know if the provision you're

7   talking about is 22-4504.02?

8        MR. LYON:  I can keep a lot of things in any head,

9   but that's not one.

10        THE COURT:  You gave me citations before.

11        MR. LYON:  That sounds right.

12        THE COURT:  Because that's the one that talks

13   about transportation of a firearm.

14        MR. LYON:  That's the FFOPA analog, Your Honor,

15   yes.

16        THE COURT:  I see.  So the point is he's

17   transporting it -- you're transporting it on the subway, for

18   example?

19        MR. LYON:  Yeah, and I think there was a report

20   from Emily Miller when she first got her gun that she locked

21   the gun up, got on the Metro and went home.

22        THE COURT:  Okay.  So I guess you would agree then

23   that under D.C. law, that if you wanted to go to the firing

24   range, you could put your handgun in a properly -- a proper

25   container in a proper manner, get on the subway, take the

1   subway to the firing range -- or take it to your car, and

2   then drive to the firing range, come back, get back on the

3   subway and then go home with it, you just can't have it with

4   you on the subway in a manner that is operable?

5           **MR. LYON:**  I would not be able to use it to

6   protect it or any other firearms I had with me.

7           **THE COURT:**  Okay.  Well, thank you all.  So I will

8   get you an opinion on the standing issue as promptly as I

9   can.  Then if I conclude that the plaintiff clears the

10  hurdle on standing, then I'll have you all back for argument

11  on the merits.  I just thought that the merits of this case

12  involves some heavy lifting and historical analysis, and it

13  would be better to address this issue first before we turn

14  to that if necessary.

15          And if I do conclude that the plaintiff has not

16  established standing for purposes of the preliminary

17  injunction, then we may have to address the issue that

18  Ms. Kelley raised as to whether the complaint adequately

19  alleges standing or whether, Mr. Lyon, you would like to

20  amend if you thought there were more specific allegations

21  you could add.  Thank you.

22          (Proceedings adjourned at 2:52 p.m.)

23

24

25

1                          C E R T I F I C A T E

2

3                 I, **Jeff M. Hook, Official Court Reporter**,

4      certify that the foregoing is a true and correct transcript

5      of the record of proceedings in the above-entitled matter.

6

7

8

9      February 21, 2023

10             DATE                                Jeff M. Hook

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**1**

10100 [1]   1/17
10:00 p.m [1]   17/24
12 [1]   1/5
1256 [1]   20/18
18 [1]   28/20
1878 [2]   1/4 2/2
1929 [1]   1/13
1986 [1]   28/21
1:22-cv-1878 [1]   1/4

**2**

20 [1]   10/15
20001 [2]   1/18 1/25
20009 [1]   1/14
2022 [1]   1/5
22-1878 [1]   2/2
22-4504.02 [1]   29/7
2501.01 [1]   28/12
2:08 [1]   1/6
2:52 p.m [1]   30/22

**3**

30 [3]   13/6 13/8
13/9
333 [1]   1/24

**4**

400 [1]   1/17
4504.02 [1]   29/7
4700-C [1]   1/24

**7**

7-2501.01 [1]   28/12

**9**

926A [1]   28/20

**A**

abiding [1]   25/21
able [3]   5/12 9/19
30/5
above [1]   31/5
above-entitled [1]
31/5
abrogates [1]   22/16
absolutely [4]   6/25
18/3 23/5 25/14
accept [1]   13/22
acknowledged [1]
20/15
act [2]   10/7 28/20
action [2]   1/3 2/2
actually [4]   9/2
21/2 22/1 23/10
add [3]   22/8 22/23
30/21
address [4]   9/9
18/7 30/13 30/17
addressed [1]   25/7
addresses [1]   24/1
adequately [1]
30/18
adjective [1]   24/17
adjourned [1]   30/22
administrative [1]
20/20
admit [1]   16/4

advisory [1]   10/21
afternoon [3]   2/8
2/12 18/11
again [3]   12/21
19/20 27/1
against [4]   8/17
9/2 17/23 20/12
agree [4]   21/23
24/7 26/23 29/22
agrees [1]   19/23
ahead [1]   8/2
al [4]   1/3 1/6 2/3
2/3
allegations [3]
18/25 19/3 30/20
alleged [2]   18/14
20/16
alleges [1]   30/19
allow [1]   27/17
allowed [6]   6/15
6/15 9/6 17/11 21/5
27/1
allowing [1]   5/9
allows [1]   21/9
along [1]   8/6
alternative [2]
14/6 23/11
although [3]   4/19
23/25 27/9
always [3]   11/22
15/4 20/16
ambit [1]   6/23
amend [1]   30/20
Amendment [5]   3/1
3/2 3/9 3/15 26/21
ammunition [2]
10/17 29/5
among [1]   6/13
analog [3]   9/10
29/2 29/14
analogs [2]   9/3 9/5
analysis [1]   30/12
ANDREW [1]   1/16
Andy [1]   2/11
ANGELO [2]   1/3 2/3
appeals [1]   26/4
APPEARANCES [1]
1/11
applicable [1]   7/22
application [1]
16/14
applied [2]   5/22
25/2
applies [3]   5/18
6/24 7/1
apply [3]   27/21
27/22 27/22
applying [2]   11/19
17/16
approach [1]   2/4
appropriate [1]
19/3
argue [1]   22/16
argued [1]   19/24
argument [8]   13/17
13/18 13/20 17/21
20/19 20/24 22/23
30/10
arguments [3]   13/18
16/8 18/12

arms [2]   5/25 21/21
around [1]   15/14
arrest [7]   3/18
10/18 10/20 10/25
11/16 11/25 24/23
arrested [6]   10/1
10/6 10/10 10/14
10/16 19/16
articulating [1]
5/17
asserted [1]   27/6
Association [2]
22/11 22/16
ATF [1]   7/9
attempted [1]   5/15
attempting [1]   20/2
attention [3]   7/24
9/14 27/16
Attorney [2]   10/19
10/19
Attorney's [1]   28/1
Attorneys [1]   1/13
authorities [1]   7/9
authority [1]   27/15
authorized [1]
11/24
availability [1]
23/10
available [1]   15/7
Avenue [1]   1/24
averse [1]   25/25
aware [1]   22/3
away [1]   15/23

**B**

Babbitt [5]   4/10
16/20 16/22 23/24
24/1
back [11]   2/17
12/17 15/12 15/16
16/20 17/19 17/21
23/23 30/2 30/2
30/10
ban [7]   3/8 3/13
6/17 7/1 7/4 7/21
14/10
banc [2]   13/22
23/15
banging [1]   9/2
Bankruptcy [1]   1/23
bases [1]   27/24
basically [2]   9/16
27/20
bear [1]   5/25
behalf [1]   18/2
Bergstrom [1]   1/13
bet [5]   4/1 14/17
24/5 26/9 26/11
better [1]   30/13
betting [1]   23/8
beyond [1]   14/17
Bill [1]   6/10
Biltmore [1]   1/13
bind [1]   7/4
bit [2]   18/15 18/18
bitter [2]   26/5
26/9
blocks [1]   17/9
bludgeons [1]   27/22
body [1]   11/1

bolster [1]   17/20
both [5]   16/11
17/16 20/8 21/17
24/10
bound [3]   13/24
13/24 23/21
break [1]   9/21
breaking [1]   16/23
breaks [1]   9/18
brief [1]   12/8
briefing [1]   27/6
briefly [1]   18/13
bring [3]   2/16 4/5
26/6
brought [2]   6/22
25/19
Bruen [3]   9/12 16/5
17/11
brush [1]   8/17
bulges [1]   8/5
busiest [1]   17/4
butt [1]   10/12

**C**

call [1]   29/1
called [1]   25/3
can [19]   2/16 2/17
3/25 4/25 8/22
10/15 17/18 17/19
19/13 21/13 21/15
21/18 22/12 24/3
27/6 27/10 29/3
29/8 30/9
car [2]   10/24 30/1
carried [1]   21/24
carrier [1]   15/21
carriers [1]   25/20
carry [23]   7/1 7/3
8/11 9/6 10/1 10/8
10/15 11/15 14/19
16/3 17/12 18/16
19/16 20/23 21/2
21/5 21/13 21/21
25/8 27/20 27/20
28/5 29/3
carrying [14]   3/9
4/20 7/23 8/4 8/19
9/6 9/10 10/1 10/10
10/16 11/23 14/21
17/6 26/24
case [25]   2/15 2/18
3/16 3/20 3/22 3/24
3/25 4/12 4/12 4/15
4/17 4/22 5/6 6/17
6/25 10/8 10/9
11/23 13/14 14/1
14/16 16/9 16/20
23/7 30/11
cases [12]   2/25 3/2
3/15 4/10 6/14 14/2
19/15 20/3 24/1
24/6 24/9 25/3
causation [2]   2/21
2/22
cause [1]   15/19
causes [1]   16/6
cell [1]   8/9
cert [2]   16/18
23/18
certainly [8]   4/9

**C**

certainly... [7]
8/22 11/16 13/9
13/22 13/24 23/17
28/8
certainty [1]   14/8
certify [1]   31/4
cetera [1]   21/22
challenge [8]   3/4
4/5 5/18 6/7 16/21
23/7 26/3 26/6
challenged [1]   5/23
challenges [2]   6/6
25/24
change [1]   24/9
check [1]   8/7
chief [6]   11/3 13/3
13/6 17/2 27/12
27/15
chill [1]   5/23
circuit [10]   5/4
7/19 13/19 13/21
13/23 13/24 14/2
23/22 24/1 24/8
circuits [1]   26/3
circumstance [1]
7/17
circumstances [5]
11/25 17/12 17/19
26/7 28/6
citation [2]   21/16
28/17
citations [1]   29/10
cite [3]   3/25 5/19
27/11
cited [1]   3/17
city [3]   4/17 4/20
4/21
civil [2]   1/3 2/2
claims [1]   22/18
Clapper [6]   3/20
3/23 3/24 4/3 4/8
23/13
Clapper's [1]   20/15
clarify [1]   28/24
clarity [4]   14/8
20/1 20/3 24/19
Clause [2]   6/6 6/14
clear [5]   6/17 6/24
7/20 14/16 21/3
clearly [2]   20/10
24/24
clears [1]   30/9
clients [4]   7/1
14/15 25/16 26/9
clients' [1]   8/18
co [1]   21/16
co-counsel [1]
21/16
Code [1]   28/12
colleague [1]   28/16
colleagues [1]   2/10
COLUMBIA [10]   1/1
1/6 2/3 2/10 3/12
10/2 11/7 26/21
27/2 27/14
coming [1]   27/16
Commerce [2]   6/6
6/14

committed [1]   19/18
complaint [7]   18/25
19/4 19/4 24/25
25/4 25/12 30/18
complicated [1]
24/8
comply [1]   14/20
concealed [16]   3/6
7/1 7/14 7/23 8/5
8/11 9/13 10/1 15/1
15/21 17/23 19/16
25/17 25/20 26/25
28/4
conceded [1]   20/24
conceivably [1]
19/10
concerned [2]   11/4
17/8
conclude [3]   2/15
30/9 30/15
concluding [1]
23/12
concrete [2]   7/4
9/23
concurring [1]
23/15
considerable [1]
13/20
considered [1]
13/19
considering [1]
16/8
consistently [1]
5/22
Constitution [3]
1/24 17/15 17/17
constitutional [2]
5/18 6/6
constitutionally [2]
3/5 16/5
consulted [1]   10/9
container [5]   21/6
21/14 21/20 29/5
29/25
contempt [1]   26/5
contest [1]   2/22
continue [1]   19/25
contrary [1]   13/21
contrast [1]   9/14
Contrasting [1]
6/19
convicted [3]   26/20
26/24 27/13
copycat [2]   6/17
7/21
counsel [6]   2/4
18/17 18/24 20/1
20/19 21/16
counsel's [4]   18/12
19/2 20/23 22/10
country [1]   15/14
course [4]   11/18
19/24 20/21 20/23
court [28]   1/1 1/22
1/23 3/19 3/21 3/25
4/3 4/8 5/3 5/4
5/13 5/21 6/16 6/21
7/5 8/23 12/8 14/16
16/21 20/1 20/17
23/24 24/4 24/14

26/4 26/5 27/7 31/3
court's [2]   17/11
23/12
courthouse [1]   7/12
Courts [1]   1/23
covered [1]   27/24
CPL [1]   3/6
creates [1]   3/13
credible [3]   24/15
24/16 24/17
crime [1]   10/3
criminal [1]   3/4
crowded [4]   8/16
9/5 9/7 9/10
curiam [1]   22/17
curious [1]   27/8
cv [1]   1/4

**D**

D.C [23]   7/19 10/20
11/6 12/19 12/20
12/21 12/23 13/19
13/23 13/24 14/1
16/3 16/4 16/9 17/3
17/13 17/18 23/22
24/1 24/7 28/12
29/2 29/23
damage [3]   5/9 5/12
5/13
dangerous [4]   15/11
15/18 15/18 17/10
DATE [1]   31/10
DC [5]   1/5 1/14
1/17 1/18 1/25
deadened [1]   18/18
dealing [1]   24/11
deals [1]   29/1
dealt [1]   21/7
December [1]   1/5
decide [2]   9/22
9/22
decision [3]   17/11
20/18 23/13
decline [1]   28/5
defendant [3]   2/9
11/4 11/8
Defendants [2]   1/7
1/15
defense [1]   9/20
defenseless [1]
16/2
defined [3]   25/7
27/18 27/19
definition [2]   21/6
28/11
demonstrate [1]
12/10
denial [1]   23/15
deny [2]   12/9 27/17
Department [4]   11/2
11/11 11/21 18/22
Depending [1]   15/20
deposition [2]   13/3
13/10
describe [1]   20/21
determine [1]   8/4
difference [2]   6/11
13/1
different [2]   4/2
11/5

directed [1]   11/22
disclaim [1]   12/16
discovery [8]   12/11
12/14 12/24 13/2
13/14 19/2 19/3
19/5
discussed [1]   18/21
dismiss [1]   19/7
distinction [4]   6/2
14/5 20/4 20/13
distinctions [2]
6/1 18/15
distinguish [2]
20/3 20/20
distinguishable [2]
14/1 24/9
distinguishing [2]
16/9 16/11
district [28]   1/1
1/1 1/6 1/10 1/23
2/3 2/10 2/22 3/12
3/17 5/4 7/2 8/16
9/16 10/2 11/7 19/2
19/23 20/10 20/10
20/22 21/17 26/5
26/16 26/21 27/2
27/14 28/9
doctrine [1]   3/1
done [1]   8/8
doors [1]   15/5
double [1]   10/11
doubt [4]   6/25 18/3
24/23 27/9
down [5]   7/13 8/24
12/18 16/15 19/11
drinking [1]   10/11
drive [1]   30/2
during [1]   17/4
duty [1]   15/21

**E**

eight [1]   17/9
either [2]   18/4
21/9
elements [1]   2/21
else [6]   15/19 18/7
22/7 22/23 28/13
28/15
Emily [1]   29/20
emphasized [2]
16/16 16/21
emphasizes [1]
23/24
empty [1]   17/7
en [2]   13/22 23/15
enforce [6]   3/13
11/6 17/14 17/15
17/22 28/9
enforced [6]   6/18
6/19 7/21 18/22
20/7 20/12
enforcement [8]
9/14 12/16 16/21
18/14 23/7 24/19
25/23 28/10
engaged [1]   10/3
enough [2]   18/19
22/7
ensure [1]   4/23
Enterprise [1]

**E**

Enterprise... [1]   14/16
entirely [4]   11/5
15/5 17/23 21/3
entirety [1]   16/1
entitle [1]   19/5
entitled [1]   31/5
entity [1]   12/22
enumerated [1]   6/10
especially [1]   28/10
essential [1]   23/11
essentially [2]   10/22 21/18
established [1]   30/16
et [5]   1/3 1/6 2/3
2/3 21/21
even [10]   11/3 15/7
16/4 19/1 19/7 21/3
21/4 21/5 21/13
26/8
everyone [1]   17/5
evidence [3]   18/23
25/12 25/15
example [7]   4/20
11/15 15/6 21/21
26/2 26/25 29/18
exception [1]   21/8
exercise [1]   5/24
expended [1]   10/23
explore [1]   19/9
exposed [1]   10/12

**F**

face [2]   16/1 26/14
facing [1]   3/18
fact [16]   3/7 3/21
4/4 4/24 8/1 8/3
8/10 8/11 10/17
10/20 11/20 14/14
21/13 24/9 24/13
25/16
factor [3]   26/18
26/19 27/16
facts [3]   19/10
20/4 20/25
failed [1]   12/10
fair [2]   18/19 22/7
fall [1]   9/3
familiar [2]   3/24
10/20
far [1]   25/17
farm [6]   4/1 14/17
23/8 24/5 26/10
26/11
Farnam [1]   15/10
fear [1]   24/15
federal [3]   21/17
28/19 28/19
feel [1]   8/18
FFOPA [3]   29/1 29/3
29/14
file [2]   16/14 27/6
find [2]   5/15 10/17
fine [1]   26/15
firearm [20]   8/11
8/17 10/10 10/25

17/6 17/12 19/17
21/2 21/5 21/9
21/13 21/24 22/2
25/8 27/1 27/12
27/21 28/4 29/4
29/13
firearms [12]   6/20
7/11 8/18 9/2 9/6
10/18 15/10 20/6
21/8 21/17 28/20
30/6
firing [4]   21/21
29/23 30/1 30/2
first [10]   2/14
2/25 3/1 3/2 3/15
7/19 18/20 18/23
29/20 30/13
floorboard [1]   10/24
follow [2]   6/5
11/14
For the [1]   1/15
force [3]   13/18
13/20 18/22
foregoing [1]   31/4
forfeit [1]   26/20
forth [1]   9/17
found [5]   3/16 7/5
26/12 26/14 28/3
four [1]   13/19
free [2]   5/23 14/16
freedom [1]   5/24
freedoms [1]   3/5
front [1]   19/7
fully [1]   15/1
Fund [1]   14/16
further [2]   18/25
19/5

**G**

gave [1]   29/10
general [7]   6/14
6/16 16/17 20/16
23/18 23/20 25/23
generalized [3]
24/24 25/2 25/3
GEORGE [2]   1/12 2/6
gets [1]   20/16
Ginsburg [4]   16/16
16/17 23/14 23/21
given [4]   13/13
13/14 24/10 28/10
glasses [1]   8/9
goes [1]   26/16
good [5]   2/8 2/12
18/11 23/19 24/21
Gorsuch's [1]   5/20
government [1]   17/3
great [2]   13/14
28/22
GREGORY [2]   1/3 2/3
ground [1]   16/10
grounds [3]   12/10
14/5 16/8
group [1]   25/7
guess [3]   7/11 7/12
29/22
gun [18]   3/12 8/12
8/19 9/13 11/23
14/22 14/24 15/1

15/9 15/11 15/15
15/17 15/19 15/22
16/14 28/10 29/20
29/21
guns [1]   20/10
guy [1]   15/10

**H**

hand [1]   17/13
handgun [2]   10/2
29/24
handguns [1]   3/9
handling [1]   15/17
happened [1]   5/6
happens [1]   26/7
happy [6]   2/19 9/9
12/24 18/1 22/20
22/23
hard [1]   8/18
hardship [5]   14/13
15/25 16/6 20/2
20/14
hardships [2]   3/13
3/14
harm [2]   20/16 25/2
harms [2]   18/16
20/22
head [2]   21/16 29/8
Health [1]   5/20
hear [3]   2/17 2/19
22/23
hearing [2]   1/9
18/18
heavy [1]   30/12
held [2]   4/4 4/8
HELEN [2]   1/16 2/10
here's [1]   14/21
higher [3]   7/8 7/16
7/16
highly [1]   9/21
historical [1]
30/12
history [2]   9/5
28/10
hold [1]   26/5
holders [1]   3/7
holding [1]   22/18
holdings [1]   24/6
holster [3]   15/12
15/12 15/16
home [8]   4/19 4/21
9/18 14/22 17/6
25/9 29/21 30/3
honest [1]   13/13
Honor [34]
HONORABLE [1]   1/9
HOOK [3]   1/22 31/3
31/10
hour [1]   17/5
hours [1]   17/4
hurdle [1]   30/10
hurdles [1]   2/15

**I**

idea [3]   7/14 16/25
20/19
identify [1]   2/5
illegal [1]   11/15
important [1]   6/1
imprisoned [1]

26/16
imprisonment [1]
26/15
inadvertently [1]
28/3
incident [1]   15/13
inclined [1]   12/9
including [2]   4/10
16/12
inconsistent [1]
4/9
indicated [3]   2/13
8/17 14/5
indication [1]
25/15
indistinguishable [1]
4/12
individual [1]   10/9
individuals [1]
25/8
injunction [4]   12/9
19/8 25/13 30/17
injured [1]   2/24
injury [6]   2/21
2/23 3/1 3/4 3/10
7/4
innocent [1]   28/2
instructor [1]
15/10
intends [1]   28/9
interested [1]
21/12
interrupt [1]   14/3
interstate [1]   29/2
into [5]   9/18 14/22
15/2 15/7 16/4
invades [1]   3/4
invalid [1]   26/4
involuntary [1]
8/13
involves [1]   30/12
issue [9]   2/23 6/2
6/3 19/10 25/23
27/9 30/8 30/13
30/17
issued [1]   7/2
issues [1]   24/5

**J**

jail [1]   26/16
JEFF [3]   1/22 31/3
31/10
John [1]   15/10
joined [1]   2/10
jostling [1]   17/5
JR [1]   1/12
JUDGE [7]   1/10
16/16 16/17 23/14
23/21 24/7 24/12
Judiciary [1]   7/13
jurisdiction [3]
11/14 11/19 27/15
Justice [3]   5/19
9/11 24/7

**K**

Kavanaugh [1]   24/7
keep [2]   22/12 29/8
KELLEY [8]   1/15 2/9
2/12 18/10 23/9

**K**

KELLEY... [3]   26/23
  28/15 30/18
kept [1]   9/17
knives [1]   27/21
know the [1]   27/3
knowledge [5]   9/25
  19/14 19/15 19/19
  25/19

**L**

lacks [1]   23/12
language [5]   6/17
  6/19 6/22 6/23 21/7
largely [1]   17/7
last [1]   22/24
lastly [1]   24/10
late [1]   17/6
law [45]
lawful [1]   15/21
laws [3]   11/7 28/9
  28/10
least [4]   7/16
  25/18 25/19 26/2
leave [1]   21/10
leaving [1]   27/24
left [1]   7/12
length [1]   20/22
letter [2]   4/25
  17/1
level [1]   24/18
license [1]   3/7
licensed [4]   4/18
  4/18 5/2 25/8
licenses [2]   4/19
  7/2
life [1]   26/22
lifting [1]   30/12
light [1]   17/10
likelihood [2]   2/16
  12/10
likely [1]   8/4
limit [1]   10/15
limits [1]   19/14
list [1]   10/7
little [3]   15/5
  18/15 24/17
loaded [1]   21/19
location [2]   16/3
  21/11
locations [1]   16/4
locked [5]   21/6
  21/13 21/19 29/4
  29/20
long [1]   29/4
look [7]   8/5 8/6
  8/14 15/13 17/3
  27/10 28/23
looking [2]   8/16
  21/3
lot [1]   29/8
luck [1]   4/7
LYON [9]   1/12 2/6
  2/8 2/19 21/23
  22/24 23/1 27/9
  30/19
Lyon's [1]   21/4

**M**

magazine [1]   14/24
makes [2]   6/10 6/23
making [2]   9/12
  23/13
manner [3]   11/24
  29/25 30/4
manufacturing [1]
  7/10
many [1]   8/8
MATEYA [2]   1/15 2/9
matter [3]   3/20 4/5
  31/5
may [9]   6/14 7/3
  7/3 7/23 9/13 10/19
  10/19 27/25 30/17
maybe [2]   8/21 11/2
mean [5]   4/3 9/13
  12/18 12/22 13/16
means [1]   14/14
members [1]   25/24
memorandum [1]
  10/21
merits [7]   2/17
  8/20 8/21 9/4 9/8
  30/11 30/11
Metro [33]
Metropolitan [4]
  11/2 11/11 11/21
  18/21
might [9]   4/4 5/12
  5/14 8/17 12/22
  17/18 17/21 20/3
  28/5
Miller [1]   29/20
mind [2]   6/8 13/12
minute [1]   2/13
misdemeanor [2]
  26/17 26/24
moot [1]   22/18
more [11]   3/14 3/16
  5/2 9/23 13/22
  22/25 23/1 24/14
  25/14 26/9 30/20
MOSS [1]   1/9
most [1]   15/11
motion [5]   1/9 12/9
  19/7 19/8 25/13
move [1]   6/4
MPD [2]   12/15 12/18
Mr. [8]   2/8 2/19
  21/4 21/23 22/24
  23/1 27/9 30/19
Mr. Lyon [7]   2/8
  2/19 21/23 22/24
  23/1 27/9 30/19
Mr. Lyon's [1]   21/4
Ms. [6]   2/12 18/10
  23/9 26/23 28/15
  30/18
Ms. Kelley [6]   2/12
  18/10 23/9 26/23
  28/15 30/18
much [4]   9/11 9/23
  10/16 24/8
must [2]   3/3 11/24
myriad [1]   10/18
myself [2]   16/13
  22/4

**N**

named [1]   20/6
Navegar [11]   6/2
  6/16 6/20 7/4 7/7
  7/17 7/19 14/2
  14/11 20/4 24/10
necessarily [1]
  13/5
necessary [1]   30/14
need [4]   4/6 13/6
  14/19 23/4
neighborhood [1]
  17/10
new [9]   4/11 4/11
  4/13 4/17 22/10
  22/15 25/9 25/10
  26/5
night [1]   17/6
nobody [1]   4/6
nodding [2]   22/20
  22/22
nolle [1]   10/19
non [1]   3/2
nor [3]   3/1 5/3 5/4
note [2]   18/23 19/1
noted [1]   15/10
nub [1]   24/20
number [2]   14/8
  15/14
NW [3]   1/13 1/17
  1/24

**O**

OAG [1]   1/17
OAG-DC [1]   1/17
object [1]   8/18
obligation [1]
  17/14
obviously [2]   7/9
  25/23
occasion [1]   24/14
off [3]   15/21 15/24
  17/9
off-duty [1]   15/21
offense [5]   26/20
  27/13 27/18 27/19
  28/11
offer [1]   19/21
offers [1]   20/13
Office [1]   28/1
officer [3]   8/7
  15/21 24/22
officers [2]   10/21
  11/22
official [3]   1/23
  17/2 31/3
often [1]   8/12
old [1]   15/10
one [25]   5/14 5/18
  7/14 7/21 7/23 8/5
  8/7 11/7 14/5 14/14
  18/4 18/4 21/13
  21/24 21/24 24/2
  24/14 24/21 25/11
  25/16 26/16 26/18
  28/3 29/9 29/12
one's [1]   17/22
ongoing [1]   3/10
only [10]   4/22 8/15

  16/2 16/17 16/22
  17/14 23/3 24/19
  26/14 27/14
operable [2]   21/18
  30/4
opinion [2]   22/17
  30/8
opportunity [1]
  16/22
opposes [1]   19/2
opposing [1]   23/18
opposition [1]
  19/24
order [4]   2/13 4/15
  4/23 14/20
organization [1]
  11/5
otherwise [1]   22/21
out [15]   3/3 5/2
  5/3 5/15 8/10 14/24
  14/24 14/25 15/9
  15/11 15/16 15/22
  20/21 21/21 27/24
outside [4]   2/25
  4/20 4/21 25/8
over [1]   9/5
overbreadth [1]
  2/25
overwhelming [1]
  15/14
own [1]   27/1
owners [2]   5/2
  28/20

**P**

p.m [3]   1/6 17/24
  30/22
packed [1]   9/1
page [1]   20/18
Palmer [1]   16/5
panel [2]   13/23
  23/21
panels [1]   13/23
panic [1]   15/20
paper [1]   10/20
Parker [11]   16/11
  16/12 16/13 18/15
  19/24 20/8 20/8
  22/16 23/5 24/10
  24/25
particular [3]   7/10
  10/7 14/2
pat [1]   8/12
patrol [1]   12/23
patted [1]   8/8
people [10]   8/10
  9/1 9/5 9/6 10/6
  10/14 10/16 14/17
  15/15 15/18
people's [1]   9/2
per [1]   22/17
perhaps [1]   21/16
permission [1]
  17/10
permit [4]   10/1
  19/17 20/11 28/5
person [1]   21/10
person's [1]   8/19
personal [2]   14/19
  17/8

**P**

persons [1]   25/9
phone [1]   8/9
pill [2]   26/5 26/9
pistol [7]   3/7 4/11
4/13 5/2 22/10
22/15 25/10
pistols [1]   4/20
place [1]   15/3
places [6]   9/5 9/7
9/11 10/7 17/25
28/3
plaintiff [3]   20/20
30/9 30/15
plaintiffs [24]   1/4
1/12 2/4 2/6 2/24
3/2 3/6 3/14 4/1
4/18 4/18 4/23 5/9
6/21 6/22 7/7 16/1
16/12 16/18 16/22
18/2 20/9 20/12
22/16
plaintiffs' [3]
3/17 20/4 22/18
please [2]   2/4
28/25
pleases [1]   27/7
plus [1]   10/15
pocket [1]   8/8
podium [1]   2/5
point [23]   9/4 9/12
9/18 13/12 13/15
18/24 19/6 19/8
19/9 19/15 19/21
19/25 20/15 20/17
20/21 22/10 22/15
23/5 23/13 24/2
24/21 25/15 29/16
pointed [2]   20/1
24/13
points [2]   2/24
18/13
pole [1]   24/21
poles [1]   24/19
police [27]   4/25
7/24 8/3 8/14 10/20
11/2 11/3 11/5 11/6
11/10 11/11 11/12
11/13 11/21 11/22
12/4 12/18 12/19
12/20 12/21 12/23
12/24 12/25 13/9
17/2 18/21 18/22
policies [5]   11/10
11/11 11/12 11/13
12/15
policy [3]   11/21
12/2 12/5
population [2]   25/2
25/24
position [1]   25/25
possession [2]
27/21 27/23
possible [3]   21/20
26/15 28/8
possibly [2]   15/4
15/19
potential [1]   16/25
practically [1]

15/25
practice [1]   21/25
pre [3]   16/21 23/7
25/23
pre-enforcement [3]
16/21 23/7 25/23
precedent [1]   13/21
preliminary [4]
12/9 19/8 25/13
30/16
present [2]   3/15
3/16
presume [1]   28/9
pretty [1]   9/11
prevails [1]   24/19
principal [1]   16/10
principally [1]
6/21
principle [1]   20/16
prior [1]   10/14
private [2]   15/3
15/5
probability [1]
24/18
probably [6]   8/7
13/3 13/4 25/20
26/15 27/23
probe [1]   19/3
problem [5]   14/23
20/9 20/13 23/25
24/20
problems [1]   25/11
proceedings [2]
30/22 31/5
process [1]   22/2
prohibit [2]   4/24
9/10
prohibited [2]   4/17
4/19
prohibits [3]   3/9
27/12 28/4
promptly [1]   30/8
proper [2]   29/24
29/25
properly [1]   29/24
proposing [1]   17/4
proposition [1]   4/3
pros [1]   10/19
prosecute [2]   28/2
28/5
prosecuted [2]   7/8
25/16
prosecution [5]
3/11 7/16 24/15
24/16 25/18
prospective [1]
22/18
protect [1]   30/6
protected [2]   3/5
16/5
protection [2]
14/19 28/20
provision [2]   10/6
29/6
public [7]   3/10
10/2 14/25 15/9
15/23 18/16 20/22
purpose [1]   5/9
purposes [1]   30/16
put [3]   14/21 25/25

29/24
putting [3]   15/12
15/16 15/23

**Q**

quote [2]   5/21
10/16

**R**

rack [1]   14/24
raise [2]   5/9 7/15
raised [1]   30/18
raises [1]   12/7
RANDOLPH [1]   1/9
range [5]   4/21
21/21 29/24 30/1
30/2
RAVE [2]   1/16 2/11
real [1]   3/11
realizing [1]   28/6
really [4]   9/4 11/1
11/4 19/9
reason [2]   25/15
27/9
recent [1]   5/20
record [5]   2/5
18/24 19/14 19/20
31/5
redressability [2]
2/22 2/23
refer [1]   23/23
referring [1]   11/20
regardless [1]
18/24
register [2]   16/14
20/9
registered [1]
10/24
registering [1]
27/12
registration [2]
27/16 27/17
regulating [2]
27/20 27/23
regulations [1]
10/18
rehearing [1]   23/15
rejects [1]   20/18
relating [1]   12/11
relaxed [1]   3/1
religion [1]   5/24
relying [2]   6/21
21/7
remaining [1]   2/17
remand [2]   4/15 5/7
remanded [3]   5/8
5/11 5/14
remedy [16]   3/18
5/10 5/12 5/13 14/6
14/15 16/14 16/18
16/19 16/25 20/17
20/20 23/6 23/7
23/11 23/11
remember [1]   12/13
rendered [1]   16/2
repeal [1]   10/15
repealed [1]   22/19
repercussions [1]
28/6
report [1]   29/19

reporter [4]   1/22
1/23 8/23 31/3
reports [1]   15/13
request [1]   19/2
requesting [1]
17/10
require [3]   4/1
14/17 24/5
requirement [1]   3/2
requirements [1]
5/22
requisite [1]   24/18
resonated [1]   24/13
respect [5]   2/16
9/15 12/14 23/19
23/20
respond [3]   22/9
22/14 23/4
response [6]   8/14
9/20 18/3 18/4 18/5
18/12
rest [1]   26/21
restroom [1]   15/2
restrooms [2]   15/4
15/6
review [1]   14/5
revoke [1]   27/15
revolver [1]   10/12
Rifle [5]   4/11 4/13
22/10 22/15 25/9
right [15]   4/2 5/14
5/24 5/25 6/10 11/1
11/3 11/9 12/22
14/6 17/2 18/10
23/9 23/16 29/11
rights [4]   3/9 6/1
6/10 26/21
ripeness [2]   7/20
20/5
risk [5]   7/6 7/8
7/15 24/16 25/25
road [1]   19/11
rode [1]   25/17
Room [1]   1/24
round [2]   10/15
14/25
rule [1]   5/17
rules [1]   6/7
rush [1]   17/4

**S**

safety [1]   17/8
SAINDON [2]   1/16
2/11
same [6]   6/7 8/24
9/11 12/5 15/23
23/13
sanguine [1]   7/22
saying [3]   7/11
7/15 10/22
schools [1]   15/13
second [9]   3/6 3/9
4/21 5/4 7/22 14/4
19/23 20/14 26/20
section [1]   28/20
secure [1]   22/1
secured [1]   21/9
securing [1]   22/2
security [1]   8/7
Seegars [17]   3/16

**S**

Seegars... **[16]**
9/15 16/11 16/13
16/17 16/18 18/15
19/25 20/8 20/8
20/17 22/17 23/5
23/10 24/10 24/12
24/25
seek **[5]**   5/12 12/11
12/14 13/2 13/11
seemed **[1]**   7/16
seems **[2]**   7/16
13/18
sees **[1]**   15/19
self **[1]**   9/20
self-defense **[1]**
9/20
selling **[1]**   7/10
separate **[2]**   23/6
29/5
serious **[1]**   14/23
severe **[3]**   3/14
3/16 28/7
shell **[1]**   10/23
shoot **[1]**   15/15
shooting **[1]**   18/18
shot **[1]**   15/22
shotgun **[5]**   9/16
9/16 9/17 9/19 9/22
shut **[1]**   15/5
significant **[1]**
2/14
similar **[5]**   4/18
6/15 7/4 14/10 25/9
simply **[2]**   4/14
22/18
singled **[3]**   3/3 5/1
5/3
sit **[1]**   22/21
sitting **[1]**   25/18
situation **[5]**   9/15
9/23 14/18 15/20
24/22
situations **[1]**
15/14
Sixth **[1]**   1/17
sole **[3]**   3/17 14/15
23/7
Solicitor **[3]**   16/17
23/18 23/20
solution **[1]**   21/4
someone **[11]**   8/12
8/17 9/18 10/22
10/22 11/23 14/18
15/19 19/16 21/1
26/24
someone's **[1]**   9/21
somewhere **[1]**   15/8
soon **[1]**   17/8
sorry **[7]**   3/22 8/2
8/23 8/25 12/17
14/3 22/14
sort **[3]**   8/13 21/19
24/20
sounds **[1]**   29/11
speak **[3]**   18/13
18/18 22/20
speaking **[1]**   8/24
special **[1]**   2/25

specific **[15]**   4/13
4/22 5/1 6/19 6/20
6/23 7/2 7/4 10/4
12/15 14/10 16/3
24/11 25/7 30/20
specifically **[5]**
3/3 3/7 7/19 20/6
20/18
speculative **[3]**
9/21 24/24 25/1
speech **[1]**   5/24
Square **[1]**   7/13
squarely **[1]**   19/25
standing **[26]**   2/13
2/14 2/16 2/21 3/15
4/5 4/6 4/7 5/5
5/22 7/5 7/7 12/11
12/12 13/17 16/12
16/15 17/21 18/8
22/20 23/12 24/8
30/8 30/10 30/16
30/19
starting **[1]**   2/4
State **[5]**   4/11 4/13
22/10 22/15 25/9
State Rifle **[1]**
4/13
statement **[1]**   5/20
states **[3]**   1/1 1/10
5/21
station **[3]**   15/6
15/8 21/25
status **[1]**   13/14
statute **[8]**   4/23
6/22 21/9 24/11
25/7 27/11 27/12
28/4
statutes **[3]**   17/14
17/17 21/3
step **[1]**   15/2
still **[3]**   6/7 8/13
14/20
stood **[1]**   5/16
stop **[2]**   10/22
24/22
Street **[2]**   1/13
1/17
strikes **[1]**   24/20
submitted **[1]**   25/12
subpoena **[1]**   26/3
substantial **[2]**
14/13 16/6
subway **[6]**   8/16
29/17 29/25 30/1
30/3 30/4
success **[2]**   2/16
12/11
successful **[1]**   5/16
sufficient **[2]**   3/4
9/10
suggestion **[2]**   8/21
23/4
Suite **[1]**   1/17
summarize **[1]**   2/24
supplemental **[1]**
27/7
support **[1]**   25/13
suppose **[3]**   11/2
28/1 28/5
supposed **[1]**   9/4

Supreme **[12]**   3/19
3/21 3/25 4/3 4/7
5/3 14/15 16/20
17/11 23/24 24/4
24/14
sure **[6]**   8/12 12/21
14/4 16/7 22/12
23/3
swallow **[1]**   26/6
sweeps **[2]**   16/2
16/4

**T**

take questions **[1]**
22/21
talked **[1]**   11/10
talking **[4]**   4/14
4/16 6/9 29/7
talks **[1]**   29/12
targeted **[3]**   3/7
6/20 24/11
tavern **[1]**   10/10
teach **[1]**   8/10
terms **[1]**   6/14
test **[2]**   24/15 26/1
therefore **[1]**   19/1
thinking **[1]**   14/2
Third **[2]**   3/13
20/21
Thomas **[1]**   9/11
though **[1]**   8/15
thought **[4]**   11/20
13/14 30/11 30/20
threat **[4]**   3/11
4/13 4/22 5/1
threatened **[1]**   3/3
three **[4]**   2/21
10/12 13/19 18/13
three-for **[1]**   10/12
tightly **[1]**   9/1
times **[2]**   8/8 13/19
today **[2]**   7/12
25/18
together **[1]**   17/5
touch **[1]**   19/1
touched **[1]**   26/19
tough **[1]**   4/7
town **[1]**   21/21
train **[3]**   7/13 8/10
17/9
training **[1]**   15/13
trains **[1]**   17/7
transcript **[2]**   1/9
31/4
transport **[3]**   27/23
29/2 29/4
transportation **[5]**
3/10 10/2 21/8
28/17 29/13
transported **[1]**
21/18
transporting **[2]**
29/17 29/17
transporting it **[1]**
29/17
tried **[1]**   22/4
trip **[1]**   16/1
true **[2]**   20/8 31/4
truth **[1]**   20/24
try **[2]**   8/10 18/20

trying **[1]**   19/9
turn **[1]**   30/13
turned **[1]**   16/15
two **[6]**   7/18 13/19
14/8 14/12 18/4
18/5
type **[1]**   25/2
types **[1]**   7/10

**U**

U.S **[4]**   1/23 10/19
10/19 28/1
U.S.C **[1]**   28/20
ultimately **[2]**
26/12 26/14
unacceptable **[1]**
17/20
unambiguously **[1]**
3/8
under **[10]**   10/18
11/25 15/8 16/4
17/11 17/19 20/19
21/17 28/6 29/23
unfortunately **[2]**
5/16 24/17
UNITED **[2]**   1/1 1/10
unless **[1]**   13/21
unloading **[1]**   15/23
unlock **[2]**   9/19
9/22
unlocked **[1]**   9/17
unnecessary **[1]**
15/17
up **[8]**   2/13 6/5
8/17 12/17 16/18
18/18 22/13 29/21
upon **[3]**   15/20
16/15 19/1
use **[7]**   9/19 9/22
14/19 27/20 27/20
27/23 30/5

**V**

valid **[2]**   26/13
26/14
variety **[1]**   14/14
various **[3]**   4/10
8/4 15/13
vehicle **[1]**   21/9
versus **[1]**   11/21
vicinity **[1]**   14/22
view **[2]**   17/17 21/1
views **[4]**   20/22
23/20 23/20 23/21
violate **[1]**   26/9
violating **[2]**   10/6
22/1
violation **[6]**   3/8
10/11 10/17 14/25
19/18 28/2
Virginia **[1]**   11/15
voice **[1]**   22/13

**W**

waistline **[1]**   8/6
wait **[1]**   26/4
walk **[2]**   17/9 21/25
wants **[1]**   14/19
Washington **[4]**   1/5
1/14 1/18 1/25

**W**

way [6]   7/15 16/13
 17/23 22/1 22/19
 28/11
ways [1]   8/4
weapon [5]   7/14
 7/23 8/5 25/17
 26/25
weapons [5]   26/20
 27/13 27/18 27/19
 28/11
weren't [1]   5/1
what's [2]   6/15
 6/15
whereas [1]   23/6
who's [2]   7/10
 27/13
whole [2]   5/20 25/3
Williams [1]   24/12
within [2]   6/22 9/3
without [2]   11/23
 22/1
witness [3]   13/7
 13/8 13/9
WMATA [1]   18/22
woman [1]   9/15
Woman's [1]   5/20
word [1]   22/24
work [2]   17/1 21/4
Wrenn [1]   16/5
write [3]   17/1
 17/19 17/21
wrote [1]   4/24

**Y**

Years [1]   18/18
York [8]   4/11 4/11
 4/13 4/17 22/10
 22/15 25/9 25/10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 7th day of February, 2025, a true copy of the Joint Appendix was filed electronically with the Clerk of Court using the Court's CM/ECF system, which will send by email a notice of docketing activity to the registered Attorney Filer on the attached electronic service list.

*/s/ Edward M. Wenger*
EDWARD M. WENGER