NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-7127

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

GREGORY T. ANGELO, *et al.*,
PLAINTIFFS-APPELLANTS,

V.

DISTRICT OF COLUMBIA, *et al.*,
DEFENDANTS-APPELLEES.

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**RESPONSE BRIEF OF APPELLEES**

JANICE L. COLE
Senior Counsel II

WMATA
300 7th Street, SW
Washington, D.C. 20004
(202) 962-2543
jlcole@wmata.com

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

BRYAN J. LEITCH
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6524
bryan.leitch@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.     *Parties and amici*.— Plaintiffs-appellants are Gregory T. Angelo, Tyler Yzaguirre, Robert M. Miller, and Cameron M. Erickson.  Defendants-appellees are the District of Columbia; Pamela A. Smith, Chief of the D.C. Metropolitan Police Department, in her individual and official capacities; Brian L. Schwalb, Attorney General of the District of Columbia, in his individual and official capacities; and Michael Anzallo, Chief of the Washington Metropolitan Area Transit Authority's Metro Transit Police Department, in his individual and official capacities.

Several amici curiae appeared in the district court.  The Second Amendment Foundation appeared as amicus curiae in support of plaintiffs-appellants.  ECF No. 31.  Everytown for Gun Safety, Brady, Team Enough, Giffords Law Center to Prevent Gun Violence, March for Our Lives Action Fund, and the States of Illinois, California, Colorado, Connecticut, Delaware, Hawaii, Maryland, Massachusetts, Minnesota, New Jersey, New York, North Carolina, Oregon, Rhode Island, and Washington appeared as amici curiae in support of defendants-appellees.  ECF Nos. 23, 24, 25.  The United States also appeared as an interested party and filed a statement of interest.  ECF No. 27.  No amici curiae have yet appeared in this Court.

B.     *Ruling under review*.— The ruling of the district court under review is the August 9, 2024 Memorandum Opinion and Order (ECF Nos. 62 & 63), entered by U.S. District Judge Randolph D. Moss, which granted defendants' motions to

dismiss (ECF Nos. 42 & 44) plaintiffs' amended complaint (ECF No. 34) for lack of standing. The decision is not reported but is available at 2024 WL 3741401 and is included in the joint appendix.

C. *Related cases*.— This case has not previously been before this Court or any other court. The district court previously denied plaintiffs-appellants' motion for a preliminary injunction (ECF No. 6) in a Memorandum Opinion and Order (ECF No. 32) on December 28, 2022. *See Angelo v. District of Columbia*, 648 F. Supp. 3d 116 (D.D.C. 2022). Undersigned counsel is not aware of any related case within the meaning of Circuit Rule 28(a)(1)(C).

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF THE ISSUES...........................................................2

STATUTES AND REGULATIONS.......................................................3

STATEMENT OF THE CASE..............................................................3

    1.    Legal Background ...............................................................3

        A.    The Metro Law...........................................................3

        B.    Article III and preenforcement standing....................4

    2.    Factual And Procedural Background ...................................7

        A.    Plaintiffs file suit and the district court denies their motion for a preliminary injunction .........................7

        B.    Plaintiffs file an amended complaint, and the district court grants defendants motion to dismiss under Rule 12(b)(1).........9

        C.    This Court denied plaintiffs' petition for initial hearing en banc ...................................................11

STANDARD OF REVIEW ..................................................................11

SUMMARY OF ARGUMENT .............................................................12

ARGUMENT .......................................................................................13

    I.    The District Court Correctly Held That Plaintiffs Failed To Establish Jurisdiction Over Their Preenforcement Challenge To The Metro Law ...............................................................13

        A.    Plaintiffs failed to demonstrate standing to seek prospective relief under binding Circuit precedent .................13

            1.    This Court's precedents require a sufficiently imminent threat of enforcement .....................................14

2.    The district court faithfully applied this Court's precedents, which cannot be overruled by a panel .........18

3.    Plaintiffs cannot distinguish *Navegar*, *Seegars*, or any other case ...............................................................21

B.    Plaintiffs have not established federal-court jurisdiction to seek damages from any defendant ...........................................23

1.    Plaintiffs have forfeited any theory of damages standing, and their self-imposed transportation costs are not traceable to the Metro Law anyways .........23

2.    Plaintiffs' damages claims against the individual defendants are abandoned or jurisdictionally barred for other reasons ...........................................................25

II.    Plaintiffs Have Not Carried The Heavy Burden To Justify A Departure From This Court's *Navegar* And *Seegars* Precedents .......26

A.    *MedImmune* did not clearly eviscerate *Navegar* or *Seegars* ...................................................................................26

B.    *Whole Woman's Health* did not clearly eviscerate *Navegar* or *Seegars* .................................................................28

C.    No other decision plaintiffs cite clearly eviscerates *Navegar* or *Seegars* .................................................................32

III.    The Court Should Decline Plaintiffs' Invitation To Summarily Upend Decades Of Article III Precedent In An *Irons* Footnote .........33

CONCLUSION ......................................................................................38

STATUTORY ADDENDUM .............................................................41

# TABLE OF AUTHORITIES*

## *Cases*

*Ali v. Trump*,
   959 F.3d 364 (D.C. Cir. 2020) ......................................................... 19

*Am. Fed'n of Gov't Emps. v. O'Connor*,
   747 F.2d 748 (D.C. Cir. 1984) ..................................................... 5, 20

*Ass'n of Civilian Technicians v. FLRA*,
   756 F.2d 172 (D.C. Cir. 1985) ......................................................... 34

*Babbitt v. United Farm Workers*,
   442 U.S. 289 (1979) ......................................................... 5, 16, 32, 33

*Bahlul v. United States*,
   77 F.4th 918 (D.C. Cir. 2023) ......................................................... 26

*Brewster v. Comm'r*,
   607 F.2d 1369 (D.C. Cir. 1979) ...................................................... 19

*Citizens for Resp. & Ethics in Washington v. FEC*,
   475 F.3d 337 (D.C. Cir. 2007) ......................................................... 27

*Citizens for Resp. & Ethics in Washington v. FEC*,
   993 F.3d 880 (D.C. Cir. 2021) ......................................................... 19

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013) ................................................. 4, 16, 23, 24, 25, 37

*Consumer Data Indus. Ass'n v. King*,
   678 F.3d 898 (10th Cir. 2012) ......................................................... 37

*Critical Mass Energy Project v. Nuclear Regul. Comm'n*,
   975 F.2d 871 (D.C. Cir. 1992) (en banc) ......................................... 19

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*District of Columbia v. Heller*,
 554 U.S. 570 (2008) ........................................................7, 36

*Ex parte Young*,
 209 U.S. 123 (1908) ..........................................................28, 29

*FDA v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) .................................................................4

*FEC v. Cruz*,
 596 U.S. 289 (2022) ...............................................................32

*Free Enter. Fund v. PCAOB*,
 561 U.S. 477 (2010) ...............................................................32

*Hejira Corp. v. MacFarlane*,
 660 F.2d 1356 (10th Cir. 1981) ............................................37

*\*Hemp Indus. Ass'n v. DEA*,
 36 F.4th 278 (D.C. Cir. 2022) ................2, 17, 20, 27, 31, 33

*Iowaska Church of Healing v. Werfel*,
 105 F.4th 402 (D.C. Cir. 2024) .......................................21, 24

*Irons v. Diamond*,
 670 F.2d 265 (D.C. Cir. 1981) ...............................................33

*Jackson v. City & Cnty. of San Francisco*,
 746 F.3d 953 (9th Cir. 2014) ..................................................36

*Kareem v. Haspel*,
 986 F.3d 859 (D.C. Cir. 2021) ...............................................11

*Kentucky v. Graham*,
 473 U.S. 159 (1985) ...............................................................25

*Laird v. Tatum*,
 408 U.S. 1 (1972) ...................................................................16

*LaShawn A. v. Barry*,
 87 F.3d 1389 (D.C. Cir. 1996) (en banc) ..............................22

*Lion Mfg. v. Kennedy*,
    330 F.2d 833 (D.C. Cir. 1964)......................................................15, 20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..........................................................................4

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)...........................................8, 11, 12, 26, 27, 28

*Mobil Oil Corp. v. Att'y Gen. of Va.*,
    940 F.2d 73 (4th Cir. 1991) ...........................................................37

*Murthy v. Missouri*,
    603 U.S. 43 (2024)......................................................................4, 24

*Muthana v. Pompeo*,
    985 F.3d 89 (D.C. Cir. 2021) .........................................................13

*Nat'l Conf. Catholic Bishops v. Smith*,
    653 F.2d 535 (D.C. Cir. 1981) ....................................................5, 20

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) .....................................................39, 46

*Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*,
    80 F.4th 215 (3d Cir. 2023) ...........................................................36

*\*Navegar, Inc. v. United States*,
    103 F.3d 994 (D.C. Cir. 1997).................. 1, 2, 5, 6, 14, 18, 21, 22, 31

*NRA v. Magaw*,
    132 F.3d 272 (6th Cir. 1997) .........................................................36

*NYSRPA v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ..........................................................36

*\*Ord v. District of Columbia*,
    587 F.3d 1136 (D.C. Cir. 2009).....................................7, 8, 11, 14, 23

*Palmer v. FAA*,
    103 F.4th 798 (D.C. Cir. 2024)......................................................34

*Parker v. District of Columbia,*
478 F.3d 370 (D.C. Cir. 2007)............................... 7, 9, 10, 14, 18, 19, 21, 23, 27

*Planned Parenthood v. Labrador,*
122 F.4th 825 (9th Cir. 2024) ...........................................................31

*Saline Parents v. Garland,*
88 F.4th 298 (D.C. Cir. 2023)...............................................16, 17

*San Diego Cnty. Gun Right Comm. v. Reno,*
98 F.3d 1121 (9th Cir. 1996) ...........................................................36

*Save Jobs USA v. U.S. Dep't of Homeland Sec.,*
111 F.4th 76 (D.C. Cir. 2024)................................................19, 31

*Seegars v. Gonzales,*
396 F.3d 1248 (D.C. Cir. 2005)......... 1, 2, 5, 6, 13, 14, 18, 22, 28, 31, 32, 33, 37

*Seegars v. Gonzales,*
413 F.3d 1 (D.C. Cir. 2005) ......................................................11, 34

*Somberg v. McDonald,*
117 F.4th 375 (6th Cir. 2024) ...........................................................37

*Steffel v. Thompson,*
415 U.S. 452 (1974).........................................................16, 17, 28

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014)......................................................5, 17, 32, 33

*Terrace v. Thompson,*
263 U.S. 197 (1923).........................................................................28

*Thomas v. Anchorage Equal Rights Comm'n,*
220 F.3d 1134 (9th Cir. 2000) (en banc) ...........................................36

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021).....................................................................24, 38

*Twin Rivers Paper Co. LLC v. SEC,*
934 F.3d 607 (D.C. Cir. 2019)...........................................................20

*United Presbyterian Church v. Reagan,*
738 F.2d 1375 (D.C. Cir. 1984) .............................................15, 16, 20

*United States v. Burwell,*
690 F.3d 500 (D.C. Cir. 2012) (en banc)....................................19, 26

*United States v. Texas,*
599 U.S. 670 (2023)....................................................................4, 35

*Whitmore v. Arkansas,*
495 U.S. 149 (1990).........................................................................4

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021)....................................... 5, 11, 12, 26, 28, 29, 30, 31, 37, 38

*Whole Women's Health v. Jackson,*
556 F. Supp. 3d 595 (W.D. Tex. 2021) ............................................30

*Will v. Mich. Dep't of State Police,*
491 U.S. 58 (1989)........................................................................25

*Woodhull Freedom Found. v. United States,*
948 F.3d 363 (D.C. Cir. 2020).......................................................33

*Younger v. Harris,*
401 U.S. 37 (1971)........................................................................31

*Statutes, Rules, and Regulations*

42 U.S.C. § 1983 .............................................................................25

D.C. Code § 7-2509.07 ...............................................................1, 3, 10

D.C. Code § 22-4504.01 ....................................................................3

D.C. Code § 22-4504.02 ....................................................................3

License to Carry a Pistol Amendment Act of 2014,
D.C. Law No. 20-279 (eff. June 30, 2015).........................................3

# GLOSSARY

| | |
|---|---|
| Br. | Opening Brief of Plaintiffs-Appellants |
| Defendants | The District of Columbia; Pamela A. Smith, Chief of the D.C. Metropolitan Police Department; Brian L. Schwalb, Attorney General of the District of Columbia; and Michael Anzallo, Chief of the Washington Metropolitan Area Transit Authority's Metro Transit Police Department |
| Individual defendants | Attorney General Brian Schwalb, Chief Pamela Smith, Chief Michael Anzallo |
| JA | Joint Appendix |
| Metro Law | D.C. Code § 7-2509.07(a)(6), enacted as part of the License to Carry a Pistol Amendment Act of 2014, D.C. Law No. 20-279 (eff. June 16, 2015) |
| MPD | Metropolitan Police Department |
| Plaintiffs | Plaintiffs-appellants Gregory T. Angelo, Tyler Yzaguirre, Robert M. Miller, and Cameron M. Erickson |
| WMATA MTPD | Washington Metro Area Transit Authority, Metro Transit Police Department |

# INTRODUCTION

Plaintiffs bring this preenforcement suit to strike down a District of Columbia law that prohibits the carrying of concealed handguns on the District's Metrorail transit system. D.C. Code § 7-2509.07(a)(6) ("Metro Law"). But under this Court's precedents, plaintiffs lack Article III standing to bring that claim. To preserve "the limits on judicial power appropriate in a democratic society," *Navegar, Inc. v. United States*, 103 F.3d 994, 998 (D.C. Cir. 1997), this Court requires parties seeking preenforcement review to show "an especially high probability" of the challenged law's "enforcement against them," *Seegars v. Gonzales*, 396 F.3d 1248, 1255 (D.C. Cir. 2005), *cert. denied*, 546 U.S. 1157 (2006). Otherwise, the possibility of enforcement is "too remote and speculative to render their challenges justiciable" under Article III. *Navegar*, 103 F.3d at 1000-01 (requiring plaintiffs to show they have been "in effect single[d] out" as "intended targets" of challenged law).

Plaintiffs here cannot satisfy this standard. They merely assert that they would carry firearms on the Metro "but for" the Metro Law's supposed "chilling effect." Br. 4, 18, 42-43. Yet this Court has rejected identical theories of standing for at least two decades. *See, e.g.*, *Seegars*, 396 F.3d at 1254-55.

Recognizing that their theory is foreclosed by existing precedent, plaintiffs ask this Court to ignore or change that precedent. But a panel of this Court, just like the district court, must apply the law of the Circuit unless and until overruled by the

en banc Court or Supreme Court—neither of which has happened. Plaintiffs not only fail to distinguish the *Navegar* and *Seegars* decisions noted above (as well as many others), but they also fail to show that those cases have been clearly eviscerated by intervening Supreme Court authority. Indeed, this Court has already addressed many of the Supreme Court cases plaintiffs cite before continuing to "faithfully apply the analysis articulated by *Navegar*." *Id.* at 1251-54; *see Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 291 (D.C. Cir. 2022) (citing *Seegars*, 396 F.3d at 1255).

Plaintiffs are left to urge this Court to take the extraordinary step of overruling *Navegar* and *Seegars* through an *Irons* footnote. But they offer nothing more than a redux of their failed arguments for initial hearing en banc in this case, which the Court rejected. Not only is there no clear legal basis to reinvent D.C. Circuit case law on preenforcement standing, but even if there were, the gravity and complexity of the issues at stake would warrant plenary review. At bottom, plaintiffs dislike Circuit precedent. But their policy arguments about the purportedly "dangerous" consequences of adhering to *Navegar* and *Seegars*—as this Court has done for decades—are wrong and, in any event, not a reason to depart from ordinary appellate procedures at this juncture, let alone to summarily overrule those precedents.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that plaintiffs failed to establish jurisdiction over their preenforcement challenges to the Metro Law.

2.      Whether plaintiffs have failed to justify a departure from this Court's precedents in *Navegar* and *Seegars* when, among other things, plaintiffs have not shown that the Supreme Court has clearly abrogated those cases.

3.      Whether plaintiffs have failed to justify overruling *Navegar* and *Seegars* in an *Irons* footnote when, among other things, the decisions are not clearly contradicted by Supreme Court precedent, this Court has repeatedly declined to revisit the cases sitting en banc, and the gravity and complexity of the issues involved would warrant plenary review if they are to be reconsidered at all.

## STATUTES AND REGULATIONS

Other than those provisions listed in plaintiffs' opening brief, pertinent statutes are set forth in the addendum to this brief.

## STATEMENT OF THE CASE

## 1.      Legal Background.

### A.      The Metro Law.

Enacted as part of the License to Carry a Pistol Amendment Act of 2014, D.C. Law No. 20-279 (eff. June 16, 2015), the Metro Law provides that "[n]o person" may "carry a pistol" in "[a] public transportation vehicle, including the Metrorail transit system and its stations." D.C. Code § 7-2509.07(a)(6). Licensed gunowners, however, may transport an unloaded registered pistol on the Metro in a locked container separate from ammunition. *Id.* §§ 22-4504.01, 22-4504.02.

**B.     Article III and preenforcement standing.**

1.  Article III is "part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787." *United States v. Texas*, 599 U.S. 670, 675 (2023) (internal quotation marks omitted).  In limiting "the judiciary's proper role" to "cases or controversies," Article III safeguards "separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408-09 (2013) (internal quotation marks omitted).  It also ensures that "federal courts decide some contested legal questions later rather than sooner, thereby allowing issues to percolate and potentially be resolved by the political branches in the democratic process." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

Plaintiffs have the burden to "clearly and specifically set forth facts" establishing Article III standing in their complaint.  *Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990).  Standing generally requires an injury-in-fact traceable to a law that is redressable by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992).  For retrospective relief (e.g., damages), plaintiffs must establish that they suffered an "actual" injury.  *Id.*  For prospective relief (e.g., injunctions), plaintiffs must establish that they are threatened with an "imminent" and "certainly impending" injury.  *Murthy v. Missouri*, 603 U.S. 43, 49-50, 58-59 (2024).

Preenforcement suits add an extra layer to plaintiffs' burden, as no litigant has "an unqualified right to pre-enforcement review of constitutional claims in federal court." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). Article III requires parties seeking preenforcement review to show that they intend "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)). A "credible threat of prosecution" exists only when "threatened enforcement [is] sufficiently imminent." *Id.* Cases presenting a "genuine threat" of enforcement "will be exceedingly rare," *Am. Fed'n of Gov't Emps. v. O'Connor*, 747 F.2d 748, 757 (D.C. Cir. 1984) (R.B. Ginsburg, J.) (internal quotation marks omitted), because Article III requires more than a "chilling effect associated with a potentially unconstitutional law being on the books," *Whole Woman's Health*, 595 U.S. at 48-50 (internal quotation marks omitted); *see Nat'l Conf. Catholic Bishops v. Smith*, 653 F.2d 535, 536-37, 539-40 (D.C. Cir. 1981).

2. Applying these principles, this Court requires preenforcement challengers to demonstrate "characteristics indicating an especially high probability of enforcement against them." *Seegars*, 396 F.3d at 1255. In *Navegar*, for example, after ATF agents visited gunmakers' facilities and began inventorying their products, the gunmakers brought preenforcement challenges to newly enacted

federal laws banning firearms that only they made, as well as more general regulations of weapons and accessories. 103 F.3d at 996-99. This Court held that the gunmakers had standing to challenge the former laws but not the latter. The gunmakers faced a sufficiently imminent threat of enforcement under the provisions that "single[d] out specific weapons manufactured only by" them, since they were the "intended targets" of those laws. *Id.* at 999-1000. But the generic weapons-and-accessories provisions "could be enforced against a great number of weapon manufacturers," and thus placed no "special priority" on "preventing these parties from engaging in specified conduct." *Id.* at 1001.

Similarly, in *Seegars*, this Court found no sufficiently imminent threat of enforcement where "nothing . . . indicate[d] any special priority placed upon preventing [appellants] from engaging in" the challenged conduct. 396 F.3d at 1255 (quoting *Navegar*, 103 F.3d at 1001). In that case, gunowners challenged the District's pre-*Heller* handgun ban and trigger-lock rule, arguing that "but for" those laws they would carry handguns and keep unsecured shotguns in their homes. 396 F.3d at 1250-51. This Court held that "no plaintiff has standing to challenge either provision," as none had alleged any "prior threats against them or any characteristics indicating an especially high probability of enforcement against them." *Id.* at 1250, 1254-55. Specifically with regard to the trigger-lock rule, the Court explained that

the absence of an administrative remedy does not "render a claim justiciable if the imminence of the threatened injury is inadequate." *Id.* at 1256.

This Court in *Parker* similarly rejected standing where gunowners again challenged the District's handgun and trigger-lock laws based on nothing more than "general threat[s]" by the government "to prosecute violations of its gun laws." *Parker v. District of Columbia*, 478 F.3d 370, 374-75 (D.C. Cir. 2007), *cert. denied in part on standing issue*, 549 U.S. 932 (2008), *aff'd in part on the merits by District of Columbia v. Heller*, 554 U.S. 570 (2008). This Court reasoned that, far from making "actual and specific threats" of enforcement against the gunowners, the District had merely expressed "a sentiment ubiquitous among stable governments the world over, to wit, scofflaws will be punished." *Id.* at 375 (internal quotation marks omitted). Because the gunowners were not "singled out or uniquely targeted," all of them lacked standing except for the one plaintiff who tried to register his handgun, because denial of registration was a "distinct injury." *Id.* at 374-76; *see Ord v. District of Columbia*, 587 F.3d 1136, 1142 (D.C. Cir. 2009) (reaffirming requirement of "a credible and imminent threat of prosecution").

## 2.    Factual And Procedural Background.

### A.    Plaintiffs file suit and the district court denies their motion for a preliminary injunction.

Plaintiffs sued the District of Columbia and then-Chief of the D.C. Metropolitan Police Department ("MPD"), Robert Contee, alleging that the Metro

Law violated the Second and Fifth Amendments.  Dkt. 1 at 3, 33-35.  Plaintiffs

moved for a preliminary injunction, Dkt. 6, and the District and then-Chief Contee

argued that they lacked Article III standing, Dkt. 18 at 14-15.

The district court denied the motion because any "threat of prosecution" was

neither "'credible'" nor "'imminent.'"  JA 50 (quoting *Ord*, 587 F.3d at 1140).  As

the court explained, plaintiffs had asserted at most a "speculative" threat of

enforcement in alleging that, "[b]ut for D.C. law, they would carry their concealed

handguns on Metro trains and buses."  JA 54 (cleaned up).  Contrary to D.C. Circuit

precedent, plaintiffs did not allege that they were targeted for prosecution, or that

they had suffered prior threats or other indicia of a high probability of future

enforcement.  JA 54-55.  Indeed, the court noted that, even aside from plaintiffs'

failure to satisfy "binding D.C. Circuit precedent," JA 54, it was "far from clear"

that they had standing under any doctrinal test having "failed to proffer *any* evidence

relating to any threat or risk of enforcement," JA 63-64.

The district court also rejected plaintiffs' contention that this Court's standing

precedents had been "eviscerated" by subsequent decisions of the Supreme Court.

JA 55.  In particular, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)

"casts less doubt on *Navegar* and *Seegars*" than plaintiffs suggested.  JA 59.  In that

case, involving not a government enforcement action but a patent dispute between

two private parties, there existed a specific threat to enforce the patent at issue against the patent licensee, consistent with this Court's precedents.  JA 59.

### B. Plaintiffs file an amended complaint, and the district court grants defendants motion to dismiss under Rule 12(b)(1).

Plaintiffs then filed an amended complaint, seeking injunctive, declaratory, and monetary relief from the District.  They also sued then-Chief Contee, Brian Schwalb (Attorney General for the District of Columbia) and Michael Anzallo (Chief of WMATA's Metro Transit Police Department) in their official and personal capacities.  JA 75-77.  Plaintiffs alleged that the Metro Law "chill[ed]" "their right to bear arms," JA 77, and that they "expend[ed] sums greater for transportation than [they] would have" without the Metro Law, JA 75.

Defendants moved to dismiss.  Dkts. 42 & 44.  They argued that plaintiffs still had not alleged "a threat of prosecution personalized to [them]," Dkt. 44-1 at 6-7, and that their "economic injuries" were "self-inflicted" and not "fairly traceable" to the Metro Law, Dkt. 44-1 at 10-11.  Chief Anzallo argued that WMATA's sovereign immunity barred the official-capacity claims against him.  Dkt. 42-1 at 5.

The district court granted the motions to dismiss, explaining that its reasons for denying a preliminary injunction "applie[d] with equal force to the present motion."  JA 27.  The court noted that it "remain[ed] bound by the D.C. Circuit's admonitions that 'the District's general threat to prosecute violations of its gun laws d[oes] not constitute an Article III injury.'"  JA 27 (quoting *Parker*, 478 F.3d at 374).

"*Navegar, Seegars*, and *Parker* remain binding precedent, and [p]laintiffs ha[d] yet to identify any reason to believe they have been, or will be, 'singled out or uniquely targeted by the D.C. government for prosecution.'" JA 27 (quoting *Parker*, 478 F.3d at 375). The court further rejected plaintiffs' "attempt to adorn an old argument with an additional Supreme Court precedent—*Whole Woman's Health*," which was "readily distinguishable," the court explained, as it involved a novel abortion ban that private persons could enforce through damages suits. JA 32-33.

The court emphasized as well that plaintiffs' "efforts to cure the jurisdictional deficiencies in their original complaint" were "unavailing." JA 27. For example, "[a]fter the close of briefing," plaintiffs tried to present "statistics" indicating that 71 arrests had been reported "for possession/carrying firearms on the Metro system" between 2018 and 2022. JA 29 (quoting Dkt. 51 at 3). But as the district court explained, "there is no evidence that any of these arrests were for violating § 7-2509.07(a)(6), rather than other criminal laws, or that they involved efforts to enforce § 7-2509.07(a)(6)," as opposed to a situation where "a § 7-2509.07(a)(6) charge was added only after an arrest was made." JA 29-30. Moreover, "even if all 71 of the arrests over the five-year period were the product of a concerted effort by the WMATA police department to enforce § 7-2509.07(a)(6), that would not show that *Plaintiffs* have been or will be targeted for enforcement." JA 30.

Finally, the court held that plaintiffs' "economic" theory of injury failed, JA 35-40; that their official-capacity damages claims against Chief Anzallo were barred by WMATA's sovereign immunity, JA 35 n.3; and that plaintiffs abandoned their personal-capacity damages claims against the individual defendants, JA 40.

### C. This Court denied plaintiffs' petition for initial hearing en banc.

Plaintiffs timely appealed and petitioned for initial hearing en banc. *See* Pet., Doc. 2078715 (Oct. 7, 2024). They argued that "the law of this Circuit" on preenforcement standing "is far out of step with Supreme Court precedent" and "sister circuit precedent." Pet. iii. The petition noted Judge Williams' opinion on the denial of rehearing en banc in *Seegars*, Pet. 8 (citing *Seegars v. Gonzales*, 413 F.3d 1, 2 (D.C. Cir. 2005)), and Judge Brown's dissent in *Ord*, "urg[ing] the court to rehear" that case "en banc and overrule *Navegar*," Pet. 9 (citing 587 F.3d at 1153). Plaintiffs also insisted that initial hearing en banc was necessary in light of Supreme Court cases like *MedImmune* and *Whole Woman's Health*. Pet. vii, 9-10.

This Court denied the petition "in the absence of a request by any member of the court for a vote." Order, Doc. 2081913 (Oct. 25, 2024).

### STANDARD OF REVIEW

Dismissal for lack of jurisdiction under Rule 12(b)(1) is reviewed de novo. *Kareem v. Haspel*, 986 F.3d 859, 865-66 (D.C. Cir. 2021).

## SUMMARY OF ARGUMENT

The Court should affirm the dismissal of plaintiffs' suit.

1. The district court faithfully applied binding Circuit precedent in holding that plaintiffs failed to establish jurisdiction over their challenges to the Metro Law. That precedent—which likewise binds a panel of this Court—demands that preenforcement challengers allege facts indicating an especially high probability of enforcement against them, such as a prior threat or evidence of being uniquely targeted for prosecution. Accordingly, this Court must affirm because plaintiffs do not allege any facts about enforcement of the Metro law against them, and so lack standing to seek prospective relief. Plaintiffs also failed to establish jurisdiction over their claims for damages, and on appeal, they have forfeited their only theory of economic injury. Moreover, plaintiffs abandoned their personal-capacity claims against the individual defendants, and their official-capacity claims fail for numerous reasons, including that their official-capacity claims against Chief Anzallo are undisputedly barred by WMATA's sovereign immunity.

2. Plaintiffs also have not justified the extraordinary step of departing from *Navegar* and *Seegars*, because they have not shown that those binding precedents were effectively overruled by intervening Supreme Court decisions. *MedImmune* did not even involve a government enforcement action. And *Whole Woman's Health* is a case principally about state sovereign immunity, *Ex parte Young*, and an entirely

novel law that attempted to outsource enforcement to private parties. Nothing about these cases clearly abrogates *Navegar* and *Seegars*.

3. Nor have plaintiffs justified summarily overruling *Navegar* and *Seegars* in an *Irons* footnote. This Court has repeatedly declined to revisit *Navegar* and *Seegars* through full en banc consideration, making an *Irons* footnote particularly inapt. Even in this very appeal, this Court denied plaintiffs' initial petition for hearing en banc, and it would be strange under those circumstances to discard Circuit precedent in a mere footnote. Additionally, even the Court were inclined to reconsider *Navegar* and *Seegars* (despite the absence of any clear conflict with the weight of other circuits' authority), the gravity of the issues involved warrants plenary en banc review, and plaintiffs' policy arguments do not support a contrary conclusion.

## ARGUMENT

## I. The District Court Correctly Held That Plaintiffs Failed To Establish Jurisdiction Over Their Preenforcement Challenge To The Metro Law.

### A. Plaintiffs failed to demonstrate standing to seek prospective relief under binding Circuit precedent.

Under Article III, "preenforcement review is limited." *Muthana v. Pompeo*, 985 F.3d 893, 911 (D.C. Cir. 2021). And under the binding precedent of this Circuit, litigants lack standing to seek injunctive or declaratory relief in a preenforcement suit absent allegations "indicating an especially high probability of enforcement against them." *Seegars*, 396 F.3d at 1250, 1254-55. The district court faithfully applied those precedents in dismissing plaintiffs' suit. A panel of this Court, too,

must apply the same binding decisions. Dismissal is therefore inevitable under a straightforward application of this Court's case law given that plaintiffs effectively admit that they cannot allege a threat of enforcement meeting that standard.

1. This Court's precedents require a sufficiently imminent threat of enforcement.

The district court correctly dismissed plaintiffs' challenge for lack of standing under this Circuit's binding precedent. As explained, *see supra* pp. 5-7, *Navegar* held that preenforcement standing requires "a threat of prosecution under the statute which is credible and immediate." 103 F.3d at 998-1001. *Seegars* then applied *Navegar* in holding that gunowners could not challenge handgun-registration and trigger-lock laws given the absence of any "prior threats against them or any characteristics indicating an especially high probability of enforcement against them." 396 F.3d at 1250, 1254-55. And *Parker* reaffirmed that a government's "general threat" to enforce the laws did not show Article III injury absent evidence that a plaintiff had been "singled out or uniquely targeted" for enforcement. 478 F.3d at 374-75; *see Ord*, 587 F.3d at 1140-41 ("To prove that a threat is both credible and imminent, we require plaintiffs to demonstrate that their prosecution results from a special law enforcement priority, namely that they have been singled out or uniquely targeted by the government for prosecution." (cleaned up)).

These precedents stem from several decisions of this Court requiring plaintiffs to show that "the enforcement of an allegedly unconstitutional statute" is

"'immediately threatened'" against them. *Am. Library Ass'n v. Barr*, 956 F.2d 1178, 1196 (D.C. Cir. 1992) (quoting *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984) (Scalia, J.)). In *Lion Manufacturing v. Kennedy*, 330 F.2d 833 (D.C. Cir. 1964), for example, makers of coin-operated games lacked standing to challenge federal gambling laws principally because they "allege[d] no specific threat of prosecution," even though the government had "threaten[ed] vigorous prosecution" and "refused" to disclaim enforcement against the plaintiffs in particular. *Id.* at 834-37, 838-39 & n.7. This Court explained that Article III requires, "at the very least," a "showing of an immediate and tangible danger to the person assertedly apprehensive of prosecution," and that, while a "specific threat of enforcement" may not "always be" required, "the absence of a specific threat should be weighed" in deciding whether the facts suggest "imminent enforcement against the plaintiff." *Id.* at 839 & n.10. The Court thus held that, even if the government promised to "enforce the law as against all," the manufacturers lacked standing because there had "been no threat to [them] in particular." *Id.*

Similar principles animated *United Presbyterian*, where this Court held that religious and political groups lacked standing to raise various constitutional challenges to an executive order that allegedly "chilled" their conduct by authorizing foreign surveillance. 738 F.2d at 1377-78. This Court was "clear and categorical: 'allegations of a subjective "chill" are not adequate,'" because Article III requires a

15

"concrete harm (past or immediately threatened) apart from the 'chill' itself." *Id.* at 1378-79 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (cleaned up)). Hence, the plaintiffs there lacked standing since they had "not adequately averred that any *specific action* is threatened or even contemplated *against them*." *Id.* at 1380 (emphases added) (citing *Steffel v. Thompson*, 415 U.S. 452, 459, 475 (1974)), *cited with approval by Clapper*, 568 U.S. at 412, 418.

Likewise, in *American Library*, publishers and distributors sought preenforcement review of laws authorizing pretrial seizure and postconviction forfeiture of property used to commit certain obscenity offenses. 956 F.2d at 1180-85, 1187-88. The plaintiffs argued that these laws "chilled" their speech and forced "them to engage in self-censorship," and the district court found their claims justiciable even "without any imminent danger of prosecution." *Id.* at 1188, 1190 (internal quotation marks omitted). This Court reversed. Despite their allegations of a "chilling effect," plaintiffs had not shown "'a credible threat' that the government would invoke the [pretrial-seizure] provisions against them," or that the government had "threatened [plaintiffs] with enforcement" of the postconviction-forfeiture laws. *Id.* at 1187, 1190-93, 1196 (quoting *Babbitt*, 442 U.S. at 298).

This Court continues to require preenforcement litigants to show that the government has "threatened *imminent*, rather than hypothetical, enforcement action *against them*." *Saline Parents v. Garland*, 88 F.4th 298, 305 (D.C. Cir. 2023)

16

(emphases added), *cert. denied*, 145 S. Ct. 144 (2024).  In *Saline Parents*, for example, parents lacked standing to challenge a federal policy memo that allegedly "chilled" their speech because they had not shown that "they are targets of the DOJ" or that the government had otherwise "threatened to take legal action against [them]."  *Id.* at 304-05.  This Court reasoned that the parents stood in marked contrast to preenforcement plaintiffs in various Supreme Court cases, where "concrete threats of enforcement" existed on account of an "'intent to engage in the same speech that was the subject of a prior enforcement action,'" *id.* (quoting *Driehaus*, 573 U.S. at 166), or a specific threat "'by the police'" that a protester "'will likely be prosecuted' if he continued handbilling," *id.* (quoting *Steffel*, 415 U.S. at 459).

In *Hemp Industries*, too, this Court held that the plaintiffs had not shown "a sufficiently imminent or substantial risk of enforcement against their desired course of conduct."  36 F.4th at 290-91.  That case involved a DEA rule regulating hemp-related products that allegedly forced various entities into "'the immediate dilemma of choosing between ceasing to process, manufacture and/or store hemp; obtaining a Schedule I registration from DEA; or risking criminal and/or civil prosecution.'"  *Id.* at 290.  Claiming to "live in fear of DEA action," the plaintiffs pointed to "statements by DEA officials," including that "'you'll never hear DEA say that we're not going to enforce any federal law.'"  *Id.* at 291 (emphasis omitted). But this Court held that, even assuming "the DEA [had] no enforcement discretion,"

the DEA's supposed "threats" were merely "'statement[s] of intent to prosecute all violators of the statute under normal prosecutorial standards,'" which do not establish a "credible or imminent threat" of "enforcement" against the plaintiffs under Article III. *Id.* (quoting *Seegars*, 396 F.3d at 1255); *see id.* at 290-93.

> 2.  The district court faithfully applied this Court's precedents, which cannot be overruled by a panel.

The district court properly held that plaintiffs' challenge necessarily fails under this Court's binding precedent. As the court recognized, JA 24-34, plaintiffs' theory of injury boils down to the assertion that the Metro Law "chills" their conduct. Br. 42-43. Yet that does not remotely establish "a threat of prosecution reaching the level of imminence required by *Navegar*." *Seegars*, 396 F.3d at 1254-55. Plaintiffs, in fact, do not even clearly allege "a general threat of prosecution by the District," *Parker*, 478 F.3d at 374, much less specific "threats against them or any characteristics indicating an especially high probability of enforcement," *Seegars*, 396 F.3d at 1255, or any other facts indicating a "special priority placed upon preventing [them] from engaging in specified conduct," *Navegar*, 103 F.3d at 1001. In short, plaintiffs have utterly failed to identify any well-pleaded facts in their amended complaint establishing that they have been "singled out or uniquely targeted" for enforcement under the Metro Law. *Parker*, 478 F.3d at 374-75.

The district court correctly explained that it was bound to apply *Navegar*. JA 27. So, too, is a panel of this Circuit. "[O]ne panel cannot overrule another."

*Citizens for Resp. & Ethics in Washington v. FEC*, 993 F.3d 880, 893 (D.C. Cir. 2021) (internal quotation marks omitted). "Stare decisis demands" instead that this Court abide by a "decision of one panel of this court unless the panel has withdrawn the opinion or the court En banc has overruled it." *Brewster v. Comm'r*, 607 F.2d 1369, 1373 (D.C. Cir. 1979); *see United States v. Burwell*, 690 F.3d 500, 504 (D.C. Cir. 2012) (en banc) (same); *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc) (same). Indeed, "if stare decisis means anything, it means a future court lacks the authority to say a previous court was wrong about how it resolved the actual legal issue before it." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 111 F.4th 76, 80 (D.C. Cir. 2024) (internal quotation marks omitted). "This principle encourages uniformity in the application of legal standards, enhances predictability in decisionmaking, promotes the interests of judicial efficiency and economy, and evinces respect for the efforts of earlier courts that have struggled to educe the appropriate legal norms." *Brewster*, 607 F.2d at 1373-74; *see Ali v. Trump*, 959 F.3d 364, 372 (D.C. Cir. 2020) ("The bottom line is that we are not at liberty to rewrite circuit precedent[.]").

Plaintiffs' opening brief fails to prove otherwise. They admit that the en banc Court has not overruled the binding circuit authority relied on by the district court, including *Navegar*, *Seegars*, and *Parker*. *See, e.g.*, Br. 14, 29-31. And yet rather than point to factual allegations in their amended complaint showing a threat of

imminent enforcement against them, plaintiffs instead allege on appeal (Br. 4) that they will not "intentionally" violate the Metro Law; that they "regularly ride" the Metro and are "apprehensive for [their] safety"; and that "but for" the Metro Law they would carry firearms on the Metro. JA 117-26; *see* Br. 18, 42-43.

None of those allegations, however, addresses the deficiencies found by the district court concerning the likelihood of the Metro Law being enforced against them. *See* JA 24-34. To the contrary, plaintiffs' assertions on appeal resemble the same inadequate allegations that prompted the district court to conclude at the outset of this case that they faced no viable threat of prosecution under any standard. *See* JA 63-65. After all, this Court's preenforcement standing decisions have always required more than "the mere existence of a statute," *Catholic Bishops*, 653 F.2d at 539, or the "possibility of criminal sanctions," *O'Connor*, 747 F.2d at 754 n.19 (internal quotation marks omitted), or a purported "chilling effect," *United Presbyterian*, 738 F.2d at 1379, or "generalized declarations" that a law will be enforced, *Lion Mfg.*, 330 F.2d at 839. And here, plaintiffs point to nothing in their amended complaint that would give them anything more than a "conjectural" fear of prosecution. *See Hemp Indus. Ass'n*, 36 F.4th at 291.

This failure is significant for several reasons, not the least of which is that "the ordinary rules of forfeiture apply to standing." *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019) (internal quotation marks omitted). By focusing

exclusively on the threadbare assertions noted above, plaintiffs have forfeited reliance on any other allegations in their complaint and cannot dredge their pleadings for additional support on reply. *See, e.g.*, *Iowaska Church of Healing v. Werfel*, 105 F.4th 402, 414 (D.C. Cir. 2024) (holding that plaintiff "waived" certain "alleged bases for standing" by not adequately raising them in its opening brief).

      3.     Plaintiffs cannot distinguish *Navegar*, *Seegars*, or any other case.

Rather than directly challenge the district court's analysis, plaintiffs criticize its reliance on the "*Navegar* line of cases," which they describe as including *Navegar*, *Seegars*, *Parker*, and *Ord*. Br. 14-21, 28, 41. Plaintiffs say (Br. 14) that "the *Navegar* line does not control the outcome here," yet they try to distinguish only two of the cases (*Navegar* and *Seegars*), and they fail even at that.

*First*, on *Navegar*, plaintiffs are correct that the gunmakers there had standing to challenge laws that singled out their firearms, and plaintiffs are correct that the gunmakers lacked standing to challenge laws generally regulating weapons and accessories. 101 F.3d at 999-1002. But plaintiffs are *wrong* to say that the latter ruling "was driven by the uniquely murky nature" of the gunmakers' "vagueness challenges," or that *Navegar* "did not specifically address why" they also lacked standing to raise an enumerated-powers challenge. Br. 16 & n.1. Indeed, a cursory glance at *Navegar* shows that its principal rationale applied equally to the "enumerated powers" and "vagueness claims": the "generic" weapons-and-

accessories laws "could be enforced against a great number of weapon manufacturers" and thus placed no "special priority" on the plaintiffs in that case. 101 F.3d at 1001. Only after rejecting standing on that generally applicable basis did the Court "[f]urther" note difficulties with the gunmakers' vagueness claim in predicting "precisely how these provisions may be applied." *Id.*

Plaintiffs' inability to distinguish *Navegar*'s primary rationale is fatal. The Metro Law, like the weapons-and-accessories statute in *Navegar*, could be enforced "against a great number of" people and places no "special priority" on anyone. *Id.* Thus, plaintiffs, like the gunmakers in *Navegar*, face no "genuine and imminent" threat of enforcement under the Metro Law. *See id.*

*Second*, plaintiffs similarly overlook key aspects of *Seegars*. According to plaintiffs (Br. 19-21), *Seegars* is different because the gunowners there had an administrative path to challenge the District's handgun law by appealing the denial of registration. Yet *Seegars* expressly rejected this distinction. As noted, *Seegars* involved challenges not only to the District's handgun law but also its trigger-lock rule for firearms in the home. 396 F.3d at 1250. In concluding that no plaintiff had standing, this Court held that the "absence" of "an administrative" avenue to challenge the trigger-lock rule could not confer standing because "the imminence of the threatened injury" was still "inadequate." *Id.* at 1256. Plaintiffs ignore this holding in *Seegars*, but it is binding, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1395

(D.C. Cir. 1996) (en banc), and its dispositive focus on "the imminence of the threatened injury" respects Article III's limits, *see Clapper*, 568 U.S. at 408-14.

*Finally*, plaintiffs do not meaningfully address *Parker* or *Ord*, both of which also support the decision below. *Parker* involved many of the same issues as *Seegars*, and is indistinguishable for that reason alone. 478 F.3d at 373-75. *Ord*, by contrast, *is* distinguishable, but not in plaintiffs' favor. There, after Ord's security guards were arrested on gun charges, and a warrant was issued for his arrest, Ord sued to obtain an exemption from District firearms laws based on his status as a Virginia "Special Conservator of the Peace." 587 F.3d at 1138-39. This Court held that Ord faced "a credible and imminent threat of prosecution" because the facts showed a "special priority on enforcing the law against him." *Id.* at 1142. *Ord* provides a striking contrast with the deficiencies in plaintiffs' allegations here, which rely on a generic and speculative chilling-effect theory. *See supra* pp. 18-21.

### B. Plaintiffs have not established federal-court jurisdiction to seek damages from any defendant.

1. Plaintiffs have forfeited any theory of damages standing, and their self-imposed transportation costs are not traceable to the Metro Law anyways.

As noted, the district court rejected plaintiffs' argument about the costs of non-public transportation (e.g., taxis, rideshares), which was their sole theory of standing for damages. JA 35-40. Plaintiffs' opening brief does not even mention this aspect of the district court's decision or their previously asserted economic

injuries. Yet standing is not dispensed in gross, and a failure to show standing for each claim and form of relief sought forecloses any unargued causes of actions and remedies. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). This Court should deem plaintiffs' erstwhile theory of economic standing forfeited, hold that they have abandoned claims for damages, and reject any belated arguments made for the first time on reply. *See, e.g., Iowaska Church*, 105 F.4th at 414.

In any event, plaintiffs' economic-injury theory lacks merit. As the district court explained, plaintiffs' "claims for monetary relief fail for the same reasons that their claims for injunctive and declaratory relief fail"—namely, their alleged economic injuries do not flow from "a credible and imminent threat of prosecution." JA 38-39; *see* JA 38 (describing similar result in *Navegar*, despite allegations that plaintiffs would lose "tens of thousands of dollars of existing inventory").

Moreover, litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Murthy*, 603 U.S. at 73 (quoting *Clapper*, 568 U.S. at 416). Here, as the district court noted, JA 36-38, plaintiffs admit that their "increased expenditures" for private transportation "have nothing to do with fear of arrest" under the Metro Law. Dkt. 46 at 30. The costs instead follow "a slightly less direct chain of events" that ultimately rests on plaintiffs' "fear" of hypothetical crimes not yet committed by hypothetical criminals. JA 36. Such costs are not *fairly* traceable to the Metro

Law because plaintiffs' fears derive, most fundamentally, from their own speculation about the future acts of unknown third parties. That theory accordingly fails as a straightforward self-inflicted harm. *See Clapper*, 568 U.S. at 416.

> 2. Plaintiffs' damages claims against the individual defendants are abandoned or jurisdictionally barred for other reasons.

This Court also lacks jurisdiction over damages claims against the individual defendants. Plaintiffs abandoned their personal-capacity damages claims below, JA 40, and their official-capacity claims against Attorney General Schwalb and MPD Chief Smith are duplicative of the claims against the District, *see Kentucky v. Graham*, 473 U.S. 159, 165-71 (1985). Also, the district court correctly held—and plaintiffs do not dispute—that their official-capacity damages claims against Chief Anzallo are barred by WMATA's sovereign immunity. JA 35 n.3 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). As the court explained, WMATA is an interstate-compact agency that is an arm of its signatory states for purposes of 42 U.S.C. § 1983, and so WMATA MTPD and its officers acting in their official capacities are not suable "persons" under Section 1983. JA 35 n.3. That plaintiffs fail to challenge this independent jurisdictional ground for dismissing their damages claims against Chief Anzallo is all the more reason to affirm.

## II. Plaintiffs Have Not Carried The Heavy Burden To Justify A Departure From This Court's *Navegar* And *Seegars* Precedents.

Unable to distinguish the many authorities confirming their lack of standing, plaintiffs urge the Court to disregard two of them: *Navegar* and *Seegars*. Br. 22. But this requires showing that *Navegar* and *Seegars* are no longer good law. Plaintiffs have not done so. Because "this Court imposes a substantial burden on a party advocating the abandonment of an established precedent," *Burwell*, 690 F.3d at 515, an "arguable" conflict with Supreme Court precedent does not justify a departure from prior panel decisions, *Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023). The party seeking to change the law must instead show that the Supreme Court has "'clearly' disavow[ed] or 'eviscerate[d]'" a past decision; otherwise, this Court "may not reconsider" the "law of the circuit." *Id.* at 926, 928-29 (holding that even "plausible" conflict "is not sufficiently clear to justify overturning the law of the circuit" (internal quotation marks omitted)). Plaintiffs here have not made that extraordinary showing, and this is evident from the two cases they focus on most—*MedImmune* and *Whole Woman's Health*.

### A. *MedImmune* did not clearly eviscerate *Navegar* or *Seegars*.

Plaintiffs claim that the Supreme Court's 2007 decision in *MedImmune* stands "in stark contrast with the *Navegar* line." Br. 24. But tellingly, they never explain what *MedImmune* actually held. For good reason. Contrary to plaintiffs'

suggestions (Br. 24), *MedImmune* did not concern "threatened action by government" at all—it was a private suit between two companies about patent rights.

In *MedImmune*, Genentech made "a clear threat to enforce [its] patent" against MedImmune and to "sue for patent infringement" if MedImmune continued selling its flagship drug (Synagis) without paying Genentech royalties. 549 U.S. at 121-22. To avoid potentially ruinous litigation, MedImmune "paid the demanded royalties 'under protest'" and brought its own suit to establish that Genentech's patent was invalid and not infringed by Synagis. *Id.* Under these circumstances, the Court found Article III satisfied. *See id.* at 128-30. The Court explained that, even if MedImmune's royalty payments temporarily rendered the specter of actual litigation "remote," MedImmune suffered ongoing injury by paying royalties that were "coerced" by the threat of litigation. *Id.* at 128-30, 134.

*MedImmune* thus did not eviscerate *Navegar* or *Seegars*, much less clearly so. This Court has implicitly recognized as much in continuing to rely on *Navegar* and *Seegars* in cases like *Parker* and *Ord*—both of which were decided after *MedImmune*. *See, e.g.*, *Citizens for Resp. & Ethics in Washington v. FEC*, 475 F.3d 337, 341 n.2 (D.C. Cir. 2007) (holding that panel precedent does not "yield" where this Court has "applied its holding and rationale after" a "later decision" from the Supreme Court). Indeed, this Court in *Hemp Industries* relied on *both Seegars* and *MedImmune* in reaffirming that, while a plaintiff need not "'expose himself to

27

liability before bringing suit,'" 36 F.4th at 290 (quoting *MedImmune*, 549 U.S. at 128-29), preenforcement standing still requires "'an especially high probability of enforcement,'" *id.* at 291 (quoting *Seegars*, 396 F.3d at 1255).

Reinforcing the point is *MedImmune*'s reliance on cases where the government had threatened specifically to enforce the challenged laws against the parties seeking preenforcement review. 549 U.S. at 129 (citing *Steffel*, 415 U.S. at 458-60; *Terrace v. Thompson*, 263 U.S. 197, 215-16 (1923)). In *Steffel*, for example, the plaintiff challenged a trespass law after repeated warnings from police that he would be arrested and prosecuted—just like his partner—if he continued handbilling at a shopping center. 415 U.S. at 454-56, 459. "In these circumstances," the Court held, the plaintiff faced "a genuine threat of enforcement" since the state had stipulated that he would be "arrested and charged," and the case against his partner proved that this threat had "not been chimerical." *Id.* at 456, 459, 475 (internal quotation marks omitted). *MedImmune*'s reliance on such cases underscores plaintiffs' failure to justify a departure from *Navegar* and *Seegars* here.

## B. *Whole Woman's Health* did not clearly eviscerate *Navegar* or *Seegars*.

Nor were *Navegar* and *Seegars* overruled by *Whole Woman's Health*, which principally addressed state sovereign immunity and *Ex parte Young*, 209 U.S. 123 (1908). There, abortion providers sued various state officials and a private individual to challenge a novel abortion ban (S.B.8) that nearly eliminated

enforcement by state officials and authorized private litigants to sue abortion providers for at least $10,000 per suit, while barring most claim- and issue-preclusion defenses. 595 U.S. at 35-37; *id.* at 59-61 (Roberts, J., concurring in the judgment in part, dissenting in part); *id.* at 62-65 (Sotomayor, J., concurring in the judgment in part, dissenting in part). The Court held that, while sovereign immunity barred suit against officials without enforcement authority (i.e., judges, clerks, the attorney general), it did not bar suit against licensing officials who *did* have specific enforcement authority. *Id.* at 45-47 (plurality op.); *id.* at 59-60 (Roberts, J., concurring in the judgment in part, dissenting in part). The Court thus indicated that the providers could sue the licensing officials but not the private defendant who had "no intention to file an S.B.8 suit against them." *Id.* at 48 (maj. op.).

None of that clearly eviscerates *Navegar* or *Seegars*. As the district court correctly recognized, plaintiffs "cannot plausibly maintain" that *Whole Woman's Health* is "so irreconcilable" with *Navegar* and *Seegars* that the latter cases "are no longer binding precedent." JA 32-33. Indeed, *Whole Woman's Health* is "readily distinguishable," JA 33, at a minimum because it involved a "novel[]" law whose "clear purpose and actual effect" was "to nullify" Supreme Court precedent, 595 U.S. at 61 (Roberts, J., concurring in the judgment in part, dissenting in part), and "to evade judicial review" under *Ex parte Young*, *id.* at 63 (Sotomayor, J., concurring in the judgment in part and dissenting in part).

Plaintiffs' contrary arguments lack merit. They assert (Br. 26-28) that *Whole Woman's Health* "flatly contradicts" *Navegar* and *Seegars* by inferring a threat of enforcement from a "general enforcement duty" or a supposed "presumption" of enforcement. But the licensing officials in that case had "*specific* disciplinary authority over" the providers. 595 U.S. at 51 (maj. op.) (emphasis added). And far from relying on a presumption of enforcement, the plurality relied on the fact that S.B.8 had "already" impaired the providers' "day-to-day operations." *Id.* at 47-48. Moreover, as four Justices emphasized, S.B.8's sui generis design guaranteed its own enforcement and ensured that the providers "will be harassed with a multiplicity of suits," *id.* at 61 (Roberts, J., concurring in the judgment in part, dissenting in part) (cleaned up), because it incentivized "private bounty hunters" to bring "essentially unlimited suits for damages" against the providers, *id.* at 62 (Sotomayor, J., concurring in the judgment in part, dissenting in part); *see Whole Women's Health v. Jackson*, 556 F. Supp. 3d 595, 614-15, 624 (W.D. Tex. 2021) (noting the providers' allegations of past harassment, including false complaints with licensing authorities and encouragement of individuals to sue).

Additionally, plaintiffs claim (Br. 25-26) that *Whole Woman's Health* "explicitly dispensed with" the "distinction" between "First Amendment pre-enforcement challenges" and those involving other rights. But *Navegar* and *Seegars* did not create any such distinction; they just recognized it in the Supreme Court's

cases. *See Seegars*, 396 F.3d at 1254; *Navegar*, 103 F.3d at 999. Regardless, even after *Whole Woman's Health*, courts have continued to preserve this distinction, recognizing that when "plaintiffs bring a pre-enforcement challenge under the First Amendment, unique standing considerations tilt dramatically toward a finding of standing." *Planned Parenthood v. Labrador*, 122 F.4th 825, 836 (9th Cir. 2024) (cleaned up); *see Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir.) ("[S]tanding rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." (internal quotation marks omitted)), *cert. denied*, 145 S. Ct. 140 (2024).

Plaintiffs at bottom misread the relevant passage of *Whole Woman's Health*. The Court wrote: "As our cases explain, the 'chilling effect' associated with a potentially unconstitutional law being 'on the books' is insufficient to 'justify federal intervention' in a pre-enforcement suit." 595 U.S. at 50 (quoting *Younger v. Harris*, 401 U.S. 37, 42, 50-51 (1971)). And the Court emphasized that parties bringing such suits "are not entitled to a special exemption" from that rule simply because a challenged law "is said to chill the free exercise of religion, the freedom of speech, the right to bear arms, or any other right." *Id.* That hardly eviscerates *Navegar* and *Seegars*, as this Court has implicitly recognized in continuing to rely on such cases even after *Whole Woman's Health*. *See, e.g.*, *Hemp Indus.*, 36 F.4th at 291; *see also Save Jobs*, 111 F.4th at 80 (adhering to circuit precedent "decided after" purportedly

abrogating Supreme Court decision because "the relationship between those two cases was [the prior panel's] legal issue, not ours").

## C. No other decision plaintiffs cite clearly eviscerates *Navegar* or *Seegars*.

The other cases plaintiffs cite have not eviscerated the law of this Circuit, either. Some of them did not even address Article III standing. *See, e.g.*, *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 489-91 (2010) (holding that Sarbanes-Oxley's administrative-review scheme was not the exclusive path for judicial review of challenges to an agency's structure). Others did not squarely address the issue of preenforcement injury. *See, e.g.*, *FEC v. Cruz*, 596 U.S. 289, 295-98 (2022) (deciding whether "pocketbook harm" was *traceable* to "threatened enforcement" of campaign-finance law). And many other cases preceded *Navegar* and *Seegars* by several years, if not decades, and so cannot have effectively overruled them. *See, e.g.*, Br. 10, 23 (citing *Babbitt*, 442 U.S. at 298).

Equally misplaced is plaintiffs' reliance (Br. 23, 28, 39) on language from *Driehaus*, 573 U.S. at 159, which in actuality just repeated a statement from the Supreme Court's pre-*Navegar* decision in *Babbitt*, 442 U.S. at 298. This Court expressly relied on *Babbitt* in *Navegar*, 103 F.3d at 998, and *Seegars* held that any "apparent tensions" between those decisions did not diminish the Court's duty to "faithfully apply the analysis articulated by *Navegar*," 396 F.3d at 1252, 1254. Moreover, even after *Driehaus*, this Court has continued to rely on such cases in

requiring plaintiffs to show "'characteristics indicating an especially high probability of enforcement.'" *Hemp Indus.*, 36 F.4th at 291 (quoting *Seegars*, 396 F.3d at 1255).[1] This Court has thus already rejected plaintiffs' basic contention that *Babbitt* and *Driehaus* eviscerated *Navegar*, and it should do so again here.

## III. The Court Should Decline Plaintiffs' Invitation To Summarily Upend Decades Of Article III Precedent In An *Irons* Footnote.

Despite failing to show that *Navegar* and *Seegars* have been abrogated, plaintiffs urge the Court to summarily dispose of those precedents in an *Irons* footnote. *See Irons v. Diamond*, 670 F.2d 265, 268 n.11 (D.C. Cir. 1981). Under this procedure, a panel may depart from Circuit precedent only with the unanimous endorsement of the en banc court in a footnote. *See* Policy Statement on En Banc Endorsement of Panel Decisions (Jan. 17, 1996) (*Irons* Policy Statement). But an *Irons* footnote would be inappropriate here, for several reasons.

As an initial matter, it is entirely unclear that revisiting *Navegar* and *Seegars* is necessary at all given plaintiffs' failure to articulate on appeal *any* cognizable

---

[1] Indeed, even the decision plaintiffs cite (Br. 23 n.16) relied on *Seegars* for the proposition that "a plaintiff must still demonstrate more than a subjective chill to establish an injury-in-fact." *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020) (citing *Seegars*, 396 F.3d at 1252). The Court there held that the creator of a sex-worker website faced a "sufficiently imminent" threat of enforcement under human-trafficking laws that provided "a private right of action," because "[t]he Supreme Court has acknowledged that 'the credibility of a threat is bolstered' where 'the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations.'" *Id.* at 373-74 (quoting *Driehaus*, 573 U.S. at 164 (cleaned up)).

threat of enforcement under the Metro Law.  *See supra* pp. 8, 18-21; *Irons* Policy Statement 2 (discouraging use of an *Irons* footnote unless "deciding the question is necessary to an adequate disposition of the case").

Regardless, plaintiffs admit (Br. 40-41) that this Court has repeatedly declined to revisit *Navegar* and *Seegars* through full en banc proceedings.  While plaintiffs note (Br. 18 n.13, 40) Judge Sentelle's dissent in *Seegars*, and Judge Brown's dissent in *Ord*, those opinions suggest at most that the issue is a complex one, with respected jurists on both sides.  *See, e.g.*, *Seegars*, 413 F.3d at 1-2 (Ginsburg, C.J., concurring in the denial of rehearing en banc) (voting against rehearing with five other judges, and agreeing with the panel decision that plaintiffs' "speculative" allegations were "insufficient").  In this very appeal, too, the Court denied plaintiffs' petition for initial hearing en banc.  *See* Doc. 2081913 (Oct. 25, 2024).  Plaintiffs should not be able to achieve the same result through a footnote where the question of whether to revisit *Navegar* and *Seegars* was already put to the en banc Court, and no judge called for a vote.  *See, e.g.*, *Palmer v. FAA*, 103 F.4th 798, 806 (D.C. Cir. 2024) (declining "to reconsider" panel opinion in *Irons* footnote where Court had "already denied en banc review of the opinion"); *Ass'n of Civilian Technicians v. FLRA*, 756 F.2d 172, 176 & n.14 (D.C. Cir. 1985) (following "controlling" panel decision where "full court" denied request for "initial hearing *en banc*").

The Court should also decline plaintiffs' invitation to wipe away precedents in an *Irons* footnote given the gravity of the issue at stake. An *Irons* footnote is inappropriate where "the circumstances of the case or the importance of the legal issues presented" would "warrant" a full en banc hearing if the matter is to be considered at all. *See Irons* Policy Statement 1. Nothing could be truer about this case. Standing is a "bedrock" constitutional requirement that "helps safeguard the Judiciary's proper . . . role in our constitutional system." *Texas*, 599 U.S. at 675. And here, even assuming *Navegar* and *Seegars* warrant reconsideration, the issue of standing in the context of this case deserves plenary review.

Additionally, the propriety of an *Irons* footnote is limited to extraordinary situations where, as relevant here, "an intervening Supreme Court decision, or the combined weight of authority from other circuits," shows that Circuit precedent "is clearly an incorrect statement of current law." *Irons* Policy Statement 1. As discussed, Supreme Court precedent has not clearly eviscerated *Navegar* and *Seegars*. *See supra* pp. 26-33. And plaintiffs have hardly shown those decisions to be "out of step with the rest of the federal-court system." Br. 31-32. The question is not whether plaintiffs can cobble together a few out-of-circuit decisions that cut in different directions—it is whether they can show that *Navegar* and *Seegars* are against the *clear weight of authority*. Plaintiffs have not done that.

The Third Circuit, for example, has cited this Court's precedents in holding that a "threat of enforcement" must be "imminent" and "specific" based on "'prior threats or characteristics indicating an especially high probability of enforcement.'" *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 219, 222 (2023) (quoting *Hemp Indus.*, 36 F.4th at 291). The Sixth Circuit, too, has relied on *Navegar* in allowing gunmakers to challenge laws banning their products where prosecution was "inevitable" and the ATF specifically warned them, while also holding that gunowners "failed to show the high degree of immediacy necessary for standing" where they merely refrained from buying banned guns. *NRA v. Magaw*, 132 F.3d 272, 281-83, 286-94 (1997). Similarly, the Ninth Circuit sitting en banc has required a "threat of imminent prosecution," which depends partly on whether "authorities have communicated a specific warning or threat to initiate proceedings." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (2000) (en banc) (rejecting landlords' challenges to housing laws as they received "no specific threat" of "future enforcement"); *see San Diego Cnty. Gun Right Comm. v. Reno*, 98 F.3d 1121, 1124-31 (9th Cir. 1996), *abrogated on other grounds by Heller*, 554 U.S. 570.[2]

---

[2]    Plaintiffs ignore these decisions. They rely instead on cases that admittedly (Br. 33) did not even analyze standing. *See NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015); *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 957-58 (9th Cir. 2014). Or cases that admittedly "parallel[ed]" *Navegar* (Br. 36) in allowing regulated entities to challenge laws specifically targeting their products. *Hejira*

The imprudence of an *Irons* footnote is even clearer given plaintiffs' inability to offer a viable test to replace *Navegar* and *Seegars*. Plaintiffs mainly assert (Br. 22-23) that the Court should require only "a 'credible' threat of criminal prosecution—full stop." But that question-begging theory is no help at all because "the adjective 'credible' says little or nothing about the requisite level of probability of enforcement." *Seegars*, 396 F.3d at 1252. And because it is plaintiffs' job to show standing, courts cannot fill in gaps with "assumptions" and then make it "the Government's burden to disprove standing." *Clapper*, 568 U.S. at 411-12 & n.4.

Finally, an *Irons* footnote is not justifiable on account of plaintiffs' misplaced policy arguments. Plaintiffs try to undermine *Navegar* and *Seegars* with conjecture about the "profoundly dangerous" consequences of not extending Article III standing to all "those who believe that their fundamental rights have been hindered" by a "law's chilling effect." Br. 41-43. But federal courts do not "speak on pressing civil rights questions," Br. 43—they decide "*actual* cases or controversies," *Clapper*, 568 U.S. at 408 (emphasis added). And "the practical difficulties of pre-enforcement review aren't an excuse to distort the boundaries of Article III." *Somberg v. McDonald*, 117 F.4th 375, 379 (6th Cir. 2024); *see Whole Woman's*

*Corp. v. MacFarlane*, 660 F.2d 1356, 1358-60 (10th Cir. 1981). Or cases involving laws that were enforceable by both the government and private parties. *See Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 901-02 (10th Cir. 2012); *Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 74-77 (4th Cir. 1991).

*Health*, 595 U.S. at 48-49 (noting other "viable avenues" for relief, including "pre-enforcement challenges" in non-Article III courts). Indeed, Article III's limits can "never" be "disregard[ed]," *Whole Woman's Health*, 595 U.S. at 51, and they are not subject to "contemporary, evolving beliefs about what kinds of suits should be heard in federal courts," *TransUnion*, 594 U.S. at 424-25.

## CONCLUSION

This Court should affirm the dismissal of plaintiffs' suit.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

THAIS-LYN TRAYER
Deputy Solicitor General

/s/ Janice L. Cole
JANICE L. COLE
Senior Counsel II
D.C. Bar Number 54489
Legal & Compliance, WMATA
PO Box 23768
Washington, DC 20026-3768
(202) 962-2543
jlcole@wmata.com
*Counsel for Appellee*
*Michael Anzallo*

/s/ Bryan J. Leitch
BRYAN J. LEITCH
Assistant Attorney General
D.C. Bar Number 1016484
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6524 (office)
(202) 741-0649 (fax)
bryan.leitch@dc.gov
*Counsel for Appellees, The District of Columbia, Brian L. Schwalb, Pamela A. Smith*

May 2025

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 9068 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Bryan J. Leitch
BRYAN J. LEITCH

# STATUTORY ADDENDUM

42 U.S.C. § 1983 .............................................................................Add. 1

D.C. Code § 22-4504.01 ...............................................................Add. 2

D.C. Code § 22-4504.02 ...............................................................Add. 3

# 42 U.S.C. § 1983

## § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(R.S. §1979; Pub. L. 96-170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub. L. 104-317, title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

## § 22-4504.01. Authority to carry firearm in certain places and for certain purposes.

Notwithstanding any other law, a person holding a valid registration for a firearm may carry the firearm:

(1) Within the registrant's home;

(2) While it is being used for lawful recreational purposes;

(3) While it is kept at the registrant's place of business; or

(4) While it is being transported for a lawful purpose as expressly authorized by District or federal statute and in accordance with the requirements of that statute.

(July 8, 1932, 47 Stat. 651, ch. 465, § 4a; as added May 20, 2009, D.C. Law 17-388, § 2(d), 56 DCR 1162.)

## § 22-4504.02. Transportation of firearms.

(a) A person may not transport a firearm unless the person:

> (1) Is not otherwise prohibited by law from transporting, shipping, or receiving the firearm;

> (2) Is transporting the firearm for a lawful purpose from a place where the person may lawfully possess and carry the firearm to another place where the person may lawfully possess and carry the firearm; and

> (3) Transports the firearm in accordance with this section.

(b)(1) If the transportation of the firearm is by a vehicle, the firearm shall be unloaded, and neither the firearm nor any ammunition being transported shall be readily accessible or directly accessible from the passenger compartment of the transporting vehicle.

> (2) If the transporting vehicle does not have a compartment separate from the driver's compartment, the firearm or ammunition shall be contained in a locked container other than the glove compartment or console, and the firearm shall be unloaded.

(c) If the transportation of the firearm is in a manner other than in a vehicle, the firearm shall be:

> (1) Unloaded;

> (2) Inside a locked container; and

> (3) Separate from any ammunition.

(d) The requirements of subsection (b) of this section shall not apply to a person who has a license to carry a pistol concealed upon their person pursuant to § 22-4506 and who is transporting the firearm concealed upon their person.

(e) The requirements of subsection (c) of this section shall not apply to a person who has a license to carry a pistol concealed upon their person pursuant to § 22-4506 and who is transporting the firearm concealed upon their person.

(f) Prosecutions for violations of this section shall be brought by the Attorney General for the District of Columbia in the name of the District of Columbia.

(July 8, 1932, 47 Stat. 651, ch. 465, § 4b; as added May 20, 2009, D.C. Law 17-388, § 2(d), 56 DCR 1162; Apr. 21, 2023, D.C. Law 24-347, § 3(b), 70 DCR 928.)