# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 3, 2025          Decided July 7, 2026

No. 24-7127

GREGORY T. ANGELO, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-01878)

———

*George L. Lyon Jr.* argued the cause for appellants. With him on the briefs were *Edward M. Wenger* and *Caleb Acker*.

*Ashwin P. Phatak*, Principal Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Brian L. Schwalb,* Attorney General, Office of the Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General*, Thais-Lyn Trayer*, Deputy Solicitor General, *Bryan J. Leitch*, Assistant Attorney General, and *Janice L. Cole*.

2

Before: SRINIVASAN, *Chief Judge*, MILLETT, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:    The District of Columbia criminalizes carrying firearms on public transportation. Gregory T. Angelo, Tyler Yzaguirre, Dr. Robert M. Miller, and Cameron M. Erickson all hold concealed-carry pistol licenses issued by the District, and they each wish to carry their pistols as they travel into and within the District, including on the D.C. public transit system, which is commonly known as the Metro system.  To avoid criminal prosecution, they have each been forced to take alternative and more expensive modes of transportation within the District.

Mr. Angelo, Mr. Yzaguirre, Dr. Miller, and Mr. Erickson ("pistol owners") filed suit, alleging that the District's ban violates their Second and Fifth Amendment rights and seeking declaratory, injunctive, and monetary relief.  They sued the District of Columbia, as well as three individual defendants in both their official and personal capacities:    then-D.C. Metropolitan Police Chief Robert J. Contee III, D.C. Attorney General Brian L. Schwalb, and Chief of the Washington Metropolitan Area Transit Authority's Metro Transit Police Department Michael L. Anzallo.

The district court dismissed the case for lack of standing. We affirm only (1) the district court's dismissal of the claims against Chief Anzallo in his official capacity, which rested on alternate grounds the pistol owners have not appealed, and (2) the district court's dismissal of plaintiffs' damages claims against the individual defendants, which the pistol owners abandoned below.  Otherwise, because the pistol owners have

3

alleged a pocketbook injury that is caused by their compliance with an allegedly unconstitutional criminal statute, we reverse and remand the case for additional proceedings.

**I**

**A**

Under District of Columbia law, "[no] person holding a license shall carry a pistol" in "[a] public transportation vehicle, including the Metrorail transit system and its stations[.]"  D.C. Code § 7-2509.07(a)(6) ("Metro Ban"). "Public transportation vehicle[s]" include "any publicly owned or operated commercial vehicle, including any * * * MetroAccess vehicle, Metrobus, or Metrorail train." *Id.* § 7-2509.07(g)(3).  "Pistol[s]" include "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length." *Id.* § 7-2501.01(12).  Violators may be fined or imprisoned for up to 180 days, *id.* § 7-2509.10(a)(1), or, in the alternative, assessed civil penalties, *id.* § 7-2509.10(a)(2).

**B**

According to the allegations in the amended complaint, Mr. Angelo, Mr. Yzaguirre, Dr. Miller, and Mr. Erickson all hold concealed-carry pistol licenses issued by the District of Columbia. J.A. 68, 70, 72, 74.  The pistol owners "regular[ly]" ride on the D.C. Metro system, which includes both trains and buses, when not carrying their pistols.  J.A. 68, 70, 72, 74. They are "aware of instances of criminal violence occurring on" the Metro system.  J.A. 70, 74; J.A. 69, 72.

Although the pistol owners "fear [for their] personal safety" on the Metro system, they cannot legally "carry [their]

4

concealed firearm[s] for personal protection." J.A. 69, 71, 73–75.  At the same time, the pistol owners are "loath to break the law[,]" J.A. 68, 70–71, 74, and they "fear * * * arrest [and] prosecution" if they carry their pistols with them, J.A. 118 (Decl. of Gregory T. Angelo); J.A. 120 (Decl. of Tyler Yzaguirre); J.A. 123 (Decl. of Cameron M. Erickson); J.A. 126 (Decl. of Robert M. Miller, Ph.D.).

To comply with the Metro Ban, the pistol owners have, "in some circumstances[,] avoided using the Metro system" entirely and paid for private transportation.  J.A. 69, 71, 74 (Am. Compl.); J.A. 73.  As a result, the pistol owners have had to "expend sums greater for transportation" than they would have if able to travel on the Metro system.  J.A. 69, 71, 75.  Dr. Miller, for instance, has been forced to increase his spending on "gasoline, mileage, tolls, and parking expenses."  J.A. 73.  As long as the Metro Ban remains in effect, the pistol owners expect to continue incurring higher costs for transportation.  J.A. 69, 71, 73, 75.  The pistol owners each declare that "but for D.C. law," they would avoid those expenses by using "Metro trains and buses" for their transportation while carrying their pistols.  J.A. 118, 120, 123, 126.

## C

On June 30, 2022, the pistol owners sued the District of Columbia and then-D.C. Metropolitan Police Chief Robert J. Contee III, in both his personal and official capacities, under 42 U.S.C. § 1983.  Compl. ¶¶ 5–6, 81–83, ECF No. 1.[1]  The

---

[1]  Chief Contee retired at the end of May 2023, and the current officeholder, Interim Chief Jeffrey Carroll, took the mantle in December 2025, while the case was pending before this court.  Under Federal Rule of Appellate Procedure 43(c)(2), Interim Chief Carroll is substituted for former Chief Contee in his official capacity.

5

complaint alleged that the Metro Ban violates the pistol owners' Second and Fifth Amendment rights by prohibiting them from carrying their firearms on the Metro system. *Id.* ¶¶ 81–83. They sought declaratory, injunctive, and monetary relief. *Id.* at 34–35.

The pistol owners moved for a preliminary and permanent injunction. The district court denied that motion. *Angelo v. District of Columbia*, 648 F. Supp. 3d 116, 119 (D.D.C. 2022). The court invoked this court's precedent, rooted in *Navegar, Inc. v. United States*, 103 F.3d 994 (D.C. Cir. 1997), to require the pistol owners to "demonstrate that their prosecution results from a special law enforcement priority, namely that they have been 'singled out or uniquely targeted by the * * * government for prosecution.'" *Angelo*, 648 F. Supp. 3d at 124 (quoting *Ord v. District of Columbia*, 587 F.3d 1136, 1140–1141 (D.C. Cir. 2009)); *see id.* ("The D.C. Circuit first articulated this imminence requirement in *Navegar*[.]"). Since the pistol owners could not satisfy this showing of a particularly heightened risk of prosecution, the district court held that they lacked standing because they "ha[d] failed to offer any evidence regarding whether and how § 7-2509.07(a)(6) is enforced." *Id.* at 132.

The pistol owners amended their complaint to add two new defendants—Brian Schwalb, the D.C. Attorney General, and Michael Anzallo, Chief of the Washington Metropolitan Area Transit Authority's Metro Transit Police Department, in both their official and personal capacities. *See* J.A. 75–77. The

Because the claims against former Chief Contee in his personal capacity were dismissed in district court, *Angelo v. District of Columbia*, No. 22-cv-1878, 2024 WL 3741401, at *12 (D.D.C. Aug. 9, 2024), and because the pistol owners do not challenge on appeal that portion of the district court's decision, he is no longer a defendant in this case.

6

amended complaint also added allegations that the Metro Ban had caused the pistol owners to take alternative, more expensive modes of transportation. *See* J.A. 69, 71, 73–75. In addition, Dr. Miller averred that he was "aware of instances when persons unlawfully carrying concealed weapons on DC Metro have been arrested and charged for violating the Metro Ban." J.A. 72.

Defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Mot. to Dismiss by Michael L. Anzallo, ECF No. 42; Mot. to Dismiss by Robert J. Contee, III, District of Columbia, Brian Schwalb, ECF No. 44. After briefing closed, the pistol owners filed "the result of an information request directed to Metro" by Dr. Miller. Notice of Suppl. Auth. at 3, ECF No. 51. According to the filing, Dr. Miller had "asked Metro to advise him of the number of arrests occurring on the Metro system in the District for the unlawful carrying of firearms in years 2018 through 2022." *Id.* In response, Dr. Miller learned that a total of 71 firearm arrests on the D.C. Metro system occurred during that timeframe. *Id.* at 4.

The district court granted the motions to dismiss. *Angelo v. District of Columbia*, No. 22-cv-1878, 2024 WL 3741401, at *12 (D.D.C. Aug. 9, 2024) ("*Angelo II*").

To start, the district court concluded that the pistol owners' new allegations did not move the needle on their standing for declaratory and injunctive relief because they still had failed to "allege any facts that, if accepted as true, would show that they face (or would face) a credible and imminent threat of prosecution (were they to violate the law)." *Angelo II*, 2024 WL 3741401, at *4.

7

Turning to standing for damages, the district court noted that the pistol owners had abandoned their damages claims against the individual defendants. *Angelo II*, 2024 WL 3741401, at \*12. The court then held that the pistol owners lacked standing to seek damages against the District for the economic injuries caused by their efforts to comply with the law. *Id.* at \*10. The court reasoned that the *Navegar* plaintiffs also had alleged economic losses in their complaint and "invoked the cost of complying with the statute" in their appellate briefing, yet they were held to lack standing. *Id.* at \*11.

Finally, the court rejected the pistol owners' argument that it should depart from this court's standing precedent, explaining that "unless and until the Court of Appeals overrules *Navegar* and its progeny, this Court remains bound to follow the rule." *Angelo II*, 2024 WL 3741401, at \*12.

The pistol owners timely appealed.

## II

We have jurisdiction under 28 U.S.C. § 1291, and we review *de novo* a Rule 12(b)(1) dismissal for lack of standing. *Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 624 (D.C. Cir. 2024).

The "irreducible constitutional minimum of standing" requires that (1) the plaintiff must have suffered an "injury in fact" that is "concrete," "particularized," and "actual or imminent, not conjectural or hypothetical"; (2) the injury must be "fairly traceable" to the defendant's conduct; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992) (formatting modified).

8

Because "standing is not dispensed in gross," courts must evaluate standing for "each claim" that plaintiffs press and "for each form of relief that they seek[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). In analyzing standing, we assume that plaintiffs will prevail on the merits. *Committee on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc).

As the Supreme Court has long recognized, plaintiffs need not violate a law to challenge its constitutionality. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) ("Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law."). Instead, the law recognizes standing to pursue pre-enforcement declaratory and injunctive relief in at least two circumstances.

First, plaintiffs can allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and demonstrate that "there exists a credible threat of prosecution thereunder." *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see Green v. Department of Justice*, 54 F.4th 738, 744 (D.C. Cir. 2022). In a "non-First Amendment preenforcement challenge to a criminal statute that has not reached the court through agency proceedings[,]" this court requires plaintiffs to allege facts like "prior threats against them" that "indicat[e] an especially high probability" that they will be targeted for enforcement. *Seegars v. Gonzales*, 396 F.3d 1248, 1254–1255 (D.C. Cir. 2005); *see also Navegar*, 103 F.3d at 1001 (Plaintiffs lacked standing to challenge portions of law that did not "indicate[] any special priority placed upon preventing [plaintiffs] from engaging in specified conduct."). *But cf. Parker v. District of Columbia*, 478 F.3d 370, 375 (D.C. Cir.

9

2007) (observing that "the Supreme Court [has] t[aken] a far more relaxed stance on pre-enforcement challenges than *Navegar* and *Seegars* permit"), *aff'd sub nom.*, *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Seegars*, 396 F.3d at 1253 ("We cannot help noting that *Navegar*'s analysis is in sharp tension with standard rules governing preenforcement challenges to agency regulations[.]"); *id.* at 1254 ("There is also tension between *Navegar* and our cases upholding preenforcement review of First Amendment challenges to criminal statutes.").

Second, standing exists when "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988). For example, in *Craig v. Boren*, 429 U.S. 190 (1976), the Supreme Court held that a liquor seller had standing to challenge on equal protection grounds a state law that barred the sale of 3.2 percent beer to men under the age of 21 and women under the age of 18, *id.* at 192–193. The Court concluded that the challenged law was "addressed directly to vendors such as" the plaintiff, and required costly compliance measures: The plaintiff was "obliged either to heed the statutory discrimination, thereby incurring a direct economic injury through the constriction of her buyers' market, or to disobey the statutory command and suffer * * * sanctions and perhaps loss of license." *Id.* at 194 (internal quotation marks omitted).

The pistol owners have shown standing for their claims for declaratory and injunctive relief against all defendants, and for their damages claims against the District, based on the pocketbook transportation-cost injuries that the Metro Ban inflicts.

10

**A**

Because the pistol owners allege an ongoing pocketbook injury that is the direct result of the law they challenge, they have standing to bring this pre-enforcement suit for declaratory and injunctive relief. Like the liquor vendor in *Craig*, and the bookstore in *American Booksellers*, the pistol owners challenge a law that is "addressed directly to" them, *Craig*, 429 U.S. at 194, and "aimed directly at" them, *American Booksellers*, 484 U.S. at 392. They are licensed D.C. pistol carriers who regularly ride the Metro system—precisely the people whose conduct the Metro Ban regulates. And they wish to carry their firearms on the Metro system—precisely the conduct that the Metro Ban criminalizes.

To comply with the Metro Ban while exercising their asserted Second Amendment rights, the pistol owners incur a "paradigmatic concrete Article III injur[y]": monetary harm. *Institutional Shareholder Servs., Inc. v. SEC*, 142 F.4th 757, 765 (D.C. Cir. 2025); *see also Tyler v. Hennepin County*, 143 S. Ct. 1369, 1374 (2023) (Taxpayer plaintiff had standing based on a "classic pocketbook injury[.]"). Because they cannot carry their firearms on the Metro system without violating District law, the pistol owners have had to resort to alternative and more expensive modes of transit. *See* J.A. 69, 71, 73–75. They allege that they will continue to pay that price for exercising their constitutional rights going forward. J.A. 69, 71, 73–75; *see TransUnion*, 594 U.S. at 435 (For plaintiffs seeking equitable relief, "a material risk of future harm can satisfy the concrete-harm requirement[.]").

The Metro Ban, in other words, has achieved its aim: forcing off of public transit individuals with the pistols they have licenses to carry. At oral argument, counsel for defendants conceded that "keep[ing] people with their guns off

11

Metro system transportation" is "exactly the purpose" of the Metro Ban. Oral Arg. Tr. 18:8–17.

On this record, the pistol owners' alleged ongoing out-of-pocket transportation expenses constitute a concrete, imminent, and recurring injury-in-fact that is caused directly by the Metro Ban and is redressable by declaratory and injunctive relief should they ultimately prevail on the merits (which we assume for purposes of standing, *McGahn*, 968 F.3d at 762).[2]

**B**

The pistol owners also initially brought claims for damages against the District, and against three individual defendants—Attorney General Schwalb, Metropolitan Police Department Chief Contee, and Metro Transit Police Department Chief Anzallo—in their personal and official capacities.

Below, the pistol owners abandoned their damages claims against the three individual defendants in both their official and personal capacities. *See Angelo II*, 2024 WL 3741401, at *12; *see also* Pls.' Mem. Opp'n to Mot. to Dismiss at 44, ECF

---

[2] The district court held that the pistol owners' claims against Chief Anzallo in his official capacity failed "for the further reason that he is not subject to suit in his official capacity under § 1983." *Angelo II*, 2024 WL 3741401, at *9 n.3. Because the pistol owners have not appealed this ground for dismissal, and because the pistol owners abandoned their damages claims against the individual defendants, *see* Section II.B, *infra*, we affirm the district court's dismissal of all claims against Chief Anzallo. Accordingly, unless otherwise indicated, any reference to "defendants" in this opinion excludes Chief Anzallo.

12

No. 46 ("Defendants move to dismiss damage remedies with respect to the individual defendants Anzallo, Contee and Schwalb on various immunity theories. We agree that damage remedies do not lie with respect to the individual defendants."). We therefore affirm the district court's dismissal of those claims.

The pistol owners have standing, though, to bring their claim for damages against the District. They have suffered a concrete economic injury, that injury flows from the Metro Ban, and it would be redressed by a damages award if they were to prevail in this litigation.

## C

Defendants strain against these straightforward grounds for standing by invoking the *Navegar* line of cases and *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013). But they overread that precedent.

## 1

Defendants first argue that *Navegar* and its progeny preclude the pistol owners from establishing standing based on economic injury. *See* Oral Arg. Tr. 13:23–14:7; *see also Angelo II*, 2024 WL 3741401, at *11. Not so.

In *Navegar*, gun manufacturers brought a constitutional challenge to the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796. *Navegar*, 103 F.3d at 996. They sought a declaratory judgment that several of the law's provisions were "outside of Congress' enumerated powers, unconstitutional Bills of Attainder, and vague in violation of the Due Process Clause of the Fifth Amendment[.]" *Id.* This court held that the manufacturers had

13

standing to challenge provisions of the act that "in effect single[d] out the appellants as its intended targets, by prohibiting weapons that only the appellants make." *Id.* at 1000.

At the same time, this court held that the manufacturers did not have standing to challenge broader prohibitions on "weapons and accessories sharing certain features[.]" *Navegar*, 103 F.3d at 1001. The court explained that those prohibitions covered a "great number of weapon manufacturers [and] distributors[.]" *Id.* Although the government had "demonstrated its interest in enforcing the Act generally," this court concluded that "nothing * * * indicate[d] any special priority placed upon preventing [the plaintiffs themselves] from engaging in specified conduct." *Id.* Without "a genuine threat of enforcement[,]" this court held, the manufacturers had failed to establish an injury in fact sufficient to support standing. *Id.*

A subsequent line of cases has applied *Navegar* to Second Amendment pre-enforcement challenges. *See Seegars*, 396 F.3d at 1255 (holding that individual gun owners did not have pre-enforcement standing in a Second Amendment challenge to the District's limits on firearm possession when they did not allege any facts "indicating an especially high probability of enforcement against them"); *Parker,* 478 F.3d at 375 (holding that D.C. residents failed to establish pre-enforcement standing in Second Amendment challenge to D.C. restrictions on gun possession when the District had never demonstrated "a 'special priority' for preventing *these* appellants from violating the gun laws, or a particular interest in punishing *them* for having done so"); *cf. Ord*, 587 F.3d at 1142 (holding that prior arrest warrant for carrying a firearm without a license could support pre-enforcement standing).

14

That precedent controls our analysis of pre-enforcement standing based on the pistol owners' claims of injury from the risk of imminent prosecution. *See New York-New York, LLC v. NLRB*, 676 F.3d 193, 194–195 (D.C. Cir. 2012) ("We are of course bound by our prior panel decision[s.]").

We have never held, however, that the *Navegar* line of cases prevents plaintiffs from establishing standing based on other injuries, including economic loss caused by compliance with an allegedly unconstitutional law. We are aware of no precedent from this court or the Supreme Court holding that an individually suffered economic injury is an insufficient basis for standing unless the defendant has made causing such expense to the specific plaintiff a "special priority[.]" *Parker*, 478 F.3d at 375; *Navegar*, 103 F.3d at 1001.

Defendants argue that *Navegar* implicitly forecloses relief for economic harm because the plaintiffs in that case asserted an economic loss in their complaint and briefing. Oral Arg. Tr. 13:17–14:7; D.C. Br. 24; Br. of Appellant at 20, *Navegar*, 103 F.3d 994 (No. 96-5088), 1996 WL 34482774, at *20; Compl. ¶¶ 17–22, *Navegar, Inc. v. United States*, 914 F. Supp. 632 (D.D.C. 1996) (No. 95-cv-0550).

But our holding in *Navegar* contains no discussion at all of economic harm. And distinct issues that merely appear in the briefing of a case but are neither decided nor discussed in our decisions carry no precedential weight. *See RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 350 n.10 (2016) (explaining that an issue present in a prior case does not control when the Court did not address it); *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 291 n.4 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) (explaining that issue briefed by amici in a prior case but not addressed in the opinion was not binding because "questions that 'merely lurk in the record

15

are not resolved, and no resolution of them may be inferred'") (quoting *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 183 (1979)).

What does bind this panel, though, are the countless decisions from the Supreme Court and this court holding both (1) that monetary harm commonly constitutes a concrete and cognizable injury in fact, *Institutional Shareholder Servs.*, 142 F.4th at 765, *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025) ("Monetary costs are of course an injury.") (quoting *United States v. Texas*, 142 S. Ct. 1964, 1970 (2023)), and (2) that regulated individuals generally "ha[ve] standing to challenge an allegedly illegal statute or rule under which [they are] regulated[,]" *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (citing *Lujan*, 504 U.S. at 560–561); *see American Booksellers*, 484 U.S. at 392; *Craig*, 429 U.S. at 194; *Corbett v. TSA*, 19 F.4th 478, 483 (D.C. Cir. 2021) ("[A]s a directly regulated party," a frequent flier "plainly ha[d] standing" to challenge a TSA mask mandate.); Oral Arg. Tr. 20:2–12 (Defendants agreeing that "[i]f this were not a criminal law but instead were a regulatory decision and they fell within the class of regulated parties and they wanted to bring a pre-enforcement challenge to agency regulation that has cost and is going to cost them much more money, * * * they have standing under our precedent for standing [in] * * * agency regulatory cases"); *see also Federal Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022) (holding that a Senator had pre-enforcement standing to challenge restrictions on candidate loan repayment based on a "$10,000 pocketbook harm"); *cf. State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 480 (D.C. Cir. 1986) ("[A]n agency enforcement policy may impose the requisite hardship [for ripeness purposes] even before the policy is implemented if, for example, it would reasonably prompt a regulated industry, unwilling to risk

16

substantial penalties by defying the policy, to undertake costly compliance measures.").

Those lines of standing precedent provide a sufficient basis for the pistol owners' standing in this case.

**2**

Defendants' reliance on *Clapper* is also misplaced. *See* D.C. Br. 24–25; Oral Arg. Tr. 17:6–18:7.

The plaintiffs in *Clapper* were a group of U.S.-based attorneys and human rights organizations ("Advocates"). 568 U.S. at 406. They filed suit to enjoin a provision of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1881a (2006 ed., Supp. V) ("FISA"), that authorized government surveillance of certain individuals outside the United States. *Clapper*, 568 U.S. at 401. The Advocates laid out two theories of standing. First, they argued that the government would likely use the challenged law to spy on their sensitive communications with contacts abroad. *See id.* at 406. Second, the Advocates argued that they had taken "costly and burdensome measures" to preserve the confidentiality of their own communications from such surveillance. *See id.* at 402.[3]

The Supreme Court rejected both bases for standing.

---

[3] The Advocates had alleged that the law would require them "to develop new protocols for dealing with sensitive information, to travel long distances to collect information that could otherwise have been gathered by telephone or email, and in some circumstances to forgo particularly sensitive communications altogether." Compl. ¶ 49, *Amnesty Int'l v. McConnell*, 646 F. Supp. 2d 633 (S.D.N.Y. 2009) (No. 8-cv-06259), ECF No. 1.

17

With respect to the Advocates' asserted injury based on having their conversations spied on, the Court explained that this theory of standing "rest[ed] on their highly speculative fear" that:

> (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under [the challenged provision] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy [the challenged provision's] many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of [the Advocates'] contacts; and (5) [the Advocates] will be parties to the particular communications that the Government intercepts.

*Clapper*, 568 U.S. at 410.

That "attenuated chain of inferences," the Supreme Court held, was too frail a reed on which to find that the asserted risk of injury based on government surveillance was "certainly impending" or "fairly traceable" to the challenged statutory provision. *Clapper*, 568 U.S. at 414 & n.5.

The causation prong of standing put the kibosh on the Advocates' alternative financial-outlay theory of standing. The Supreme Court held that the same long chain of assumptions broke the causal connection between governmental action and the Advocates' expenses. *See Clapper*, 568 U.S. at 416 ("Any ongoing injuries that respondents are suffering are not fairly

18

traceable to" the challenged law.).  Those expenses were "simply the product of their fear of surveillance," and so they did not trace back to the statute.  *Id.* at 417.  The Court added that, even before the passage of the statutory provision at issue, the Advocates "had a similar incentive to engage in many of the countermeasures that they are now taking" because FISA already separately authorized various forms of surveillance that the Advocates had not challenged.  *Id.*

In sum, the Supreme Court concluded that the Advocates' "self-inflicted injuries [were] not fairly traceable to the Government's purported activities * * *, and their subjective fear of surveillance [did] not give rise to standing."  *Clapper*, 568 U.S. at 418.

This case is quite different.  To start, the pistol owners are the direct target of the Metro Ban, not individuals who might incidentally be caught up in the government's oversight of third parties.  It is an Article III commonplace to recognize that those who are directly and adversely regulated by a law have standing to challenge that law based on the injuries it inflicts. *See, e.g.*, *Cruz*, 142 S. Ct. at 1647 (*Clapper* did not defeat standing when plaintiffs' harm was "directly inflicted by the FEC's threatened enforcement of the provisions they * * * challenge[d].");  *Corbett*, 19 F.4th at 484; *State Nat'l Bank*, 795 F.3d at 53.

Defendants nonetheless argue that the pistol owners' increased transportation costs ultimately flow from their "fear of hypothetical crimes not yet committed by hypothetical criminals[,]" and thus are not fairly traceable to the Metro Ban. D.C. Br. 24 (internal quotation marks omitted) (citing *Angelo II*, 2024 WL 3741401, at *10).

19

That characterization blinks away the pistol owners' central injury. Keeping in mind that we must assume at the standing stage that the pistol owners are right on the constitutional merits, recall that their principal injury is that they wish to be able to exercise their Second Amendment right to carry their pistols while riding on the Metro system, rather than to be singularly excluded from public transportation and forced to bear additional monetary costs because of their constitutional exercise. Whether their invocation of that constitutional right is subjectively motivated by fear or a desire for convenient or cheaper transportation options, and whether their fear is well-founded or not, is beside the point.

Said another way, unlike the Advocates in *Clapper*, the pistol owners do not simply "claim[] that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." 568 U.S. at 419. Far from it—their conduct is the specific and direct criminalized object of the Metro Ban, and their exclusion from the Metro system while exercising an alleged constitutional right is the law's very purpose.

The District suggested at oral argument that *Clapper* requires us to import our *Navegar* precedent into economic-injury analysis. *See* Oral Arg. Tr. 17:22–18:7. Not at all. The problem for the Advocates in *Clapper* was that allowing them to establish standing based on "costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of [their] first failed theory of standing." *Clapper*, 568 U.S. at 416. Both theories of injury relied on precisely the same long chain of speculative inferences—the Advocates feared government surveillance, and they took costly measures to mitigate that fear even though the challenged law did not regulate the Advocates, would not likely capture their conversations, and did not direct a change in their

20

behavior. *See id.*; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914–915, 918–919 (D.C. Cir. 2015) (holding that plaintiffs lacked standing to challenge chicken manufacturing regulation when plaintiffs' alleged increased risk of foodborne illness and their costs of avoiding regulated chicken both rested on the same speculative fear).

Again, this case is the opposite because the Metro Ban directly regulates the pistol owners and its central purpose is to compel a costly change in behavior—to get lawful concealed pistol carriers off of the Metro system, requiring them to rely upon privately financed forms of transportation. That is a monetary injury that those choosing not to exercise their Second Amendment rights do not incur.

That is also why this suit stands apart from precedent, like the *Navegar* line of cases, that concerns pre-enforcement standing based solely on a fear of prosecution. In that setting, a plaintiff attempts to establish an Article III injury based on a threat of prosecution that admittedly will never materialize because she does not intend to break the law. *Seegars*, 396 F.3d at 1251. When that threat of prosecution supplies the plaintiff's only injury in fact, we require it to be credible and imminent. *See id.*

In contrast, already-incurred and ongoing monetary harm readily satisfies the injury-in-fact requirement. *Institutional Shareholder Servs.*, 142 F.4th at 765. The relevant question, instead, becomes whether the law caused plaintiff's compliance costs. *Cf. Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5–6 (D.C. Cir. 2017) (Because "[e]conomic harm to a business clearly constitutes an injury-in-fact[,]  * * * [c]ausation is the more difficult question when considering allegations of future economic harm arising from government action[.]").

21

To be sure, causation may pose a daunting hurdle when, for instance, it is not clear whether the challenged law proscribes a plaintiff's desired conduct. *Cf. generally American Library Ass'n v. Barr*, 956 F.2d 1178, 1192 (D.C. Cir. 1992) (A prohibition on child pornography did not impose a "chilling effect" on plaintiff organizations when "there [was] nothing in the record, no allegation in the complaint and no affidavit, indicating that they or their members produce images * * * that could possibly fit within the statute's description."); *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 36 F.4th 278, 292–293 (D.C. Cir. 2022) ("Broad-based market effects stemming from regulatory uncertainty are quintessentially conjectural, and it is difficult to imagine an agency action that would not confer standing under this theory.") (formatting modified).

But this case does not demand any delicate line-drawing. Again, as both parties agree, the very purpose and designed regulatory effect of the Metro Ban is to bar the pistol owners from carrying their firearms on the Metro system. So the costs they incur in complying with the law are fairly traceable to the Ban.

**III**

For the foregoing reasons, we reverse the district court's dismissal of the pistol owners' claims for declaratory and injunctive relief against all defendants, as well as their claims for damages against the District. We affirm the district court's dismissal of the pistol owners' damages claims against the individual defendants, and we remand for further proceedings consistent with this opinion.